UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOHN WILLIS RICHARD,

                                Plaintiff,

                                                      9:15-CV-00006

v.

                                                     (BKS/TWD)

LUCIEN J. LECLAIRE, et al.,

                                Defendants.

_____

APPEARANCES:                              OF COUNSEL:

JOHN WILLIS RICHARD
Plaintiff pro se
91-A-0169
Eastern NY Correctional Facility
Box 338
Napanoch, NY 12458

HON. ERIC T. SCHNEIDERMAN          RYAN W. HICKEY, ESQ.
Attorney General for the State of New York      Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

This *pro se* lawsuit commenced by Plaintiff John Willis Richard under 42 U.S.C. §§

1983, 1985(3), and 1986 has been referred to this Court for Report and Recommendation by the

Hon. Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

N.D.N.Y. L.R. 72.3(c).  The matter is now before the Court on the motion to dismiss for failure

to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) filed on behalf of

Defendants Lucien J. Leclaire, Deputy Commissioner of the Department of Correctional

Services and Community Supervision ("DOCCS") in the State of New York; Captain Timothy

McCarthy, Auburn Correctional Facility ("Auburn"); Lieutenant Daniel Oleksiw, Auburn;

Lieutenant Michael P. Brown, Auburn; Sergeant Anthony P. Volpe, Auburn; Corrections Officer

("C.O.") Gary C. Gibson, Auburn; C.O. Michael Woodard, Auburn; Lieutenant Wayne Jordan,

Sullivan Correctional Facility ("Sullivan"); Lieutenant Garry Sipple, Sullivan; C.O. Joseph

Daddezio, Sullivan; Sergeant Paul Mace, Sullivan; and C.O. Jeremy McGaw, Upstate

Correctional Facility ("Upstate").[1]  (Dkt. Nos. 46, 52, 53.)

    The suit arises out of actions taken by Defendants in response to Plaintiff's long-time

practice of shaving designs into his beard.  (*See generally* Dkt. No. 1.)  The claims remaining

after initial review of the complaint by the District Court are: (1) Fourteenth Amendment due

process claims against Defendants Brown, Jordan, and Giglio, arising out of disciplinary

hearings and appeals[2]; (2) First Amendment retaliation claims against Defendants Gibson,

Volpe, Woodard, McCarthy, Burns, and Brown involving the issuance of a false inmate

misbehavior report ("IMR") and the rigging of the disciplinary hearing on the IMR; (3)

Fourteenth Amendment due process vagueness claim against Leclaire regarding DOCCS

---

[1]  Plaintiff's complaint was dismissed as against ten of the original Defendants upon initial review under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A.  (Dkt. No. 10.)  Summonses were returned unexecuted as to Defendants Burns and Giglio.  (Dkt. No. 37.)  There has been no appearance on behalf of Burns and Giglio, and they are not parties to the motion to dismiss. (Dkt. No. 46.)  Defendant Oleksiw was added as a movant subsequent to the filing of the motion papers.  (Dkt. No. 53.)

[2]  Fourteenth Amendment due process claims arising out of the disciplinary hearings and appeals alleged against Defendants John Doe #1 and John Doe # 2 also survived initial review. (Dkt. No. 10 at 39.)  However, they have not yet been identified and served and are not part of the motion to dismiss.  (Dkt. No. 46.)

Directive 4914; (4) Fourteenth Amendment equal protection claims against Defendants Gibson,

Volpe, Woodard, Burns, McCarthy, Brown, McGaw, Jordan, Daddezio, Sipple, Mace, and

Giglio; and (5) various conspiracy claims against Gibson, Volpe, Woodard, Burns, McCarthy,

Oleksiw, Brown, Jordan, Sipple, Daddezio, Mace, and Giglio.  (Dkt. No. 10 at 39.[3])

The moving Defendants seek dismissal on statute of limitations grounds of the following

claims: (1) Brown's denial of Plaintiff's Fourteenth Amendment right to procedural due process

in a disciplinary hearing; (2) Fourteenth Amendment vagueness claim against LeClaire; (3) First

Amendment retaliation claim against Gibson, Volpe, Woodard, McCarthy, and Brown; (4)

conspiracy claim against Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown; and (5)

denial of Plaintiff's Fourteenth Amendment right to equal protection at Auburn by Gibson,

Volpe, Woodard, McCarthy, Brown, and at Upstate by McGaw.  (Dkt. No. 46-1 at 5-13.)

Defendants also seek dismissal for failure to state a claim of Plaintiff's Fourteenth

Amendment claims for denial of procedural due process against Brown, Jordan, and Giglio in

disciplinary hearings held on IMRs and an appeal.  *Id*. at 13-15.  In addition, Defendants claim

they are entitled dismissal of conspiracy claims against Gibson, Volpe, Woodard, Burns,

McCarthy, Oleksiw, Brown, Jordan, Sipple, Daddezio, Mace, and Giglio for failure to state a

claim and as barred under the intracorporate conspiracy doctrine.  Although on initial review,

the District Court required Defendants to respond with regard to the Fourteenth Amendment

equal protection claim against Jordan, Sipple, Daddezio, Mace, and Giglio asserted independent

of Plaintiff's conspiracy claim (Dkt. No. 10 at 39), those Defendants have not moved to dismiss

---

[3]  Page references to documents identified by docket number are to the numbers assigned
by the CM/ECF docketing system maintained by the Clerk's Office.

the claim.  (Dkt. No. 46-1 at 16-18.)  Consequently, the Court does not consider Plaintiff's independent equal protection claim against Jordan, Sipple, Daddezio, and Mace to be a part of this motion to dismiss and will not consider it.

Plaintiff has filed papers in opposition to Defendants' motion.  (Dkt. Nos. 59, 59-1.)  For reasons explained below, the Court recommends that Defendants' motion to dismiss be granted in part and denied in part.

## I.    BACKGROUND

### A.    DOCCS Directive 4914

The stated purpose of DOCCS Directive 4914, dated September 2, 2010, and entitled "Inmate Grooming Standards," is to "to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual."  (Dkt. No. 1-2 at 6-7.)  Section III, Paragraph B of the Directive sets forth general grooming standards for DOCCS inmates.  *Id*. at 7.  Paragraph B, subsection 1, entitled "<u>Beards and Mustaches</u>," provides that absent a court order restraining DOCCS from enforcement or a religious exemption, "an inmate may grow a beard and/or mustache, but the beard/mustache hair may not exceed one (1) inch in length."[4]  *Id*.  Paragraph B, subsection 2 is entitled "<u>Hair</u>."  *Id*.  Subsection 2(a) provides, *inter alia*, that inmates are allowed only one straight part in their hair, "with no other lines, designs, or symbols cut into the hair."  *Id.*

_____

[4]  The Court takes judicial notice that Directive 4914, Section III, Paragraph B, subsection 1 regarding beards and mustaches was amended subsequent to the time period relevant to this lawsuit to include the language "NOTE: Patterns, designs, or braids are not allowed."  *See* Directive 4914, dated March 1, 2013, in *Michel v. Manna*, No. 9:15-cv-01187 (N.D.N.Y., Dkt. No. 1-1 at 20).)

4

### B.    2008 Inmate Misbehavior Report

On July 8, 2008, while Plaintiff was housed at Wende Correctional Facility ("Wende"), C.O. Lemke filed an IMR against him for violation of Rule 106.10    violating a direct order.[5] (Dkt. No. 46-5 at 22.)  Plaintiff, who claims to have been shaving exotic styles into his beard for over twenty years, was described in the IMR as having "unusual and unauthorized designs cut into his facial hair."  *Id.*; Dkt. No. 1-2 at 35.  Plaintiff was charged with twice refusing orders to come into compliance with paragraph B, subsection 2 of Directive 4914, which prohibited "lines, designs, or symbols cut into" an inmate's hair.  (Dkt. No. 1-2 at 7.)  The hearing officer found Plaintiff not guilty of the charge, noting that there were no regulations regarding beards in Directive 4914 other than the one inch rule, and the design in Plaintiff's beard did not appear to be gang related.  *Id*. at 17-18.

### C.    Gibson's October 5, 2010, IMR at Auburn

On October 5, 2010, Auburn C.O. Gibson filed an IMR against Plaintiff charging him with violation of Rule 106.1    violating a direct order, Rule 110.32    beard length, and Rule 110.31    change of appearance from ID card.[6]  (Dkt. No. 1-2 at 15.)  According to the IMR, Gibson observed that Plaintiff had a "designer beard" while the two were in the school basement

---

[5]  Rule 106.10 provides that "an inmate shall obey all orders of department personnel promptly and without argument."  (Dkt. No. 46-5 at 17.)

[6]  Rule 110.31 provides that: "An inmate shall pay the cost of a replacement ID card whenever the inmate's appearance is changed as a result of a beard, mustache, or change in hair length or color.  Refusal to voluntarily pay for replacement cost may result in restitution being imposed through the disciplinary process."  (Dkt. No. 46-5 at 13.)  Rule 110.32 provides that absent a court order or religious exemption "[a] inmate shall not grow a beard or mustache over one inch in length."  *Id*.

at Auburn.  *Id*.  Plaintiff showed Gibson the old misbehavior report disposition from 2008, and

Gibson told him it had no bearing on the present.  Gibson ordered Plaintiff to shave his beard or

trim off the design, and Plaintiff responded "lock me up, I'm not changing a thing." (Dkt. No. 1-

2 at 15.)  Plaintiff was then escorted back to his cell.  *Id.*

Plaintiff was found not guilty by hearing officer Lt. Vasile on October 10, 2010,

following a Tier II disciplinary hearing on the IMR.  (Dkt. No. 1-2 at 19-27.)  Vasile's not-guilty

determination was based upon Plaintiff's testimony and Directive 4914, which Vasile concluded

contained no regulation regarding designs in an inmate's beard.  *Id*. at 27.  Vasile also found

that Plaintiff's beard did not appear to be gang related.  *Id*.

### D.    Plaintiff's November 2, 2010, Complaint Letter to Auburn Superintendent and McCarthy's December 3, 2010, Responsive Memorandum to Plaintiff

On November 2, 2010, Plaintiff wrote to Auburn Superintendent Graham complaining

that following Vasile's not-guilty disposition, DOCCS personnel started threatening him for

refusing to shave the design out of his beard.  (Dkt. No. 46-5 at 27-30.)  Plaintiff complained

that on November 2, 2010, a tall, clean-shaven bald headed officer told him that he had to shave

the illegal design out of his beard.  *Id*. at 27; Dkt. No. 1 at ¶ 87.[7]  Plaintiff showed the officer the

Gibson IMR and the dismissal paper, and the officer ripped up the papers and told Plaintiff "I'll

write a bigger and better report, that's how that's done."  (Dkt. Nos. 1 at ¶ 87; 46-5 at 27.)  A

sergeant then pulled Plaintiff over and said Plaintiff had been told to shave his beard and the

sergeant was giving him a direct order to shave it.  (Dkt. No. 1 at ¶ 87.)  Plaintiff told the

sergeant the beard issue had already been researched, his beard had been found not to be in

---

[7] Paragraph numbers are used where documents identified by CM/ECF docket number
contain consecutively numbered paragraphs.

violation of any rule, and DOCCS personnel were required to follow DOCCS rules and regulations. (Dkt. Nos. 1 at ¶ 87; 46-5 at 28-29.)

On December 3, 2010, McCarthy sent Plaintiff a memorandum regarding the investigation of Plaintiff's November 2, 2010, harassment complaint to Graham. (Dkt. No. 1-2 at 33, 62.) The investigation had been conducted by Oleksiw and Sgt. Mahunik. *Id*. According to the memorandum, Plaintiff had been told by Mahunik to make sure he carried with him proof that the issue with his beard had been addressed in the past and he was allowed to have it after going through the disciplinary process. *Id*.

Plaintiff was advised in the memorandum that C.O. O'Hara, not a defendant herein, had gone on record denying that he had ever written Plaintiff up on charges, and stating that he was not even at the facility at the time of the final go back. *Id*. McCarthy concluded that "a review of the investigation into your complaint, conducted by Lt. Oleksiw and Sgt. Mahunik The (sic) area supervisor shows that there is no rule violation in regards to the way you have your beard as it is right now and that it does not violate an (sic) departmental rules." *Id*.

### E.    Woodard's January 28, 2011, IMR at Auburn

#### 1.    Events Leading Up to the Filing of the IMR

Plaintiff claims that after hearing officer Vasile found him not guilty at the hearing on Gibson's October 5, 2011, IMR, Gibson "sought a 'code of silence' conspiracy of mutual understanding/verbal planning to again retaliate through Woodard's planned report with photo, a coached Lt. (Burns) to approve report and to rig hearing for guilty (Lt. Brown)." (Dkt. No 1 at ¶ 89.)

On January 27, 2011, as Plaintiff was walking to the school building, Gibson looked at

him with a "mean face." *Id*. at ¶ 91.  As Plaintiff was leaving the program, Gibson asked for his

ID, looked at it with a smile. and gave it back.  (Dkt. No 1 at ¶ 91.)  Plaintiff later went back to

programs with a different exotic style in his beard, and Gibson said "I thought we had that talk."

*Id*.  Plaintiff explained that the IMR had been dismissed because his beard designs did not

violate any rules.  *Id*.  Gibson became angry and stated "we need a new sheriff around here."  *Id*.

On January 28, 2011, three officers confronted Plaintiff, and he showed them copies of

Vasile's dismissal and McCarthy's memorandum.  *Id*. at ¶ 92.  They attempted to refute the

paperwork and told Plaintiff to shave.  *Id*.  Plaintiff responded "if you believe it's illegal then

write it up because I will always refuse to shave."  *Id*.  Later that day, Plaintiff was told to go to

the ID room.  (Dkt. No. 46-5 at 33.)  Volpe told Plaintiff the beard was illegal and that they were

going to take a picture of it because Gibson had said the IMR he filed on October 5, 2010, had

been dismissed because Plaintiff had shaved off the beard style before he went to the hearing.

(Dkt. No. 1 at ¶ 93.)  Plaintiff claims that was a known lie, that he did not shave off his beard

before the hearing, and that Vasile saw the beard design before he dismissed the IMR.  *Id*.

According to Plaintiff, Woodard told him "I'm giving you a direct order to shave, and the

difference between officer Gibson and me is I know how to write a report with proof that's why

we took your picture, Gibson didn't have a picture taken to support his report.  I got everything

. . . this one will stick."  *Id.* at ¶ 96.  Plaintiff was then placed in keeplock.  *Id*.

### 2. Filing of the Woodard IMR and the Tier II Disciplinary Hearing

On January 28, 2011, Woodard filed an IMR charging Plaintiff with Rule 106.10

violating a direct order, Rule 107.10 interference with an employee, and Rule 110.31

unreported ID change.  (Dkt. No. 46-5 at 37.)  According to the IMR, on January 28, 2011,

Woodard gave Plaintiff a direct order to shave the designer facial hair from his face. *Id*.
Plaintiff responded "no, it ain't gonna happen." (Dkt. No. 46-5 at 37.) Woodard then informed
Plaintiff that the designs in his facial hair were not acceptable and were not in compliance with
Directive 4914. *Id*. Plaintiff again refused and told Woodard to write him up. *Id*. Woodard
then read the language in the Directive regarding Hair where designs were not permitted, and
Plaintiff became argumentative and stated "like I said, go ahead and write me up, I ain't shaving
nuffin." *Id*.

      Brown was the hearing officer at Plaintiff's Tier II disciplinary hearing that began on
February 3, 2011. (Dkt. No. 1-2 at 41.) At the commencement of the hearing, Plaintiff told
Brown that Directive 4914 was being intentionally misconstrued and that no one was messing
with white inmates who had ZZ Top style beards that were longer than an inch. *Id*. Plaintiff
claimed he was being singled out because he was the only one doing the type of designs he did
in his beard, and that nothing in subdivision one of Directive 4914 said that designs were not
allowed in beards. *Id*. at 42-43.

      Brown acknowledged that while Plaintiff had pretty compelling evidence regarding his
beard, he was not being written up for his beard but for interference, refusing a direct order, and
an unreported ID change. *Id.* at 45. Brown established that Plaintiff had no design shaved into
his beard in his ID picture. *Id*. at 44.

      McCarthy was called as a hearing witness at Plaintiff's request. *Id*. at 44. When
questioned about the December 3, 2010, McCarthy memorandum Plaintiff had relied upon to
support his position regarding his beard designs, McCarthy testified "[a]s far as it go (sic)
talking about a beard, O.K., it didn't say anything in my response about a design in the beard.

There are no designs in beards." *Id*. at 47. When asked where he had obtained that knowledge regarding designs in beards, McCarthy stated that "I believe [Directive 4914] states there's no designer hair cuts and that's uh, it's including facial hair as well." (Dkt. No. 1-2 at 47.) Brown thereafter informed Plaintiff that designs were not allowed in his facial hair. *Id*. at 49. Plaintiff alleges in his complaint that the conspiracy against him "took full shape through Brown's intentional misinterpretation of Dir 4914." (Dkt. No. 1 at ¶ 101.)

Woodard also testified at the hearing regarding his interpretation of, and reliance on, Directive 4914 in concluding that designs in beards were not allowed. (Dkt. No. 46-5 at 50.) He testified that he had paid no attention to McCarthy's memorandum because it had nothing to do with the charge of disobeying a direct order. *Id*. at 56. Plaintiff took the position that he did not disobey a direct order because the order to shave his beard violated a DOCCS rule, his appearance had not changed enough to require a new ID, and when he was taken to the ID room to have his picture taken for Woodard's IMR, he did not refuse to have a new ID picture taken and had therefore not violated Rule 110.31. *Id*. at 56, 59. Plaintiff conceded that he had no religious exemption or permit from Albany authorizing the designs in his beard. *Id*. at 69-70.

Oleksiw, who had conducted the investigation that led to McCarthy's memorandum, was brought in to testify at Plaintiff's request but his testimony offered little of substance. *Id*. at 62-64. Brown denied Plaintiff's request to have Volpe, Cole, and Vasile testify at the hearing. *Id.* at 61, 68.

### 3.    Determination, Penalty, and Affirmance on Appeal

Hearing officer Brown rendered his hearing determination on February 4, 2011. (Dkt. No. 1-2 at 72-73, 75-76.) Brown found Plaintiff not guilty of interference with an employee but

guilty on the other two charges and imposed a penalty of twenty days of keeplock and loss of

packages, commissary, and phone for the same time.  (Dkt. No. 1-2 at 72.)  The evidence relied

upon by Brown in making the determination of guilt included Woodard's IMR, Plaintiff's

admission that he refused a direct order, and the fact that he had not attempted to inform staff

that he needed a new ID due to a change in appearance.  (Dkt. No. 1-2 at 76.)  In addition,

Brown concluded that Plaintiff's interpretation of what hair is and is not in Directive 4914 was

not substantiated, and Brown determined that facial hair is hair and designs are not allowed in

hair under the Directive.  *Id.*  The disposition was initially affirmed on appeal by Auburn

Superintendent Graham.  (Dkt. No. 46-5 at 57.)

### 4.    Subsequent Expungement on Appeal of Brown's Disposition

On or about September 17, 2012, Giglio reversed and expunged the disposition of the

disciplinary hearing on Woodard's January 28, 2011, IMR finding Plaintiff guilty of violating

Rules 106.10, refusing a direct order, and 110.31, unreported ID change.  (Dkt. No. 1-2 at 109.)

Plaintiff claims that Giglio reversed and expunged Brown's disposition in order to prevent

Plaintiff from prevailing in an Article 78 proceeding he had commenced challenging the

disposition.  (Dkt. No. 1 at ¶¶ 192-98.)  Plaintiff's Article 78 was dismissed as moot as a result

of the reversal and expungement.  *Id.* at ¶ 204.

### F.    February 14, 2011, Complaint Letter to Former Commissioner Fischer and March 22, 2011, Response from Leclaire

On February 14, 2011, Plaintiff wrote to now retired DOCCS Commissioner Fischer

complaining of continuous harassment, reports, and threats by DOCCS staff, as well as

intentionally delayed investigations by Superintendent Graham.  (Dkt. No. 46-5 at 47-56.)  The

11

complaint letter dealt largely with alleged staff harassment of Plaintiff because of his beard designs, the IMR filed by Woodard on January 28, 2011, and the guilty disposition by Brown. (Dkt. No. 46-5 at 47-56.)

Fischer asked Leclaire to respond to Plaintiff's letter and he did so in a March 22, 2011, letter. *Id*. at 57. According to Leclaire, a copy of Plaintiff's letter had been sent to Superintendent Graham for investigation, and the investigation had included interviews with Plaintiff and certain identified staff, as well as a review of facility records. *Id*. Leclaire noted that when he interviewed Plaintiff, Plaintiff reiterated his complaint and provided no witnesses to support his allegations. *Id*.

Leclaire informed Plaintiff that issues regarding misbehavior reports should be resolved through the DOCCS disciplinary process, and since he had a disciplinary hearing, exercised his right to appeal to the Superintendent, and received a decision on his appeal, no action was warranted at the Commissioner's level. *Id*. In addition, Leclaire stated that no evidence was found to support Plaintiff's claim of staff harassment. *Id*.

### G.    McGaw's June 10, 2011, IMR at Upstate

On June 11, 2011, as Plaintiff was preparing to be released from the Special Housing Unit at Upstate and transferred to Sullivan, Defendant C.O. McGaw, displaying a very nasty attitude, told Plaintiff he would have to shave the designs out of his beard. (Dkt. No. 1 at ¶¶ 221-22.) Plaintiff called McGaw a "bitch," forcing him to write an IMR. *Id*. at ¶ 224. Plaintiff has alleged that McGaw then wrote a disciplinary report unwittingly recording the unwritten discriminatory policy by stating that in order to draft out of the facility Plaintiff would have to shave off the design he had shaved into his beard. *Id*. According to McGaw, Plaintiff then

12

stated 'Get the fuck out of here and go write your ticket bitch, I'm not doing nothing.'" (Dkt. Nos. 1 at ¶ 224, 1-2 at 111.)  The IMR also stated that Plaintiff had refused to pack his bags for the draft.  (Dkt. No. 1-2 at 111.)  The IMR charged Plaintiff with violation of Rule 106.10 violating a direct order, Rule 107.10    interference with an employee, and Rule 107.11 harassment.  *Id*.

The hearing on the IMR was held at Sullivan.  (Dkt. No. 1 at ¶¶ 226-28.)  Jordan, the hearing officer, found that there was no proof of a rule stating that Plaintiff could not have designs cut into his beard, and that Rule 106.10 was not supported as to the beard part of the IMR.  *Id*. at 112.

### H.    C.O. Daddezio's January 6, 2012, IMR at Sullivan

On January 6, 2012, Defendant Daddezio filed an IMR against Plaintiff stating that on that date he observed Plaintiff with a design in his facial hair and referencing attached photos. (Dkt. No. 1-2 at 113.)  According to Daddezio, he ordered Plaintiff to shave his beard or at least grow the beard without shaving a design into it, and Plaintiff refused.  *Id*.  Plaintiff alleges that Sipple approved the Daddezio IMR at Jordan's request, despite his knowledge of DOCCS rules and regulations and the employee manual handbook.  (Dkt. No. 1 at ¶ 242.)

Jordan was the Hearing Officer at Plaintiff's Tier II of a Tier III disciplinary hearing on the IMR held on January 9, 2012.  (Dkt. No. 1-2 at 114.)  When asked by Jordan what had happened, Plaintiff explained that Daddezio stopped and asked Plaintiff about a design shaved into his beard.  *Id*. at 115.  Plaintiff pulled out the disciplinary report finding that a design was not a violation and told Daddezio he did not have to shave.  *Id*.  Later, Sgt. Rivera told Plaintiff he could not have his beard in any design, and when Plaintiff told him to look in his file, Rivera

13

declined.  *Id*.  Both Daddezio and Rivera gave Plaintiff a direct order to shave.  *Id.*  at 116.  He

refused, and the Daddezio IMR followed.  *Id*. at 113.

Plaintiff requested that Daddezio and Rivera be called as witnesses at the hearing.  (Dkt.

No. 1-2 at 114.)  Rivera testified that Daddezio was looking for Plaintiff, and the two of them

found him in the welding shop.  *Id*. at 117.  Plaintiff showed Rivera the disposition of the initial

hearing in front of Jordan, and Rivera nonetheless told Plaintiff to shave.  *Id*. at 118.  Plaintiff

refused, and Daddezio took Plaintiff to get a new ID card.  *Id.*  Rivera denied giving Plaintiff a

direct order to shave his beard.  *Id.*

Daddezio also testified at the hearing.  *Id*. at 121-23.  According to Daddezio, after

Plaintiff showed him Jordan's disposition on the earlier IMR, Daddezio looked at Directive

4914 and talked to Mace about it.  *Id*. at 122.  Daddezio's interpretation of the Directive was

that it was applicable whether the hair was on an inmate's face or on top of his head.  *Id*. at 123.

Jordan indicated he would read the Directive and consider it when he made a decision.  *Id*. at

124.

Jordan found Plaintiff guilty on 106.10   violating a direct order and imposed a penalty

of thirty days keeplock, with fifteen days suspended for ninety days, and thirty days loss of

packages and commissary.  *Id*. at 125.  In reaching his disposition, Jordan considered

Daddezio's IMR and his testimony supporting the IMR.  *Id.*  Jordan acknowledged the

documents submitted by Plaintiff showing he had previously been found not guilty on similar

misbehavior reports.  *Id.*  Jordan concluded, nonetheless, that Plaintiff had disobeyed a lawful

order given by Daddezio.  *Id.*  Plaintiff appealed the disposition of guilt on January 9, 2012.  *Id*.

at 118-44.  Giglio affirmed the disposition on January 24, 2012.  (Dkt. No. 1 at ¶ 288.)

14

## II.    LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6).  The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972).  Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged   but it has not shown   that the pleader is entitled to relief." *Id.* at 679  (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id*.  at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id*.  (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).

On a motion to dismiss, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint," quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).[8]

---

[8] The Court finds that the exhibits submitted by Defendants in support of their motion to dismiss are largely, if not entirely, duplicative of documents annexed as exhibits to Plaintiff's complaint, and that they are integral to the allegations in Plaintiff's complaint. Therefore, the Court concludes that they may be considered on Defendants' Rule 12(b)(6) motion to dismiss without converting the motion to one for summary judgment. *See Chambers*, 282 F.3d at 153.

In addition, "the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at * 6 and n.41 (N.D.N.Y. Oct. 22, 2008)[9] (collecting cases). The Court may also consider documents "possessed by or known to the plaintiff and upon which [he] relied in bringing the suit." *ASTI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

## III.    ANALYSIS

### A.    Statute of Limitations

A statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint or in documents attached to the complaint or incorporated therein by reference. *See Kramer v. Time Warner*, 937 F.2d 767, 773 (2d Cir. 1991); *see also Town of Ramopo, New York v. Town of Clarkstown*, No. 16 Civ. 2004 (NSR), 2017 WL

---

[9] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

782500, at * 3 (S.D.N.Y. Feb. 27, 2017) ("[F]or a Court to grant a motion to dismiss on the

basis that the asserted claims are time-barred, there must be no factual question as to whether the

alleged violations occurred within the statutory period.").

The statute of limitations for a § 1983 action accruing in New York is three years. *See*

*Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009). Although state law provides the

applicable statute of limitations, federal law determines when the federal claim accrues. *Morse*

*v. University of Vermont*, 973 F.2d 122, 125 (2d Cir. 1992). Generally, under federal law, a

cause of action accrues when "the plaintiff knows or has reason to know the injury which is the

basis of his action." *Covington v. New York*, 171 F.3d 117, 121 (2d Cir. 1999) (quoting

*Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)). That is so even if "the full

extent of the injury is not then known or predictable." *Fahs Const. Group, Inc. v. Gray*, 725

F.3d 289, 292 (2d Cir. 2013) (per curiam). State law tolling rules determine whether the

limitations period has been tolled. *See Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997).

There is an exception to "'the normal knew-or-should-have-known accrual date' in cases

of a continuing violation." *JCG v. Ercole*, No. 11 Civ. 6844 (CM)(JLC), 2014 WL 1630815, at

* 9 (S.D.N.Y. April 24, 2014) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir.

1999)). The continuing violation doctrine applies to claims "composed of a series of separate

acts that collectively constitute one unlawful [ ] practice." *Gonzalez v. Hasty*, 802 F.3d 212, 220

(2d Cir. 2015) (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004)).

"The continuing violation doctrine thus applies not to discrete unlawful acts, even where those

discrete acts are part of a 'serial violation [ ],' but to claims that by their nature accrue only after

the plaintiff has been subjected to some threshold amount of mistreatment." *Id*. (quoting *Nat'l*

18

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 (2002)); *see also Annis v. County of Westchester*, 136 F.3d 239, 246 (2d Cir. 1998) ("The continuing-violation exception extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination, even if those acts, standing alone, would have been barred by the statute of limitations.") (citation and internal quotation marks omitted).  A continuing violation cannot "be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris*, 186 F.3d at 250.

The continuing-violation doctrine is generally disfavored in this Circuit.  *See Town of Ramopo,* 2017 WL 782500, at * 5; *Grimes v. Fremont Gen. Corp.*, 785 F.Supp. 2d 269, 292 (S.D.N.Y. 2011) ("Courts in the Second Circuit and elsewhere have been loath to apply the continuing violation doctrine absent a showing of compelling circumstances.") (internal citation, quotation marks, and brackets omitted).

      1.      <u>Fourteenth Amendment Due Process Claim Against Brown in Connection with the Disciplinary Hearing Held on February 3-4, 2011</u>

Plaintiff claims that Brown violated his Fourteenth Amendment due process rights at the disciplinary hearing by, *inter alia*, intentionally ignoring proof of prior dismissals of IMRs related to designs in his beard and McCarthy's December 3, 2010, memorandum (Dkt. No. 1-2 at 77); claiming that documents requested by Plaintiff were unavailable, *id*. at 82; showing bias and partiality in favor of the DOCCs officers, *id*. at 82-83; denying Plaintiff's request for the hearing testimony of Volpe, Cole, and Vasile, *id*. at 61, 85, 92-94; and finding Plaintiff guilty on two charges without substantial evidence.  *Id*. at 87.  One of Brown's arguments for dismissal of Plaintiff's procedural due process claim is that it is barred by the three year statute of limitations

for claims asserted under § 1983.  (Dkt. No. 46-1 at 7-9.)  The Court agrees.

"Courts in this District have generally set the accrual date for procedural Due Process claims related to disciplinary hearings either at the date of the disciplinary hearing or at the date the prisoner's final administrative appeal is decided." *Tafari v. Rock*, No. 11-CV-0057 (MAT), 2012 WL 1424725, at * 2 (W.D.N.Y. April 24, 2012) (*quoting Williams v. Roberts*, No. 9:11-CV-29 (GTS/RFT), 2011 WL 7468636, at * 5 (N.D.N.Y. Dec. 15, 2011); *see also Best v. Newton*, 15 Civ. 4316 (ER), 2016 WL 5416505, at * 5 (S.D.N.Y. Sept. 28, 2016) (collecting cases).  The guilty disposition on the Woodard IMR by Brown occurred on February 4, 2011.  (Dkt. No. 1-2 at 75-76.)  Plaintiff administratively appealed to Superintendent Graham on February 5, 2011.  (Dkt. No. 46-5 at 58-68.)  Graham affirmed the disposition on February 15, 2011.  (Dkt. No. 1 at ¶ 36.)

Following the mailbox rule and applying the presumption that Plaintiff delivered the complaint to a prison official on the date it was signed, the Court finds that Plaintiff filed his complaint in this action for statute of limitations purposes on December 14, 2014.  (Dkt. No. 1 at 130.)  *See Houston v. Lack,* 487 U.S. 266, 271 (1988) (a *pro se* litigant's papers are deemed to have been filed when they are placed in the hands of a prison official for mailing); *Johnson v. Coombe*, 156 F.Supp. 2d 273, 277 (S.D.N.Y. 2001) (where it is unclear when the complaint was given to prison officials, absent evidence to the contrary, the court assumes the complaint was given to prison officials the date it was signed).  Even if the Court were to conclude that Plaintiff's procedural due process claim against Brown accrued on February 15, 2011, the last day on which Plaintiff could have timely filed his complaint was February 15, 2014, some ten months before he filed.

Plaintiff claims that his procedural due process claim against Brown is not time-barred because: (1) the claim was tolled during the pendency of his Article 78 proceeding challenging the hearing determination and affirmance; (2) the claim did not accrue until Giglio reversed and expunged the hearing determination on September 17, 2012; and (3) accrual was delayed by a continuing violation. (Dkt. Nos. 1 at ¶¶ 36-38, 145-46; 59 at 2-5.)

"A plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983." *Abbas,* 480 F.3d at 641. Plaintiff's argument that under *Heck v. Humprey*, 512 U.S. 477 (1994), the statute of limitations on his § 1983 claim remains unaffected until the determination of his Article 78 proceeding fails because the penalty imposed by Brown at the disciplinary hearing in no way affected the length of Plaintiff's confinement, *i.e.*, no loss of good time, rendering *Heck* inapplicable. *See e.g., Mohamed v. Powers*, No. 14-CV-1389, 2015 WL 8492472, at * 3 (N.D.N.Y. Dec. 10, 2015).

Plaintiff's assertion that his procedural due process claim did not accrue until September 17, 2012, when Giglio reversed and expunged the guilty disposition rendered by Brown, likewise fails. As discussed above, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know the injury which is the basis of his action." *Covington,* 171 F.3d at 121. Plaintiff knew of the injury sustained by him as a result of Brown's alleged denial of procedural due process on February 4, 2011, when the guilty disposition was rendered on Woodard's IMR or, at the very latest when Graham affirmed the disposition on February 15, 2011.

Finally, the continuing violation doctrine has been found inapplicable in the case of Fourteenth Amendment due process claims arising out of disciplinary hearings, because "[e]ach

decision made without due process is a discrete violation, and the statute of limitations begins to run the date that the plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer*, No. 14-CV-0578-RJA-MJR, 2014 WL 4939389, at * 3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez,* 802 F.3d at 223); *see also Chrichlow v. Fischer,* No. 6:15-CV-06252 EAW, 2017 WL 920753, at * 5 (W.D.N.Y. March 7, 2017) (citing *Gonzalez*, 802 F.3d at 223); *McFadden v. Kralik*, No. 04 Civ. 8135 (RCC) (JCF), 2007 WL 924464, at * 7 (S.D.N.Y. Mar. 28, 2007) (holding that the continuing violation doctrine did not apply because plaintiff's due process claim arose from his disciplinary hearing, which constituted a discrete incident).

Based upon the foregoing, the Court recommends that Plaintiff's Fourteenth Amendment procedural due process claim against Brown be dismissed as time-barred. Although leave to amend should be liberally granted when claims asserted in *pro se* complaints are dismissed on a Rule 12(b)(6) motion, where any amendment to the complaint would prove futile in curing the complaint's deficiencies, a dismissal without leave for plaintiff to amend is warranted. *Cuoco,* 222 F.3d at 112. As a result, "where dismissal of a claim under Rule 12(b)(6) is granted because the claim was filed outside of the allowable statute of limitations period, a dismissal with prejudice is appropriate." *See Abrams v. National Westminster Bank PLC*, No. 11 Civ. 01667 (GBD), 2012 WL 946792, * 3 (S.D.N.Y. March 19, 2012).

      2.    <u>First Amendment Retaliation Claim Against Gibson, Volpe, Woodard, McCarthy, and Brown</u>

Plaintiff claims that after the hearing officer dismissed Gibson's October 5, 2010, IMR on October 10, 2010, Gibson, Volpe, Woodard, McCarthy, Burns,[10] and Brown worked together

---

[10]  As noted above, Burns is not a party to the motion.

to retaliate against Plaintiff for the dismissal by filing a false IMR on January 28, 2011, and rigging the disciplinary hearing so that it would result in a guilty finding.  (Dkt. Nos.  1 at ¶¶ 89, 91-93, 101; 1-2 at 41-44, 47, 49-50, 56, 72-73, 75-76; 46-5 at 37.)

Defendants also seek dismissal of Plaintiff's First Amendment retaliation claim on statute of limitations grounds.  First Amendment retaliation claims typically accrue at the time the allegedly wrongful conduct occurred.  *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015); *see also Albritton v. Morris*, No. 13-CV-3708 (KMK), 2016 WL1267799, at * 10 (S.D.N.Y. March 30, 2016) (same); *Turner v. Boyle*, 116 F.Supp. 3d 58, 83-84 (D. Conn. 2015) ("Under federal law, a claim for . . . First Amendment retaliation [ ] accrues at the time that the allegedly wrongful conduct took place.").  Therefore, the statute of limitations begins to run when the defendant has "engaged in enough activity to make out an . . . actionable claim."  *Gonzalez*, 802 F.3d at 220 (quoting *National Railroad Passenger Corp. v Morgan*, 536 U.S. 101, 117 (2002)).

To prevail on a First Amendment retaliation claim, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225-26 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  In this case, the alleged adverse actions include the filing of a false IMR on January 28, 2011, by Gibson, Volpe, and Woodard; acceptance of the false IMR for filing by Burns; the testimony of McCarthy that contradicted the position taken by him in his December 3, 2010, memorandum; and Brown's handling of the disciplinary hearing on February 3 and 4, 2011, and his determination of guilt and imposition of punishment on February 4, 2011.  (Dkt. Nos. 1 at ¶¶ 92-96; 1-2 at 41-50, 72-73; 75-76; 46-5 at 37.)

The allegations in Plaintiffs complaint, as well as the documents the Court is authorized to consider on this Rule 12(b)(6) motion, show that Plaintiff's First Amendment retaliation claim against Gibson, Volpe, Woodard, McCarthy, and Brown accrued no later than February 4, 2011, when Brown found Plaintiff guilty of two of the charges in the January 28, 2011, IMR, and imposed a penalty.  At that point, the Defendants had "engaged in enough activity to make out an . . . actionable claim" for retaliation.  *See Gonzalez*, 802 F.3d at 220.

The Court finds that the three year statute of limitations on Plaintiff's § 1983 claim for First Amendment retaliation claim expired on February 4, 2014, or at the very latest on February 15, 2014, three years after Brown's disposition was affirmed.  Inasmuch as the complaint was not filed for statute of limitations purposes until more than ten months later on December 14, 2014, the claim is time-barred.

As noted above, Plaintiff's commencement of an Article 78 did not toll the statute of limitations for filing a claim pursuant to section 1983." *Abbas*, 480 F.3d at 641.  Plaintiff seeks to avoid the time-bar imposed by the three year statute of limitations by claiming that it was extended by a continuing violation of Plaintiff's rights through Daddezio's filing of the January 6, 2012, IMR regarding designs in Plaintiff's beard, and the subsequent determination of guilt by Jordan.  (*See* Dkt. No. 1 at ¶¶ 38-39.)  However, the facts alleged by Plaintiff in his complaint and the documents the Court authorized to review on this Rule 12(b)(6) motion show that the First Amendment retaliation alleged against Gibson, Volpe, Woodard, McCarthy, and Brown involved discrete acts on the part of those Defendants, allegedly in furtherance of a plan to retaliate against Plaintiff by filing the January 28, 2011, IMR and rigging the hearing so that Plaintiff lost on February 4, 2011.  *See Gonzalez*, 802 F.3d at 220.  Plaintiff left Auburn on or

about June 10, 2011, more than three years before the complaint was filed, and there are no facts alleged in the complaint or documents annexed to the complaint tending to show that the Defendants' claimed acts of retaliation continued beyond the time Plaintiff left Auburn.

The Court has found no facts plausibly showing that Defendants' actions, along with subsequent independently filed IMRs, were "a series of separate acts" that "collectively constitute[d] one unlawful [ ] practice." *Id*. Furthermore, Plaintiff has not alleged any "non-time barred acts" by Gibson, Volpe, Woodard, McCarthy, and Brown contributing to the alleged retaliation as required for a finding of continuous violation. *See Gonzalez*, 802 F.3d at 220 (quoting *Harris,*186 F.3d at 248). Therefore, the Court recommends that Plaintiff's First Amendment retaliation claim be dismissed as time-barred, and that the dismissal be with prejudice.

3.    Fourteenth Amendment Equal Protection Claim Against Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw

Plaintiff has alleged in his complaint that Defendants Gibson, Volpe, Woodard, McCarthy, Burns, Brown, and McGaw discriminated against him on the basis of race when they ordered him to shave his beard designs and disciplined him for refusing to shave, while white inmates with ZZ Top style long beards that violated the one inch beard provision in Directive 4914 were not disciplined or required to shave. (Dkt. No. 1 at ¶¶ 130-34, 226, 318-19.) On initial review, the District Court found that Plaintiff's allegations were sufficient at that early stage of the litigation to state an equal protection claim against those Defendants and others. (Dkt. No. 10 at 33-34.) The Defendants now seek dismissal of the equal protection claims alleged against them on statute of limitations grounds. (Dkt. No. 46-1 at 12-13.)

A §1983 claim Fourteenth Amendment equal protection claims accrues when the plaintiff knows or should have known of the disparate treatment.  *Fahs,* 725 F.3d at 292. Plaintiff's comment at his disciplinary hearing on February 3, 2011, that white inmates were "running around with beards that's longer than one inch, I mean that ZZ Top type of style beards and nobody messing with them and I actually have the names myself," shows that he knew of the claimed disparate treatment at least as of February 3, 2011.  (Dkt. No. 1-2 at 41.)  Plaintiff was found guilty by Brown on February 4, 2011.  *Id*. at 72.  Therefore, the Court finds that Plaintiff's equal protection claim against Gibson, Volpe, Woodard, McCarthy, Burns, and Brown, which accrued on February 4, 2011, when Plaintiff was found guilty, or at the latest on February 15, 2011, when the disposition was affirmed, is time-barred.

The continuing violation doctrine can apply to an equal protection claim challenging a continuous practice and policy of discrimination.  *Fahs*, 725 F.3d at 292.  However, "it cannot save a time-barred claim that is based on discrete acts, even if the discrete acts were 'pursuant to a general policy that result[ed] in other discrete acts occurring within the limitations period.'" *Raus v. Town of Southampton*, 661 F. App'x 81, 84 (2d Cir. 2016) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 157 (2d Cir. 2012)).  The equal protection claim asserted by Plaintiff against Gibson, Volpe, Woodard, McCarthy, and Brown arose out of discrete actions by each related to the January 28, 2011, IMR and allegedly rigged disciplinary hearing.  Inasmuch as Plaintiff was transferred out of Auburn no later than June 10, 2011 (Dkt. No. 10 at 8 n.10), Gibson, Volpe, Woodard, McCarthy, and Brown, who were all at Auburn, would not have been in a position to continue to discriminate against Plaintiff after that time, and Plaintiff has alleged no facts suggesting that they did so.

26

On June 11, 2011, McGaw filed an IMR against Plaintiff at Upstate for, *inter alia*, refusing McGaw's direct order to shave the design in his beard.  (Dkt. No. 1-2 at 111.)  At a disciplinary hearing held on the IMR at Sullivan on June 28, 2011, Jordan found Plaintiff not guilty on the charge of violating a direct order on the grounds that there was no rule stating that he could not have designs in his beard.  *Id*. at 112.  Therefore, even assuming *arguendo* that Plaintiff could be found to have stated an equal protection claim against McGaw for filing the IMR against him while white inmates were allowed to have ZZ Top style beards, the latest the equal protection claim would have accrued was June 28, 2011, rendering it time-barred.  The Court finds the continuing violation doctrine inapplicable to the equal protection claim against McGaw for the same reason as the Auburn Defendants.

Therefore, the Court recommends that Plaintiff's equal protection claim against Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw be dismissed as time-barred, and that the dismissal be with prejudice.

### 4.    Conspiracy Claim Against Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown

Plaintiff alleges that Gibson became upset when Plaintiff was found not guilty on the October 5, 2010, IMR Gibson had filed and began conspiring with Volpe, Woodard, McCarthy, Burns, Oleksiw, and Brown to (1) prevent Plaintiff from having designs in his beard by filing a false IMR against Plaintiff and rigging the hearing so that he would be found guilty; (2) violating Plaintiff's right to equal protection; and (3) retaliating against him in violation of the First Amendment.  (Dkt. No. ¶¶ 89-102, 131-41.)

The facts relevant to the conspiracy claim are essentially the same as those discussed

above regarding the January 28, 2011, IMR filed by Woodard and the disciplinary hearing held before hearing officer Brown.  The District Court found that Plaintiff's conspiracy claims under §§ 1983, 1985, and 1986 against Gibson, Volpe, Woodard, McCarthy, Oleksiw, Burns, and Brown survived initial review and required a response.  (Dkt. No. 10 at 27.)  The moving Defendants seek dismissal of the conspiracy claim against them on the grounds that it is time-barred.  The Court agrees.

The elements of a conspiracy claim under § 1983 are: (1) an agreement between two or more state actors or between a state actor and private actor; (2) to act in concert to inflict an unconstitutional injury on plaintiff; and (3) an overt act committed in furtherance of that goal causing damages.  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  To state a claim for a conspiracy under § 1985(3), a plaintiff must allege "four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013) (summary order) (quoting *United Board of Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983)).  "Section 1986 imposes liability on an individual who has knowledge of discrimination under § 1985 . . . and is contingent on a valid § 1985 claim."  *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996) (citation omitted).

The statute of limitations on civil conspiracy claims brought under §§ 1983 and 1985 is three years.  *Milan v. Werthheimer,* 808 F.3d 961, 963 (2d Cir. 2015).  The statute of limitations accrues at the time of the wrongful act and the existence of a conspiracy does not postpone the

28

accrual of causes of action arising out of the conspirators' separate wrongs. *Singleton,* 632 F.2d at 192; *see also Afshar v. Procon Incor., UOP Inc.,* 442 F.Supp. 887, 891 (S.D.N.Y. 1977), *aff'd,* 580 F.2d 1044 (2d Cir. 1978) (statute of limitations for civil conspiracy claim commences to run upon the commission of the overt act causing damage). "Accrual of a cause of action based on specific acts of which plaintiff was aware cannot be postponed simply by alleging that the acts were taken pursuant to a conspiracy." *Pearl v. City of Long* Beach, 296 F.3d 76, 87 (2d Cir. 2002).

The overt actions attributed to the alleged members of the conspiracy occurred at various points between January 28, 2011, when Plaintiff's picture was taken and Woodard filed the IMR, and February 4, 2011, when Brown found Plaintiff guilty of two of the charges in the IMR. (Dkt. Nos. 1 at ¶¶ 89, 91-93, 96, 101; 1-2 at 41-49, 75-76; 46-5 at 50, 56, 59, 61-68.) Therefore, the Court finds that the latest date on which the conspiracy claim could be found to have accrued is February 4, 2014, and Plaintiff's conspiracy claim against Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown became time-barred on February 4, 2014. The continuing violation doctrine and tolling are inapplicable to Plaintiff's conspiracy claim for the same reasons the Court has found them inapplicable to the retaliation claim asserted against the Auburn Defendants.

Therefore, the Court recommends that Plaintiff's conspiracy claims against Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown be dismissed as time-barred, and that the dismissal be with prejudice.

5.    Fourteenth Amendment Due Process Vagueness Claim Against Leclaire

Plaintiff claims that his Fourteenth Amendment due process rights were violated because

Directive 4914, dated September 2, 2010, which was approved by Leclaire, was impermissibly

vague with regard to whether designs were allowed in beards.  (Dkt. No. 1 at ¶ 60.)  During the

time period in which Plaintiff was issued IMRs for refusing to shave the designs out of his

beard, the September 2, 2010, version of Directive 4914 was construed inconsistently by

DOCCS personnel with respect to whether it contained language prohibiting beard designs.  On

October 5, 2010, and January 28, 2011, (Auburn); June 10, 2011 (Upstate); and January 6,

2012, (Sullivan), Plaintiff was issued IMRs by corrections personnel for, *inter alia*, violating

direct orders to shave the designs out of his beard.  (Dkt. Nos. 1-2 at 111, 113; 46-5 at 22, 37.)

        Vasile, the hearing officer on the Gibson October 5, 2010, IMR at Auburn concluded

that Directive 4914 contained no regulation regarding beard designs.  *Id*. at 27.  At the Woodard

January 28, 2011, IMR, hearing officer Brown, while conceding that Plaintiff had pretty

compelling evidence that there was no prohibition on beard designs in Directive 4914,

ultimately concluded that beard designs were not allowed under the Directive.  *Id*. at 45, 76.

Brown found Plaintiff guilty of violation of a direct order, and failing to obtain a new ID.  *Id*. at

75-76.  Jordan, the hearing officer from Sullivan on the McGaw June 10, 2011, IMR, found no

proof of a rule stating that Plaintiff could not have designs cut into his beard and concluded that

Rule 106.10    violating a direct order, was not supported by the evidence.  *Id.* at 112.  However,

at the disciplinary hearing on the Daddezio January 6, 2012, IMR, Jordan reversed course and

found Plaintiff guilty of refusing a direct order.  *Id*. at 125.

        "It is a basic principle of due process that an enactment is void for vagueness if its

prohibitions are not clearly defined."  *Grayned v. City of Rockland*, 408 U.S. 104, 108 (1972).

Due process vagueness challenges to prison disciplinary rules and directives have been

recognized in the Second Circuit. *See, e.g., Chatin v. Coombe*, 186 F.3d 82, 88-89 (2d Cir. 1999); *Leitzsey v. Coombe*, 998 F.Supp. 282, 289 (W.D.N.Y. 1998) (recognizing "prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct [because] . . . inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice of the actions that could subject them to discipline.").

Leclaire seeks dismissal of Plaintiff's due process vagueness claim on statute of limitations grounds, arguing that Plaintiff knew or had reason to know of the alleged deficiency in the Directive at least as early as February 4, 2011, when he was found guilty on two charges in the Woodard IMR, and more likely in 2008, when he was initially given an IMR regarding his beard design.[11] (Dkt. No. 46-1 at 9.) However, unlike the discrete claims asserted against the Auburn corrections personnel that occurred over a finite period of time, ending more than three years before Plaintiff filed his complaint, the language of Directive 4914, which was allegedly approved by Leclaire, and the manner in which it was interpreted by corrections personnel and hearing officers, resulted in a continuous stream of IMRs against Plaintiff relying on Directive 4914 that ended on January 6, 2012, at Sullivan, well within the three year statute of limitations. The Court finds that determination of: (1) whether Plaintiff's due-process vagueness claim against Leclaire is time-barred; and (2) whether the continuing violation doctrine arguably applies, would be premature on a Rule 12(b)(6) motion to dismiss. The Court therefore recommends that Leclaire's motion to dismiss the Fourteenth Amendment vagueness claim

---

[11] The September 2, 2010, version of Directive 4914 being challenged was not in effect at the time of the 2008 IMR. (See Dkt. No. 46-5 at 10.)

against him on the grounds that it is time-barred be denied.

**B**.    **Fourteenth Amendment Procedural Due Process Claims Against Defendants Brooks and Jordan Arising Out of Disciplinary Hearings**[12]

To establish a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Accordingly, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation, and (2) the segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). "Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life" under § 1983. *Vasquez*

---

[12] Plaintiff has also alleged a procedural due process claim against Giglio, who originally affirmed Brook's guilty finding on the January 28, 2011, IMR. (Dkt. No. 1 at ¶¶ 288-292.) However, as noted above, Giglio has not been served and is not a party to the motion to dismiss.

*v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014). However, in cases involving shorter periods of segregated confinement, where a plaintiff has not alleged any unusual conditions, a detailed explanation of this analysis is not required. *See Hynes,* 143 F.3d at 658.

### 1.    Brooks

The Court has recommended dismissal of Plaintiff's Fourteenth Amendment procedural due process claim against Brooks on statute of limitations grounds. The Court finds that even if the claim were not time-barred, it would be subject to dismissal for failure to state a claim because Plaintiff has not alleged facts plausibly showing a protected liberty interest.

After finding Plaintiff guilty on two charges at his Tier II disciplinary hearing on the Woodard IMR on February 4, 2011, Brown imposed a penalty of twenty days of keeplock, loss of packages, commissary, and phone.[13]  (Dkt. No. 1-2 at 75.)  There is no bright-line duration of time in segregated confinement that qualifies as a loss of a protected liberty interest*. Palmer v.*

---

[13]  The maximum sentence that may be imposed in a Tier II disciplinary hearing is thirty days of confinement in either a special housing unit or in keeplock in the inmate's own cell. *See* N.Y. Comp.Codes R. & Regs. Tit. 7 § 253.7(a)(1)(iii).

*Richards*, 364 F.3d 60, 64 (2d Cir. 2004).  However, "there is broad agreement in the Second

Circuit that 'keeplock or SHU confinement of 30 days or less in New York prisons' does not

implicate due process."[14]  *Smith v. Fischer*, No. 13-CV-6127-FPG, 2016 WL 3004670, at * 15

(W.D.N.Y. May 23, 2016) (quoting *Williams v. Keene*, No. 95 CIV. 0379 AJP JGK, 1997 WL

527677, at * 6 (S.D.N.Y. Aug. 25, 1997) (collecting cases)); *see also Sandin*, 515 U.S. at 485-

86 (30 days of confinement in restrictive housing unit did not implicate constitutional liberty

interest).  The loss of phone, package, and commissary privileges does not give rise to a

protected liberty interest under New York law.  *Smart v. Goord*, 441 F.Supp. 2d 631, 640

(S.D.N.Y. 2006) (quoting *Williams*, 1997 WL 527677, at * 6).

Inasmuch as Plaintiff's penalty of twenty days in keeplock fails to implicate a protected

liberty interest, and Plaintiff has failed to allege facts plausibly showing particular conditions of

confinement that imposed atypical or significant hardship in relation to the ordinary incidents of

prison life during his brief time in keeplock, the Court finds that Plaintiff has failed to state a

claim for violation of his procedural due process rights against Brown.  *See Sealey v. Giltner*,

197 F.3d 578, 583 (2d Cir. 1999).  The Court therefore recommends that in the event the

procedural due process claim against Brown is not dismissed as time-barred, it be dismissed for

failure to state a claim.  The Court further recommends that because the deficiencies in the claim

could not be cured by a better pleading, that the dismissal be with prejudice.

---

[14]  "[T]he Second Circuit generally takes the position that SHU confinement under
ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU
confinement of 101 days or less does not."  *Thompson v. LaClair*, No. 9:08-CV-37 (FJS/DEP),
2008 WL 191212, at * 3 (N.D.N.Y. Jan. 22, 2008).

2.    Jordan

After finding Plaintiff guilty at a Tier II hearing on the Daddezio IMR on January 9,

2012, Jordan imposed a penalty of thirty days keeplock, with fifteen days suspended, and thirty

days loss of packages and commissary, also with fifteen days suspended.  (Dkt. No. 1-2 at 125.)

As with Brown, because Plaintiff's penalty did not exceed thirty days, and Plaintiff has failed to

allege facts plausibly showing particular conditions of confinement that imposed atypical or

significant hardship in relation to the ordinary incidents of prison life during his time in

keeplock, the Court finds that Plaintiff has also failed to state a claim for violation of his

procedural due process rights against Jordan and recommends dismissal with prejudice.  *See*

*Sealey*, 197 F.3d at 583.

**C.    Conspiracy Claims Against Gibson, Volpe, Woodard, Burns, McCarthy, Oleksiw, and Brown**

The Court has already concluded that the §§ 1983, 1985(3), and 1986 conspiracy claims

Plaintiff has alleged against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and

Brown are time-barred.  The Defendants argue that even if Plaintiff's conspiracy claims are not

time-barred, they should be dismissed for failure to state a claim under the intracorporate

conspiracy doctrine.  (Dkt. No. 46-1 at 16.)  The Court agrees.

The intracorporate conspiracy doctrine states that officers, employees, and agents of a

single corporate entity are legally incapable of conspiring together.  *Hartline v. Gallo*, 546 F.3d

95, 99 n.3 (2d Cir. 2008).  The intracorporate conspiracy doctrine has been applied to

conspiracy claims under §§ 1983 and 1985(3).  *Dilworth v. Goldberg*, 914 F.Supp. 2d 433, 467

(S.D.N.Y. 2012) (§ 1983); *Hartline,* 546 F.3d at 99 n.3 (§ 1985).  Even though the Second

Circuit has not issued a decision specifically addressing the use of the intracorporate conspiracy

doctrine in prisoner civil rights suits, district courts within the Circuit have applied the doctrine

to such claims.  *See, e.g., Green v. Santiago,* No. 3:16-cv-1724 (CSH), 2017 WL 2312355, at *

9 (D. Conn. May 26, 2017) (finding the intracorporate conspiracy doctrine applicable to § 1983

conspiracy claim by inmate against prison officials); *Richard v. Dignean*, 126 F. Supp. 3d 334,

338-39 (W.D.N.Y. 2015) (finding intracorporate conspiracy doctrine applicable to claim by

inmate against prison officials for discrimination against him based on race and religion);

*Toliver v. Fischer*, No. 9:12-CV-00077 (MAD/ATB), 2015 WL 403133, at * 22 (N.D.N.Y. Jan.

29, 2015) (dismissal of conspiracy claim by inmate against DOCCS personnel under the

intracorporate conspiracy doctrine); *Vega v. Artus*, 610 F.Supp. 2d 185, 205-06 (N.D.N.Y.

2009) (dismissing conspiracy claim pursuant to intracorporate conspiracy doctrine where all of

the defendants were DOCCS employees acting within the scope of their employment).

　　　Even where the intracorporate conspiracy doctrine applies, there is an exception to the

doctrine when the individuals are "pursuing personal interests wholly separate and apart from

the entity."  *Ali v. Connick*, 136 F.Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (citation and internal

quotation marks omitted).  However, a plaintiff must show more "than simply alleging that the

defendants were motivated by personal bias against the plaintiff."  *Medina v. Hunt*, No. 9:05-

CV-1460 (DNH), 2008 WL 4426748, at * 8 (N.D.N.Y. Sept. 25, 2008); *see also Vega*, 610

F.Supp. 2d at 205 ("in order to allege facts plausibly suggesting that individuals were pursuing

personal interests wholly separate and apart from the entity" to overcome the intracorporate

conspiracy doctrine "more is required of a plaintiff than simply alleging that the defendants were

motivated by personal bias against plaintiff.")

Plaintiff has failed to allege facts even remotely suggesting that Defendants were pursuing personal interests that were wholly separate and apart from their employment responsibilities at Auburn in connection with the alleged filing of a false IMR and rigging the outcome of the disciplinary hearing against Plaintiff. Therefore, based on the authority above, the Court recommends that in the event the District Court does not dismiss the conspiracy claim with prejudice as time-barred, that the claim be dismissed with prejudice under the intracorporate conspiracy doctrine.

### D.    Conspiracy Claims Against Defendants Jordan, Mace, Daddezio, and Sipple

Plaintiff has alleged that when he was transferred to Sullivan, DOCCS personnel at Sullivan, including the named Sullivan Defendants, continued to question his beard designs and single him out for discipline, while totally ignoring the white inmates who wore biker style long beards or ZZ Top very long beards in violation of Directive 4914. (Dkt. No. 1 at § 231.) According to Plaintiff, a conspiracy to retaliate and discriminate against him and violate his rights to due process and equal protection was devised by Jordan, who was pressured by Mace and Daddezio. *Id*. at ¶¶ 233-34. Plaintiff contends that Jordan read Plaintiff's records from Auburn and learned of the guilty finding in the disciplinary hearing and told Mace and Daddezio to wait until Plaintiff shaved designs in his beard again and file an IMR. *Id*. at ¶ 241. Jordan then told Sipple to approve the IMR. *Id*. at ¶ 242. When Mace and Daddezio saw Plaintiff with designs in his beard on January 6, 2012, they confronted him about it and then told Jordan and Sipple. *Id*. at 243-46. Jordan told Mace and Daddezio to write the IMR only on violation of a direct order because Plaintiff's appeal from the Brown determination was good and the

determination might not stick. *Id*. at ¶ 248. Daddezio and Mace took photographs to support

the IMR as had been done at Auburn. *Id*. at 253. Plaintiff claims that Jordan caved into

pressure from lower ranking officers to rig the hearing so that Plaintiff would be found guilty.

*Id*. at ¶ 265.

As with the conspiracy claim against the Auburn Defendants, the Sullivan Defendants

argue that Plaintiff's §§ 1983, 1985, and 1986 conspiracy claim against them must be dismissed

under the intracorporate conspiracy doctrine. (Dkt. No. 46-1 at 16-18.) For the reasons

articulated above with regard to the conspiracy against the Auburn Defendants, including

Plaintiff's failure to allege nonconclusory facts plausibly showing that the Sullivan Defendants

were pursuing personal interests wholly separate and apart from DOCCS and their employment

by DOCCS, the Court recommends that Plaintiff's conspiracy claims against Jordan, Mace,

Daddezio, and Sipple be dismissed with prejudice under the intracorporate conspiracy doctrine.

## IV.    CONCLUSION

The Court recommends that all of the claims on which the moving Defendants seek

dismissal under Rule 12(b)(6), with the exception of Plaintiff's Fourteenth Amendment due

process vagueness claim against Leclaire, be dismissed with prejudice against the movants.

Inasmuch as Defendants have not moved specifically for dismissal of Plaintiff's stand alone

equal protection claim against Jordan, Sipple, Daddezio, Mace, and Giglio, the Court has not

considered the claim on this motion. Should the District Court adopt this Court's

recommendation with regard to the claims of the moving Defendants, the only two claims

alleged against the movants remaining in the lawsuit will be Plaintiff's stand alone equal

protection claim against Jordan, Sipple, Daddezio, Mace, and Giglio, and his due process

vagueness claim against Leclaire.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 46) pursuant to Rule 12(b)(6) be **GRANTED** in part and **DENIED** in part; and it is further

**RECOMMENDED** that the motion to dismiss be granted as to and that the following claims be **DISMISSED WITH PREJUDICE**: (1) Fourteenth Amendment procedural due process claims against Defendants Brown and Jordan; (2) First Amendment retaliation claim against Defendants Gibson, Volpe, Woodard, McCarthy, and Brown; (3) Fourteenth Amendment equal protection claim against Defendants Gibson, Volpe, Woodard, McCarthy, Brown, and McGaw; (4) conspiracy claim against Defendants Gibson, Volpe, Woodard, McCarthy, Oleksiw, and Brown brought under §§ 1983, 1985(3), and 1986; and (5) conspiracy claim against Defendants Jordan, Mace, Daddezio, and Sipple brought under §§ 1983, 1985(3), and 1986, and it is further

**RECOMMENDED** that the motion to dismiss be **DENIED** as to the Fourteenth Amendment due process vagueness claim against Defendant Leclaire; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam). Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[15]  Such objections shall be filed with the Clerk of the Court.

---

[15]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period,

**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:  July 10, 2017
       Syracuse, New York

                                               Therése Wiley Dancks
                                               United States Magistrate Judge

---

meaning that you have seventeen days from the date the Order and Report-Recommendation
was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that
prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended
until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ.
6(a)(1)(C).

2012 WL 946792
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Allan ABRAMS, Irawaddy Ventures, LLC, Isabel
Knispel, Loire Ventures, LLC, Louise Abrams
Irrevocable Trust Dated 4/2/70, Orinoro Ventures,
LLC, Trust FBO Louise Abrams Dated 12/22/50,
Parana Ventures, LLC, Trust FBO Roberta Abrams
Dated 1/11/88, Yengtzi Ventures, LLC, Trust FBO
Joshua Abrams Dated 1/11/88, Yenisei Ventures,
LLC, Trust FBO Roberta Abrams Dated 12/14/88,
St Lawrence Ventures, LLC, Trust FBO Joshua
Abrams Dated 12/14/88, Zamibezzi Ventures, LLC,
Roberta Abrams Trust Dated 12/7/76, Will1amette
Ventures, LLC, Joshua Abrams Trust Dated
12/7/76, Indus Ventures, LLC, David Abrams Trust
Dated 12/7/76, Senegal Ventures, LLC, Plaintiffs,
v.
NATIONAL WESTMINSTER
BANK PLC, Defendant.

No. 11 Civ. 01667(GBD).
|
March 19, 2012.

*MEMORANDUM DECISION AND ORDER*

GEORGE B. DANIELS, District Judge.

**\*1** This case arises out of a purported loan that
defendant National Westminster Bank PLC ("NatWest")
provided to plaintiffs in the execution of a tax shelter
strategy known as a Bond Linked Issue Premium
Structure ("BLIPS"). Plaintiffs allege that, in executing
BLIPS, NatWest fraudulently deducted $6,897,000 from
plaintiffs' account as payment for fees on a loan that
was never actually provided to plaintiffs. Am. Compl. ¶¶
1–7, 41. Plaintiffs assert causes of action for breach
of fiduciary duty, fraud, and fraudulent concealment arising
from activities that took place in 1999 and 2000. *Id.* ¶¶ 49–
64. Defendant moves to *dismiss* the amended complaint as
untimely in violation of the statute of limitations pursuant
to Federal Rule of Civil Procedure 12(b)(6). Defendant's
motion is GRANTED.

**Background**

In the fall of 1999, plaintiffs invested in the BLIPS [1]
strategy to offset substantial gains following the sale
of their family company. In November 1999, plaintiffs
entered into a Credit Agreement with defendant for
a loan totaling $880 million, consisting of a $550
million principal and a $330 premium. Am. Compl. ¶
3, 33. Plaintiffs allege that, seven days after the Credit
Agreement was executed, defendant entered into an
interest rate swap that eliminated the premium loan, but
still charged plaintiff fees on the premium loan. *Id.* ¶ 41.
Plaintiffs allege that at the time the Credit Agreement was
entered into, defendant did not disclose that it intended to
enter into an interest rate swap to extinguish the premium
loan. *Id.* During the two-month life of the BLIPS strategy,
defendant is alleged to have diverted $6,897,000 in fees
from plaintiffs' account. *Id.* ¶¶ 32, 35. Plaintiffs allege that
the loan was a sham. *Id.* ¶ 1–7.

In September of 2000, the Internal Revenue Service
("IRS") deemed BLIPS a "potentially abusive tax shelter"
and commenced investigations and audits on BLIPS
participants, including plaintiffs. Def. Ex. 2 ¶ 49. Around
the same time, companies that had promoted and enabled
tax shelter strategies including BLIPS, became the targets
of numerous civil lawsuits, criminal prosecutions, and
government investigations. These public and private
actions generated considerable press coverage.

In November 2003, the Senate Subcommittee on
Investigation of the Committee on Government Affairs
released a report ("Senate Report") on the development
and marketing of BLIPS and other abusive tax shelters.
*See* Minority Staff of S. Subcomm. of the Investigations,
108th Cong., U.S. Tax Shelter Industry: The Role
of Accountants, Lawyers, and Financial Professionals
(Comm. Print 2003). The Subcommittee found that
"[m]ajor banks such as Deutsche Bank, HVB, UBS, and
NatWest, provided purported loans for tens of millions of
dollars essential to the orchestrated transactions ... [but]
the funds 'loaned' by the banks were never really put at
risk." *Id.* at 10. The Senate Report described loan interest
rate swap agreements in BLIPs transactions: "[T]he fund
enters into a swap transaction with the bank on the 'loan'
interest rate ... The effect of the swap is to reduce the 'loan'
interest rate to a market-based rate." *Id.* at 112. The Senate

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 42 of 282

2012 WL 946792

Report stated that "NatWest apparently also participated in a significant number of BLIPS transactions in 1999 and 2000, provided credit lines totaling more than $1 billion." *Id.* at 72. [2] The Report also described the interest rate swap agreements in BLIPS transactions. *Id.* at 112.

**\*2** Following the Report, a number of civil actions were filed claiming that banks fraudulently obtained fees on non-existent BLIPS loans. In June 2005, plaintiffs in this action filed a suit in the Superior Court of New Jersey against KPMG, Presidio Advisory Services, LLC ("Presidio"), and the law firm Sidley Austin Brown & Wood alleging that BLIPS was a fraudulent scheme, Def. Ex 2. Although NatWest was not named as a defendant in that lawsuit, plaintiffs alleged in the complaint that NatWest did not make bona fide loans in connection with plaintiffs' BLIPS transactions: "the terms of the loans made by NatWest and other lenders to BLIPS ... [were] highly unusual terms which greatly reduced the risk to NatWest and the other lenders of making the loans." *Id.* ¶ 35. That same month, a class-action complaint alleged that banks, including NatWest, fraudulently obtained fees on sham loans in connection with BLIPS transactions. *See Simon et al. v. KPMG LLP et al.,* No. 05–cv3189 (D.N.J.). The parties in *Simon* settled, and the agreement was published in the *Wall Street Journal* and the *Newark Star Ledger* in November 2005. In a 2007 suit involving similar facts to those at bar, the Eastern District of Texas held that "in truth, NatWest did not make any loans" in connection with executing BLIPS transactions, *Klamath Strategic Inv. Fund, LLC v. U.S.,* 472 F.Supp.2d 885 (E.D.Tex.2007). The *New York Times* reported on the *Klamath* decision, noting that the Eastern District of Texas "found that Blips was not a real investment at all, that its loans were fake and that it had no economic substance or genuine business purpose...." Lynnley Browning, N.Y. TIMES, *Court Rejects Tax Shelter Once Sold by KPMG,* Feb. 2, 2007.

From 2005 through 2008, the government obtained a number of highly-publicized indictments and deferred prosecution agreements against various entities and individuals involved in executing BLIPS. On August 12, 2005, the *Wall Street Journal* reported that a former executive at the German bank Hypo Und Vereinsbank ("HVB"), Domenick DeGiorgio, pleaded guilty to criminal charges for his involvement in promoting fraudulent tax shelters. Jonathan Weil & Kara Scannell, *HVB Ex–Official Pleads Guilty Over Tax*

*Shelter,* WALL ST. J., Aug. 12, 2005, at A3, At his plea, DeGiorgio admitted that "[t]he loan proposed by the BLIPS promoters was a sham because, among other things, as designed, no money ever left the bank ...." *Id.* Not long after DeGiorgio's plea, the United States Attorney's Office for the Southern District of New York unsealed an indictment against KPMG, Presidio executives, and a lawyer from a national law firm alleging in part that "the purported loan transactions that were part of BLIPS ... were shams—no money ever left the bank ...." Def. Ex. 23.

In September 2007, the *New York Times* reported that David Amir Makov ("Makov"), a former employee of Presidio, pleaded guilty to criminal charges brought against him for his involvement in BLIPS. Lynnley Browning, *Guilty Plea Seen Aiding Tax Shelter Prosecution,* N.Y. TIMES, Sept. 11, 2007. According to the article, Makov admitted at his plea that "[a]lthough Blips (sic) were created on paper to look like seven-year investments, it had neither *real loans* nor a real investment component ... 'There was no economic substance ... we created the appearance of economic substance, rather than the reality.' " *Id.* (emphasis added). In October 2008, two of Makov's former Presidio colleagues were tried for their criminal participation in the BLIPS scheme. Makov testified at their criminal trial that "there was [an interest rate swap], so there is no premium loan. The whole thing doesn't exist anyway." Pl.Ex. 4, 3081–82.

**\*3** Defendant contends that plaintiffs' lawsuit here, which was filed on March 8, 2011, is time barred under New York law because plaintiffs had notice of potential claims as early as 2000. Plaintiffs contend that they were not put on inquiry notice of the potential fraud concerning the BLIPS interest rate swap until March, 9, 2009. At that time, Makov's 2008 testimony that the BLIPS loan premium was misrepresented and did not actually exist was published on the Court's docket.

### Standard of Review

When considering a motion to dismiss, this Court must review the plaintiff's Amended Complaint assuming all factual allegations are true and drawing all reasonable inferences from these facts in non-movant's favor. *Staehr v. Hartford Financial Services Group, Inc.,* 547 F.3d 406, 424 (2d Cir.2008). Dismissal under a Rule 12(b)(6) motion

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 43 of 282
Abrams v. National Westminster Bank PLC, Not Reported in F.Supp.2d (2012)
2012 WL 946792

is appropriate when the defendant raises a statutory bar as an affirmative defense and it is clear from the complaint that the plaintiff's claims are barred as a matter of law. *Id.* at 425 (citing *Conopco, Inc. v. Roll Intern.,* 231 F.3d 82, 86 (2d Cir.2000)). Further, where any amendment to the complaint would prove futile in curing the complaint's deficiencies, a dismissal without leave for the plaintiff to amend is warranted. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000). As a result, where dismissal under Rule 12(b)(6) is granted because the complaint was filed outside the allowable statute of limitations period, a dismissal with prejudice is appropriate.

### New York Statute of Limitation for Fraud Actions

Under New York law [3], actions based in fraud must be brought within six years of the commission of the alleged fraud [4], or two years from when a plaintiff was aware ("specific notice") or should have been aware of enough facts such that they could have discovered the fraud with reasonable diligence ("inquiry notice"). N.Y. C.P.X.R. §§ 213(8), 203(g). Where the facts needed for determination of inquiry notice can be "gleaned from the complaint and papers ... that are integral to the complaint," resolution by 12(b)(6) is appropriate. *Id.* (citing *Dodds v. Cigna Securities, Inc.,* 12 F.3d 346, 352 n. 3 (2d Cir.1993)).

Under the discovery prong of section 213(8), where circumstances exist that a person of ordinary intelligence would understand there was a probability that he had been defrauded, that person is deemed to be on inquiry notice. *AXA Versicherung AG v. New Hampshire Ins. Co.,* 391 Fed. Appx. 25, 29 (2d Cir.2010) (citing *Guilbert v. Gardner,* 480 F.3d 140, 147 (2d Cir.2007)). Inquiry notice imposes a duty on the potential victim of a fraud to investigate the potential for legal claims against those who have defrauded him. *Id.* If the victim fails in his duty to investigate, when such action would have otherwise uncovered the truth, such knowledge will be imputed to the victim. *Id.*

Whether, and at what point, a plaintiff was placed on inquiry notice is analyzed under an objective standard. *Id.* (citing *Staehr v. Hartford Financial Services Group, Inc.,* 547 F.3d 406, 417 (2d Cir.2008)). A potentially defrauded investor need not have notice of the entire fraud being perpetuated to be put on notice; rather, a totality-of-the-circumstances test applies to determine whether,

as a matter of law, the uncontroverted evidence clearly demonstrates that the plaintiff should have discovered the fraudulent acts in question. *Id.*

### Inquiry Notice of Potential Claims Existed Long Before March 9, 2009

**\*4** Inquiry notice was triggered more than two years before plaintiffs filed the complaint. By 2003, the BLIPS strategy and the fraud-based actions associated with it had become public by the U.S. government, the media, and the courts. Notably, the Senate Report indicated that NatWest made loans in connection with BLIPS transactions, and that those loans may have been sham loans. *See* Report at 9–10 ("[T]he funds 'loaned' by the banks were never really put at risk.") The Senate Report emphasized NatWest's significant role in BLIPS transactions: "NatWest ... provided credit lines totaling more than $1 billion [in BLIPS transactions]. *Id.* at 78. As Judge Barbara Jones explained in a substantively similar case to the one at bar, "the Report unequivocally explore [d] the fact that NatWest did not make bona fide loans in connection with the BLIPS transactions." *See Gonzales v. National Westminster Bank PLC,* No. 11 Civ. 1435, 8–9 (Mar. 6, 2012 S.D.N.Y.). [5] The Report garnered considerable media attention, with a number of newspapers reporting on the potentially fraudulent nature of BLIPS loan structure. The Senate Report and its accompanying media attention was enough to put a person of ordinary intelligence on notice of the potentially fraudulent nature of NatWest's loans.

The Senate Report was followed by a flurry of BLIPS-related litigation, further putting plaintiffs on notice of their potential claim against NatWest. Additionally, the government brought numerous criminal charges against participants in the tax shelter strategy. Plaintiffs even filed their own lawsuit in June 2005 against KPMG and Presidio based on the allegedly fraudulent nature of BLIPS loan transactions.

Plaintiffs contend that they were not put on inquiry notice of their potential fraud claim until Makov's 2008 testimony concerning BLIPS interest rate swaps was published on the Court's docket sheet on March 9, 2009. This argument fails because the allegedly fraudulent interest rate swap was publicly known as early as 2003. The 2003 Senate Report found that BLIPS

transactions involved "funds 'loaned' by ... banks [that] were never really put at risk." See Senate Report at 9–10.The Senate Report also outlined swap agreements in BLIPS transactions, and explained how these agreements functioned to extinguish premium loan rates in favor of market-based rates:

> [T]he Fund enters into a swap transaction with the bank on the "loan" interest rate. In effect, the Fund agrees to pay a floating market rate on an amount equal to the "loan" and "loan premium" ... while the bank agrees to pay the 16% fixed rate on the face amount of the "loan" ... The effect of this swap is to reduce the "loan" interest rate to a market-based rate.

*Id.* at 112.

Plaintiffs' June 2005 complaint against KPMG and Presidio severely undercuts their argument that they could not have known about a potential fraud claim related to the rate swaps until 2009. The complaint in that case devoted an entire section to the Senate Report entitled "The U.S. Senate's Condemnation of BLIPS and KPMG After a Lengthy Investigation." Def. Ex.2 at 15. Plaintiffs were well-versed in the 2003 Senate Report as early as June 2005. Plaintiffs were thus on notice of any potential claims against defendant for fraudulent rate swaps well before the March 9, 2009 date they now claim.

**\*5** HVB's 2006 publicly available deferred prosecution agreement outlined the exact rate swap that plaintiffs claim they could not discover until 2009. The facts attached to the deferred prosecution agreement set forth that "although the 'loans' were represented in the transaction documents and opinion letters to be above-market, fixed-rate loans with a premium, they were intended from inception to be variable loans with no premium." Def. Ex. 31, at Statement of Facts, ¶ 13. Additionally, the 2007 *Klamath* decision discussed the structure of the BLIPS loan rate swaps: "The partnerships then assumed the loans and entered into swap agreements with NatWest ... The swap agreements ... required a

Final Fixed Payment (distinct from the 'premium') of $25,000,000." *Klamath,* 472 F.Supp.2d at 892. In light of all of this public information, none of which plaintiffs claim that they were unaware, inquiry notice of a potential fraud based on the BLIPS rate swaps existed well before March 9, 2009.

Plaintiffs also argue that defendant fraudulently concealed its activities, preventing inquiry notice and tolling the statute of limitations period under the doctrine of equitable estoppel. This argument fails because "[i]n the fraudulent misrepresentation context, the equitable estoppel doctrine is not available to a plaintiff who possesses timely knowledge sufficient to place him or her under a duty to make inquiry and ascertain all the relevant facts prior to the expiration of the applicable statute of limitations." *Malone v. Bayerische Hypo–Und Vereins Bank,* No. 09–cv7277, 2010 WL 391826, at \*11 (S.D.N.Y. Feb.4, 2010); *see also Sierra Rutile Ltd. v. Katz,* No. 09–cv–4913, 1995 WL 622691, at \*7 (S.D.N.Y. Oct.24, 1995). Here, plaintiffs were independently on notice of the alleged fraudulent activity well before the statute of limitations expired, and therefore "may not claim the benefits of equitable tolling under the doctrine of fraudulent concealment." [6] *Malone,* 2010 WL 391826, at \*11.

Plaintiffs brought this claim on March 8, 2011, well past the six year New York statute of limitations period for fraud actions. Plaintiffs had both actual and inquiry notice of their potential fraud claims more than two years before this lawsuit was filed. Plaintiffs' amended complaint is therefore dismissed.

### CONCLUSION

Defendant's motion to dismiss with prejudice plaintiffs' amended complaint is GRANTED.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 946792

Footnotes

2012 WL 946792

1    The BLIPS strategy, created by the accounting firm KPMG and the investment advisor Presidio Advisory Services ("Presidio"), was designed to create large on-paper losses for individuals or entities to offset substantial capital gains or income in that tax year. To execute BLIPS, an individual investor forms a single-member limited liability corporation ("LLC") and contributes eash equal to a small portion of the tax loss to be generated by BLIPS. Next, the LLC enters into a credit agreement with a bank for a substantial size non-recourse loan consisting of a stated principal amount and a premium. The LLC partners with two Presidio affiliates to form a Strategic Investment Fund ("Fund"). The Fund is capitalized with the LLC's *assets,* which consist of the bank loan, the loan premium, and the individual's cash contribution. The LLC assigns the bank loan to the Fund, which in turn assumes the LLC's obligation of repayment. After 60 to 180 days, the investor withdraws the LLC from the fund and suffers an on-paper loss attributable to the difference between the bank loan it contributed to the Fund and its significantly smaller investment distribution following the Fund's repayment of the bank loan. The individual, the sole-member of the LLC, uses the loss to offset any ordinary or capital gains income in that tax year.

2    The Senate's Report and its accompanying public hearings generated significant press coverage. *See* Cassel Bryan–Low, KPMG Insiders Questioned Shelter—Senate Panel's Report Says Firm Disregarded Partners Concerns on Capital Gains, Wall St. J., Nov. 19, 2003, at A2.

3    The Court's subject-matter jurisdiction for this case rests on diversity of citizenship. *See* 28 U.S.C. § 1332(a). As such, this Court must apply New York substantive law and statute of limitations. *See Guaranty Trust Co. of N.Y. v. York,* 326 U.S. 99, 109–110, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Pricaspian Development Corp. (Texas) v. Royal Dutch Shell, P.L.C.,* 382 Fed. Appx. 100, 102 (2d Cir.2010) (citing *Diffley v. Allied–Signal Inc.,* 921 F.2d 421, 423 (2d Cir.1990)).

4    Neither party disputes that the six year period from the commission of the alleged fraud to bring this action has expired.

5    Like plaintiffs in this case, the plaintiffs in *Gonzales* alleged breach of fiduciary duty, fraud, and fraudulent concealment claims against NatWest based on alleged sham loans NatWest made in connection with BLIPS transactions. The *Gonzalez* plaintiffs also alleged they were put on notice only by Makov's 2008 testimony. Judge Jones rejected that assertion, holding that "[b]y 2003, and perhaps earlier, the BLIPS strategy and fraud associated with it had been brought into the public light by the media, the U.S. Government, and the courts." 11 Civ. 1435, at 7.

6    Additionally, plaintiffs did not. plead the elements of fraudulent concealment necessary to toll the statute of limitations.

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1267799
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jemal Albritton, Plaintiff,
v.
C.O. S. Morris, Lt. Tokarz, C.O. Gonyo,
Sgt. Fitzpatrick, C.O. Blott, C.O. Sawyer,
Supt. William A. Lee, Voc. Supv. R. Ryan,
Sgt. O'Connor, C.O. McDonough, and
Commissioner Brian Fisher, Defendants.

Case No. 13-CV-3708 (KMK)
|
Signed 03/30/2016

**Attorneys and Law Firms**

Jemal Albritton, Napanoch, NY, Pro Se.

James Brennan Cooney, Esq., Mary Kim, Esq., New York
State Office of the Attorney General, New York, NY,
Counsel for Defendants.

OPINION & ORDER

**\*1** KENNETH M. KARAS, District Judge

Plaintiff Jemal Albritton ("Plaintiff") brings this
action pursuant to 42 U.S.C. § 1983 against C.O.
S. Morris ("Morris"), Lt. Tokarz ("Tokarz"), C.O.
Gonyo ("Gonyo"), Sgt. Fitzpatrick ("Fitzpatrick"),
C.O. Blott ("Blott"), C.O. Sawyer ("Sawyer"),
Superintendent William Lee ("Lee"), Supervisor R.
Ryan ("Ryan"), Sergeant O'Connor ("O'Connor"), C.O.
McDonough ("McDonough"), and Commissioner Brian
Fischer ("Fischer") (collectively, "Defendants"), alleging
violations of his constitutional rights stemming from
a number of occurrences while he was an inmate
at Greenhaven Correctional Facility ("Greenhaven"). [1]
Defendants have moved to dismiss Plaintiff's claims
against Lee, Tokarz, and O'Connor for failure to state a
claim, and all of Plaintiff's claims that occurred in 2008
as barred by the applicable statute of limitations. For the
reasons that follow, Defendants' Motion is granted in part
and denied in part.

I. Background

A. Factual Background

The following facts are taken from Plaintiff's Complaint
and Opposition to Defendants' Motion and, for purposes
of this Motion, are assumed true. [2]

1. Events Occurring in 2008

a. Tokarz Threatens Plaintiff in March 2008

On March 4, 2008, around 8:10 pm, Plaintiff heard the
A-officer of the G-block tell the third-deck officer not to
let Plaintiff's cell out for recreation ("rec"). [3] (See Compl.
11 (Dkt. No. 2).) Fifteen minutes after rec, Plaintiff was
let out of his cell, at which time he went over to the A-
officer to ask what was going on. (Id.) The A-officer told
Plaintiff that "they wanted to see [him]." (Id.) Plaintiff
asked who, but the A-officer simply instructed Plaintiff to
go down to the F&G corridor. (Id.) Plaintiff did so, and
the control-station officer let Plaintiff in and told him to
have a seat. (Id.) Then, Morris and another corrections
officer emerged from the sick cell to see Plaintiff. (Id.)
Plaintiff asked Morris why Plaintiff was there and who
wanted to see him, but Morris told Plaintiff that he did
not need to know, and instructed him to stand up and put
his hands on the wall. (Id.) Morris then searched Plaintiff,
took his asthma inhaler, and told Plaintiff that someone
from the administration building wanted to see him. (Id.)
Plaintiff said that he did not want to see anyone who could
not identify himself or herself to Plaintiff, but Morris told
Plaintiff he had no choice. (Id.) Morris gave Plaintiff his
asthma inhaler back just as he was leaving. (Id.)

**\*2** As Plaintiff entered the room, he found Tokarz,
seated at a table upon which his baton was resting, with
a grievance and a recent complaint that Plaintiff had
sent to the superintendent. (Id.) Plaintiff felt a "negative
vibe" from both officers. (Id.) Tokarz began reading the
grievance and the letter, then "stat[ing] in his atrocious
manner," "'this is a bunch of bull [ ]shit you wrote.'" (Id.)
Tokarz further told Plaintiff that he would not allow
an inmate to write up an officer for something as little
as name calling. (Id.) Morris was standing in the room,
blocking the door, and another corrections officer stood
behind Plaintiff. (Id.) Tokarz further told Plaintiff that he

should "save the writing for when [Plaintiff] [is] in [the] SHU [Special Housing Unit] with his head busted open," and that if Plaintiff "continued to write up his officers[,] [Tokarz] [would not] have any control over what ... Morris and the other [corrections officer] [would] do to Plaintiff later on." [4] (*Id.*; *see also* Reply Aff'n in Resp. to A.A.G. Kim's May 22, 2015 Mot. To Dismiss ("Pl.'s Opp'n") 8 ("Lt. Tokarz threatened Plaintiff while stating to, 'stop writing grievances and the next time I (Tokarz) have to see you (Plaintiff) about a grievance you (Plaintiff) will end up with his [sic] head busted open and in SHU.'" (italics omitted)).) [5] Plaintiff further alleges that Tokarz said, "'you must think that the superintendent [sic] because I spelled my name with a capital letter and did not write the superintendent name with a capital letter[']" [sic]. (Compl. 11.) Tokarz further told Plaintiff that, if Tokarz were the superintendent, he would put Plaintiff's letter in the trash, and further went on to say that, if Plaintiff were in the yard and an inmate attacked him, the officers would turn their backs on Plaintiff because he wrote them up. (*Id.*) Tokarz then told Plaintiff that, if an officer called Plaintiff a "nigger and retard," then Plaintiff "deserve[d] to be called a nigger and retard." (*Id.*) Tokarz then told Plaintiff that the next time he decides to write a grievance, "'think for two or three days about what will happen'" because the next time that Tokarz had to talk to Plaintiff, he would "'end up hurt'" by one of his officers. (*Id.*) Tokarz then "made a few more threats" before telling his officers to take him back. (*Id.*) According to Plaintiff, this incident was in retaliation for a grievance that Plaintiff had written and about which Sgt. J. Carter had interviewed him two days before. (*See id.*)

### b. Morris Inappropriately Touches Plaintiff and Continues To Harass him

On April 8, 2008, Plaintiff wrote a complaint concerning Morris and Tokarz. (*Id.* at 12.) Sometime later, while Plaintiff waiting in the yard for a telephone, a sergeant ordered Plaintiff to step inside, and he did so. (*Id.*) Once inside, Morris began to search Plaintiff. (*Id.*) While doing so, Morris said, "'you don't even know who I am[;] I got your ass now, don't I? Come off the wall[,] and I will show you who's tough.'" (*Id.*) During the search, Morris was "proper" until he reached Plaintiff's waistline. (*Id.*) At that time, Morris placed his right hand inside Plaintiff's crotch area, "while his left hand braced and rested on the lower center part of Plaintiff's back, with what felt like his penis" on Plaintiff's buttocks. (*Id.*) Plaintiff asked Morris why he was searching Plaintiff in that manner, but Morris told Plaintiff to be quiet. (*Id.*) Morris continued the search, reached between Plaintiff's legs from behind, and then roughly grabbed Plaintiff's scrotum, before taking his fingers and running them between Plaintiff's buttocks. (*Id.*) "After leaving the previous area, Morris asked [Plaintiff,] 'did you like that?'" (*Id.*) Morris told Plaintiff that Morris was going to "keep lock" Plaintiff. (*Id.*) A sergeant came by and asked Morris why he was "keep locking" Plaintiff. (*Id.*) Morris wrote Plaintiff a "false ticket," but, when Plaintiff went to a hearing, he was found not guilty. (*Id.*)

A few weeks later, as Plaintiff was leaving G-Block, Morris stepped in front of Plaintiff and told him that he had better stop writing grievances. (*Id.*) Plaintiff tried to walk around him, but Morris jumped in front of Plaintiff and said that, if Plaintiff called this harassment, he "ha[s] not seen nothing." (*Id.*) Morris then "wrote [Plaintiff] another false ticket and keep locked [him]." (*Id.*) Morris committed other acts of harassment against Plaintiff around this time. (*See id.*) A few weeks later, Plaintiff's lawyer contacted R. Ercole, the superintendent at the time, who commissioned an investigation. (*Id.*)

### 2. O'Connor Denies Plaintiff's Complaint

Sometime before or in December 2009, Plaintiff apparently filed another complaint within the prison. (*See id.*) On December 17, 2009, around 6:30 pm, he was escorted to the sergeant's lounge area of building 2, where he found O'Connor and three other sergeants seated. (*Id.*) O'Connor told Plaintiff that he was a troublemaker who needed to "stop writing these complaints." (*Id.*) O'Connor further told Plaintiff that Morris had both warned O'Connor about Plaintiff and told him that Plaintiff had been writing complaints ever since he came to Green Haven. (*See id.*) O'Connor went on to say that he had "heard about the time that [Plaintiff] pissed off Lt. Tokarz." (*Id.*) With regard to the complaint that Plaintiff had recently filed, O'Connor said that he "'interviewed the officers involved[,] and they all denied [Plaintiff's] entire claim,'" and that, therefore, O'Connor was dismissing Plaintiff's claim without further investigation. (*Id.*) In total, Plaintiff "endured about 20 minutes of mockery and farce investigation procedures" before O'Connor ended the investigation. (*Id.*) Additionally, "[O'Connor] called

[Plaintiff's] witness down and told him not to get involved with [Plaintiff's] problems." (*Id.*)

### 3. O'Connor Threatens Plaintiff

**\*3** On January 9, 2010, Plaintiff was called out of the yard over the P.A. system and was instructed to report back to the G-Block. (*Id.* at 13.) There, he was told to report to the administration building, where O'Connor ordered Plaintiff to step into the office adjacent to the package room. (*See id.*) O'Connor then told Plaintiff that "'if [he] ke[pt] writing these B.S. grievances, [Plaintiff] [was] going to end up either in the box, hospital[,] or [,] better yet[,] dead." (*Id.*) O'Connor then told Plaintiff that he needed to learn his place as an inmate. (*Id.*) Plaintiff asked what that place was, and O'Connor said that, "'for one [thing], [Plaintiff] [is] a nigger,'" and, "'second[,] [he] [is] an inmate[,] and [his] place is under [O'Connor's] corrections officers.'" (*Id.*) O'Connor further told Plaintiff that he "'wouldn't care if [Plaintiff's] problem was a medical one[;] [Plaintiff] [would] have to beg [them] for anything that [he] need[ed]." (*Id.*)

With regard to his grievance, Plaintiff said that he had a witness, whom O'Connor had still yet to address. (*Id.*) O'Connor then became irate, and said, "'fuck your witness,'" before walking over to Plaintiff, poking him in the cheek three times, and asking if Plaintiff was listening. (*Id.*; *see also* Pl.'s Opp'n 11.) O'Connor then said that Plaintiff was "'lucky' that [O'Connor] [did not] just smack [Plaintiff] in the mouth.'" (Compl. 13; *see also* Pl.'s Opp'n 11.) O'Connor then warned Plaintiff that he would find himself in a "'world of trouble'" if he wrote up O'Connor's officers again, and that Tokarz told O'Connor that he had spoken to Plaintiff about these complaints in 2008, but that Plaintiff was still at it, before adding, "'[w]e know how to deal with your type around here.'" (Compl. 13.)

That same day, O'Connor tried to have another inmate rob and assault Plaintiff, telling him, "'you should stay away from [Plaintiff] because he was a trouble[ ]maker, no good asshole, and that [the inmate] should take [Plaintiff] for everything he has.'" (*Id.*) "O'Connor told him that he will take care of things his way" as well as "several other things." (*Id.*) Plaintiff filed an "accusatory instrument complaint" as well as a letter to the "I.G." in Albany, who forwarded both to Lee. (*Id.*) [6]

### 4. Morris Threatens Plaintiff

On August 21, 2010, around 9:05 am, Morris came to the cell that Plaintiff was in, and told Plaintiff that the next time he "'ha[s] [his] line up[,] [Morris] would [give] [Plaintiff] a ticket,'" and also that "'[Plaintiff] need[ed] to stop writing those bitch grievance[s].'" (Compl. 13.) Plaintiff asked why Morris was harassing Plaintiff, to which Morris responded, "'because you are a bitch.'" (*Id.*) Morris then went to the front of the company and told "someone else" that "those guys in the back better stop writing [Morris] up," and, more specifically, that "'if 337 cell ke[pt] writing [Morris] up,'" the inmate in that cell would "'find himself in the hospital.'" (*Id.*; *see also* Pl.'s Opp'n 3 (indicating that another inmate "had become concerned for Plaintiff's safety after overhearing ... Morris stating to the [e]ffect that 'those prison bitches better stop writing grievances, and that #337 doesn't stop writing he will end up in the hospital'").) At that time, Plaintiff was in cell #337. (Pl.'s Opp'n. 3.) An inmate—apparently named Nelson, based on Plaintiff's Opposition—relayed Morris' statement to Plaintiff, and further assured Plaintiff that he would write to Lee to let him know about Morris' threats, and later did so. (*See* Compl. 13; Pl.'s Opp'n 3.) After receiving the letter about one week prior to the incident on September 22, 2010, Lee ordered O'Connor to investigate the letter and the circumstances that led to its writing. (Pl.'s Opp'n 3.) O'Connor called the inmate down to the sergeant's office. (Compl. 13) Rather than investigating the threat, O'Connor asked the inmate a number of questions unrelated to Morris' threat, including whether the inmate had any tattoos and how he knew Plaintiff. (*Id.* at 13–14) According to the inmate, it was more as though O'Connor was trying to stop the inmate from repeating what he heard Morris say. (*Id.* at 14; *see also* Pl.'s Opp'n 3 ("Instead of conducting a full and proper investigation of the surrounding circumstances and the writing of the letter by Nelson, Sgt. O'Connor tried to intimidate Nelson.").) [7]

### 5. Plaintiff's Mother and Lawyer
### Contact Various Officials

**\*4** Sometime in August 2010, Plaintiff's mother called the facility and asked to speak to Superintendent Ward. (Compl. 14.) Whoever Plaintiff's mother spoke to told her that he or she was the secretary, and that Superintendent

2016 WL 1267799

Ward was on vacation. (*Id.*) Plaintiff's mother left her phone number, and asked that the Superintendent call her back to discuss an incident involving O'Connor. (*Id.*) About an hour later, Plaintiff's mother received a phone call from a blocked number from someone claiming to be Superintendent Ward, even though there is no Superintendent Ward at Green Haven. (*Id.*) The person with whom Plaintiff's mother spoke assured her that that they "were taking care of the matter" and that they would "look into it." (*Id.*) The person further assured her that Plaintiff was "doing fine," and that no one would "bother" him. (*Id.*) Plaintiff's mother told whomever she was talking to that she would notify her attorney if anything happened to Plaintiff. (*Id.*)

In addition to Plaintiff's mother attempting to reach out to the superintendent, Plaintiff alleges that his lawyer contacted Lee several times about "what was going on with [Plaintiff]." (*Id.*) Plaintiff further alleges—although it is not clear whether he claims his attorney said so to Lee— that Lee "kept letting [Plaintiff's] rights be violated" and that "he did nothing to try and stop the problems." (*Id.*) Plaintiff further indicates that Lee was "informed [that] the same Correction Officer staff that were supposed investigate [Plaintiff's] complaints [were] some of the same one[]s that [were] violating [his] rights." (*Id.*) Nevertheless, Lee "continued to allow this to go on." (*Id.*)

Finally, in his Opposition to Defendants' Motion, Plaintiff indicates that his "mother ... and [Plaintiff's attorney B. Alan Seidler ("Seidler") ] ... had both informed Supt. Lee that inmate Nelson had overheard a statement made by C.O. Morris regarding the threatening of Plaintiff." (Pl.'s Opp'n 3–4.) In support of this assertion, Plaintiff cites Exhibits A and E to his Opposition. (*Id.*) Exhibit A, however, is a letter directed to Lee concerning "a grievance [Plaintiff] presently has with a Sgt. Oconnor," which alludes to but does not attach a letter that Plaintiff apparently sent to Seidler. Exhibit E appears to comprise two letters purportedly from Plaintiff's mother, one dated September 25, 2010 addressed to the "Inspector's General Office," and the other dated September 29, 2010 and directed toward the Governor of the State of New York. Both letters indicate that Plaintiff had been beaten. (*See* Pl.'s Opp'n Ex. E, first letter, at unnumbered 2 ("My family saw [Plaintiff] at documented all of the swelling + bruises that were on his body."); *id.*, second letter, at 3 ("My son got kicked and punched in the face, head, back and even while handcuffed punched in the stomach.").)

### 6. Fredericks Threatens Plaintiff

On September 9, 2010, Plaintiff was "coming off the company for [his] call-out." (Compl. 14.) At that time, Fredericks was on the third company. (*Id.*) Fredericks called Plaintiff over to the gate, where Fredericks asked, "[W]hat is going [on] with you and Officer Morris." (*Id.*) Plaintiff said that he could not speak about it, unless Fredericks was the person in charge of the investigation. (*Id.*) Fredericks said that he "'heard that [Plaintiff] wrote a grievance also on correspondence[ ] [sic]," and that Plaintiff would be "'lucky if [he] receive[d] [his] mail when he is here on the 3:00 shift.'" (*Id.*)

Later, around 11:10 am, Plaintiff was coming back from the law library, and, as he reached the second floor, a corrections officer told him that Fredericks called for him to come to the back. (*Id.*) Plaintiff did so, and Fredericks "then started to harass [Plaintiff] again[,] and made threats of force towards [Plaintiff]." (*Id.*) Plaintiff could see that Fredericks was "trying to do anything he could to keeplock [Plaintiff] or get [him] sent to the SHU." (*Id.*)

### 7. Plaintiff Sees Tokarz

**\*5** The next afternoon at around 3:30 pm, Plaintiff was summoned to the Administration Building to a see a lieutenant. (*Id.*) When Plaintiff arrived, he was met by Tokarz, who told him to step into the room. (*Id.*) Tokarz then asked Plaintiff what happened between him and Morris, and Plaintiff explained the situation. (*Id.*) In addition to making a number of "bias[ed] statements" concerning Plaintiff's grievances, Tokarz told Plaintiff to stop writing grievances, remarking that "'inmates never win grievances even if they are in the right.'" (Compl. 14–15.) Tokarz then told Plaintiff that it was his last day of work for the week, and then, when he came back the next week, he would handle things his way. (*Id.* at 15.) This was the first occasion that Plaintiff saw Tokarz since the time that Tokarz threatened Plaintiff with a "'busted open'" head if he continued to file grievances. (*See* Pl.'s Opp'n 8.) Additionally, although he does not say specifically that it was on this occasion, Plaintiff indicates that he told Tokarz about Morris' statement that Nelson overheard. (*Id.*) Finally, as a general matter, "Plaintiff

alleges that Lt. Tokarz condoned his subordinates['] behavior repeatedly." (*Id.*) [8]


### 8. Subsequent Threats from Fredericks and Morris

While Plaintiff was waiting to be let back into the G-Block after seeing Tokarz, Fredericks came to the door and asked Plaintiff where he was coming from. (Compl. 15.) Plaintiff told him, and Fredericks said that Plaintiff was "down there snitching on ... Morris." (*Id.*) He then made "several other unprofessional statements" before walking off. (*Id.*)

A few days later, during the morning of September 16, 2010, Plaintiff was let out of the cell for mess hall, and, when he "came down the company," Fredericks was standing at the gate. (*Id.*) As Plaintiff passed Fredericks, he called to Plaintiff, and asked why Plaintiff wrote a grievance about him. (*Id.*) Plaintiff needed to be a man about things, Fredericks said. (*Id.*) At that time, Morris came off the other company and stood behind Morris, remaining there, as if preparing to attack Plaintiff. (*Id.*) At that time, Fredericks said that, if he wanted Plaintiff "in the box," referring to the SHU, Plaintiff would already be there. (*Id.*) Fredericks asked Plaintiff how long he had been in prison and what his age was. (*Id.*) He also told Plaintiff that, had Fredericks wanted, he could have "'done things the old way by using force,'" and called Plaintiff a "'snitch'" for writing up Morris and other officers. (*Id.*) Throughout this exchange, several inmates stopped by to see if Plaintiff was okay. (*Id.*)

On September 22, 2010, Plaintiff was let out of his cell for rec in the morning. (*See id.*) Upon his return, Morris called Plaintiff to the gate and said that Plaintiff's "luck was running out" and that Plaintiff "got the wrong people upset." (*Id.* at 15–16.) Plaintiff was an inmate, he said, and inmates do not have a voice to speak. (*Id.* at 16.) Later, around noon that day, Plaintiff was let out of his cell to go to the mess hall. (*Id.*) While doing so, Fredericks called Plaintiff over to tell him not to "thin[k] that [he] [was] going to get away with snitching on [him] and ... Morris." (*Id.*)


### 9. Plaintiff is Assaulted

That evening, around 6:50 pm, Plaintiff was on the way to the yard, when Morris pointed him to Gonyo. (*Id.* at 16.) Gonyo came up to Plaintiff, and told him to step back inside and stand on the yellow line. (*Id.*) Plaintiff did so, and Gonyo went to exchange words with Morris. (*Id.*) Gonyo then returned, told Plaintiff to step over to the wall, to take everything out of his pockets, to remove his jacket, and to put his hands on the wall. (*Id.*) Plaintiff did so, then Gonyo brought his hand up Plaintiff's legs, then around Plaintiff's waist, to the front, where he grabbed the front of Plaintiff's belt and pulled it tight. (*Id.*) Plaintiff looked down, while Gonyo dropped a metal object from his hand and screamed "weapon." (*Id.*; *see also id.* at 5.) At the same time, Gonyo slammed Plaintiff into the ground, and Sawyer along with another officer jumped on Plaintiff, and Sawyer began punching him in the back of the head. (*Id.* at 16; *see also id.* at 5.) Plaintiff "was already on the floor on [his] stomach and helpless." (*Id.* at 16.) Gonyo had Plaintiff's left arm, and was twisting it while still punching Plaintiff. (*Id.* at 16; *see also id.* at 5.) McDonough struck Plaintiff several times in his back with his baton, and also kicked him several times, all while Plaintiff was pinned down with his right arm behind his back, being twisted. (*Id.* at 16; *see also id.* at 5.) While Plaintiff was still held down on the floor with his legs and ankles being twisted, more corrections officers came. (*Id.* at 16; *see also id.* at 5.) At that time, Blott came and kicked and punched Plaintiff several times including in his right eye. (*Id.* at 16; *see also id.* at 5.) Plaintiff further alleges that a witness informed him that Morris came over and punched Plaintiff several times. (*Id.* at 16.) While he was still on the floor, Plaintiff heard McDonough screaming, "[y]ou won't be writing grievances anymore," and then screamed out, "we are going to break your F----ing arm.'" (*Id.*) Plaintiff felt like he could not breathe, and called out to Fitzpatrick, whom Plaintiff asked to tell the assailants to get off of him because he could not breathe. (*Id.*) In response, Fitzpatrick said, "'you should not have done whatever you did,'" and then turned around as if walking off. (*Id.*) According to Plaintiff, Morris, Fitzpatrick, Blott, and McDonough all saw the attack, as did inmates Marlon Reynolds, Lucien Salnave, and Dwayne Middleton. (*Id.* at 5.)

**\*6** Once Plaintiff was brought to his feet, he was placed against the wall. (*Id.* at 16.) He had difficulty breathing, and so one of the corrections officers administered his inhaler, during which McDonough came over and punched Plaintiff in the stomach. (*Id.*) Plaintiff fell to

his knees, and another officer said that that was enough. (*Id.*) The officer helped Plaintiff to his feet, and finished administering Plaintiff's inhaler.

#### 10. Plaintiff is Written Up; Subsequent Proceedings

On September 23, 2010, Plaintiff was given a ticket with several misbehavior charges on it. (*Id.* at 17.) Five days later, on September 28, 2010, Plaintiff's "Superintendent hearing" began, with Ryan serving as the hearing officer. (*Id.*) According to Plaintiff, Ryan "violated [Plaintiff's] due process rights," inasmuch as he failed to call a number of important witnesses Plaintiff requested, was biased, conducted his own investigation, and "read some of the ... written statements" from witnesses whom Ryan said he would call, but as to whom Ryan "changed his mind for no good reason" "at the last minute." (*Id.*) With respect to one of the witnesses that Plaintiff wanted to call, Ryan told Plaintiff, "all he is going to do is come in here and tell me the same thing all the other C.O. witness[es] told him." (*Id.*) With regard to another, Ryan told Plaintiff the witness was not there, despite Plaintiff telling Ryan otherwise. (*Id.*) In addition, Plaintiff says that there were other witnesses whom Ryan "denied," but who had information that would have supported Plaintiff's defense. (*Id.*) Indeed, Plaintiff says, had Ryan "honored [Plaintiff's] due process," "the hearing could have had a different outcome." (*Id.*) Instead, Plaintiff was placed in the SHU on September 22, 2010, and, on October 28, 2010, Ryan "gave [Plaintiff] 12 months in SHU." (*Id.*)

On October 31, 2010, Plaintiff spoke with Lee, and told him what happened at the hearing. (*Id.*) Lee told Plaintiff to write him, and assured Plaintiff that Lee would review Plaintiff's hearing. (*Id.*) Plaintiff did so, but Lee still affirmed Ryan's decision. (*Id.*; *see also* Pl.'s Opp'n 4 ("Plaintiff wrote Supt. Lee on October 31, 2010 informing him that certain witnesses were requested to testify on Plaintiff's behalf but were never called to offer said testimony."); Pl.'s Opp'n Ex. F (Letter from Pl. to Lee (Oct. 31, 2010)).) In support of this assertion, Plaintiff cites an October 4, 2010 letter that he received from "Captain M. Royce," indicating that he "interviewed [Plaintiff] on September 29, 2010[,] and at that time[,] [Plaintiff] had nothing further to add concerning the grievance [he] filed," but further "stated that [his] current situation is a result of [his] interview with Lieutenant Tokarz." (Pl.'s Opp'n Ex.

G.)[9] The letter further indicates that "[Plaintiff] [was] advised to make statements or supply any evidence [Plaintiff] had at [his] disciplinary hearing, for [his] current situation," and that Royce "spoke to and received written documentation from Lieutenant Tokarz denying the statement [Plaintiff] alleged [Tokarz] said[ ] about inmates never winning grievances," and concluding that Tokarz "acted in a professional manner." (*Id.*) Plaintiff appealed the decision to Fischer, but Fischer affirmed Plaintiff's "Superintendent hearing" on December 30, 2010. (Compl. 17.) Plaintiff thus concludes that "Lee is liable for Plaintiff's injuries that occurred on September 22, 2010 when Plaintiff was assaulted ..., set up ... [,] and given a false misbehavior report," and that he is "further liable for Plaintiff's injuries that took place on October 28, 2010, when he completely failed to remedy the wrong(s) by affirming Plaintiff's appeal to the disciplinary hearing." (Pl.'s Opp'n 5.)

#### 11. Plaintiff's Other Allegations Relating to O'Connor

**\*7** In his Opposition, Plaintiff recounts a visit that O'Connor allegedly paid to his cell. Although it is not clear when this supposedly happened, it appears that the event may have occurred on or around September 22, 2010, as Plaintiff's Opposition in the sentence immediately before refers to a "video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22, 2010." (*See id.* at 10.) Plaintiff alleges that a corrections officer came to his cell, and said that a sergeant wanted to talk to Plaintiff. (*See id.* at 10–11.) Plaintiff asked which sergeant wanted to speak with him, and was told that it was O'Connor. (*Id.* at 11.) Plaintiff asked what O'Connor wanted to see him about, and O'Connor subsequently arrived at Plaintiff's cell, which he asked Plaintiff to exit. (*Id.*) Plaintiff asked why, and O'Connor said that he would tell Plaintiff once he exited the cell. (*Id.*) Plaintiff told O'Connor that Plaintiff feared for his safety, and that O'Connor was part of the basis for that fear. (*Id.*) "O'Connor did not indicate that he was at Plaintiff's cell to discuss the grievance filed by Plaintiff." (*Id.*) Afterward, Plaintiff wrote a grievance, and "[i]t appears that Sgt. O'Connor lied to Lt. Laporto telling him (Laporto) that he did go to Plaintiff's cell to discuss the grievance, which he did not do." (*Id.*)[10]

Finally, in his Opposition, Plaintiff makes a number of conclusory allegations concerning O'Connor, specifically alleging that his "action(s) did not advance legitimate

goals of the Correctional Institution," that his "acts would chill or silence a person of ordinary firmness from future first amendment activities," that his "actions were arbitrary and capricious, and ... unnecessary to the maintenance of order in the institution." (Pl.'s Opp'n 10 (citing Pl.'s Opp'n Ex. M (videotapes)).) Similarly, Plaintiff alleges that O'Connor "did not manage his subordinates personally involved in the unlawful conduct [sic]," and that "O'Connor ... did condone his subordinates['] unlawful conduct." (*Id.* at 12.) In support of this proposition, Plaintiff relies on an affidavit from another inmate, Reginald Dugree ("Dugree"). (*See id.*) Plaintiff attaches an affidavit from Dugree to his Opposition, which says in pertinent part:

> I was called down to Building 2 to the Sgt. Lounge. Sgt. O'Connor was there with three other officers (sergeants). Sgt. O'Connor told me that Albritton called me as a witness. I was told that if I wanted to stay here close to home that I should not get involved with a piece of shit like Albritton. "He is on borrowed time." "Let Albritton know he is pissing off me and my officers.["] I asked to speak and was told "that if it had anything to do with that spoiled brat I don't want to hear it." "Just go back and give him some good advice. ["] "A few days later C.O. Morris stopped me and told me to stay away from Albritton and his days are numbered and [d]on't number your days."

(Pl.'s Opp'n Ex. I.) Noting that Dugree's affidavit indicates that Morris advised Dugree to stay away from Plaintiff, and that "[t]his was a few days after O'Connor saw Dugree[;] thus[,] it can be reasonably inferred that Sgt. O'Connor spoke to C.O. Morris about Plaintiff's complaints and grievances." (Pl.'s Opp'n 12.)

### 12. Lee's Knowledge

Finally, although the timing is less than completely clear, Plaintiff alleges that he "informed [Lee] about sending ... O'Connor to investigate [Plaintiff's] grievances, when [O'Connor] [was] one of the security staff members that [Plaintiff] was having problems with" and as to whom Plaintiff had previously submitted grievances. (Compl. 17.) According to Plaintiff, Lee knew that that could be a security risk for Plaintiff. (*Id.*) Indeed, in his Opposition, Plaintiff stresses that Lee was "fully apprised about the situation pertaining to Sgt. O'Connor," and similarly was "fully apprised of the several other

defendants named herein and Lt. Tokarz's conduct as well." (Pl.'s Opp'n 2.) Moreover, according to Plaintiff, he complained to Lee about O'Connor "in relation to Plaintiff's rights being violated," yet Lee "failed to take any remedial actions regarding his ... subordinates['] ongoing conduct toward Plaintiff." (*Id.*) "In short," Plaintiff alleges, "Supt. Lee had full prior knowledge of the many instances of violating Plaintiff's constitutionally protected rights and did absolutely nothing to rectify the ongoing violations." (*Id.*)

**\*8** To bolster his claims, Plaintiff submits a number of documents that purportedly show Lee's knowledge from early 2010. Those documents are:

- A letter dated January 15, 2010, addressed to the warden from B. Alan Seidler, indicating that he is Plaintiff's attorney and "writing to request [the warden's] assistance with a grievance [Plaintiff] presently has with a Sgt. Oconnor [sic]," and purporting to enclose a letter that Plaintiff sent to Seidler. (*See id.* Ex. A.) [11]

- A letter dated February 2, 2010 from Lieutenant R. Ward ("Ward") to Plaintiff, indicating that he was "responding to [Plaintiff's] letter, concerning [staff harassment], on behalf of Lee." (*See* Pl.'s Opp'n Ex. B, at 1.) According to that letter, Ward interviewed Plaintiff, at which time he "reiterated [his] original complaint." (*Id.*) The letter further indicates that he "spoke to and received written documentation from Sergeant O'Connor and Sergeant Lonczak denying the allegations against them," and closing the matter accordingly. (*Id.*) The attachment also includes a letter dated January 4, 2010 to Plaintiff from Lee, "acknowledg[ing] receipt of [Plaintiff's] letter concerning the above subject," which simply reads "Sergeant's Investigation," and advising Plaintiff that Lee "forwarded [Plaintiff's] letter for action to DSS Koskowski." (*Id.* at 2.)

- A letter dated April 1, 2010, indicating that Plaintiff's "correspondence dated January 20, 2010 to the District Attorney's Office" was forwarded to Lee, and that the issues raised in that letter "have been addressed and responded to through the inmate grievance process." (Pl.'s Opp'n Ex. C.) The letter further advises Plaintiff that Lee "received correspondence from [Plaintiff's] attorney," and "advised him that [Plaintiff's] complaint had

previously been addressed via the inmate grievance process." (*Id.*) The letter also noted that Lee had been advised that Plaintiff met with Ward, and that Plaintiff advised Ward that Plaintiff had had no further issues with O'Connor, such that Lee considered the matter resolved. (*Id.*)

With respect to these latter two exhibits in particular, Plaintiff asserts that Lee "had prior actual knowledge of a substantial risk of serious harm to Plaintiff by the other named [D]efendants." (Pl.'s Opp'n 2–3.)

### B. Procedural History

Plaintiff filed his Complaint on May 30, 2013. (Dkt. No. 2.) On October 24, 2013, the Office of the Attorney General requested an extension of time to move to dismiss or answer the Complaint until 30 days after the last-named Defendant had been served and requested representation from the Office of the Attorney General, (Dkt. No. 19), a request the Court approved the same day, (Dkt. No. 20). In order to identify the defendants and effectuate service, on September 17, 2014, the Court issued an order pursuant to the Second Circuit's decision in *Valentin v. Dinkins*, 121 F. 3d 72 (2d Cir. 1997), directing the New York State Attorney General to identify certain defendants. (Dkt. No. 34.) On October 15, 2014, the Office of the Attorney General submitted a response to the Court's order. (Dkt. No. 35.) On November 24, 2014, Plaintiff filed a Motion for Default Judgment. (Dkt. Nos. 36–37.) On December 2, 2014, the Office of the Attorney General responded, indicating that the Office's earlier request for an extension of time to respond to the Complaint, and further noting that Plaintiff as of that date had still not yet served the Defendants identified as a result of the *Valentin* order. (Dkt. No. 38.)

**\*9** On January 13, 2015, Plaintiff requested that the Court direct the Office of the Attorney General to accept service on McDonough's behalf, (Dkt. No. 45), but the Office responded indicating that it was unable to do so, that McDonough was no longer employed by the New York State Department of Corrections and Community Supervision, and that correspondence sent to his last-known address was returned undeliverable, (Dkt. No. 46). Pursuant to the Office's request, the Court gave Defendants until February 27, 2015 to answer or otherwise respond to the Complaint. (Dkt. No. 47.) On that date, Defendants submitted a pre-motion letter to the Court seeking a conference in advance of its anticipated

Motion to Dismiss, (Dkt. No. 50), which was held on April 16, 2015, (Dkt. (minute entry for Apr. 16, 2015)). By Order also dated April 16, 2015, the Court denied Plaintiff's earlier Motion for a Default Judgment. (Dkt. No. 53.) On May 22, 2015, Defendants Blott, Fitzpatrick, Gonyo, Morris, Ryan, and Sawyer answered the Complaint, (Dkt. No. 57), and Lee, Morris, O'Connor, and Tokarz moved to dismiss, (Dkt. No. 58–61). After several extensions of time to respond, (Dkt. Nos. 63–64), on July 17, 2015, Plaintiff informed the Court that he wished to submit certain cassette tapes with his opposition papers, (Dkt. No. 65). The Office of the Attorney General responded on July 31, 2015, indicating that it did not need copies if the tapes were of Plaintiff's Tier III disciplinary hearings, but that he should inform Defendants if he was referring to other tapes. (Dkt. No. 68). Plaintiff submitted his opposition dated July 16, 2015 in hardcopy form. On August 17, 2015, Defendants submitted their reply. (Dkt. No. 69.)

### II. Discussion

### A. Standard of Review

Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (amended, citations, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alterations and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level ...." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and, although a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across

the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Graham v. Macy's Inc.*, No. 14-CV-3192, 2015 WL 1413643, at *1 n.1 (S.D.N.Y. Mar. 23, 2015) ("For the purpose of resolving the motion to dismiss, the [c]ourt assumes all well-pled facts to be true ...."). Further, "[f]or the purpose of resolving [a] motion to dismiss, the [c]ourt ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Hendrix v. City of N.Y.*, No. 12-CV-5011, 2013 WL 6835168, at *2 (E.D.N.Y. Dec. 20, 2013) (same).

*10 Lastly, because Plaintiff is proceeding pro se, the Court must construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam) (same). This admonition "applies with particular force when a plaintiff's civil rights are at issue." *Maisonet*, 640 F. Supp. 2d at 348; *see also McEachin v. McGuinnis*, 357

F.3d 197, 200 (2d Cir. 2004) (same). However, the liberal treatment afforded to pro se litigants does not excuse a pro se party "from compliance with relevant rules of procedural and substantive law." *Maisonet*, 640 F. Supp. 2d at 348 (internal quotation marks omitted).

### B. Analysis

Defendants do not move to dismiss all the claims in the Complaint; rather, they seek dismissal only of Plaintiff's claims insofar as they (1) relate to the incidents that occurred in 2008, which, Defendants argue, are barred by the statute of limitation of limitations and/or (2) are brought against Lee, Tokarz, and O'Connor, as to whom, Defendants argue, Plaintiff fails to state a claim.

### 1. Statute of Limitations

To begin, Defendants argue that Plaintiff's claims are time-barred insofar as they relate to conduct that occurred in 2008. (*See* Defs.' Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Mem.") 8–9 (Dkt. No. 60).) Indeed, in New York, "[c]laims under § 1983 are governed by a three-year statute of limitations ...." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015). The date upon which a § 1983 claim accrues, however, "is a question of federal law that is not resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (italics omitted). "A [§] 1983 claim ordinarily accrues when the plaintiff knows or has reason to know of the harm." *Shomo v. City of N.Y.*, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks omitted). Somewhat more specifically, First Amendment retaliation claims typically it accrue at the time that the allegedly wrongful conduct occurred. *Smith v. Campbell*, 782 F.3d 93, 101 (2d Cir. 2015) ("[T]he cause of action [in a First Amendment retaliation claim] accrues when all of the elements necessary to state the claim are present ...."); *see also Turner v. Boyle*, 116 F. Supp. 3d 58, 83–84 (D. Conn. 2015) ("Under federal law, a claim for ... First Amendment retaliation[ ] accrues at the time that the allegedly wrongful conduct took place.").

For his part, Plaintiff relies on the "continuing violation" doctrine to argue that his 2008 claims are timely. (*See* Pl.'s Opp'n 13.) "The continuing violation doctrine is an exception to the normal knew-or-should-have-known accrual date." *Shomo*, 579 F.3d at 181 (internal quotation

marks omitted). It "applies to ongoing circumstances that combine to form a single violation that 'cannot be said to occur on any particular day.'" *Matthews v. Conn. Dep't of Pub. Safety*, No. 10-CV-325, 2010 WL 3984645, at *5 (D. Conn. Oct. 8, 2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002)), *adhered to on reconsideration*, 2011 WL 285868 (D. Conn. Jan. 26, 2011). "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (alterations and internal quotation marks omitted). [12] However, "where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim." *Id.* (alterations and internal quotation marks omitted). "A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation." *Id.* (alterations and internal quotation marks omitted).

**\*11** The continuing violation doctrine is a poor fit for this set of facts: In essence, Plaintiff alleges that "on a[ ] particular day," *Morgan*, 536 U.S. at 115, in 2008, Tokarz, among other things, threatened Plaintiff with a "busted open" head if he continued to file grievances. (*See* Compl. 11; Pl.'s Opp'n 8.) Later, in 2010, Tokarz told Plaintiff to stop filing grievances, and informed him that "inmates never win grievances even if they are in the right." (*See* Compl. 14–15.) These presumed-true instances, troubling though they may be, are best characterized as discrete acts, rather than a continuing violation. *See, e.g., Gonzalez*, 802 F.3d at 222 (finding allegedly retaliatory confinement to SHU on two occasions two years apart each was a discrete act for purposes of continuing violation analysis, and further noting that "the mere fact that the effects of retaliation are continuing does not make the retaliatory act itself a continuing one" (alteration and internal quotation marks omitted)). As such, the law demands the ordinary rule—rather than its "exception," *Shomo*, 579 F.3d at 181—apply, and therefore, Plaintiff's allegations concerning Tokarz's actions in 2008 are time-barred, *see Barnes v. Pozzi*, No. 10-CV-2554, 2012 WL 5451033, at *2 (S.D.N.Y. Nov. 8, 2012) (finding that the continuing violation doctrine could not apply to allegedly retaliatory stays in the SHU where a 19-month gap existed between when the plaintiff was transferred out of that jail and

when he returned, punctuated by five return visits for court appearances, but noting that certain discrete acts occurred after the applicable statute-of-limitations date and considering them as timely).

The same logic applies a fortiori to Plaintiff's allegations that, in 2008, Morris inappropriately touched him, wrote "false ticket[s]," told him that he had better not write any more grievances, and committed other acts of harassment. (*See* Compl. 12.) To the extent that these state a claim under § 1983, there is no indication that theirs is an "ongoing" wrong, sufficient to bring otherwise time-barred § 1983 claims within the palisades of the continuing violation doctrine. *Cf. Shomo*, 579 F.3d at 182 ("To assert a continuing violation for statute of limitations purposes, the plaintiff must allege both the existence of an ongoing policy ... and some non-time-barred acts taken in the furtherance of that policy." (internal quotation marks omitted)).

As one final note, at the risk of breathing further life into tired stereotypes about lawyers' aptitude for math, it appears to the Court that the statute of limitations would bar any claims that accrued before approximately May 30, *2010*—that is, three years before the Complaint was filed. (*See* Dkt. No. 2.) Plaintiff further alleges that O'Connor (1) in late 2009, among other things, told Plaintiff that he needed to "stop writing these complaints," denied his grievance, and told Plaintiff's witness not to get involved, (*see* Compl. 12), and (2) in January 2010, threatened Plaintiff, poked Plaintiff in the cheek, used abusive language toward him, tried to have another inmate rob and assault Plaintiff, and told that inmate to stay away from Plaintiff, (*see id.* 12–13; Pl.'s Opp'n 11.) Therefore, to the extent that these facts state a claim for relief that accrued at that time, they are time-barred. [13]

### 2. Failure to State a Claim

**\*12** As noted, in addition to their timeliness argument, Defendants argue that Plaintiff has failed to state a claim against Lee, Tokarz, and O'Connor. (*See* Defs.' Mem. 4–8.) The Court will address each of these Defendants' individually.

### a. Lee

To begin, Plaintiff offers essentially two categories of allegations with respect to Lee. First, Plaintiff alleges that Lee received certain communications from a number of persons relating to Plaintiff's alleged mistreatment, and, second, Plaintiff indicates that Lee affirmed Plaintiff's flawed disciplinary proceedings. Because each implicates a different set of legal principles, each will be discussed separately.

### i. Communications with Lee

First, Plaintiff's Complaint can be read to state an Eighth Amendment claim against Lee for failing to protect him from assault. (*See* Compl. 13; Pl.'s Opp'n 2–4.) The Eighth Amendment, which prohibits cruel and unusual punishment, requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (same). "To prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff must demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference." *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (citing *Farmer*, 511 U.S. at 834; *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002)); *see also Elleby v. City of N.Y.*, No. 14-CV-1436, 2014 WL 7242899, at *2 (S.D.N.Y. Dec. 16, 2014) ("Specifically in the context of [the objective prong in] a failure-to-protect claim, the inmate must show 'that he was incarcerated under conditions posing a substantial risk of serious harm.' To satisfy the subjective element, the inmate must show that prison officials acted with 'deliberate indifference to inmate health or safety.'" (alteration and citations omitted) (quoting *Farmer*, 511 U.S. at 834, 837).) Likewise, pursuant to the subjective requirement, a defendant "cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer, 511 U.S. at 837*; *see also McKenney v. DeMarco*, No. 13-CV-7270, 2014 WL 6389591, at *4 (E.D.N.Y. Nov. 14, 2014) (same). "A

prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001); *see also Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (same); *Reid v. Nassau Cty. Sheriff's Dep't*, No. 13-CV-1192, 2014 WL 4185195, at *17 (E.D.N.Y. Aug. 20, 2014) (same).

**\*13** Here, Plaintiff alleges that Lee received (1) an "accusatory instrument complaint" and a letter that Plaintiff sent to the "I.G." in Albany, (*see* Compl. 13), (2) Nelson's late August or early September 2010 letter to Lee concerning Morris' threat, (*see id.*; Pl.'s Opp'n 3), (3) Plaintiff's mother's and lawyer's attempts to contact Lee, (*see* Compl. 14), in which he was "informed ... the same Correction Officer staff that were supposed investigate [Plaintiff's] complaints [were] some of the same one[ ]s that [were] violating his rights," (*see id.*), and was further informed about the statement Nelson allegedly overheard, (*see* Pl.'s Opp'n 3–4), and (4) communications from Plaintiff after the September 22, 2010 incident, (*see* Compl. 17; Pl.'s Opp'n 4–5). Additionally, as noted, Plaintiff makes a number of conclusory comments concerning Lee's knowledge of Plaintiff's concern over O'Connor's and Tokarz's conduct. (*See* Compl. 17; Pl.'s Opp'n 2–3.) [14] Finally, the Complaint further indicates that Lee ordered O'Connor to investigate Nelson's letter and the circumstances that led to it. (Pl.'s Opp'n 3.)

Taken together, Plaintiff's allegations concerning the correspondence that Lee received *before* the assault and his subsequent investigatory efforts are sufficient to state a claim for failure to protect in violation of the Eighth Amendment. "Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." *Beckles*, 2008 WL 821827, at *17*; *see also Stephens v. Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) ("Courts have found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." (internal quotation marks omitted)), *adopted by 2016 WL 1047388* (S.D.N.Y. Mar. 10, 2016). Indeed, they appropriately do

so in cases where that assault was allegedly committed by another prison official. *See* Breckles, 2008 WL 821827, at *18 (denying summary judgment to sergeant when the plaintiff told the sergeant that he feared certain officers would assault him, the plaintiff described those officers' threatening behavior, and the sergeant said he would check on the plaintiff but did not so); *Brewer v. Jones*, No. 02-CV-3570, 2003 WL 22126718, at *5 (S.D.N.Y. Sept. 12, 2003) (denying summary judgment partially on the grounds that a "genuine issue of material fact exist [ed] with respect to whether [one] defendant ... was aware that a substantial risk of harm to the plaintiff existed as he was being escorted to and from the infirmary," where the plaintiff was allegedly punched on the way to the infirmary and assaulted on the way back); *cf. Torres v. Mazzuca*, 246 F. Supp. 2d 334, 339 (S.D.N.Y. 2003) (finding no failure-to-protect claim in connection with alleged assault by prison guard where there were "no facts that show [the defendant] played a part in the [i]ncident or that he had knowledge of, or reason to have knowledge of, any danger to [the plaintiff] prior to the [i]ncident that could place particular responsibility on [the defendant] for protecting [the plaintiff] from the [i]ncident").

**\*14** If Plaintiff's allegations are taken as true, Lee did not simply receive complaints relating to Plaintiff's treatment, but rather read correspondence that allegedly indicated that if Plaintiff, as identified by his cell number, "ke[pt] writing [Morris] up," Plaintiff would "find himself in the hospital," and then commissioned an investigation. (*See* Compl. 13; *see also* Pl.'s Opp'n 3.) Rather than successfully resolving that situation, the same officer who threatened Plaintiff not long thereafter pointed him out to another officer who feigned discovering a weapon on Plaintiff before beginning an assault. (Compl. 16.) Indeed, assuming the truth of his submissions, Plaintiff is correct in his contention that "it cannot be seriously argued that Supt. Lee did not have actual and prior knowledge of a substantial risk of serious harm to Plaintiff." (Pl.'s Opp'n 4.) This is sufficient for Plaintiff's claim against Lee to go forward. *Cf. Torres*, 246 F. Supp. 2d at 339 (finding no failure to protect claim in the absence of "facts that show [the defendant] played a part in the [i]ncident or that he had knowledge of, or reason to have knowledge of, any danger to [the plaintiff] prior to the [i]ncident that could place particular responsibility on [the defendant] for protecting [the plaintiff] from the [i]ncident"). [15]

### ii. Affirmed Disciplinary Proceedings

Plaintiff's second theory of liability for Lee is that he affirmed the flawed disciplinary proceedings against Plaintiff. (*See* Compl. 17.) Although Defendants argue that Plaintiff "fails to state a claim" upon this theory because "courts have dismissed such claims based on the bare and conclusory allegation that a defendant violated a plaintiff's constitutional rights simply by affirming a disciplinary hearing disposition," (Defs.' Mem. 5–6), the analysis turns on whether such affirmation can establish personal involvement in the underlying wrong.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (internal quotation marks omitted)); *Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (some internal quotation marks omitted) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *3 (S.D.N.Y. July 25, 2014) (dismissing § 1983 claims where the complaint contained "no allegations whatsoever indicating that [the defendants] were personally involved in the purported violations" of the plaintiff's constitutional rights). Relatedly, "[i]n an action under 42 U.S.C. § 1983, defendants cannot be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at *7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in other words, "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Iqbal*, 556 U.S. at 676; *see also Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) ("Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." (internal quotation marks omitted)).

**\*15** "Before *Iqbal*, the most important case in this Circuit regarding the evidence required to establish the personal involvement of a supervisory official was *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)." *Haynes v. Mattingly*, No. 06-CV-1383, 2014 WL 4792241, at \*7 (S.D.N.Y. Sept. 24, 2014), *aff'd*, (2d Cir. Oct. 27, 2015). Under the framework set forth in that case, courts find personal involvement of a supervisory defendant where the plaintiff shows that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (italics omitted) (quoting *Colon*, 58 F.3d at 873); *see also Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Colon*, 58 F.3d at 873) (same). Since then, the Second Circuit has recognized that the "[*Iqbal*] decision ... may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," *Grullon*, 720 F.3d at 139; however, "[it] has thus far declined to resolve the question," *Goldner v. City of New London*, No. 14-CV-173, 2015 WL 1471770, at \*7 (D. Conn. Mar. 31, 2015); *see also Fortunato*, 2015 WL 5813376, at \*6 (noting that "the continuing validity of the *Colon* factors has been called into question by the Supreme Court's ruling in *Iqbal*").

Interestingly, "[c]ourts within the Second Circuit are split over whether ... an allegation [that a defendant affirmed a disciplinary proceeding] is sufficient to establish personal liability for supervisory officials." *Scott v. Frederick*, No.

13-CV-605, 2015 WL 127864, at \*17 (N.D.N.Y. Jan. 8, 2015). On the one hand, some courts have concluded that merely affirming a disciplinary proceeding is not enough to create personal involvement, while others have determined that it is. *Compare id.* ("We subscribe to the affirmance-plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement."); *Hinton v. Prack*, No. 12-CV-1844, 2014 WL 4627120, at \*17 (N.D.N.Y. Sept. 11, 2014) (same); *and Brown v. Brun*, No. 10-CV-397, 2010 WL 5072125, at \*2 (W.D.N.Y. Dec. 7, 2010) (noting that "there is an apparent split in the Circuit as to whether the affirmance of disciplinary hearing disposition is sufficient to establish personal involvement," and concluding that "[t]he distinction ... appears to be that while personal involvement cannot be founded solely on supervision, liability can be found if the official proa[c]tively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results" (internal quotation marks omitted)) *with Murray v. Arquitt*, No. 10-CV-1440, 2014 WL 4676569, at \*12 (N.D.N.Y. Sept. 18, 2014) ("The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement."); *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011) ("[I]t cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of [the] [p]laintiff ['s] due process rights, thus continuing a deprivation of liberty without due process of law"); *and Thomas v. Calero*, 824 F. Supp. 2d 488, 508 (S.D.N.Y. 2011) (finding personal involvement of a prison official who affirmed a hearing determination with only a modification of the penalty).

**\*16** The Court thinks the better view is that an affirmance of an unconstitutional disciplinary proceeding is itself sufficient to find personal involvement. This is so for several reasons. First, on a simple conceptual level, it is difficult to imagine how a prison official could be deemed uninvolved where that official considered the inmate's objections and had the power to undo or preserve punishment, that, allegedly, was improperly imposed. *Cf. Tolliver v. Lilley*, No. 12-CV-971, 2014 WL 10447163, at \*12 (S.D.N.Y. Oct. 24, 2014) (finding personal involvement where a prison official "reviewed" and "acted on" an inmate's grievance), *adopted sub nom Tolliver v. Skinner*, 2015 WL 5660440 (S.D.N.Y. Sept. 25, 2015). Second, the Court does not think there is

any tension between such a determination and *Iqbal*, the relevant teaching of which was that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Third, if *Colon* indeed survived *Iqbal*, the Court finds it telling that the Second Circuit has held that personal involvement could be found where "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," without further clarifying that "fail[ing] to remedy the wrong" is not enough where the defendant also affirmed the decision. *See Colon*, 58 F.3d at 873. Therefore, the Court declines to dismiss the claims against Lee for failure to state a claim due to lack of personal involvement with respect to his affirmance of the disciplinary proceeding.

### b. Tokarz

Next Plaintiff's alleges that Tokarz made a number of threats to discourage him from filing grievances, and, further, failed to protect him despite knowing about Morris' statement. (*See* Compl. 14–15; Pl.'s Opp'n 7–8, 12.) Defendants move to dismiss Plaintiff's claim against Tokarz because, they say, Plaintiff alleged "mere verbal threats and harassment," which, they indicate, fail to state a claim for a constitutional violation. (*See* Defs.' Mem. 6–7.) Similarly, they argue that Plaintiff's allegations that he told Tokarz about the comments that Nelson overheard Morris make cannot form the basis of a failure-to-protect claim for the same reasons that, as they argued, Plaintiff failed to state such a claim against Lee. (*See* Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 6 (Dkt. No. 69).) [16]

### i. First Amendment Retaliation

**\*17**  At the outset, it bears noting that Plaintiff makes essentially two sets of allegations against Tokarz: first, Tokarz threatened him in 2008 over Plaintiff's filing of grievances, (*see* Compl. 11–12; Pl.'s Opp'n 8), and, second, that Tokarz discouraged Plaintiff from writing grievances, telling him that inmates never win, (*see* Compl. 14–15). For the reasons discussed earlier, Plaintiff's allegations against Tokarz from 2008 are time-barred, and the Court thus confines its inquiry to the conduct in 2010. As told by Plaintiff, in 2010, Tokarz summoned Plaintiff into a room in the Administration Building, where Tokarz asked

Plaintiff what happened between him and Morris, made a number of "bias[ed] statements" concerning Plaintiff's grievances, told Plaintiff to stop writing grievances, as "inmates never win grievances even if they are in the right," and then said it was Tokarz's last day of work for the week and that he would handle things his way before coming back the following week. (*See* Compl. 14–15.)

To the extent that Tokarz's conduct on this occasion implicates a § 1983 cause of action, it is First Amendment retaliation. "To state a First Amendment retaliation claim ..., a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015); *Ramrattan v. Fischer*, No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same). The Second Circuit has made clear that courts are to "approach prisoner retaliation claims 'with skepticism and particular care,' +" because "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003); *see also Dolan*, 794 F.3d at 295 (same); *Corley v. City of N. Y.*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30, 2015) (same).

"It is well-established that inmates' filing of grievances is a constitutionally protected exercise of their right under the First Amendment to petition the government for the redress of grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16, 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996); *Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010)). However, with respect to the second prong, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). A corollary of that proposition, however, is that the "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[T]he fact that a particular plaintiff ...

responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *see also Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (internal quotation marks omitted) (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))). In considering these principles, courts have found that, while verbal threats may qualify as adverse action, they must be "sufficiently specific and direct" to be actionable. *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted)); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action ... depend[ing] on their specificity and the context in which they are uttered").

**\*18** Here, to the extent that Tokarz's words can be considered a threat at all, they are not sufficiently specific or direct. To the contrary, Tokarz apparently only told Plaintiff that grievances were unlikely to succeed and said that he would handle things "his way." (*See* Compl. 14–15.) The Court recognizes that Plaintiff alleges that Tokarz had earlier told Plaintiff that the next time that the two saw one another about a grievance, Plaintiff would "end up with [his] head bust [sic] open and in the SHU." (*Id.* at 15.) And, in his Opposition, Plaintiff notes that "[t]he very next time Lt. Tokarz saw Plaintiff it was in connection with a grievance filed against C.O. Morris." (Pl.'s Opp'n 8.) These facts, no doubt, add to the menacing quality of Tokarz's words. Nevertheless, so long as the putative threat's directness and specificity matter, *see Mateo*, 2013 WL 3863865, at *5, it is difficult to understand how Plaintiff's claims against Tokarz are sufficient, *cf. Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted)); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that "me and my boys ... going to get you" while brandishing a copy of a grievance); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the

defendant's] comment ... that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his ... comment that "[y]ou're not the only one who can write. I'm willing to bet you'll break or get broke up', was a 'direct' nor 'specific' threat." (alterations and citations omitted)"), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012). Therefore, because the facts as alleged, while "consistent with" Plaintiff's entitlement to relief, nonetheless do not "plausibly suggest" it, Plaintiff's claim against Tokarz must be dismissed. Nevertheless, the Court grants Plaintiff leave to amend his Complaint to allege further relevant facts, to the extent that he is able to do so.

### ii. Failure To Protect

Plaintiff also claims that Tokarz violated Plaintiff's rights under the Eighth Amendment by failing to protect Plaintiff despite being told about Morris' alleged statement. (*See* Compl. 14–15; Pl.'s Opp'n 8, 12.) As with Plaintiff's analogous claim against Lee, Plaintiff's failure-to-protect claim against Tokarz is sufficient to survive a motion to dismiss. For the reasons explained earlier, it is sufficient at this stage that Plaintiff (1) relayed Morris' putative statement as told by Nelson to Tokarz, (2) told Tokarz that he feared for his safety, and (3) was told that Tokarz would "handle things," albeit his way. *See Beckles*, 2008 WL 821827, at *18 (denying summary judgment on failure-to-protect claim where "[the] [p]laintiff ... identified the specific officers that he feared," "describ[ed] their threatening behavior," and "refus[ed] to return to the cell block," but was "assur[ed] ... that he had nothing to fear and [was] [sent] ... back to his cell block"). [17]

### c. O'Connor

**\*19** Finally, Plaintiff also makes a number of assertions concerning O'Connor's conduct, at least some of which are fairly construed as alleging that O'Connor violated Plaintiff's Eighth Amendment rights by failing to protect him from Morris' attack. (*See* Compl. 13–14; Pl.'s Opp'n 3–4, 10–14.) Defendants move to dismiss Plaintiff's claims against O'Connor arguing that (1) his alleged threats and verbal harassment do not amount to a constitutional violation, (2) the occasion upon which he poked Plaintiff in the cheek amounted to, at most, a de minimis use of force, insufficient to amount to an excessive force claim,

(3) the allegation that O'Connor "tried to get another inmate to rob and assault" Plaintiff is too conclusory and fails to state a claim without an accompanying injury alleged, and (4) Plaintiff's allegations that O'Connor conducted investigations of his complaints in an unfair manner did not rise to the level of constitutional violation, and, further, entailed no accompanying injury. (*See* Defs.' Mem. 7–8.) With respect to the first three, the Court has already dismissed any claims that arose in connection with those occurrences as time-barred. With respect to Plaintiff's allegations concerning the manner in which O'Connor conducted his investigations, however, Plaintiff has, in fact, stated a claim.

To begin, it merits clarification that, between his Complaint and Opposition, Plaintiff makes two non-time-barred sets of allegations concerning O'Connor's investigation into Plaintiff's claims—one before the assault, (*see* Compl. 13; Pl.'s Opp'n 3), and one around the time of the assault, (*see* Pl.'s Opp'n 10–11). With respect to the former, Plaintiff has successfully stated a claim for relief. Although Defendants' Motion does not address them, a number of statements appear in Plaintiff's Complaint—and, subsequently, his Opposition—that give rise to a failure-to-protect claim. As Plaintiff tells it, sometime after Nelson wrote a letter telling Lee about Morris's statements relating to Plaintiff but before the assault, Lee dispatched O'Connor to investigate the letter and the circumstances that led to its writing. (Compl. 13; Pl.'s Opp'n 3.) Plaintiff further alleges that O'Connor called Nelson down to the sergeant's office, but, rather than actually investigating the incident, he tried to intimidate Nelson, and asked him questions unrelated to the issue at hand, as though O'Connor were trying to prevent Nelson from saying what he heard Morris say. (*See* Compl. 13–14; Pl.'s Opp'n 3.) If true, which the Court of course must take it to be, this assertion makes out a failure-to-protect claim for the same reasons as the allegations against Lee and Tokarz. *See Beckles*, 2008 WL 821827, at *18 (denying summary judgment on failure-to-protect claim where "[the] [p]laintiff ... identified the specific officers that he feared," "describe[ed] their threatening behavior," and "refus[ed] to return to the cell block," but was "assur[ed] ... that he had nothing to fear and [was] [sent] ... back to his cell block").

The second set of allegations, however, appears for the first time in Plaintiff's Opposition. As recounted therein, O'Connor allegedly came to Plaintiff's cell, and Plaintiff told O'Connor that Plaintiff feared for his safety, in part, because of O'Connor. (Pl.'s Opp'n 11.) According to Plaintiff, O'Connor "did not indicate that he was at Plaintiff's cell to discuss the grievance filed by Plaintiff," and that "[i]t appears that Sgt. O'Connor lied to Lt. Laporto telling him (Laporto) that he did go to Plaintiff's cell to discuss the grievance, which he did not do." (*Id.*) As noted, although Plaintiff does not ascribe a date to this event, he describes it immediately after citing to an exhibit which he characterizes as "video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22, 2010." (*Id.* at 10.) However, a review of the Complaint reveals no allegations relating to such a visit, very arguably with the possible exception of the last two lines of the Complaint, which read:

> Also I informed Superintendent William A. Lee about sending Sgt. O'Connor to investigate my grievances, when he, Sgt. O'Connor, is one of the security staff members that I was having problems with and that I had written grievances on him previously. He was part of the retaliation. Supt. William Lee knew that this could be a security risk, when it came to my safety.

**\*20** (Compl. 17.) While this sentence may contemplate an occasion upon which O'Connor visited Plaintiff's cell, it certainly does not reveal an effort by Plaintiff to assert a claim against O'Connor. That observation, coupled with the fact that this visit, as described in Plaintiff's Opposition, was a matter as to which O'Connor evidently reported to someone named Lt. Laporto, (*see* Pl.'s Opp'n 11), strongly suggests that it did not form the basis of a claim in Plaintiff's original Complaint. Therefore, to the extent that Plaintiff attempts to make out a claim for relief against O'Connor on the basis of the visit, it is a "new claim[ ] not specifically asserted in the complaint [,] [which] may not be considered by courts when deciding a motion to dismiss." *Bernstein v. City of N.Y.*, No. 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (alteration and internal quotation mark omitted). Therefore, the Court cannot infer a new claim for relief rooted in these facts at this time.

## III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion in part, and dismisses Plaintiff's claims to the extent that they are rooted in conduct barred by the statute of limitations, and Plaintiff's claims against Tokarz for First Amendment retaliation. These dismissals are without prejudice, meaning that Plaintiff will be given an opportunity to amend his Complaint, but he must do so within 30 days. In particular, because Defendants did not seek dismissal of Plaintiffs claims from 2009 and early 2010, the Court invites Plaintiff to set forth in his Amended Complaint any facts sufficient to conclude that they are timely in his Amended Complaint. Defendants' Motion is in all other respects denied.

The Clerk of the Court is respectfully requested to terminate the pending Motion. (See Dkt. No. 58.)

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 1267799

Footnotes

1   Fischer's name is misspelled as "Fisher" in the Complaint. (*See* Defs.' Mem. of Law in Supp. of their Mot. to Dismiss ("Defs.' Mem.") 1 n.1 (Dkt. No. 60).)

2   In their Memorandum of Law, Defendants allude to Plaintiff's "Amended Complaint," which, they indicate, bears ECF-generated page numbers. (*See* Defs.' Mem. 2. n.2.) However, no Amended Complaint has been filed on ECF (nor has one been filed with the Court in any other form), and the Court assumes this was a simple typographical error on Defendants' part.

3   Because certain pages of the Complaint either lack a page number or share the same page number as others in the Complaint, this Opinion will cite to the page numbers as designated by ECF in the upper right-hand corner of the page.

4   In quoting Tokarz, Plaintiff variously uses both the first-and second-person pronouns. Context suggests, however, that both were intended to refer to Plaintiff. (*See* Compl. 11.)

5   At the time of resolution of this Motion, Plaintiff's Opposition submission did not appear on the docket. His submission to chambers, however, is being docketed simultaneously with the issuance of this Opinion.

6   The Court surmises that the "I.G." is the inspector general. (*Cf.* Pl.'s Opp'n Ex. E (including letter from Plaintiff's mother directed to the "Inspector's General Office").)

7   In connection with his Opposition to Defendants' Motion To Dismiss, Plaintiff submitted certain cassette tapes to the Court, which purport to be a "hearing tape confirming what inmate Nelson had overheard." (Pl.'s Opp'n 3.) In his materials to the Court, Plaintiff submitted a sheet of paper labeled "Exhibit D," to which Plaintiff attached a letter that read:
    "Enclosed in the package is video cassette tape from Mr. Nelson's testimony and video tape with testimony from Sgt. O'Connor. I was unable to find anyone who has the old equipment in order for me to pinpoint where the testimony began + ended for each testimony presented in this case. We were also only given one copy of each so we were unable to send to attorney general's office. Thank you."
    In addition, Plaintiff also enclosed as Exhibit M certain cassette tapes, which he describes as "video tape of O'Connor when he was sent to investigate Plaintiff's grievance on Sept. 22, 2010." (Pl.'s Opp'n 10.)
    Before filing his Opposition, Plaintiff submitted a letter to the Court indicating that he "ha[d] cassette tapes [that] [he] want[ed] to send with [his] [Opposition]," but that he did not have any copies to send to the Attorney General or to keep for himself. (Letter from Pl. to Court (July 17, 2015) (Dkt. No. 65).) Counsel for Defendants responded, indicating that, if Plaintiff was referring to tapes of his Tier III disciplinary hearing, there was no need to provide copies, but that, "[i]f [P]laintiff is referring to some other tapes, he should advise [D]efendants." (Letter from Defs. to Court (July 31, 2015) (Dkt. No. 68).) Despite the fact that the tapes Plaintiff submitted are apparently something other than footage of his disciplinary hearing, as far as the Court can tell, he did not advise Defendants. Defendants, in their reply, indicated that Plaintiff did not sufficiently describe the tapes for Defendants to obtain copies, and accordingly requested an opportunity to examine the evidence and file a sur-reply were the Court to rely on them. (Defs.' Reply Mem. of Law in Supp. of their Mot. To Dismiss ("Defs.' Reply") 6 n.5 (Dkt. No. 69).) The Court has, however, concluded that there is no need to rely on the tapes to decide the Motion.

8   In support of this proposition, Plaintiff cites two exhibits attached to his Opposition. These exhibits are statements from other inmates alleging that O'Connor referred to Plaintiff by derogatory names, and further discouraged them from associating with him. (*See* Pl.'s Opp'n Ex. I, J.)

9   In his Opposition, Plaintiff refers to this as a "letter from Supt. Lee affirming Plaintiff's hearing." (Pl.'s Opp'n 4.)

2016 WL 1267799

10  In support of this statement, Plaintiff cites Exhibit L, which he describes as "Laporto decision of incident regarding Sgt. O'Connor." (Pl.'s Opp'n 8.) The packet of exhibits submitted to the Court, however, does not appear to include an Exhibit L. Nevertheless, because these allegations, for reasons to be explained, are infirm regardless of the contents of Exhibit L, its omission makes no difference.

11  As submitted to the Court, Plaintiff's letter to Seidler was not included as part of Exhibit A.

12  It merits observation that courts have not seen it as a foregone conclusion that the continuing violation doctrine, which was developed in the context of Title VII claims, could even apply to § 1983 First Amendment retaliation claims. *Compare Matthews*, 2010 WL 3984645, at *6 (noting that "[n]either the Supreme Court nor the Second Circuit has had occasion to consider whether the continuing violation doctrine can be applied to a First Amendment retaliation claim brought under § 1983" but finding "no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983, including First Amendment retaliation claims") *with Gierlinger v. Town of Brant*, No. 13-CV-370, 2015 WL 269131, at *7 n.8 (W.D.N.Y. Jan. 21, 2015) ("Although not raised by [the] defendants, I question whether the continuing violation doctrine can even apply here to [the] plaintiffs' claims of First Amendment retaliation which do not arise from their employment or from complaints of discrimination.").

However, the Second Circuit's recent decision in *Gonzalez v. Hasty* provides some support for the notion that there is no per se bar to applying the continuing violation doctrine to non-employment-based § 1983 First Amendment retaliation claims: There, the plaintiff inmate attempted to save his otherwise untimely First Amendment retaliation claims through the continuing violation doctrine, but the Second Circuit rebuffed his efforts, not on the grounds that the doctrine was wholly inapplicable, but rather because he had not sufficiently alleged any retaliatory decisions after the statute-of-limitations cutoff date. *Gonzalez*, 802 F.3d at 222 ("[The plaintiff] might have had a timely First Amendment claim against ... the ... defendants to the extent that they made periodic retaliatory decisions to maintain [him] in the SHU after the cutoff date. But he does not allege that ... any of the ... defendants' periodic decisions not to release him from the SHU were motivated by such retaliation." (footnote omitted)).

13  As a matter of doctrinal purity, the Court notes that Defendants incorrectly rely on Rule 12(b)(1). (*See* Defs.' Mem. 1.) However, an expired statute of limitations in a § 1983 lawsuit is not jurisdictional issue. *See, e.g., Khudan v. Lee*, No. 12-CV-8147, 2015 WL 5544316, at *2 (S.D.N.Y. Sept. 17, 2015) (referring to the defendants' statute of limitations defense as "not jurisdictional"); *Jefferson v. Kelly*, No. 06-CV-6616, 2008 WL 1840767, at *4 (E.D.N.Y. Apr. 22, 2008) ("The court is cognizant of the fact that a statute of limitations is not jurisdictional ...."). Because Defendants raised the statute of limitations issue, but appear simply to have whiffed on the question of which claims are time-barred, and because that issue is plain from the face of Plaintiff's Complaint, which, in any event, the Court grants Plaintiff leave to amend, the Court declines to consider Plaintiff's allegations from 2009 and from the untimely portion of 2010. *See Milan v. Wertheimer*, 808 F.3d 961, 963–64 (2d Cir. 2015) (affirming sua sponte dismissal of untimely § 1983 claims in pro se complaint); *Clemmons v. Holder*, No. 13-CV-7229, 2015 WL 4894184, at *6 (E.D.N.Y. Aug. 17, 2015) (dismissing sua sponte claim against certain defendants in light of the statute of limitations, when certain other defendants had moved for dismissal on such ground).

14  These statements, however, are too vague. Indeed, as the Supreme Court has made clear, "conclusory ... allegations" are "disentitle [d] ... to the presumption of truth." *Iqbal*, 556 U.S. 681; *see also Shepherd v. Fischer*, No. 10-CV-1524, 2015 WL 1246049, at *13 (N.D.N.Y. Feb. 23, 2015) (rejecting as "appear[ing] to assert a non-cognizable constitutional claim or ... [as] vague and conclusory" certain claims against [the department of corrections commissioner] where the plaintiff alleged that he "[was] aware" of certain problems at a facility (internal quotation marks omitted)), *adopted by* 2015 WL 1275298 (N.D.N.Y. Mar. 18, 2015); *Vann v. Fischer*, No. 11-CV-1958, 2012 WL 2384428, at *6 (S.D.N.Y. June 21, 2012) (dismissing claims against department of corrections commissioner for lack of personal involvement where the plaintiff alleged that the commissioner "ha[d] knowledge of actions taken" (first alteration in original) (internal quotation marks omitted)). Similarly, the latter is insufficient, as Second Circuit law has long taught that "merely recit[ing] the legal elements of a successful § 1983 claim for supervisory liability ... does not meet the plausibility pleading standard." *Dotson v. Farrugia*, No. 11-CV-1126, 2012 WL 996997, at *6 (S.D.N.Y. Mar. 26, 2012), *reconsideration denied*, 2012 WL 1864278 (S.D.N.Y. May 22, 2012); *see also Lindsey v. Butler*, 43 F. Supp. 3d 317, 329 (S.D.N.Y. 2014) ("Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient ...." (internal quotation marks omitted)), *reconsideration granted in part on other grounds*, No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014), *reconsideration denied*, 2015 WL 1501625 (S.D.N.Y. Apr. 1, 2015); *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) ("To the extent [the plaintiff] may argue that [two of the defendants] failed to properly supervise subordinates who were violating her rights, the mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." (internal

quotation marks omitted)). Thus, to the extent that Plaintiff's allegations contravene these rules, they cannot make out a claim of personal involvement.

15    An important distinction is to be drawn between this case, and those many other cases in which a prisoner alleges that he complained to a prison official concerning some issue, but that that official took no action. In those cases, personal involvement is, quite frequently, found wanting. *See, e.g., Whitenack v. Armor Med.,* No. 13-CV-2071, 2014 WL 5502300, at *6 (E.D.N.Y. Oct. 30, 2014)* ("Since [the] plaintiff has pled no facts, beyond [the sheriff's] presumed receipt of grievances and his position atop the correctional center ...., [the plaintiff] has failed to plausibly plead [the sheriff's] personal involvement in any infringement of [the plaintiff's] constitutional rights." (alterations and internal quotation marks omitted)); *Rivera v. Bloomberg,* Nos. 11-CV-629, 11-CV-4325, 2012 WL 3655830, at *10 (S.D.N.Y. Aug. 27, 2012)* (concluding that the "[p]laintiffs [did] not ple[a]d facts sufficient to demonstrate that [one defendant] was personally involved in the alleged violation of their constitutional rights," despite allegation that the "[p]laintiffs [had] informed [her] of their claims"); *Moor v. Fischer,* No. 10-CV-4038, 2011 WL 2988527, at *2 (S.D.N.Y. July 22, 2011)* (dismissing Lee from a separate action involving excessive force claim where the "[p]laintiff allege[d] that he grieved to Superintendent Lee in connection with the claimed incident," but finding that "insufficient to establish that Lee was responsible for the underlying incident, [the] plaintiff's resulting injuries, or his subsequent treatment or lack thereof," reasoning that "[t]he mere receipt of a letter, complaint[,] or grievance from an inmate is insufficient to establish a claim of personal involvement by a correctional supervisor"). Here, the information that Lee allegedly received described the alleged misconduct with much greater specificity.

16    Defendants also assert that certain of Plaintiff's allegations concerning Tokarz, among other Defendants, are too conclusory to pass muster. (*See, e.g.,* Defs.' Mem. 4.) While Defendants are no doubt correct about many of them, (*see, e.g.,* Pl.'s Opp'n 8 ("Lt. Tokarz condoned his subordinates['] behavior repeatedly.")), the Court nonetheless decides that Plaintiff has adequately stated at least some claim against each of the Defendants in this case. Because the purpose of a Motion to Dismiss is to test the legal *sufficiency* of a claim, *see, e.g., Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705, 729 (2d Cir. 2013)* (noting that the court "test[s] the sufficiency of a complaint by a familiar standard" before describing the *Twombly* standard), rather than its necessity, the Court declines to embark upon the extracurricular caper of identifying conclusory allegations on a line-by-line basis. Indeed, such an exercise would more appropriately be pursued via a motion to strike. *Cf. SRSNE Site Grp. v. Advance Coatings Co.,* No. 12-CV-443, 2014 WL 671317, at *1 (D. Conn. Feb. 21, 2014)* (noting that the defendant "'move[d] to dismiss' one of the forms of relief requested by [the] [p]laintiffs," but that "[s]uch a motion is not properly a motion to dismiss and is more properly styled as a motion to strike"); *Feiner v. SS & C Techs.,* 11 F. Supp. 2d 204, 210 n.8 (D. Conn. 1998)* (noting, in context of motion to dismiss the plaintiff's claims that a prospectus contained materially false statements or omissions, that the court "decline[d] to address the materiality of every allegation in the complaint" because "[t]o do so would sua sponte convert defendants' motions to dismiss into motions to strike" (italics omitted)). However, while, under Rule 12(f), a court may indeed "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," Fed. R. Civ. P. 12(f), motions to strike are "generally disfavored and granted only if there is a strong reason to do so," *Neogenix Oncology, Inc. v. Gordon,* No. 14-CV-4427, 2015 WL 5774171, at *6 (E.D.N.Y. Sept. 29, 2015); *see also Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Research,* No. 15-CV-2044, 2016 WL 205445, at *8 (S.D.N.Y. Jan. 15, 2016)* (indicating that Rule 12(f) motions "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation" (internal quotation marks omitted)). For that reason, the Court will not strike these allegations pursuant to Fed. R. Civ. P. 12(f) either.

17    Defendants may, the Court suspects, write off as mere sophistry the notion that Tokarz, by saying that he would "take care of things," really endeavored to reassure Plaintiff, and conclude that, consequently, Plaintiff's claim comes closer to that class of cases where a prison official failed to act upon a Plaintiff's complaint, which is insufficient to establish that defendant's personal involvement. *See, e.g., Johnson v. Goord,* No. 01-CV-9587, 2004 WL 2199500, at *7 (S.D.N.Y. Sept. 29, 2004)* ("[T]he receipt of letters or grievances or complaints from inmates is insufficient to impute personal involvement."). Nevertheless, such assurances are not legally required; rather, "[t]o prevail on a claim that officials have failed to protect an inmate from harm, a plaintiff [need instead] demonstrate that, objectively, the conditions of his incarceration posed a substantial risk of serious harm and, subjectively, that the defendant acted with deliberate indifference." *Beckles* 2008 WL 821827, at *17. In meeting this test, it of course cannot be said that the officer who disingenuously or even falsely says he will "take care of things" is less likely to have acted with the proscribed subjective intent than his counterpart who says the same thing sincerely.

2016 WL 1267799

It perhaps merits mention, however, that it is not entirely clear from Plaintiff's Complaint that he told Tokarz about what Plaintiff heard from Nelson. Had he not, that could be a problem because, while "the policy reasons favoring liberal construction of pro se complaints permit a court to consider allegations of a pro se plaintiff in opposition papers on a motion where ... consistent with the complaint," *Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 247 (S.D.N.Y. 1998) (italics omitted), "new claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss," *Bernstein v. City of N.Y.*, No. 06-CV-895, 2007 WL 1573910, at *10 (S.D.N.Y. May 24, 2007) (alteration and internal quotation marks omitted). Nevertheless, in his original Complaint, Plaintiff alleges that, on September 10, 2010, "[Tokarz] asked ... what happened with [Plaintiff] and C.O. Morris," and that "[Plaintiff] told him what was going on." (Compl. 16.) Informal though this statement is, it plausibly could be construed to suggest that Plaintiff described what he understood Morris to have said.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 5416505
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Hilary Best, Plaintiff,
v.
Warden Clarence Newton, Captain
Morris, and Captain Martin, Defendants.

15 Civ. 4316 (ER)
|
Signed 09/28/2016

**Attorneys and Law Firms**

Hilary Best, Forest Hills, NY, pro se.

Daniel Guillermo Saavedra, New York City Law
Department, New York, NY, for Defendants.

**OPINION AND ORDER**

Ramos, D.J.

**\*1** *Pro se* Plaintiff Hilary Best brings this action
against Defendants Warden Clarence Newton ("Warden
Newton"), Captain Morris ("Morris"), and Captain
Martin ("Martin") for alleged violations of his
constitutional rights during disciplinary proceedings that
took place while Plaintiff was confined at the Otis Bantum
Correctional Center ("OBCC").

Before the Court is Warden Newton's motion to dismiss
pursuant to Federal Rule of Civil Procedure 12(b)(6)
(Doc. 15). [1] For the reasons discussed below, Warden
Newton's motion to dismiss is GRANTED.

**I. Factual Background** [2]
On April 2, 2012, while a pre-trial detainee at OBCC,
Plaintiff was assaulted by another inmate in an
unprovoked attack. Pl. Opp. at ¶ 7; Compl. at 3. Officer
Bellino, who claimed to have witnessed the altercation,
wrote and signed a Report and Notice of Infraction
that day charging Plaintiff with fighting in violation of
Department of Corrections ("DOC") regulations. *Id.*

Inmate disciplinary infractions are processed pursuant
to The City of New York DOC's Inmate Disciplinary
Due Process Directive, a detailed and comprehensive
process for both the disciplinary hearing and the
appeals process. [3] Directive 6500R-B states that once an
employee prepares a Report and Notice of Infraction, the
employee must notify a supervising officer to conduct an
investigation. Directive 6500R-B at 1. At the conclusion
of the investigation, the investigating supervisor must
write an official report and give notice to the inmate
of any resulting infraction, no later than three business
days after the incident. *Id.* at 2. If the supervisor decides
there is reasonable cause to proceed with a hearing, the
inmate must be served with a copy of the Report and
Notice of Infraction at least twenty-four hours before the
commencement of the hearing. *Id.* at 3. The inmate will
also be asked to sign the Report and Notice of Infraction
as proof of receipt. *Id.* If on the day of the hearing the
inmate has not been served, the Captain overseeing the
hearing will personally serve the inmate with a copy and
adjourn the hearing until the twenty-four hour notice
period has elapsed. *Id.* at 3, 9.

**\*2** At the disciplinary hearing, the inmate is afforded
several rights, including the right to appear, make
statements, present material evidence, and present
witnesses. *Id.* at 10. Although the Captain should make
reasonable efforts to conclude the hearing in one session,
adjournments may be granted if an inmate requests
additional time to locate witnesses or prepare his defense.
*Id.* at 16. When a case is adjourned, the adjournment
and the underlying reason for it must be stated on the
record and noted on the Hearing Report and Notice
of Disciplinary Disposition. *Id.* A disposition must be
reached within five days after the conclusion of the hearing
and a copy of the disposition must be served on the inmate
within one business day. *Id.* at 17.

An inmate who is found guilty at a disciplinary hearing
has the right to appeal an adverse decision within two
business days of receipt of the Notice of Disciplinary
Disposition. *Id.* at 11. An appeal is filed by submitting
Form 6500H. *Id.* at 19, Attachment H. If the inmate
is given a penalty of less than thirty days in punitive
segregation, the inmate must appeal to the Commanding
Officer of the Institution in which the infraction occurred.
*Id.* at 20. If an inmate is given a penalty of thirty days or
more in punitive segregation, the inmate must appeal to
the General Counsel. *Id.* A decision on the appeal must be

rendered and delivered to the inmate within five business days after receipt of the appeal by the Warden or General Counsel. *Id.* If an inmate's appeal is not decided within ten business days after the appeal is submitted, the inmate may file an Article 78 proceeding. *Id.*

Plaintiff's disciplinary hearing was held on April 10, 2012. Compl. at 3 At the hearing, over which Martin presided, Plaintiff told Martin, that he had not been served a copy of the infraction report. *Id.* Martin then served Plaintiff with a copy of the report and adjourned the hearing to give Plaintiff the required twenty-four hours to review the charge. *Id.*

The next day, on April 11, 2012, the hearing was recommenced, at which time Plaintiff told Martin that the handwriting on the infraction report, presumably prepared by Officer Bellino, and the handwriting of the investigating captain, Morris, appeared to be identical. *Id.* Plaintiff requested that both Officer Bellino and Morris be produced as witnesses at the hearing. *Id.* Plaintiff also denied the charges, claiming that he was assaulted by another inmate as "a result of a third inmate's mischievous act." *Id.* at 4. The hearing was again adjourned to obtain Plaintiff's requested witnesses, but was never recommenced. *Id.*

Notwithstanding that the hearing was never recommenced, on April 17, 2012, Plaintiff was served with a copy of the disposition of the disciplinary hearing. *Id.* The disposition was based on Martin's findings, which relied on Officer Bellino's written report and Morris's subsequent investigation. *Id.* The disposition found Plaintiff guilty of fighting and imposed fifteen days of punitive segregation and a twenty-five dollar surcharge, which was deducted from Plaintiff's inmate account. *Id.*

On April 18, 2012, Plaintiff sent a letter[4] to Warden Newton appealing the disciplinary disposition. *Id.* at 5. In his letter, he sought reversal of the disposition on several grounds, including that the disposition contained false statements, and that Plaintiff was deprived of (1) the opportunity to question witnesses and (2) an impartial hearing officer, in violation of Directive 6500. *Id.* at 5-6. Plaintiff also claimed that it was unconstitutional for the DOC to impose the surcharge because it would deprive him of property without due process of law. *Id.* at 6.

**\*3**  According to Plaintiff, a reply to his letter was due within thirty days of his submission. *Id.* While Plaintiff, by his reckoning, should therefore have received a reply by May 18, 2012, he never received a reply to his appeal. *Id.* However, Plaintiff never filed an Article 78 proceeding, and did not file the instant Complaint until May 27, 2015, more than three years after the deadline to issue a response to his appeal.

## II. Procedural History

Plaintiff commenced this action on May 27, 2015, alleging that the disciplinary proceeding was unconstitutional because it was commenced less than twenty-four hours prior to Plaintiff being served with a copy of the infraction; the infraction report was written by Morris, who did not witness the alleged incident; and the infraction report was not signed by Officer Bellino, the alleged author. *Id.* at 5-6. Plaintiff also argues that following the second adjournment, he was denied the opportunity to call and cross-examine witnesses and was not served the disposition within twenty-four hours of the hearing's completion. *Id.* at 6. Lastly, Plaintiff contends that Warden Newton did not timely respond to his appeal. *Id.* At the time he filed the instant Complaint, Plaintiff was no longer incarcerated. *Id.* at 1.

On December 11, 2015 the Court granted Warden Newton's request for leave to file a motion to dismiss, which was filed on January 11, 2016. Warden Newton's motion is based on the fact that Plaintiff's due process claims are time-barred; that he was not personally involved in the deprivation of Plaintiff's constitutional rights; and that Plaintiff's procedural due process claims fail as a matter of law. Defendant Newton's Memorandum of Law ("Def. Memo.") at 1-2.

### III. Standard of Review

#### A. 12(b)(6) Motion

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept as true all of the factual allegations from the complaint, and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory statements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555 (2007)). The complaint must adhere to Rule 8(a), which has been interpreted to require that it contain enough factual matter for the claim to be plausible on its face. *Id.* (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Rule 8(a) "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] Complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The same standard applies to motions to dismiss *pro se* complaints. *See Mancuso v. Hynes*, 379 Fed.Appx. 60, 61 (2d Cir. 2010). However, the Court is also obligated to construe a *pro se* complaint liberally and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). A complaint that "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks and brackets omitted); *see also Triestman*, 470 F.3d at 477 ("*[P]ro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'") (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)) (internal quotation marks omitted).

## IV. Discussion

**\*4** Plaintiff's complaint alleges causes of action under 42 U.S.C. § 1983 and New York state and city laws arising out of his disciplinary proceedings and subsequent punishment. Warden Newton argues that all of Plaintiff's claims are time-barred under the applicable statute of limitations.

### A. Plaintiff's Claims are Time-Barred

Section 1983 claims are governed by state statutes of limitations for personal injury actions. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). In New York, Section 1983 claims are subject to a three-year statute of limitations. *See Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing New York Civil Practice Law and Rules § 214(5)); *see also Fairley v. Collins*, No. 09 Civ. 6894 (PGG), 2011 WL 1002422, at \*3 (S.D.N.Y. Mar. 15, 2011). While state law determines the applicable limitations period of a section 1983 claim, federal law governs the accrual date. *Pearl*, 296 F.3d at 80; *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980). Under federal law, a cause of action accrues "when the plaintiff knows or has reason to know" of the injury which is the basis of his action. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994); *see also Singleton*, 632 F.2d at 191.

### i. Exhaustion of Administrative Remedies [5]

Before a prisoner can bring his Section 1983 action in federal court, the prisoner must first exhaust the administrative remedies available to him. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."); *Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009) (analyzing plaintiff's exhaustion of administrative remedies pursuant to 42 U.S.C. § 1997e(a)). The exhaustion requirement for disciplinary hearings is satisfied, not through the prisoner grievance program, but rather through an administrative appeal to the warden of the facility. [6] *See Williams v. Roberts*, No. 9:11 Civ. 0029 (GTS) (RFT), 2011 WL 7468636, at \*5 n.12 (N.D.N.Y. Dec. 15, 2011) (Report & Recommendation), *adopted*, 2012 WL 760777 (N.D.N.Y. Mar. 7, 2012) (noting that the exhaustion requirement for disciplinary hearings "is satisfied not through the prisoner grievance program but through administrative appeal"); *see also* Directive 6500R-B at 20 (allowing prisoner to bring Article 78 proceeding after filing appeal and barring DOC from claiming exhaustion defense at Article 78 proceeding when DOC failed to respond to prisoner's appeal within ten days).

### ii. Accrual

**\*5** For procedural due process actions related to disciplinary hearings, courts in the Second Circuit generally set the accrual date at the date of the disciplinary hearing. *Lenihan v. Keane*, No. 93 Civ. 8914 (MGC), 1995 WL 28513 at *2 (S.D.N.Y. Jan. 25, 1995) (dismissing claim as time-barred because Section 1983 action in which prisoner alleged denial of due process in connection with a disciplinary hearing, accrued on the day of his disciplinary hearing); *see also Williams v. Roberts*, 2011 WL 7468636, at *5 (N.D.N.Y. Dec. 15, 2011) (holding that plaintiff's 1983 due process claims accrued on date of disciplinary hearings and dismissing claims as time-barred); *Allah v. Kelly*, No. 96 Civ. 323A (H), 1998 WL 386390, at *2 (W.D.N.Y. May 18, 1998) (finding that plaintiff's 1983 due process claims accrued on the day of his disciplinary hearing).

However, some courts in this District have discounted, for statute of limitations purposes, the time a plaintiff has spent exhausting his administrative remedies. *See, e.g., Anderson v. Romano*, No. 08 Civ. 0559 (JSR) (KNF), 2009 WL 602965, at *4 (S.D.N.Y. Mar. 6, 2009) (finding that plaintiff's deliberate indifference claim was timely because he filed it less than three years after he received a final decision on his grievance); *see also Baez v. Pinker*, No. 13 Civ. 9165 (KBF), 2015 WL 3457277, at *4 (S.D.N.Y. June 1, 2015) (finding a prisoner's procedural due process claims accrued no later than the date on which the director confirmed the hearing officer's determination, exhausting the prisoner's administrative remedies); *Odom v. Calero*, No. 06 Civ. 15527 (LAK) (GWG), 2008 WL 449677, at *6-7 (S.D.N.Y. Feb. 19, 2008) (considering—in discussion of the accrual date of a prisoner's procedural due process claim—the dates of the treatment of his appeals); *LeBron v. Swaitek*, No. 9:05 Civ. 0172 (GLS) (DRH), 2007 WL 3254373, at *2 (N.D.N.Y. Nov. 2, 2007) (finding a prisoner's procedural due process causes of action accrued, at the latest, on the dates that his administrative appeals were denied).

Clearly, if we measure accrual from the date of the hearing, April 11, 2012, or the date of the disposition, April 17, 2012, the Complaint is time-barred because it was filed more than three years later, on May 27, 2015. However, even assuming that the limitations period was tolled while Plaintiff filed his appeal, his Complaint is still barred. Here, while Plaintiff, mistakenly, alleges that Warden Newton was required to respond to his appeal within thirty days, [7] Compl. at 6, the applicable disciplinary procedure in place at the time of the hearing specifically provides that Warden Newton was required to respond within five business days after receipt of the appeal. *See* Directive 6500R-B at 20. Because Plaintiff's appeal had not been decided within ten business days after his submission, Plaintiff did not have to wait for a response from Warden Newton because his administrative remedies were deemed fully exhausted and he was free to file an Article 78 proceeding. [8] *Id.* Since Plaintiff filed his appeal on Wednesday, April 18, 2012, his constitutional claim accrued no later than Wednesday, May 2, 2012 – ten business days after he filed his appeal. *See Davis*, 576 F.3d at 132 (holding that plaintiff's due process action accrued when appeal decision was rendered). Accordingly, Plaintiff had three years from May 2, 2012, when his due process claim accrued, to bring suit. Because Plaintiff did not file a complaint until May 27, 2015, his claims are time-barred. *See, e.g., Taylor v. N.Y.S. Dep't of Corr.*, 2004 WL 2979910, at *11 (S.D.N.Y. Dec. 22, 2004) (noting that despite plaintiff not receiving a response to his grievance, IGRP rules clearly state that he had the right to appeal four business days after filing his grievance and finding that claims are time-barred even after tolling statute of limitations until that date). Importantly, even if we calculated the limitations period as starting from Plaintiff's mistaken date of thirty days after he appealed to Warden Newton – May 18, 2012 – his claim would still be time-barred because he filed this action more than three years after that date. [9]

### B. The Continuing Violation Doctrine Does Not Apply

**\*6** Plaintiff contends that the continuing violation doctrine applies to preserve his claims. Pl. Opp. at ¶ 6. In order to assert the doctrine, Plaintiff must demonstrate "specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). Importantly, " 'courts of this circuit consistently have looked unfavorably on continuing violation arguments ... and have applied the theory only under compelling

circumstances.' " *Blankman v. Cnty. of Nassau*, 819 F. Supp. 198, 207 (E.D.N.Y. 1993) (quoting *Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1415 (S.D.N.Y. 1989)). Indeed, "[t]he mere fact that wrongful acts may have a continuing impact is not sufficient to find a continuing violation." *Blankman*, 819 F. Supp. at 207; *see also Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) ("We have made it clear that a continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act."). "Nor may it be based on 'the fact that the plaintiff's ongoing protests, objections, requests for reconsideration, and persistent demands for administrative and judicial review have caused the dispute to linger to the present day.' " *McFadden v. Kralik*, No. 04 Civ. 8135 (RCC) (JCF), 2007 WL 924464, at *7 (S.D.N.Y. Mar. 28, 2007) (quoting *Yip v. Bd. of Trs. of State Univ. of N.Y.*, No. 03 Civ. 0959, 2004 WL 2202594, at *5 (W.D.N.Y. Sept. 29, 2004)).

The continuing violation doctrine is inapplicable here. Plaintiff argues that Warden Newton's failure respond to his appeal is sufficient to trigger the doctrine. Pl. Aff. Opp. ¶ 6. He notes that as of the filing of the instant Complaint, Warden Newton had still not responded. *Id.* However, here, Plaintiff's claims are based on a single, allegedly inadequate disciplinary hearing, and not "a series of separate acts that collectively constitute one unlawful [act]." *McFadden*, 2007 WL 924464, at *7 (holding that continuing violation doctrine did not apply because plaintiff's due process claim arose from his disciplinary hearing, which constituted a discrete incident). Additionally, Plaintiff has not alleged that the violation was "permitted to continue unremedied for so long as to amount to a discriminatory policy or practice." *Young v. Strack*, No. 05 Civ. 9764 (WHP), 2007 WL 1575256, at *4-*5 (S.D.N.Y. May 29, 2007) (quoting *Velez v. Reynolds*, 325 F. Supp. 2d 293, 312 (S.D.N.Y. 2004)). Although Warden Newton had not responded to Plaintiff's appeal by the time Plaintiff filed his complaint, Plaintiff does not allege that he was in any way hindered from filing a petition for a writ under Article 78 or pursuing his claim in federal court once the ten days for Warden Newton's response had expired. *See Davis*, 576 F.3d at 132 (holding that inmate's appeal of a disciplinary hearing determination "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court").

Accordingly, the continuing violation doctrine does not toll Plaintiff's claims.

### C. New York State and City Law Claims

Warden Newton has also moved to dismiss Plaintiff's state law claims. Where as here, the Court has dismissed all of the claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction. 28 U.S.C. § 1367(c)(3). Subject matter jurisdiction in the instant action is based on federal question jurisdiction. 28 U.S.C. § 1331. Having dismissed all of Plaintiff's federal claims under Rule 12(b)(6) as untimely, the Court declines to exercise supplemental jurisdiction over his state law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well,"); *McGugan v. Aldna-Bernier*, No. 11 Civ. 0342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice,") *aff'd*, 752 F.3d 224 (2d Cir. 2014). Therefore, Plaintiff's state law claims are hereby dismissed as well.

### V. Conclusion

**\*7** For the reasons set forth above, Warden Newton's motion to dismiss is GRANTED.

The Clerk of the Court respectfully directed to terminate the motion, Doc. 15, mail a copy of this Order to Plaintiff, and close.

Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

It is SO ORDERED.

Dated: September 28, 2016.

**All Citations**

Slip Copy, 2016 WL 5416505

Footnotes

1     Pursuant to Federal Rule of Civil Procedure 4(m), the Court *must* dismiss an action without prejudice against defendants who are not served within 90 days of the filing of a complaint or order that service be made within a specified time. Fed. R. Civ. P. 4(m); *see also Zapata v. City of New York*, 502 F.3d 192, 193 (2d Cir. 2007). Here, Defendants Morris and Martin have not been properly served or waived service and have not responded to the Complaint. *See* Doc. 8. Since the time to serve Defendants has long elapsed, the Court dismisses Plaintiff's complaint against Defendants Morris and Martin without prejudice.

2     The Court accepts the following allegations from the Complaint ("Compl.") (Doc. 2), and Plaintiff's Affidavit in Opposition to Defendants' Motion to Dismiss ("Pl. Opp.") (Doc. 24), as true for purposes of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Vail v. City of New York*, 68 F. Supp. 3d 412, 427 (S.D.N.Y. 2014) ("Where new allegations in a *pro se* plaintiff's opposition memoranda are consistent with the allegations contained in the Complaint, they may be read as supplements to the pleadings.") (citation omitted).

3     *See* N.Y. City Dep't of Corr., Inmate Disciplinary Due Process, Directive No. 6500R-B ("Directive 6500R-B"). The NY DOC has updated this Directive twice since Plaintiff filed his Complaint in May 27, 2015. Directive 6500R-B, the version in place at the time of the filing, became effective on March 29, 2006 and continued in effect until September 16, 2015. The Court may rely on Directive 6500R-B because it is incorporated by reference in the Complaint. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Seymore v. City of New York*, No. 12 Civ. 6870 (GBD) (HBP), 2014 WL 1259563, at *3 (S.D.N.Y. Mar. 26, 2014) (noting that at motion to dismiss stage, Magistrate Judge "correctly took judicial notice" of the DOC's Inmate Grievance and Request Program Directive); *see also Mitchell v. Dep't of Correction*, No. 05 Civ. 5792 (JSR) (HBP), 2008 WL 744041, at *1 (S.D.N.Y. Feb. 20, 2008) (relying on Directive 6500 dated March 29, 2006 for disciplinary penalties imposed on pretrial detainees); *Taylor v. Santana*, No. 05 Civ. 1860 (AKH), 2007 WL 737485, at *2 (S.D.N.Y. Mar. 6, 2007), *aff'd sub nom. Taylor v. Comm'r of New York City Dep't of Corr.*, 317 Fed.Appx. 80 (2d Cir. 2009) (relying on Directive 6500 for inmate disciplinary proceeding process).

4     For purposes of the instant motion, the Court assumes that the "letter" Plaintiff sent to Warden Newton was an adequate method of appealing the adverse determination, in light of the fact that the guidelines require that an appeal be made using a particular form. *See also infra*, note 5.

5     It is well established that failure to exhaust administrative remedies is an affirmative defense not a pleading requirement, as such, defendants bear the burden of demonstrating that a plaintiff failed to exhaust administrative remedies before pursuing his action in federal court. *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)). Additionally, like other affirmative defenses, "failure to exhaust may be grounds for dismissal under Rule 12(b)(6) if the defense appears on the face of the complaint." *Walker v. Vargas*, No. 11 Civ. 9034 (ER), 2013 WL 4792765, at * 4 (S.D.N.Y. Aug. 26, 2013). Here, because Warden Newton does not assert an exhaustion defense, and any failure to exhaust is not evident on the face of the Complaint, the Court will not determine whether Plaintiff properly exhausted his administrative remedies at this stage. *See Pratt v. City of New York*, 929 F. Supp. 2d 314, 318 (S.D.N.Y. 2013) (holding that "scope of proper [ ] procedure, whether the plaintiff followed that procedure properly, and [possible excuses for nonexhaustion]" should not be determined on a motion to dismiss).

6     Under New York's Inmate Grievance and Request Program ("IGRP"), "dispositions stemming from a program or procedure that has its own departmental administrative or investigative process are not subject to the IGRP process." *See* N.Y. City Dep't of Corr., Inmate Grievance and Request Program, Directive No. 3376 at 5. Thus, Plaintiff's due process claim arising from his disciplinary hearing and disposition is "non-grievable." *See* N.Y. City Dep't of Corr., Inmate Grievance and Request Program, Directive No. 3376, at Appendix A (listing "inmate disciplinary process and disposition" as not subject to the IGRP and requiring appeal to the Deputy Warden of Security); *see also Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) ("Where an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing, ... (e.g., a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal.") (internal quotation and citations omitted).

7     Plaintiff's mistaken belief that Warden Newton was required to respond to his appeal within thirty days does not rise to the level of an "extraordinary circumstance" required for equitable tolling. *See Hickey v. Senkowski*, No. 02 Civ. 1437

(DC), 2003 WL 255319, at *4 (S.D.N.Y. Feb. 4, 2003) ("Even a *pro se* plaintiff's misapprehension of the law regarding the statute of limitations does not constitute 'extraordinary or unusual circumstances' preventing him from filing a timely petition). Plaintiff provides no further explanation for his inaction between April 2012 and May 2015, and thus, equitable tolling of the three-year statute of limitations period is not warranted.

8    To the extent that Plaintiff can be said to argue that he had to wait for a reversal or invalidation of the disciplinary disposition from Warden Newton before pursing his Section 1983 claims in federal court, this claim is unavailing. Because Plaintiff did not allege that the fifteen day penalty "affected the fact or duration of his overall confinement," he was not required to obtain a reversal of his disciplinary proceedings before filing his Section 1983 claims in federal court. *See Peralta v. Vasquez*, 467 F.3d 98, 100 (2d Cir. 2006); *Sims v. Artuz*, 230 F.3d 14, 24 (2d Cir. 2000) (holding that because plaintiff "did not challenge the disciplinary proceedings on the basis that they affected the overall length of his confinement," plaintiff did not have to show that the disciplinary rulings had been invalidated before pursuing his Section 1983 due process claims in federal court)

9    Plaintiff claims that he signed the Complaint on May 18, 2015 and gave it to a notary public to file. Pl. Opp. at ¶ 9. However, the Complaint was not filed until May 27, 2015. Since Plaintiff was not incarcerated at the time of his filing, the "prison mailbox rule" does not apply. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) (finding that a *pro se* prisoner's complaint is deemed filed on the date the prisoner turns his complaint over to prison officials). No similar accommodation is made for an individual who is not incarcerated. And mere ignorance of the law is insufficient to delay the accrual of the statute of limitations. *See Ormiston v. Nelson*, 117 F.3d 69, 72 n.5 (2d Cir. 1997); *see also supra*, note 5. This is true even for *pro se* petitioners. *See Gonzalez-Ramos v. United States*, 2007 WL 1288634, at *10 (S.D.N.Y. May 2, 2007) (collecting cases).

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4939389
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Johnny Bunting, Plaintiff,
v.
Brian Fischer, Albert Prack, Norman Bezio,
Sibatu Khahaifa, Mark Passage, David
F. Napoli, M. Sheahan, James Esgrow,
Richard A. Donahue, Patrick Griffin, Thomas
Griffin, Stephen Wenderlich, Defendants.

14-CV-0578-RJA-MJR
|
Signed August 2, 2016
|
Filed 08/04/2016

**Attorneys and Law Firms**

Johnny Bunting, Mount Vernon, NY, pro se.

Christopher L. Boyd, NYS Attorney General's Office, Buffalo, NY, for Defendants.

REPORT AND RECOMMENDATION

MICHAEL J. ROEMER, United States Magistrate Judge

**\*1** This case has been referred to the undersigned by the Hon. Richard J. Arcara for all pre-trial matters, including preparation of a report and recommendation on dispositive motions. (Dkt. No. 22). Before the Court is a motion to dismiss for failure to state a claim brought on behalf of all the defendants. (Dkt. No. 16). For the following reasons, I recommend that the motion be granted in its entirety.

**BACKGROUND**

Johnny Bunting commenced this *pro se* action under 42 U.S.C. § 1983 on July 17, **2014**, while he was incarcerated at Southport Correctional Facility. By that time, Bunting had served more than sixty-five months in the Special Housing Unit (SHU). (Dkt No. 1 at ¶ 127). He alleged that the long SHU sentences he had received violated

his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment due process rights. (*Id.* at ¶¶ 158, 159).

According to the complaint, Bunting, who was then incarcerated at Orleans Correctional Facility, was first sent to the SHU on January 22, 2009, on a twenty day sentence "for smuggling, interference, refusing [a] direct order and threats." (*Id.* at ¶ 68). While he was serving the twenty day sentence, Bunting was charged with "false statements, [1] [a] correspondence violation, soliciting, and selling articles." (*Id.* at ¶ 69). Defendant Mark Passage sentenced him to 180 days in the SHU with loss of correspondence privileges for two years. (*Id.* at ¶ 69).

On April 16, 2009, Bunting was transferred to Southport Correctional Facility. (*Id.* at ¶ 73). Eight days after his arrival, he was given a misbehavior report for sending an "invoice" to defendant Sibatu Khahaifa, the superintendent of the Orleans Correctional Facility. (*Id.* at ¶¶ 15, 74). Defendant James Esgrow found Bunting guilty of harassment, lying, and tampering with property, and sentenced him to twenty-one months in the SHU with three months suspended. (*Id.* at ¶ 74). Based on a misbehavior report filed two days later for an unhygienic act, threats, and harassment, Esgrow sentenced him to six additional months in the SHU. (*Id.* at ¶ 77). Defendant Norman Bezio affirmed the sentences on appeal. (*Id.* at ¶ 80-81).

On September 23, 2009, after a hearing for possession of unauthorized identification and unauthorized UCC material, [2] Esgrow sentenced Bunting to eighteen months in the SHU. (*Id.* at ¶¶ 82-83, 85-86). After the hearing, Bunting wrote letters to defendants David Napoli and M. Sheahan, the superintendent and acting superintendent of Southport Correctional Facility, to complain about "the overbroad usage of the UCC rules." (*Id.* at ¶¶ 17-18, 89-90). He also wrote two grievances challenging Esgrow's actions, both of which were dismissed. (*Id.* at ¶ 91).

**\*2** On September 30, 2009, after a hearing on charges of smuggling tobacco, defendant Richard Donahue sentenced Bunting to ninety days in the SHU. (*Id.* at ¶¶ 88, 92).

On November 6, 2009, Bezio reduced the sentence from the September 23rd hearing to twelve months. (*Id.* at ¶ 95.) Later that month, Bunting wrote to Napoli requesting a

discretionary review of the September 23, 2009 decision. (*Id.* at ¶ 96). His request was denied by Sheahan, the acting superintendent. (*Id.*)

On November 30, 2009, Esgrow held a hearing on a misbehavior report charging Bunting with possession of UCC material, an unauthorized lien, and violating a direct order. (*Id.* at ¶¶ 97-98). Bunting alleges that Esgrow ejected him from the hearing, even though Bunting did not present any threat to security. (*Id.* at ¶ 98). Esgrow sentenced him to eighteen months in the SHU. (*Id.* at ¶ 99).

On February 12, 2010, and February 18, 2010, Bunting received additional misbehavior reports for possession of unauthorized UCC material and a correspondence violation. (*Id.* at ¶ 102-03). He alleges that these two misbehavior reports were based on the same document at issue at the November 30, 2009 hearing, which according to Bunting was "an affidavit for a tort claim." (*Id.* at ¶ 104). Esgrow ejected Bunting from the hearing on the February 12, 2010 misbehavior report, "claiming that Mr. Bunting glared at a witness." (*Id.* at ¶ 106). At the end of the hearing, Esgrow sentenced Bunting to twenty-one months in the SHU. (*Id.* at ¶ 107). The decision was affirmed by Bezio. (*Id.* at ¶ 115). Esgrow also ejected Bunting from the hearing on the February 18, 2010 misbehavior report "because he raised the defense of immunity as a sovereign." (*Id.* at ¶ 110). Esgrow imposed a sentence of an additional five months in the SHU. (*Id.* at ¶ 111). Defendant Albert Prack affirmed the decision. (*Id.* at ¶ 116).

On March 15, 2010, Bunting wrote to Patrick Griffin, the superintendent of the Southport Correctional Facility at the time, requesting that he review the misbehavior reports connected to the UCC material. (*Id.* at ¶ 113). His request was denied. (*Id.*)

On July 7, 2010, Bunting received another misbehavior report for possession of unauthorized UCC material. (*Id.* at ¶ 117). Esgrow sentenced him to twelve months in the SHU. (*Id.* at ¶ 118).

On May 9, 2011, Bunting had a hearing before Esgrow on charges of soliciting, smuggling, stealing, and a correspondence violation. (*Id.* at ¶¶ 120-121). Esgrow found him guilty and sentenced him to six months in the SHU. (*Id.* at ¶ 121).

Bunting has not alleged that he received any new sentences after May 9, 2011, but he was confined in the SHU until his release from prison on January 6, 2015. (Dkt. No. 20 at 5; Dkt. No. 9). Defendants Thomas Griffin and Stephen Wenderlich were superintendents of Southport Correctional Facility in 2012 and **2014**, respectively, and are alleged to have reviewed and authorized Bunting's continued confinement in the SHU. (Dkt. No. 1 at ¶¶ 124-25).

Bunting originally pleaded four causes of action. He has withdrawn the first two, which requested declaratory and injunctive relief, because he is no longer incarcerated. Defendant Brian Fischer, the Commissioner for Department of Corrections and Community Supervision (DOCCS), was sued only under those two causes of actions, so there are no active claims against him. Bunting's two remaining claims seek money damages from the other defendants for alleged violations of his rights under the Eighth Amendment and the Fourteenth Amendment due process clause.

## Analysis

### *Motion to Dismiss Standard*

**\*3** A motion to dismiss for failure to state a claim should be granted where the complaint fails "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 546 (2007). To state a plausible claim, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facts described in the complaint must "possess enough heft to 'show that the pleader is entitled to relief.' " *Bell Atlantic Corp.*, 550 U.S. at 557 (citing *Fed. R. Civ. P. 8(a)(2)*). Legal conclusions that are unsupported by facts cannot save a complaint from dismissal. *Ashcroft*, 556 U.S. at 679.

### *Statute of Limitations*

The statute of limitations for section 1983 actions in New York's federal district courts is three years. *Jewell v. County of Nassau*, 917 F.2d 738, 740 (2d Cir. 1990). Defendants argue that Bunting's action is barred by the statute of limitations because the last SHU sentence mentioned in his complaint was imposed on May 9, 2011,

and Bunting did not file the complaint until July 17, **2014**, more than three years later.

In general, the statute of limitations begins to run when the plaintiff "knows or has reason to know of the injury that is the basis of the action." *Leon v. Murphy*, 988 F.2d 303, 309 (2d Cir. 1993) (internal quotation omitted). Where the complaint is based on a continuing violation, i.e. where the constitutional violation is the cumulative effect of a series of activities, the entire course of conduct will be considered timely as long as some of the actions took place within three years of the complaint being filed. *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

The Second Circuit has held that the continuing violation doctrine should be applied to Eighth Amendment claims based on SHU confinement because these claims "typically accrue[ ] only after an inmate has been confined in the SHU for a prolonged period of time." *Id.* at 224. The "entire Eighth Amendment claim will be timely as long as the violation of rights continued past the cutoff date." *Id.* Since Bunting's allegedly unconstitutional SHU confinement continued past the cutoff date—in fact, he was still in the SHU when the complaint was filed—his Eighth Amendment claim is not time-barred.

The continuing violation doctrine does not apply to the Fourteenth Amendment due process claim, however. A due process claim arises when the defendants have deprived the plaintiff of a liberty interest as a result of insufficient process. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). Each decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing that he was entitled to. *See Gonzalez*, 802 F.3d at 223 (a separate claim for violation of due process rights accrues "each time that a defendant fails to provide an inmate with the notice, hearing, or evaluation to which he is entitled after a liberty interest attaches.") Since the last allegedly unlawful SHU sentence mentioned in Bunting's complaint was imposed at a hearing on May 9, 2011, more than three years before the complaint was filed, the due process claims are untimely.

Bunting requests equitable tolling of the statute of limitations because he was in the SHU until his release from prison in 2015. He has not explained why his SHU confinement would have prevented him from filing the complaint, however. To seek equitable tolling, the plaintiff

"must have acted with reasonable diligence throughout the period he seeks to toll." *Warren v. Garvin*, 219 F.3d 111, 113 (2d Cir. 2000). He cannot "avoid statute of limitations problems when he knew after each allegedly wrongful act that it was actionable, but chose not to file federal claims regarding them within the limitations period." *Konigsberg v. Lefevre*, 267 F.Supp.2d 255, 262 (N.D.N.Y. 2003). Bunting has not pleaded any facts from which the Court could infer that he acted with reasonable diligence in failing to bring this lawsuit until July **2014**. While he was in the SHU, he was able to file grievances and legal papers, as evidenced by the various letters he describes in his complaint and the fact that the complaint in this action was filed when he was in the SHU. The statute of limitations will not be tolled.

 **\*4** As the Fourteenth Amendment claim is barred by the statute of limitations, it must be dismissed.

*Eighth Amendment*

Bunting's Eighth Amendment claim is based on the length of his confinement in the SHU. He does not allege that he was treated any differently from other prisoners in SHU confinement, only detailed the ways in which SHU confinement is more restrictive than regular confinement. In Bunting's eyes, the long periods he spent in isolation constitute cruel and unusual punishment. But SHU confinement is a common punishment within state prisons, and the regular conditions of SHU confinement do not violate the Eighth Amendment. *Dixon v. Goord*, 224 F.Supp.2d 739, 748 (S.D.N.Y. 2002). Numerous cases in this circuit have upheld long SHU sentences that were challenged merely for the amount of time prisoners were held in segregation. *See, e.g.*, *Sostre v. McGinnis*, 442 F.2d 178, 193, *overruled on other grounds by Davidson v. Scully*, 114 F.3d 12 (2d Cir. 1997) (declining to hold that plaintiff's confinement in punitive segregation for more than twelve months violated the Eighth Amendment); *Gulley v. Roach*, 02-cv-908S, 2004 **WL** 2331922 (W.D.N.Y. Oct. 15, 2004) (holding that seven-month "duration of Plaintiff's confinement alone does not rise to the level of a constitutional violation"). Given this precedent, Bunting's complaint does not state a claim that would entitle him to relief, and the Eighth Amendment claim should be dismissed.

## Conclusion

The plaintiff has withdrawn his first two causes of action, leaving claims under the Eighth Amendment and the Fourteenth Amendment. As the Fourteenth Amendment claims are barred by the statute of limitations and the Eighth Amendment claims fail to state a cause of action, I recommend that the defendants' motion be granted in its entirety and the complaint dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED** that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72. Any requests for an extension of this deadline must be made to Judge Arcara.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. See *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**\*5  SO ORDERED.**

Dated: August 2, 2016.

**All Citations**

Slip Copy, 2016 WL 4939389

## Footnotes

1    According to the defendants, Bunting had filed fraudulent liens under the Uniform Commercial Code (UCC) against a member of the parole board, an assistant attorney general, and several corrections officers. (Dkt. No. 16-1 at 3-4).

2    Several of Bunting's offenses appear to be related to his activities as a "sovereign citizen." (*See* Dkt. No. 16-1 at 3). Sovereign citizens view the American government as illegitimate and claim to be exempt from various laws. Creating non-governmental drivers' licenses and making inappropriate filings under the Uniform Commercial Code are typical of sovereign citizens. *See* UNC School of Government, *A Quick Guide to Sovereign Citizens* 1 (2013).

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 920753
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Kevin Damion CRICHLOW, Plaintiff,

v.

Brian FISCHER et al., Defendants.

6:15-CV-06252 EAW
|
Signed March 7, 2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District
Judge

## INTRODUCTION

*1 Plaintiff Kevin Damion Crichlow ("Plaintiff") filed
this action pursuant to 42 U.S.C. § 1983 in the Southern
District of New York on October 16, 2012. (Dkt. 2).
Plaintiff filed an amended complaint seeking relief against
136 Defendants on June 17, 2013. (Dkt. 12). The action
was transferred to this Court on April 28, 2015. (Dkt. 168).
The action was then severed by this Court on February
10, 2017. (Dkt. 223). Following severance, 35 Defendants
(together "Defendants") remain. (See id. at 5-6).

Presently before the Court are: Defendants' motion for
summary judgment (Dkt. 177); Plaintiff's motion for
discovery (Dkt. 182); Plaintiff's motion to appoint counsel
(Dkt. 182); Plaintiff's motion for a stay (Dkt. 182);
Plaintiff's motion for a medical exam (Dkt. 187); Plaintiff's
motion for reconsideration (Dkt. 192); Plaintiff's motion
to amend (Dkt. 192); Plaintiff's motion for a hearing (Dkt.
192); Defendants' motion for sanctions (Dkt. 195); and
Plaintiff's motion for sanctions (Dkt. 198).

For the reasons stated below, Defendants' motion for
summary judgment is granted in part and denied in
part; Plaintiff's motion for discovery is denied without
prejudice; Plaintiff's motion to appoint counsel is denied
without prejudice; Plaintiff's motion for a stay is denied
without prejudice; Plaintiff's motion for a medical exam
is denied; Plaintiff's motion for reconsideration is denied;
Plaintiff's motion to amend is denied as moot; Plaintiff's
motion for a hearing is denied; Defendants' motion
for sanctions is denied without prejudice; and Plaintiff's
motion for sanctions is denied.

## I. Plaintiff's Allegations

Plaintiff's amended complaint spans 142 pages. (See
Dkt. 12). Following severance of the action into three
separate parts, this Court retained Plaintiff's claims in
which he asserts violations of his constitutional rights
by Defendants relating to Plaintiff's incarceration at the
Wende Correctional Facility ("Wende") and treatment at
Wyoming Community Hospital. (See Dkt. 223).

Plaintiff alleges actions occurring at Wende beginning
on or about September 27, 2008—the date Plaintiff was
transferred to Wende—through his transfer to Eastern
Correctional Facility on November 16, 2010. (See Dkt. 12
at 14-36; Dkt. 12-1 at 1-12).

Plaintiff alleges inadequate or nonexistent medical care
throughout his incarceration at Wende, in violation of
the Eighth Amendment. Plaintiff argues that he was not
provided mental health treatment as required (Dkt. 12 at
19), and that he was "unreasonably exposed to infectious
disease" (id. at 25, 36; Dkt. 188 at 35-36, 38-39). Plaintiff
alleges deficient dental care from "2008 into 2013 at 3
[New York Department of Corrections and Community
Supervision] prisons." (Dkt. 12 at 36). He contends he
was not provided care for "alot of pain hip, jaw, hand,
tooth's also need replacement of four's lost teeths &
restoration of function and 'oral surgery & periodontics.'
" (Id. at 31; see, e.g., Dkt. 12-1 at 1). Plaintiff further
alleges that he was denied dental care at Wende on June
30, 2008, to fix a broken jaw." (Dkt. 12 at 36). As to
his medical care, Plaintiff states that Defendant George
Boucher, M.D., was grossly negligent in misdiagnosing an
injury to Plaintiff's hand, which led to Plaintiff's receiving
the "wrong surgery" on January 13, 2010. (Dkt. 12-1
at 2). Plaintiff complains that he was denied treatment
for "injuries hip, back, shoulder, head" for "about 68
months." (Id. at 3). Plaintiff also asserts that he was

subjected to a risk of disease due to asbestos in Wende. (Dkt. 12 at 21-24, 31; Dkt. 188 at 35).

**\*2** Plaintiff also charges he was deprived of adequate nutrition and hygiene while incarcerated at Wende. Plaintiff claims that from April to September 2009, Defendants C.O. Bartels and C.O. Kevin Barlow "routinely deprived [Plaintiff] ... meaningful opportunities for yard, food, shower, exercise, adequately nutrition." (Dkt. 12 at 25). He makes similar claims against Defendants C.O. Richard Brooks ("Brooks") (*id.* at 32), and C.O. Alicia Humig ("Humig") (*id.* at 26). Plaintiff complains that he was "taken off" of a mandatory religious diet for months because he was not allowed to go to the mess hall. (*Id.* at 32). Plaintiff also alleges that because he is H.I.V. positive, a nutritious diet is critical to his health, and he was deprived of such a diet. (Dkt. 12-1 at 1, 3). Plaintiff asserts that on November 11, 2009, Humig and Defendant Sergeant Paul Olszewski ("Olszewski") refused to let him out of his cell, and placed him in keeplock for about six weeks. (Dkt. 12 at 32). Plaintiff further alleges that he was refused basic laundry services from 2008 through November 1, 2009. (*Id.* at 27).

Plaintiff complains that Defendant T.M.C. Christopher Zaluski ("Zaluski") and others failed to provide reasonable accommodations for Plaintiff's hearing disability. (Dkt. 12 at 14-16; Dkt. 12-1 at 1). Plaintiff alleges that he was in New York Department of Corrections and Community Supervision ("DOCCS") custody for six months before receiving hearing aids. (Dkt. 12 at 30; Dkt. 12-1 at 1). He also claims that he was denied equal access to opportunities and recreation in Wende because of his hearing disability, and that the failure to accommodate his hearing disability was retaliation for his standing up for himself and other disabled inmates. (Dkt. 12 at 33-35; Dkt. 12-1 at 11-12).

Plaintiff claims he was harassed and verbally abused while at Wende. He alleges numerous instances of sexual harassment by Defendant C.O. Attea, and states that he reported such harassment to others, including the superintendent of Wende. (*Id.* at 17-18, 19, 31). Plaintiff claims that on June 18, 2010, Brooks verbally abused and threatened Plaintiff. (Dkt. 12-1 at 8-9). Plaintiff asserts C.O. Corey Petties verbally abused and threatened Plaintiff on July 12, 2010. (*Id.* at 9-10). Plaintiff alleges that DOCCS has a "common practice to encourage and further its employee's, and officers discrimination and harassment

and assault and [deprivation] of proper nutrition." (Dkt. 12 at 20).

Plaintiff also raises Fourteenth Amendment due process claims. Plaintiff complains of unspecified disciplinary proceedings that led a total of 180 days of disciplinary confinement between 2008 and 2010. (*Id.* at 29). Plaintiff claims his due process rights were violated because of the handling of "over 150" grievances filed through November 16, 2010, by Defendants Director Karen Bellamy ("Bellamy") and Sergeant William Scott ("Scott"). (*Id.* at 27-30). Plaintiff asserts that he was retaliated against for filing grievances and that no investigations were conducted into his claims. (*Id.* at 28). Plaintiff states that he filed over 300 grievances. (Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1).

He also alleges that on July 4, 2010, C.O. Hojsan destroyed Plaintiff's legal documents in the Wende law library, thereby depriving Plaintiff of an opportunity to be heard by the courts. (Dkt. 12-1 at 10-11). Hojsan also allegedly denied Plaintiff access to the law library. (*Id.* at 11).

Plaintiff complains that a fire broke out in his cell block on April 12, 2010, and that the correctional officers in the area, including Olszewski, failed to respond to calls for help. (*Id.* at 6-7). Plaintiff claims that he was denied "fresh-air" and was thereafter denied medical care. (*Id.* at 7).

Plaintiff further contends that on some unspecified date Zaluski instructed others not to let Plaintiff out of his cell, in retaliation for Plaintiff's filing of grievances against Zaluski. (Dkt. 12 at 30).

Plaintiff complains that Defendant Brian Fischer ("Fischer")—the commissioner of DOCCS during Plaintiff's incarceration at Wende—knew of constitutional violations against Plaintiff and failed to take action. (Dkt. 12-1 at 4-5). Plaintiff states that he personally sent "several letters" detailing inadequate health care and assault. (*Id.* at 4). Plaintiff also contends that Defendants "disregarded conditions posing an excessive risk to [his] health and safety ...," and that prison staff was inadequately trained. (*Id.*).

## II. Defendant's Motion for Summary Judgment

### A. Standard of Review

**\*3** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 206 (2d Cir. 2003).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec.,* 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). But, summary judgment is generally not appropriate until after some discovery has occurred. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate on the proper showing "after adequate time for discovery"); *see, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." (emphasis original) (internal quotation marks and citations omitted)). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom,* 201 F.3d at 97; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not

be 'railroaded' into his offer of proof in opposition to summary judgment." (citing *Celotex,* 477 U.S. at 326)).

## B. Statute of Limitations

Defendants argue that some of Plaintiff's claims are time-barred by the statute of limitations. (Dkt. 177-5 at 3). "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions....' " *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50 (1989)). A § 1983 action filed in New York is subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013).

Here, Plaintiff filed this action October 16, 2012. (Dkt. 1). Therefore, any claim arising before October 16, 2009, is barred by the statute of limitations. Plaintiff points to the "continuing violation doctrine" to save his otherwise time-barred claims. (Dkt. 209-3 at 21-22).

> [The continuing violation doctrine] applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim. A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation.

**\*4** *Gonzalez v. Hasty,* 802 F.3d 212, 220 (2d Cir. 2015). Although the continuing violation doctrine generally applies to claims "composed of a series of separate acts that collectively constitute one unlawful practice," *id.* at 220, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-

2017 WL 920753

barred acts taken in furtherance of that policy." *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 292 (2d Cir. 2013) (quoting *Harris v. City of N. Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see, e.g., Shomo v. City of N. Y,* 579 F.3d 176, 182 (2d Cir. 2009).

Here, Plaintiff alleges four patterns of conduct which occurred both before and after October 16, 2009: (1) denial of adequate medical and dental treatment; (2) denial of adequate nutrition and hygiene; (3) discrimination and failure to accommodate based on Plaintiff's disability; and (4) denial of due process rights.

The continuing violation doctrine applies to Eighth Amendment claims for deliberate indifference to medical needs. *See Shomo,* 579 F.3d at 182 ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). Plaintiff raises a number claims that he was denied adequate medical and dental treatment, which, taken together, could comprise an Eighth Amendment claim for deliberate indifference to serious medical needs. Plaintiff also complains of ongoing deprivations of adequate food and access to showers and laundry. Prison officials' Eighth Amendment obligations require that they "ensure that inmates receive adequate food, shelter, and medical care...." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

Defendants argue that Plaintiff failed to allege the existence of a policy of deliberate indifference. (Dkt. 196-2 at 10). The Court disagrees. Plaintiff's amended complaint includes allegations that senior prison officials, including Fischer, knew of ongoing violations related to Plaintiff's inadequate heath care but failed to take action. Plaintiff claims he sent letters to Fischer to point out the inadequacies of his health care at Wende. Plaintiff also attaches a reply letter from Bellamy in which Bellamy states that she is responding to Plaintiff's letters on behalf of "governor Cuomo and Commissioner Fischer." (Dkt. 209-4 at 2). Plaintiff also asserts that the practices complained of "are widespread, longstanding, and deeply embedded in the culture of all [DOCCS] agenc[ies], constitut[ing] unwritten [DOCCS] policies & customs." (Dkt. 12-1 at 5).

Similarly, the amended complaint can be read as alleging a continuing violation as to Defendants' indifference

to Plaintiff's nutrition and hygiene needs. Plaintiff alleges that he was routinely deprived of meaningful opportunities to shower and exercise, and was not provided adequate nutrition. (Dkt. 12 at 25; *see, e.g., id.* at 26). Plaintiff states that while he was in keeplock, corrections officers were told not to feed him. (*Id.* at 26). He also claims that he was only allowed to shower six times in a nine-month period, and that "his clothing and linen's [sic] were never laundered." (*Id.* at 27).

Plaintiff's allegations are sufficient to establish a plausible claim of "an ongoing policy of deliberate indifference and acts taken in accordance with that policy." *See Taylor v. Goord,* Civil Action. No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825661, at *7 (N.D.N.Y. Sept. 2, 2010), *report and recommendation adopted by* No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825656 (N.D.N.Y. Sept. 24, 2010). *Cf. Bussey v. Fischer,* Civil Action No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4862478, at *5 (N.D.N.Y. Aug. 1, 2011) (finding a plaintiff failed to allege an ongoing policy of deliberate indifference sufficient to show a continuing violation where the alleged unwritten policy was inconsistent with written policies and requirements), *report and recommendation adopted by* No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011). Thus, particularly at this stage of the proceedings, Plaintiff's pre-October 16, 2009, claims as to inadequate medical and dental treatment, as well as inadequate food and hygiene, survive Defendants' statute of limitations defense.

**\*5** Similarly, Plaintiff alleges ongoing discrimination because of his hearing disability in violation of the Eighth and Fourteenth Amendments, as well as the "Rehabilitation Act" and the Americans with Disabilities Act.[1] (Dkt. 12-1 at 1). Plaintiff alleges a pattern of discriminatory conduct, arguing that DOCCS and individual Defendants at Wende failed to accommodate his hearing disability. The last complained-of act of discrimination at Wende occurred on August 18, 2010, well within the three-year statute of limitations. Plaintiff alleges that prison staff at Wende continuously failed to provide him reasonable accommodations, such as providing working hearing aids. Plaintiff also states that other disabled prisoners were not provided reasonable accommodations. Such *pro se* allegations are sufficient, at this stage, to state the existence of an ongoing policy of disability discrimination against Plaintiff.

Plaintiff also claims due process violations related to the processing of his grievances and disciplinary hearings. In this context, the continuing violation doctrine does not apply to Plaintiff's Fourteenth Amendment due process claims because "[e]ach decision made without due process is a discrete violation, and the statute of limitations begins to run from the date that the plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer*, 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez*, 802 F.3d at 223), *report and recommendation adopted by* 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016). Thus, all of Plaintiff's claimed due process violations which occurred before October, 16, 2009, are subject to the statute of limitations and must be dismissed.

In sum, at this stage in the proceedings, Plaintiff's claims of deliberate indifference to medical care, inadequate food and hygiene, and the failure to provide reasonable accommodations for his hearing disability all survive Defendants' statute of limitations challenge. Plaintiff's due process claims which are based on the processing of his grievances and which arose before October 16, 2009, are time barred and must be dismissed.

### C. Failure to Exhaust Administrative Remedies

Next, Defendants argue that many of Plaintiff's claims must be dismissed for failure to exhaust administrative remedies. (Dkt. 177-5 at 4-6). An inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment made in lieu of an answer. *See Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a summary judgment motion made in lieu of answer where inmate failed to exhaust administrative remedies). Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under § 1983.

*Crenshaw*, 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). Pursuant to the Second Circuit's decision in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano*, 604 Fed.Appx. 1, 3 (2d Cir. 2015) (quoting *Hemphill*, 380 F.3d at 686). However, the third prong of *Hemphill*, relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016). *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill*, is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

**\*6** Here, Plaintiff claims he filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (*See* Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1). Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under § 1997e.

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for most of his claims, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); Dkt. 211 at 1

(same)). "Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at [Wende] do not create a material issue of fact in this case." *See Mims v. Yehl,* Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014).

However, Defendants' submissions show that Plaintiff has satisfied the exhaustion requirement for some potential claims. Defendants' sworn declaration from Jeffery Hale—the Assistant Director of the DOCCS Inmate Grievance Program—states that Plaintiff exhausted 25 grievances between the beginning of his incarceration in 2008 and the filing of this action in October 2012. (Dkt. 177-3 at 2). Of those 25 exhausted grievances, 23 relate to Plaintiff's incarceration at Wende. (*See id.* at 5-6). Defendants provide only a printout listing the titles and grievance numbers of the 23 exhausted grievances that arose at Wende (*see id.*); they did not submit any paperwork relating to the grievances themselves or the final resolution of any exhausted grievance. (*See* Dkt. 177).

Plaintiff clearly exhausted some potential claims which could be raised in federal court pursuant to § 1997e. However, the Court cannot determine whether the claims Plaintiff raises in this action are those which have been exhausted because neither party submitted sufficient information which would allow the Court to make such a determination. It is possible that none of Plaintiff's exhausted grievances relate to the named Defendants in this action; it is equally possible that all 23 exhausted grievances relate to actions taken by the named Defendants. Since Defendants seek summary judgment on this basis, it is their burden to establish the lack of any issue of material fact on the exhaustion argument. They have failed to meet this burden. Thus, Defendants' motion based upon Plaintiff's alleged failure to exhaust is denied.

### D. Plaintiff's Due Process Claims

Regardless of whether grievances were exhausted or whether the claims were timely asserted, Plaintiff's due process claims relating to disciplinary confinement and grievance processing fail as a matter of law and summary judgment is appropriate.

### 1. SHU Confinement

Plaintiff alleges due process claims related to disciplinary proceedings which led to disciplinary confinement. (Dkt. 12 at 29). "[A] prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived, and then show that he was deprived of that interest without due process of law." *Aguirre v. Kendra,* 123 F. Supp. 3d 419, 422 (W.D.N.Y. 2015). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Where a prisoner alleges that he was confined to the Special Housing Unit ("SHU") as the result of a disciplinary hearing, the court considers how long the confinement lasted, along with "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population," in determining whether a liberty interest is implicated. *Vasquez v. Coughlin,* 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*7** There is no "bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days under "normal" SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest under the Due Process Clause. *Ortiz,* 380 F.3d at 654-55; *see also Tafari v. McCarthy,* 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that SHU confinements of up to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions.' " (quoting *Palmer,* 364 F.3d at 65)).

Here, Defendants argue that none of Plaintiff's disciplinary confinements violated Plaintiff's due process rights. (Dkt. 177-5 at 6-7). Defendants submitted Plaintiff's prison disciplinary record. (*See* Dkt. 177-4). The records show Plaintiff was subjected to only one non-time-barred SHU confinement at Wende. (*See id.* at 8). That SHU confinement was for 30 days. (*Id.*). Plaintiff

2017 WL 920753

does not argue that the conditions of his confinement were in any way abnormal or atypical. Because Plaintiff's disciplinary confinement fell within the "short" range and did not involve any abnormalities, it did not implicate any liberty interest sufficient to raise a due process violation. Plaintiff's due process claims as to disciplinary confinement at Wende fail as a matter of law.

### 2. Grievance Processing

Plaintiff also raises due process complaints about the handling of his grievances. (*See* Dkt. 12 at 27-30; Dkt. 209-2 at 21). It is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances. *See Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "[Although] there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (internal citations omitted).

Plaintiff has no liberty interest in the prison grievance program. Even if Defendants violated their own procedures in processing Plaintiff's grievances, Plaintiff cannot find relief under § 1983. A prisoner may raise due process claims related to disciplinary hearings. *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 608 (W.D.N.Y. 2015); *Richard v. Fischer*, 38 F. Supp. 3d 340, 358-59 (W.D.N.Y. 2014). However, Plaintiff's allegations here relate only to allegedly faulty grievance processing; Plaintiff makes no allegations of due process violations related to disciplinary hearings. Therefore, these claims fail as a matter of law.

Plaintiff's only claim against Defendants Bellamy and Scott are the due process claims related to the grievance process. Because Plaintiff's claims fail, Defendants Bellamy and Scott must be dismissed from the action.

### E. Retaliation

Finally, Plaintiff alleges that he was retaliated against because he filed grievances. (Dkt. 12 at 28).

A prisoner has a substantive due process right not to be subjected to false misconduct charges as

retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances. Retaliating against inmates for filing grievances by filing false disciplinary reports violates the First Amendment. In fact, our Circuit has held that the filing of a false disciplinary report is a serious enough action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. Accordingly, a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.

**\*8** *Richard v. Fischer*, 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, Plaintiff asserts that because of his filing of numerous grievances, unspecified Defendants retaliated by filing false misbehavior reports. (*See* Dkt. 12 at 28). Defendants have not raised any argument related to Plaintiff's retaliation claim. (*See* Dkt. 177-5). Therefore, the Court will not dismiss the retaliation claim.

### F. Summary

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's alleged due process claims, but is denied as to Plaintiff's Eighth Amendment claims related to the alleged denial of adequate medical treatment and adequate food and nutrition, and it is also denied with respect to Plaintiff's claims alleging retaliation and the failure to provide reasonable accommodations for Plaintiff's disability.

### III. Plaintiff's Motion for Discovery

Plaintiff moves this Court to open discovery. (Dkt. 182). Plaintiff states that he is "asking for interrogatory answers and other evidence [to] show that the material facts are in dispute." (*Id.* at 2). Plaintiff also states that discovery will allow him to show that he filed "over 300 grievances." (*Id.*).

The Court construes Plaintiff's motion as one under Fed. R. Civ. P. 56(d). In opposing a summary judgment

motion, if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials "must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient."

Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 151 (2d Cir. 2016) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, Plaintiff has not submitted any sworn affidavit or declaration requesting particular information, nor has he described how the material requested is germane to his defense related to the due process claims (the only claims on which the Court has granted summary judgment). As discussed above, the due process claims are barred as a matter of law, and Plaintiff has not made a showing that discovery would alter that conclusion. Therefore, the motion for discovery is denied without prejudice to Plaintiff seeking discovery with respect to the claims that remain.

### IV. Plaintiff's Motion to Appoint Counsel

As part of Plaintiff's motion for discovery, he also moves this Court to appoint counsel "to assist [Plaintiff] in preparing his case...." (Dkt. 182 at 5). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, see, e.g., Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc., 865 F.2d 22, 23-24 (2d Cir. 1988), and the assignment of pro bono counsel in civil cases is within the trial court's discretion. In re Martin-Trigona, 737 F.2d 1254, 1260 (2d Cir. 1984). The court must evaluate "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." Cooper v. A. Sargenti Co., Inc., 877 F.2d 170, 172 (2d Cir. 1989). Particular attention must be paid to the merits of the plaintiff's claim. Id. ("Even where the claim is not frivolous, counsel is often unwarranted where the

indigent's chances of success are extremely slim." (quoting Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986))). Additionally, for prison inmates, the court must also give weight to the plaintiff's lack of practical access to attorneys. Id. at 173-74.

**\*9** Plaintiff was in prison when he filed the complaint, and remains in custody. (See Dkt. 1; Dkt. 4). Plaintiff has already been granted in forma pauperis status in this case. (Dkt. 5). In his in forma pauperis motion, Plaintiff stated that he was incarcerated, had not worked in the past 12 months, and did not have any cash or other assets. (Dkt. 4 at 1-2). A prison official certified that Plaintiff's average account balance for the previous six months was $1.07. (Id. at 3). Plaintiff has conclusively shown that he is indigent, and has met the threshold test for appointing counsel.

However, the Cooper factors all weigh against appointing counsel at this time. Plaintiff's motion papers provide no information suggesting that he attempted to obtain counsel to assist in his case. (See Dkt. 182 at 5). As the Second Circuit has noted, "[t]he vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." Cooper, 877 F.2d at 173. In the absence of an affirmative statement by Plaintiff otherwise, the Court assumes that he has not sought an attorney to represent him. This weighs against the appointment of counsel.

The Court also finds that the Plaintiff has failed to show anything more than a remote possibility of success on the merits. Plaintiff's ultimate success on the merits faces significant hurdles, including Defendants' defense that Plaintiff failed to exhaust his administrative remedies. This too weighs heavily against the appointment of counsel.

Balancing the factors set forth in Cooper, the Court finds that appointing counsel is inappropriate at this time, and Plaintiff's motion is denied without prejudice.

### V. Plaintiff's Motion for a Stay

Plaintiff moves this Court to stay the action while he undergoes surgery on his wrist, arm, and back. (Dkt. 182 at 6). Plaintiff does not disclose the date of the surgery, or any further information which would allow the Court to evaluate the necessity of such a stay. (See id.). Plaintiff has

Crichlow v. Fischer, Slip Copy (2017)

2017 WL 920753

not sufficiently shown a need for a stay in the litigation. Therefore, the motion is denied without prejudice.

## VI. Plaintiff's Motion for a Medical Exam

Plaintiff asks this Court, pursuant to Fed. R. Civ. P. 35, to order a medical examination so that he can access medical care for currently occurring medical issues. (Dkt. 187). Rule 35 permits a court to order "a party whose ... condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody...." Fed. R. Civ. P. 35. "In order to obtain a medical examination under Rule 35, the moving party must establish 'good cause....' " *Kelly v. Times/review Newspapers Corp.,* CV 14-2995 (JMA) (SIL), 2016 WL 2901744, at *1 (E.D.N.Y. May 18, 2016). " 'Rule 35 does not, however, authorize a party to file a motion for his own physical examination.' Neither may a plaintiff invoke Rule 35 in order to receive medical care." *Rodriguez v. Conway,* No. 10-CV-6243L, 2011 WL 4829725, at *3 (W.D.N.Y. Sept. 6, 2011) (citations omitted), *affirmed in relevant part by* No. 10-CV-6243L, 2011 WL 4829869 (W.D.N.Y. Oct. 12, 2011).

Here, Plaintiff's current medical condition is not "in controversy." Plaintiff has already submitted records regarding his medical and dental maladies for the time period at issue in this action. (*See* Dkt. 209-5 at 1-27). Defendants have in no way challenged the substance of Plaintiff's claimed medical needs during his incarceration at Wende from 2008 to 2010. Further, Plaintiff cannot use Rule 35 to receive medical care. Therefore, Plaintiff's motion is denied.

## VII. Plaintiff's Motion for Reconsideration

 **\*10** Plaintiff titles his motion at Dkt. 192 as a "motion for reconsideration," however, he does not point to any order or decision of the Court for which he seeks reconsideration. Although the Court has the inherent power to reconsider and modify interlocutory orders prior to the entry of judgment, *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other ... that adjudicates fewer than all the claims ... does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Williams v. Cty. of Nassau,* 779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) ("A district

court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."), *aff'd,* 581 Fed.Appx. 56 (2d Cir. 2014), Plaintiff has not provided sufficient information to allow the Court to decide his motion. Therefore, Plaintiff's motion is denied.

## VIII. Plaintiff's Motion to Amend

Plaintiff also filed a motion which, in essence, asks the Court to allow Plaintiff to amend his response to Defendants' motion for summary judgment. (Dkt. 192). The Court granted such relief already (Dkt. 208), and Plaintiff already filed amended response papers (Dkt. 209; Dkt. 211). Therefore, Plaintiff's motion is denied as moot because he has already received the requested relief.

## IX. Plaintiff's Motion for a Hearing

Plaintiff further asks the Court to hold a hearing "to cover several issue[s] that Plaintiff [does not] fully[ ] understand." (Dkt. 192 at 3). Plaintiff also seeks scheduling conferences or orders pursuant to Fed. R. Civ. P. 16(b) and 26(f). The Court finds that neither a hearing nor a scheduling order is necessary at this time. If Plaintiff has legal questions, he may retain an attorney or do further legal research to answer those questions. It is not the Court's role to answer such questions. Thus, Plaintiff's motion is denied. Once an answer is filed, the case will proceed to discovery.

## X. Defendant's Motion for Sanctions

Defendants move this Court to impose sanctions on Plaintiff pursuant to Fed. R. Civ. P. 11. (Dkt. 195). Defendants argue that, as part of his response to the motion for summary judgment, Plaintiff filed a grievance exhausted by another inmate, claiming the grievance as one Plaintiff had himself exhausted. (Dkt. 195-2 at 1-2 (citing Dkt. 188-8 at 2)). Plaintiff allegedly did so in an attempt to show that the Jeffery Hale declaration was knowingly false and that Defendants had destroyed Plaintiff's grievances. (*Id.* (citing Dkt. 188 at 12)).

A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions

may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.,* 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "Further, even when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction is committed to the district court's discretion.' " *Id.* (quoting *Perez v. Posse Comitatus,* 373 F.3d 321, 325 (2d Cir. 2004)).

Defendants argue that "the only appropriate sanction in this matter is dismissal." (Dkt. 195-2 at 3). The Court disagrees. The grievance at issue relates to a complaint which arose during 2012 and 2013. (Dkt. 188-8 at 2). Even if Plaintiff was the grievant, the grievance itself would be irrelevant to this Court's inquiry into Plaintiff's incarceration conditions from 2008 until 2010. Indeed, the grievance at issue was not taken into account during the Court's review of the motion for summary judgment because it is irrelevant to the time frame at issue. Further, although the filing of false documents in bad faith to a court can, in egregious cases, result in dismissal, *see Ceglia v. Zuckerberg,* No. 10-CV-00569A(F), 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. 2014), *aff'd,* 600 Fed.Appx. 34 (2d Cir. 2015), such an extreme sanction is not warranted at this time. However, **Plaintiff is hereby warned that any future violation of Rule 11 may result in dismissal of the action or other appropriate sanctions.**

**\*11** Defendants' motion is denied without prejudice.

## XI. Plaintiff's Motion for Sanctions

Finally, Plaintiff asks this Court to impose sanctions on Defendants for making materially misleading and false statements to the Court in its response in opposition (Dkt. 174) to Plaintiff's letter motion (Dkt. 172). (Dkt. 198). The Court denied Plaintiff's motion as unrelated to the claims at issue in this action. (Dkt. 176).

Read generously, Plaintiff argues that Defendants' counsel failed to acknowledge in his response that one of the individuals named in the letter motion was also a named Defendant in this action. (*See* Dkt. 198 at 1-2). Such a misstatement is immaterial and does not warrant

sanctions. As Plaintiff failed to assert any material violation of Rule 11, sanctions are inappropriate, and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (Dkt. 177);

INSTRUCTS the Clerk of Court to terminate Defendants Bellamy and Scott from this action;

DIRECTS Defendants to answer the complaint within 30 days of the filing of this Decision and Order;

DENIES Plaintiff's motion for discovery (Dkt. 182) without prejudice;

DENIES Plaintiff's motion to appoint counsel (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a stay (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a medical exam (Dkt. 187);

DENIES Plaintiff's motion for reconsideration (Dkt. 192);

DENIES Plaintiff's motion to amend (Dkt. 192) as moot;

DENIES Plaintiff's motion for a hearing (Dkt. 192);

DENIES Defendants' motion for sanctions (Dkt. 195) without prejudice; and

DENIES Plaintiff's motion for sanctions (Dkt. 198).

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 920753

Footnotes

2017 WL 920753

1   Defendants have not made any statute-of-limitations arguments regarding Plaintiff's claims under the Rehabilitation Act or the Americans with Disabilities Act. (*See* Dkt. 177-5 at 3). Thus, the Court only addresses Defendants' statute-of-limitation argument as it relates to Plaintiff's constitutional claims of discrimination under § 1983.

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2312355
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

Courtney GREEN, Plaintiff,

v.

Antonio SANTIAGO, Scott Erfe, Peter Murphy,
Deputy Warden J. Zegarzewski, Deputy
Warden G. Mudano, Captain D. Williams,
Captain Doughtory, Lieutenant Conger,
Lieutenant M. Pluszynski, Michelle King, and
Visiting Coordinator S. Jubinsky, Defendants.

3:16-cv-1724(CSH)
|
Signed 05/26/2017

**Attorneys and Law Firms**

Courtney Green, Somers, CT, pro se.

## INITIAL REVIEW ORDER

Charles S. Haight, Jr., Senior United States District Judge

*\*1* Plaintiff Courtney Green ("Green"), incarcerated in a Connecticut prison and appearing *pro se*, has filed a Complaint, containing a number of allegations which assert claims under 42 U.S.C. § 1983 against several state prison officials.

The Defendants identified by the Complaint are Warden Antonio Santiago; Warden Scott Erfe; District Administrator Peter Murphy; Deputy Warden J. Zegarzewski; Deputy Warden G. Mudano; Captain D. Williams; Captain Doughtory; Lieutenant Conger; Lietenant M. Pluszynski; Administrative Remedies Coordinator Michelle King, and Visiting Coordinator S. Jubinsky.

All Defendants are named in their individual and official capacities and were employed at Corrigan-Radgowski Correctional Institution ("Corrigan") where Green was incarcerated at the time of the alleged events.

This Ruling begins with, and consists principally of, the Court's *sua sponte* review of Green's pleadings, a review mandated by the Prison Litigation Reform Act of 1996 (PLRA), 28 U.S.C. § 1915A.

## I. STANDARD OF REVIEW

28 U.S.C. § 1915A directs federal district courts to consider all prisoner civil complaints against governmental actors, and dismiss any portion of the complaint that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." § 1915A(b)(1),(2).

A district court's *sua sponte* dismissal of a prisoner's complaint under § 1915A is reviewed *de novo* by the court of appeals. Where the district court has dismissed for failure to state a claim, the Second Circuit has said that "we accept all of plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff. We must reverse a district court's dismissal pursuant to § 1915A whenever a liberal reading of the complaint gives any indication that a valid claim might be stated." *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (citations and internal quotation marks omitted).

At the district court level, the district judge's § 1915A review of whether a complaint "fails to state a claim upon which relief can be granted" is guided by the Federal Rules of Civil Procedure, as interpreted by Supreme Court and Second Circuit decisions whose principles have become familiar. A *pro se* complaint is adequately pleaded if its allegations, liberally construed, could "conceivably give rise to a viable claim." *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005). The Court must accept as true all well-pleaded and non-conclusory factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (same). Nevertheless, it is well-established that *pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). In *Larkin* the

Second Circuit took care to say, in the § 1915A context: "We will not affirm the dismissal of a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts that would entitle him to relief." 318 F.3d at 139 (citation omitted). The Court will apply these standards in conducting its initial review of any claims asserted by Green. The Court begins with a recitation of the factual allegations contained in these pleadings.

## II. FACTUAL ALLEGATIONS

**\*2** The factual allegations contained in Green's Complaint, filed on October 17, 2016, are recounted herein, recited in the light most favorable to Green. They describe Green's August 2014 transfer from Cheshire Correctional Institution ("CCI") to Corrigan, his subsequent exposure to Corrigan's visiting policies, and the chronology of his objections to these policies, including his formal administrative grievance.

### A. Green's History of Contact Visits at CCI

Green was confined at CCI for approximately four and one half years, prior to his August 2014 transfer to Corrigan. As of August 2014, Green had been "discipline report free" for five and one-half years, with no assaults on Department of Correction staff. Green had no gang affiliation, no history of introducing contraband into a correctional facility, and posed no unusual safety concern to prison staff or fellow inmates.

While confined at CCI, Green was afforded contact visits with his family, in accordance with Connecticut Department of Correction Administrative Directive 10.6(6)L.1. Green was then, and remains today, in compliance with the provisions of that Directive regarding prisoner eligibility for contact visits.

### B. Initial Denial of Contact Visits at Corrigan

Following his transfer to Corrigan, in September 2014, Green received a visit from his spouse and child. This visit was non-contact, meaning that a glass partition separated Green from his visitors. Green expressed his displeasure with this arrangement to the visiting officer

in charge. Green was told he would not be allowed contact visits, as Corrigan is a "non-contact facility." Green objected to the visiting officer's characterization of Corrigan as a "non-contact facility," telling the officer this could not be true, as two other inmates were receiving contact visits at the same time that such visits were denied to Green. The visiting officer replied that while the officer was not responsible for making the visiting rules, Green could write to Defendant Conger to get into the "M.A.C. group," as only M.A.C. group members were eligible to receive contact visits at Corrigan. The visiting officer inquired into Green's disciplinary record, and, upon hearing that Green had not had a disciplinary report for five and one-half years, assured Green that there would be no difficulty in his obtaining contact visits.

### C. The M.A.C. Group

A few days after the visit described above, Green wrote to Defendant Conger, the M.A.C. group coordinator, to request enrollment in the M.A.C. group, via inmate request. Defendant Conger never responded to Plaintiff's request in writing. However, while Defendant Conger was touring Green's housing unit, F-Pod, Defendant Conger notified Green in person that Green did not meet the requirements for M.A.C. group membership.

The requirements for membership in the M.A.C. group are as follows: (1) inmates must be "discipline free" for two years; and (2) inmates must have a minimum of twenty-five years remaining on their sentence at the time of their application to the group. Green met the first condition, by virtue of his clean disciplinary record. He did not meet the second condition; at the time of his application to the M.A.C. group, Green had less than twenty-five years remaining on his sentence. As Defendant Conger informed him, Green was therefore ineligible for membership in the M.A.C. group.

The M.A.C. group consists of fifteen inmates. Corrigan has a population of approximately 800 inmates, but of this population, the fifteen members of the M.A.C. group are the only inmates afforded contact visits. Defendant Williams served, at one time, as M.A.C. group coordinator. Defendant Pluszynski is the M.A.C. group contact visit/high security coordinator. Defendant Jubinsky is Visiting Coordinator, and as such "signed off" on the M.A.C. group policies. Defendant Doughtory

is the Intel Captain of Corrigan, and also approved of the M.A.C. group policies. Defendant Zegarzewski, as Deputy Warden of Programs and Treatment, allowed the M.A.C. group to function under that authority. Defendant Mudano, as Deputy Warden, also gave approval to the M.A.C. group policies.

**\*3** Other Level 4 correctional facilities in Connecticut, including CCI, Garner Correctional Institution, and MacDougall Correctional Institution, allow contact visits for their general populations, as described by Administrative Directive 10.6(6)L.1. There is no M.A.C. group or equivalent limitation on access to contact visits at the referenced institutions.

### D. Green's Protests and Grievance

In late September 2014, after receiving Defendant Conger's negative response to his application to join the M.A.C. group, Green wrote to Defendant Erfe in protest of Corrigan's contact visit policies. At the time this letter was sent, Green understood that Defendant Erfe was the warden of Corrigan. Green never received a response to this letter.

In January 2015, Green mentioned the lack of response to his letter to Defendant Erfe to Green's counselor, non-party Counselor Meigs. Counselor Meigs informed Green that Defendant Erfe was no longer the warden of Corrigan, and had not held that post for a few months. Counselor Meigs suggested that Green address his concerns to the new warden, Defendant Santiago.

On February 22, 2015, Green addressed an inmate request to Defendant Santiago, inquiring into the authority cited for Corrigan's failure to provide contact visits to its general population, while allowing contact visits for the fifteen members of the M.A.C. group. By the same inmate request, Green further requested a contact visit with Defendant Santiago.

On March 2, 2015, Green received a written response from Defendant Santiago. This response again denied Green's request for contact visits, without providing any additional rationale for this denial.

Green then filed an administrative remedy (grievance) to protest the repeated denial of his requests for contact visits.

Defendant King denied Green's grievance. Defendant King cited the permissive language of Administrative Directive 10.6, which states that Level 2, 3, and 4 facilities *may* provide for contact visits (emphasis added). Defendant King instructed Green to contact nonparty Counselor Supervisor Cruz, to request placement on the transfer list, and to contact Defendant Conger to see whether Green would meet the criteria of the M.A.C. group.

Green contacted Counselor Supervisor Cruz, and was denied a facility transfer. Green did not contact Defendant Conger at this time, as Defendant Conger had already informed Green that he did not meet the criteria of the M.A.C. group.

Green appealed his grievance to Level 2, where the denial was upheld by Defendant Murphy, on the same basis as the initial denial by Defendant King. Defendant Murphy informed Green that the Level 2 review exhausted Green's administrative remedies. Green believes Defendant Murphy's statement as to exhaustion to have been in error. Green believes he was entitled to appeal this denial to Level 3.

On November 11, 2015, Green wrote a letter to nonparty Connecticut Department of Correction Commissioner Scott Semple, informing Commissioner Semple that Corrigan was enforcing policies outside the scope of the Department's Administrative Directives. Specifically, Green informed the Commissioner of the "unwritten rule," that, at Corrigan, an inmate must be in the M.A.C. group to receive contact visits.

On or about December 4, 2015, Green received a memo from Defendant Santiago, in response to Plaintiff's November 2015 letter to Commissioner Semple. The memo stated that the M.A.C. group was not listed in the program compendium, and that the M.A.C. group was currently on hold and under review. To Green's knowledge, the M.A.C. group has never been listed and described on the Department's website or in the program compendium.

#### E. Negative Health Impacts Associated with Green's Lack of Contact Visits

**\*4** During his nineteen months at Corrigan, Green was diagnosed with elevated hypertension. Green has also required mental health consultation for distress while at Corrigan. Green attributes both his elevated hypertension and his distress to his lack of access to contact visits while at Corrigan.

### III. DISCUSSION

Green contends that the Defendants have violated his Eighth and Fourteenth Amendment rights to freedom from cruel and unusual punishment, equal protection, and due process. Green also contends that the Defendants have violated the Eighth and Fourteenth Amendment rights to freedom from cruel and unusual punishment and equal protection of the general Corrigan inmate population. Additionally, Green contends that Defendants have not complied with various Administrative Directives of the Connecticut Department of Correction. Citations in the discussion below are to the Complaint's numbered paragraphs.

#### A. Claims on Behalf of Other Inmates

Green includes general assertions on behalf of other inmates at Corrigan with regard to the contact visit policy. ¶ 29. Green lacks standing to bring claims on behalf of other inmates, unless he were to do so as part of a Rule 23 class action. Fed. R. of Civ. P. 23. One of Rule 23's requirements for class certification is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Green, as a *pro se* plaintiff, *in forma pauperis*, is ill-placed to represent a the interests of a class of fellow inmates. "A *pro se* plaintiff lacking any formal training in the law will not be permitted to represent a class." Am. Jur. 2d Fed. Courts § 1667. *See, e.g., Howard v. Pollard*, 814 F.3d 476 (7th Cir. 2015); *Ransom v. U.S. Postal Service*, 170 Fed. Appx. 525 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 373 (U.S. 2006); *Ziegler v. State of Michigan*, 90 Fed. Appx. 808 (6th Cir. 2004); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975) (per curiam); *Vazquez v. Fed. Bureau of Prisons*, 999 F. Supp. 2d 174, 177 (D.D.C. 2013) ("As

a general rule applicable here, an individual appearing pro se may not represent other individuals in federal court, see 28 U.S.C. § 1654, and courts have routinely denied a prisoner's request to represent a class of prisoners without the assistance of counsel."); *DeBrew v. Atwood*, 847 F.Supp.2d 95, 104–05 (D.D.C. 2012); *Maldonado v. Terhune*, 28 F.Supp.2d 284, 288 (D.N.J. 1998); *Nilsson v. Coughlin*, 670 F. Supp. 1186, 1191 (S.D.N.Y. 1987). While, generally, *pro se* complaints are to be liberally construed, "the Court is reluctant to extend this type of procedural relaxation to the requirements of Rule 23(a)." *Jeffery v. Malcolm*, 353 F. Supp. 395 (S.D. N.Y. 1973).

Given the difficulty, if not impossibility, of a *pro se* plaintiff advancing a class action certification under Rule 23, as well as the general nature of Green's assertions on behalf of other inmates, any claims Green has asserted on behalf of other inmates are dismissed, pursuant to 28 U.S.C. § 1915A(b)(1).

#### B. Sovereign Immunity for Official Capacity Claims

Green has named all Defendants in their individual and official capacities, but he seeks only money damages. The Eleventh Amendment divests the Court of subject matter jurisdiction over any claims for monetary damages against a state official acting in his official capacity unless the state has waived this immunity or Congress has abrogated it. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Section 1983 does not abrogate state sovereign immunity. *Id.* at 169 n.17; *see also Quern v. Jordan*, 440 U.S. 332, 341-45 (1979). Nor has Green alleged any facts suggesting that Connecticut has waived this immunity.

**\*5** Accordingly, any and all claims against the Defendants in their official capacities are dismissed pursuant to 28 U.S.C. § 1915A(b). *See Al-Bukhari v. Dep't of Corr.*, No. 3:16-cv-205, 2016 WL 730703, at \*3 (D. Conn. Feb. 23, 2016) (slip copy) (dismissing claims against an individual in his official capacity based on sovereign immunity)

#### C. § 1983 Claims Against Defendants in Their Individual Capacities

Green also asserts each of these claims against all Defendants in their individual capacities, again, seeking

2017 WL 2312355

only monetary damages. Specifically, Green alleges that Defendants' denial of his various requests for contact visits violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment rights to due process and equal protection. Green further alleges a conspiracy amongst the Defendants to deprive Green of the aforementioned constitutional rights. The Complaint also claims that the Defendants' conduct violated certain administrative policies and directives of the State of Connecticut Department of Correction. The Court will address each of Green's claims in turn.

### 1. Under the Eighth Amendment

A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when the official's action involves the "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)).

> In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.

*Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (internal quotation marks omitted). The deprivations must be examined in light of contemporary standards of decency to determine whether they are sufficiently serious. *See Helling v. McKinney*, 509 U.S. 25, 35-36 (1993); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Subjectively, the plaintiff must show that the defendants acted with "more than mere negligence." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

While there may be some limitations on visitation that would violate a prisoner's rights under the Eighth Amendment, limitations much more severe than those described by Green have not cleared that bar. *See Overton v. Bazzetta*, 539 U.S. 126, 136-37 (2003) (disciplinary regulation that subjected some inmates to ban of at least

two years on *all* visitation, including non-contact visits, exclusive of clergy and attorneys, did not violate the Eighth Amendment, though some more permanent or arbitrary ban might); *see also Smith v. Coughlin*, 748 F.2d 783 (2d Cir. 1984) (no Eighth Amendment violation where inmate had been denied all contact visits, save those with priest, attorney, and medical professionals); *Marrero v. Weir*, No. 3:13-cv-0028, 2014 WL 4799228 (D. Conn. Sept. 26, 2014) (no Eighth Amendment violation where plaintiff's phone privileges and all visits from his mother were suspended indefinitely as a disciplinary measure).

Here, even liberally construed, Green's allegations are not sufficiently serious to state an Eighth Amendment claim. The Court does not doubt that Green was in fact distressed and discomfitted by his lack of contact visits with his family. However, this district court is bound by the cited appellate authority holding that not every psychological discomfort a prisoner is forced to endure will amount to a constitutional violation. *See also Calhoun v. DeTella*, 219 F.3d 936, 939 (7th Cir. 2003). Considering the history of Eighth Amendment jurisprudence, Green's allegations that he was denied contact visits do not rise to the "wanton infliction of pain" that establishes a prison official's violation of the Eighth Amendment. *See Whitley*, 475 U.S. at 319. Thus, Green fails to state any cognizable Eighth Amendment claims. Green's § 1983 claims based on violations of the Eighth Amendment are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### 2. Under the Due Process Clause of the Fourteenth Amendment

**\*6** Green alleges several Fourteenth Amendment procedural due process claims. To state a procedural due process claim, a plaintiff must allege that he has been "deprived of a protected liberty interest," without sufficient due process. *Batts v. Richards*, 4 F. Supp. 2d 96, 98 (D. Conn. 1998) (citing *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996)). The Court will first consider whether Green was deprived of any protected liberty interest, before reaching the question of whether sufficient process accompanied any such deprivation.

#### i. As to Visitation Rights

Green's primary procedural due process claim relates to the visitation policies he encountered upon his transfer from CCI to Corrigan. Having been afforded the opportunity for regular contact visits with his family while at CCI, Green was deprived of that opportunity upon his arrival at Corrigan, as first became evident to him during the September 2014 non-contact visit with his spouse and child. In the Complaint, Green specifically asserts that Defendant Santiago violated Green's Fourteenth Amendment rights to due process by "failing to give notice as to why plaintiffs [sic] privileges were revoked." ¶ 30. The first question in this due process inquiry, then, is whether Green had a protected liberty interest in contact visitation.

There is some support for an independent, fundamental constitutional right to visitation for inmates. This Circuit has held that pretrial detainees have a First Amendment right to contact visits. *Marcera v. Chinlund*, 595 F.2d 1231, (2d Cir. 1977), *vacated and remanded on other grounds*, 442 U.S. 915 (1979), acknowledged by *Bell v. Wolfish*, 441 U.S. 520, 559 n.40 (1979); *see also Rhem v. Malcolm (Rhem II)*, 527 F.2d 1041 (2d Cir. 1975); *Boudin v. Thomas*, 533 F.Supp.786, (S.D.N.Y. 1982), *appeal dismissed and remanded*, 697 F.2d 288 (2d Cir. 1982). All the cited opinions for the existence of a constitutional right to visitation in this Circuit refer to the rights of pretrial detainees. [1] Meanwhile, courts in this district have failed to find that inmates have any such independent, fundamental constitutional right to visitation, contact or otherwise. *See, e.g., Mercado v. Dep't of Corr.*, No. 3:16cv1622, 2017 WL 1095023 (D. Conn. Mar. 23, 2017) (Bryant, *J.*) (slip copy); *Mclellan v. Chapdelaine*, No. 3:16-cv-2032, 2017 WL 388804, at *6 (D. Conn. Jan. 27, 2017) (Bolden, *J.*) (slip copy) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454 (1989)) ("[A] prisoner has no constitutionally protected right to contact or noncontact visits under the Due Process Clause of the Fourteenth Amendment."); *Graziani v. Murphy*, No. 3:11-cv-1615, 2012 WL 2785907 (D. Conn. July 5, 2012) (Chatigny, J.); *Calderon v. Lantz*, No. 3:06cv969, 2007 WL 2727149 (D. Conn. Sept. 18, 2007) (Underhill, *J.*); *Calderon v. Lantz*, No. 3:06cv61, 2006 WL 2092080, at *4 (D. Conn. July 24, 2006) (Dorsey, *J.*) (citing *Flanagan v. Shively*, 783 F.Supp. 922, 934 (M.D.Pa.), *aff'd*, 980 F.2d 722 (3d Cir. 1992), *cert. denied*, 114 S.Ct. 95 (1993)) ("Inmates ... have no constitutional right to visitation."). This Court is not convinced that Green can assert any independent, fundamental constitutional right to contact visits, sufficient to create a protected liberty interest.

*7 Even if there is no independent constitutional right to visitation, "state law may create enforceable liberty interests in the prison setting." *Thompson*, 490 U.S. at 461. However, the ability of states to create an enforceable liberty interest is restricted to protections from restraints which "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). This Circuit has consistently interpreted *Sandin* to mean that "a prisoner has a liberty interest only if the deprivation ... is atypical and significant and the state has created the liberty interest by statute or regulation." *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000), citing *Sealy v. Gitner* 116 F.3d 47, 52 (2d Cir. 1997).

While it is doubtful that the deprivation of contact visits alleged by Green would rise to the standard of an "atypical and significant hardship," the Court need not reach this question, as the state of Connecticut has not created any liberty interest in contact visitation by either statute or regulation. In determining whether specific state prison regulations create a liberty interest, courts will look to whether the regulation, first, establishes "substantive predicates to govern official decision-making," and, second, mandates "the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson*, 490 U.S. at 462. While Connecticut Department of Correction Administrative Directive 10.6(6)L, "Contact/Non-Contact Visit," establishes substantive predicates to govern official decision-making as to which inmates will be afforded contact visits, *e.g.* by providing a (non-exclusive) list of characteristics which indicate that an inmate "presents a reasonable security concern," and should therefore be denied contact visits, the Directive explicitly provides that "[n]o inmate shall be entitled to a contact visit." State of Conn. Dep't of Corr., Admin. Directive 10.6(6)L (Oct. 10, 2013) available at http://www.ct.gov/doc/LIB/doc/PDF/AD/ad1006.pdf (last accessed May 24, 2017); *see also Graziani*, 2012 WL 2785907, at *3 ("Under Connecticut law, visitation is viewed as a privilege, not an entitlement."). As with the Kentucky prison visitation regulations at issue in *Thompson*, here, in Connecticut,

> The overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would

necessarily be allowed absent the occurrence of one of the listed conditions. Or, to state it differently, the regulations are not worded in such a way that an inmate could reasonably expect to enforce them against the prison officials.

*Thompson*, 490 U.S. at 464-65.

Failing to find either an independent constitutional right to visitation, or a state-created liberty interest in contact visitation, the Court finds that Green has failed to state a claim that Defendants violated his Fourteenth Amendment right to due process by depriving him of contact visits. The § 1983 claims based on due process violations related to the deprivation of contact visitation privileges are dismissed pursuant to 28 U.S.C. § 1915A(b) (1).

### ii. As to Grievance Procedures

Having addressed Green's due process claims as they relate to the denial of contact visits, the court now turns to Green's assertions that Defendants Murphy and King violated his right to procedural due process "by creating impediments and partiality within the grievance procedure." ¶¶ 31, 33. Specifically, Green asserts that Defendant Murphy told Green, in error, that Green's administrative remedies were exhausted after Defendant Murphy denied Green's Level 2 appeal. [2]

**\*8** Prisoners have no constitutionally protected right to have prison officials comply with grievance procedures or even to respond to grievances. *See Torres v. McGrath*, No. 3:15cv1558, 2016 WL 1948806, at \*4 (D. Conn. May 3, 2016) (slip copy) (quoting *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008) (collecting cases)) ("It is well established ... that inmate grievances procedures are undertaken voluntarily by the state, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievance does not in itself give rise to a constitutional claim."); *Kalican v. Dzurenda*, No. 3:12-cv-1009, 2015 WL 1806561, at \*6 (D. Conn. Apr. 21, 2015) (no constitutional entitlement to have prison officials comply with grievance procedures or respond to grievances); *see also Fernandez v. Armstrong*, No. 3:02cv2252, 2005 WL 733664, at \*9

(D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right.").

Because Green has no protected liberty interest in having correctional officials follow the state of Connecticut's established grievance procedure, and has not alleged that he was denied a constitutionally or federally protected right, there is no basis for a due process claim. The § 1983 claims based on due process violations related to the grievance procedures are therefore dismissed, pursuant to 28 U.S.C. § 1915A(b)(1).

### 3. Under the Equal Protection Clause of the Fourteenth Amendment

Green asserts two § 1983 claims based on the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause requires that the government treat similarly situated people in a similar manner. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citation omitted). Green has alleged facts sufficient to state a claim of purposeful discrimination towards two identifiable classes of inmates: (1) those incarcerated at Corrigan, as opposed to those incarcerated at CCI and other comparable Connecticut institutions; and (2) those with less than twenty-five years remaining on their sentences, as opposed to those with twenty-five years or more.

Where the differential treatment does not discriminate against a protected class, the government must meet only the lenient "rational basis" standard, whereby "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne* 473 U.S. at 440. The government must meet the higher "strict scrutiny" standard when it treats individuals differently based on a suspect or protected class, such as race or national origin. *Id.*

It is well-established that "[m]erely being a prisoner is insufficient to place [one] in a suspected class." *Robles v. Dennison,* 745 F. Supp. 2d 244, 301 n.18 (W.D.N.Y. 2010), *aff'd,* 449 Fed.Appx. 51 (2d Cir. 2011) (summary order). Courts have applied rational basis analysis to equal protection claims where prison policies distinguished between non-suspect classes of prisoners. *See, e.g., McGinnis v. Royster,* 410 U.S. 263 (1973) (good-time policy distinguished between inmates held at county jails and those held at state prison); *Hammer v. Ashcroft,* 570 F.3d 798 (7th Cir. 2009), *cert. denied,* 130 S. Ct. 1735 (2010) (federal prison media-access policy distinguished between prisoners housed in special confinement unit, most of whom had been sentenced to death, and other prisoners); *Williams v. Manson,* 499 F.Supp. 773 (D. Conn. 1980) (mail policy distinguished between prisoners making lottery purchases and those making other financial transactions); *Delafonse v. Manson,* 385 F.Supp. 1115 (D. Conn. 1974) (prison pay policy distinguished between prisoners held at psychiatric hospital and those held at other hospitals); *Beatham v. Manson,* 369 F.Supp. 783 (D. Conn. 1973) (seniority pay-scale distinguished between inmates of one correctional institution and those of another). As neither of Green's asserted classes of inmates has suspect or protected status, the less-stringent rational basis standard will apply.

*9 The Complaint makes frequent reference to a violation of Green's right to equal protection under a theory of "legitimacy." It is not clear to the Court what significance or effect Green ascribes to this noun. In the equal protection context, legitimacy is the legal status of a child born to parents legally married to each other, as opposed to illegitimacy, the legal status of a child born outside a lawful marriage. *See Legitimacy* and *Illegitimacy,* Black's Law Dictionary (10th ed. 2014). Official discriminations between legitimate and illegitimate children face an intermediate level of scrutiny, between strict scrutiny and the rational basis standard, and "will survive equal protection scrutiny to the extent they are substantially related to a legitimate state interest." *City of Cleburne,* 473 U.S. at 441 (quoting *Mills v. Habluetzel,* 456 U.S. 91, 99 (1982)). Green does not provide any factual basis for a claim that prisoners are discriminated against on the basis their status of legitimacy or illegitimacy, and his § 1983 claims based on equal protection violations as to the status of legitimacy are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Accordingly, Green's § 1983 claims against Defendants will go forward only on the two bases described above, namely (1) the differential treatment of inmates housed at Corrigan, as opposed to those housed at CCI or other comparable Connecticut institutions; and (2) the differential treatment of inmates with less than twenty-five years remaining on their sentences, as opposed to those inmates with twenty-five years or more remaining. As noted *supra,* the governing law requires Defendants to demonstrate that the protocols for contact visits at Corrigan are rationally related to a legitimate state interest. At this early stage, there is no evidentiary record on that issue, and the Court intimates no view with respect to it. Green makes particularized allegations that each named Defendant shared responsibility for the discriminatory practices at Corrigan, and Green's equal protection claims, as described in this paragraph, will proceed against all named Defendants.

### 4. Under a Theory of Conspiracy to Violate § 1983

The Complaint makes two claims of conspiracy amongst the Defendants to violate Green's constitutional rights, in violation of § 1983. Green asserts that all Defendants "knowingly, intentionally, and recklessly" conspired to deprive him of his rights under the Eighth and Fourteenth Amendments. ¶ 41. Green also makes a more specific assertion that Defendant Murphy intentionally misled Green as to Green's appeal rights under the grievance system. Green asserts that Defendant Murphy's misrepresentation was in service of a conspiracy to uphold the prior negative determinations of Defendants Santiago and King as to Green's requests, without regard to the potential merit of Plaintiff's grievance. Green asserts that the aim of this alleged conspiracy is to satisfy the personal vendettas of corrections officials, at the expense of inmates' constitutional rights. To establish a conspiracy under § 1983, Green must prove "(1) the existence of an agreement between two or more state actors (or a state actor and a private entity), (2) to act in concert to inflict an unconstitutional injury, and (3) an overt act done in furtherance of that goal." *Watrous v. Town of Preston,* 902 F. Supp. 2d 243, 268 (D. Conn. 2012) (quoting *Phoenix v. Reddish,* 175 F. Supp. 2d 215, 218 (D. Conn. 2001)).

Both of Green's general conspiracy claims are barred by the intracorporate conspiracy doctrine, and thus, are futile. "[U]nder the intracorporate conspiracy doctrine,

officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (internal quotation marks omitted). "The intracorporate conspiracy doctrine applies to claims of § 1983 conspiracy." *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 467 (S.D.N.Y. 2012). Even though "the Second Circuit Court of Appeals has not issued a decision specifically addressing the use of the intracorporate conspiracy doctrine in prisoner civil rights cases," courts "within the Second Circuit ... have applied the doctrine to [such] claims." *Richard v. Dignean*, 126 F. Supp. 3d 334, 338-39 (W.D.N.Y. 2015) (collecting cases).

**\*10** There is an exception to the application of the doctrine when the individuals are "pursuing personal interests wholly separate and apart from the entity," *Ali v. Connick*, 136 F. Supp. 3d 270, 282-83 (E.D.N.Y. 2015) (quoting *Bond v. Bd. of Educ. of the City of New York*, No. 97 cv 1337, 1999 WL 151702, at \*2 (E.D.N.Y. Mar. 17, 1999)). For the exception to apply, a plaintiff "must also allege that [the defendants] acted other than in the normal course of corporate duties." *Id.* (quoting *Girard v. 94th St & Fifth Ave. Corp.*, 530 F.2d 55, 72 (2d Cir. 1976)).

That exception does not apply to this case. Green's Complaint alleges only that the prison officials have been acting in the normal course of their corporate duties. The general conspiracy claim asserts that Defendants conspired to deprive Green of his constitutional rights, but this does not articulate a personal interest "wholly separate and apart" from the interests of the government entity they serve. *Ali*, 136 F. Supp. 3d at 282. With regards to the specific claim of conspiracy against Defendants Murphy, Santiago, and King, Green does allege that "personal vendettas" played into Defendants choices to deny grievances, but without any more specific allegation as to what this personal interest or vendetta was, the Court cannot conclude that the exception would apply. Defendants were acting in the course of their duties by addressing the grievances and no interest "wholly separate and apart" from those duties justified their actions. All of Green's conspiracy claims against Defendants are therefore dismissed, pursuant to 28 U.S.C. § 1915A(b)(1).

**5. Violation of Administrative Directives**

Green also makes independent assertions that all eleven Defendants failed to comply with Administrative Directives, citing the directives and the failure to comply. The failure to comply with state-created procedures does not in and of itself create a protected liberty interest that would implicate due process rights. *See Fernandez*, 2005 WL 733664, at \*10 (citing *Sandin*, 515 U.S. at 483) ("The Supreme Court has held that mandatory language in a prison directive or regulation does not in and of itself create a liberty interest"). All of Green's claims against Defendants for failure to comply with Administrative Directives are therefore dismissed, pursuant to 28 U.S.C. § 1915A(b)(1).

**IV. CONCLUSION**

For the reasons set forth above, Green's Complaint [Doc. 1] is DISMISSED, pursuant to 28 U.S. § 1915A(b), to the extent it seeks to plead any claim on behalf of other inmates; any claim against Defendants in their official capacities; any claim of violation of Administrative Directives; any § 1983 claims based on violations of rights established by the Eighth Amendment or the due process clause of the Fourteenth Amendment; and any claims of criminal conspiracy.

Green's § 1983 claims based on alleged Fourteenth Amendment equal protection violations occurring as a result of (1) the differential treatment of Corrigan prisoners as opposed to similarly situated prisoners at CCI and other Connecticut facilities; and (2) the differential treatment of Corrigan inmates with less than twenty-five years remaining on their sentences, as opposed to similarly situated inmates with twenty-five years or more on their sentences, will proceed against all Defendants in their individual capacities.

**\*11** In accordance with the foregoing analysis, the Court enters the following orders:

(1) The Clerk shall verify the current work address of Defendants Antonio Santiago; Scott Erfe; Peter Murphy; Deputy Warden J. Zgarzewski; Deputy Warden G. Mudano; Captain D. Williams; Captain Doughtory; Lieutenant Conger; Lietenant M. Pluszynski; Michelle King, and Visiting Coordinator S. Jubinsky with the Department of Correction Office of Legal Affairs and mail a waiver of service of process request packet to each

defendant at the confirmed address within **twenty-one (21) days** from the date of this Order. The Clerk shall report to the Court the status of that waiver request on the **thirty-fifth (35th) day** after mailing. If any Defendant fails to return the waiver request, then the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the Defendant in his or her individual capacity and Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2) The Clerk shall send a courtesy copy of the complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(3) Defendants shall file their response to the Complaint, either an answer or a motion to dismiss, within **sixty (60) days** from the date the waiver form is sent. If they choose to file an answer, then they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules of Civil Procedure.

(4) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(5) All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(6) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

**It is SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 2312355

Footnotes

1    In a 2012 summary order, this Circuit affirmed a district court's dismissal of a 42 U.S.C. § 1983 complaint against New York prison officials, where the plaintiff-inmate had allegedly been denied an expected visit with his minor son. Considering the plaintiffs' assertion of a First Amendment constitutional right to visitation, and citing only to *Overton,* 539 U.S. at 131-32, the court noted, as dicta, that, "the intentional or malicious deprivation of visitation to a prisoner, even on one occasion, *could* rise to the level of a constitutional violation." *Mills v. Fischer,* 497 Fed.Appx. 114, 116 (2d Cir. 2012), *cert. denied,* 133 S.Ct. 1255 (2013) (summary order) (emphasis added). One judge in this district, finding that a parolee did not have a First Amendment right to visitation with his minor child, had the following comment on *Mills*: "while the Second Circuit recognized that the possibility of a constitutional violation could arise from the malicious deprivation of visitation to an inmate, it did not find that there was, specifically, a First Amendment right to such visitation." *Hoegemann v. Palma,* No. 3:16-cv-1460, 2017 WL 455930, at *8 (D. Conn. Feb. 2, 2017) (Bolden, *J.*).
2    This assertion is linked to Green's conspiracy claims, discussed further below.

🟨 KeyCite Yellow Flag - Negative Treatment
Distinguished by Stewart v. Richardson, S.D.N.Y., December 27, 2016

2014 WL 1630815
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

JCG, Plaintiff,

v.

Robert E. ERCOLE, et al., Defendants.

No. 11 Civ. 6844(CM)(JLC).
|
Signed April 24, 2014.

### REPORT AND RECOMMENDATION

JAMES L. COTT, United States Magistrate Judge.

| | | | | |
|---|---|---|---|---|
| I. | | BACKGROUND .................... | | 2 |
| | A. | Plaintiff's Allegation .................. | | 2 |
| | | 1. | Denial of Religious Accommodations .............. | 3 |
| | | 2. | Harassment ............... | 3 |
| | | 3. | Assalt ................. | 4 |
| | | 4. | Supervisory Liability ............... | 5 |
| | | 5. | Ticket and Administrative Hearing ........... | 5 |
| | B. | Procedural History .................. | | 6 |
| II. | | DISCUSSION .................... | | 9 |
| | A. | Standard of Review for a Motion to Dismiss ........... | | 9 |
| | B. | Exhaustion of Administrative Remedies ............ | | 11 |
| | | 1. | Legal Standard under the PLRA ............. | 11 |
| | | 2. | Analysis of Plaintiff's Efforts To Exhaus t ........... | 13 |
| | | | a. | Plaintiff Failed to Complete the Exhaustion Requirements .. | 13 |
| | | | b. | Even Though Plaintiff Failed to Properl y Exhaust, Dismissal is Not Warranted On This Ground ........... | 14 |
| | C. | The Statute of Limitations .............. | | 18 |
| | | 1. | The Original Complaint ........... | 20 |
| | | | a. | Claims Against Defendant Chill Should N ot Be Dismissed as Time–Barred ................. | 20 |
| | | | b. | Claims Against Defendant Ercole Should Not Be Dismissed as Time–Barred ................. | 22 |
| | | 2. | The Amended Complaint ................ | 23 |
| | | | a. | Plaintiff's Claims Against the "John Doe" Defendants Do Not Relate Back to the Original Complaint .......... | 24 |

JCG v. Ercole, Not Reported in F.Supp.3d (2014)
Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 99 of 282
2014 WL 1630815

| | | | |
|---|---|---|---|
| | b. | Plaintiffs Claims Against Defendants Described in the Original Complaint Should Not Be Dismissed as Time–Barred ....... | 29 |
| | c. | In the Alternative, the Claims Against the Defendants Described in the Original Complaint Should Be Deemed to Relate Back .. | 32 |
| D. | | Requirement of Personal Involvement Under § 1983 .......... | 36 |
| E. | | Plaintiff's Freedom of Religion Claims ............. | 38 |
| | 1. | Plaintiff Does Not Have a Viable Claim Under the RFRA .......... | 38 |
| | 2. | Plaintiff's First Amendment Free Exercise Claim .......... | 39 |
| | a. | Right to Receive Kosher Meals ............ | 40 |
| | i. | The Motion to Dismiss the Claim Against Defendant Chill For Failure to Provide Kosher Meals Should Be Denied........................... | 40 |
| | ii. | The Motion to Dismiss the Claim Against Defendant Foroscij Should Be Granted................................................................................ | 41 |
| | b. | The Motion to Dismiss the Claim Against Defendant Chill For Denying Access to Religious Services Should Be Denied ............... | 42 |
| F. | | Eighth Amendment Violations .......... | 44 |
| | 1. | Plaintiff's Excessive Force Claim Should Be Dismissed .......... | 44 |
| | 2. | Plaintiff's Failure to Protect Claim Should Be Dismissed ......... | 45 |
| | 3. | Plaintiff's Failure to Train and Supervis e Claim Should Be Dismissed .................. | 50 |
| | 4. | Plaintiff's Claim of Inadequate Medical Care Should Be Dismissed Against All Defendants, With the Exception of Koskowski .......... | 53 |
| G. | | Other Claims ................. | 58 |
| | 1. | Plaintiff's First Amendment Retaliation Claim Should Be Dismissed .................. | 58 |
| | 2. | Plaintiff's Deprivation of Property Claim Should Be Dismissed ...... | 59 |
| | 3. | Plaintiff's Search and Seizure Claim Should Be Dismissed .......... | 60 |
| | 4. | Plaintiff's Claim Regarding the Disciplinary Ticket Should Be Dismissed .................. | 61 |
| H. | | Leave to Amend ................. | 63 |
| III. | | CONCLUSION ................... | 64 |

**\*1 To The Honorable Colleen McMahon, United States District Judge:**

Plaintiff JCG,[1] a prisoner currently incarcerated at Marcy Correctional Facility in Marcy, New York, has brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights while he was incarcerated at Green Haven Correctional Facility

("Green Haven"), in Stormville, New York. Proceeding *pro se,* Plaintiff has sued 20 Defendants: Robert Ercole, former superintendent of Green Haven, Rabbi Chill, Sgt. R. Wahlquist, CO. D. Benitez, Jr., Sgt. S. Murphy, CO. Phillips, C.O. Foroscij (sued herein as CO. Forosky, hereafter "Foroscij"), C.O. Brothers, C.O. C. Mell, C.O. W. Monzon, C.O. M. Wesley, C.O. John Thorpe, CO. J. Martin, C.O. M. Speed, Dr. J. Bendheim, Sgt. L. Fitch, R.N. S. Fila, C.O. L. Iuzinni (sued herein as C.O. L. Luzinni, hereafter "Iuzinni"), former Assistant Deputy Superintendent of Programs L, Cecilia, and former Deputy Superintendent of Security R. Koskowski (collectively, "Defendants"), as well as a group of "John Doe" Defendants. [2]

Plaintiff's Amended Complaint includes a series of allegations that can loosely be divided into five separate claims: (1) Rabbi Chill did not provide adequate accommodation for Plaintiff's religious beliefs in violation of the First Amendment and the Religious Freedom Restoration Act; (2) Plaintiff was assaulted by several officers on September 23, 2008, and was subsequently denied adequate medical treatment; (3) Green Haven staff engaged in a campaign of harassment against Plaintiff by committing the assault described above and by engaging in theft and other misconduct; (4) Ercole and Koskowski are responsible for the constitutional wrongs described in the Amended Complaint in that they failed to protect Plaintiff and failed to properly train and supervise Green Haven staff; and (5) Koskowski, Murphy, and Cecelia failed to conduct a proper investigation of fraudulent charges against Plaintiff, causing Plaintiff to spend 69 days in the Special Housing Unit ("SHU"), and that their actions constitute libel and slander. Plaintiff seeks $700,000 in compensatory damages for pain and suffering and $300,000 in punitive damages.

Defendants have moved to dismiss the Amended Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, I recommend that the motion to dismiss be granted, except for Plaintiff's claim against Defendant Chill for violating his right to receive Kosher meals and access to religious services and his claim against Defendant Koskowski pertaining to inadequate medical treatment, as to which the motion should be denied.

## I. BACKGROUND

### A. Plaintiff's Allegations

The following facts are taken from the Amended Complaint, which Plaintiff filed on June 28, 2012. Amended Civil Rights Complaint Pursuant to 42 U.S.C. § 1983 ("Am.Compl.") (Dkt. No. 20). [3]

### 1. Denial of Religious Accommodations

 *2 Plaintiff is "a type of Messianic Jew" who keeps kosher in accordance with his religious beliefs. Am. Compl., ¶ 4. Plaintiff states that while he was housed at Green Haven, he wrote several letters to the facility's Jewish Chaplin, Rabbi Chill, to request kosher meals. *Id.* However, Rabbi Chill allegedly ignored all of these requests, as well as other staff orders to place Plaintiff on the kosher meal list. *Id.* at ¶¶ 4–5. Plaintiff asserts that in one instance, he encountered Rabbi Chill and asked whether he had received Plaintiff's letter requests, to which Rabbi Chill replied: "you are [Plaintiff]? You are not a jew and jews don't do what you did." *Id.* at ¶ 5. Plaintiff also contends that Rabbi Chill denied Plaintiff the right to attend religious services and meet with a rabbi. *Id.* at ¶ 32. Finally, Plaintiff claims that on November 3, 2008, during his time in the SHU, Foroscij, a corrections officer, "purposefully denied [him] his kosher breakfast tray." *Id.* at ¶ 27.

### 2. Harassment

Beginning at the time of his arrival at Green Haven, Plaintiff states that he experienced "an immediate hostility" due to the fact that he was convicted of a sexual offense. Am. Compl., ¶ 1. He provides several examples of this hostility, describing the offenses allegedly carried out by corrections officers at Green Haven. Plaintiff contends he was called a "raper" and a "baby rapo" and was asked "[w]ho are you going to rape here?" *Id.* at ¶¶ 2, 3. He also alleges that Koskowski made derogatory comments regarding his criminal conviction. *Id.* at ¶ 14.

Plaintiff further asserts that corrections officers took Plaintiff's personal property "in retaliation for [his] criminal case" (*id.* at ¶ 2) and because of an administrative ticket that had been issued against him (described further below). *Id.* at ¶ 28. Specifically, Officer Benitez "retaliated" against him by searching and "thrashing" his cell, calling it "filthy" on a search slip, and entering his cell while Plaintiff was not there to steal his lamp, calculator, bibles, food, commissary items, and other

property. *Id.* at ¶¶ 16–17. Plaintiff was then prevented from retrieving his bags of property. *Id.* at ¶ 18. Plaintiff also asserts that other unidentified officers stole a guitar case, personal paper work, some legal paper work, and all of his personal property. *Id.* at ¶ 29. Officers Phillips and Brothers allegedly stole a newspaper, writing pad, a pen, two magazines, and some newspapers. *Id.* at ¶ 28.

### 3. Assault

Plaintiff maintains that on or around September 23, 2008, he was woken up and taken to the front of the block, where he was "ordered to get in the pat frisk position and then [was] severely assaulted while being held against the wall by at least three or four officers (very possibly CO. Joseph Martin, CO. Christian Mell, CO Mark Wesley and CO. John Thorpe) and Sgt. Robert Wahlquist." *Id.* at ¶ 20 .[4] Plaintiff contends he was punched in the back and in the back of his head, and was kicked and kneed in the back of his right leg, after which he was unable to stand. *Id.* at ¶ 21. Corrections officers purportedly held Plaintiff up so that Sergeant Wahlquist could knee him in the leg, arm, and chest. *Id.* Then, Plaintiff alleges, he was dragged to the SHU, where he was "mocked, harassed, taunted, made fun of and physically abused" by Officer Brothers and another officer. *Id.* at ¶ 22. An unidentified corrections officer allegedly pressed his finger into Plaintiff's injured leg and hurt him by "almost violently taking off [his] clothes and sneakers." *Id.* at ¶ 23. According to Plaintiff, he was subsequently dragged to the nurse's office, while "screaming, crying, [and] hyperventilating," and then was dragged back to his cell in the SHU, where he was dropped on the floor "only wearing undershorts, screaming and crying with nothing in the cell." *Id.*

**\*3** A short time later, Plaintiff was taken to Hudson Hospital, where he was X-rayed and placed on IV pain medication. *Id.* at ¶ 24. According to Plaintiff, he was released back to prison the same day, spent the night in the infirmary, and was discharged from the infirmary even though he could not walk and had not seen a doctor. *Id.* at ¶¶ 24–25. Plaintiff contends that two officers ("possibly" Officers Iuzzini and Speed) came to collect him, forced him to stand up and violently dropped him, held him up by the nose by placing fingers in his nostrils, and then cuffed him and dragged him back to the SHU. *Id.* at ¶ 26. During this altercation, one of the officers allegedly referred to Plaintiff as a "spick" and a "pedophile." *Id.*

### 4. Supervisory Liability

According to Plaintiff, Ercole, who was Superintendent of Green Haven at the time Plaintiff was incarcerated there, was aware of "criminal activity" and "other constitutional violations" committed by his staff. *Id.* at ¶ 7. Plaintiff alleges that Ercole's failure to train, supervise, or correct the behavior of his staff, and to prevent assaults against Plaintiff, amounted to deliberate indifference. *Id.* at ¶ 7, 8, 33. Further, Plaintiff asserts, Ercole "knew first hand of the numerous instances of petit larcenies performed by staff, retaliations, conviction, race, religion, sexual orientation discriminations and violations of due process and equal protection by staff." *Id.* at ¶ 8. Plaintiff also maintains that Koskowski, who was Deputy Superintendent of Security, was aware of the attacks against Plaintiff, failed to train prison staff, and denied Plaintiff his right to medical care. *Id.* at ¶¶ 10, 11, 14, 36. Specifically, Plaintiff claims that Koskowski "personally knew of" and "condoned" the assault against him and yet "failed to punish the offenders." *Id.* at ¶¶ 11, 12, 14. Further, Plaintiff maintains, Koskowski purposefully failed to remove Plaintiff from the SHU to the clinic and did not change the policy forbidding inmates in the SHU from using a cane or crutches, thereby denying him proper access to medical care. *Id.* at ¶¶ 13, 36.

### 5. Ticket and Administrative Hearing

According to Plaintiff, at some point prior to September 15, 2008, other inmates with "severe ulterior motives" brought false allegations against him. *Id.* at ¶ 9. In response, Sergeant Murphy "deliberately and negligently performed what he knew was a closed and critically deficient investigation" in which he only interviewed the accusers. *Id.* Plaintiff was subsequently issued a disciplinary ticket charging him with threats and attempt to commit bodily harm. *Id.* at ¶¶ 9, 28.[5] Plaintiff claims that Koskowski failed to properly dismiss all proceedings against him, despite being "presented [with] incontrovertible evidence that the allegations ... were not only NOT plausible or feasible but actually impossible." *Id.* at ¶¶ 9–10. The disciplinary ticket against Plaintiff was ultimately dismissed, but, Plaintiff asserts, Koskowski still issued an administrative segregation ticket and, consequently, Plaintiff spent 69 days in the SHU. *Id.* at ¶¶ 11, 30. Plaintiff contends that Cecelia was also aware of the assault and knew the charges were false. *Id.* at ¶ 31. He further alleges that Cecelia improperly urged Plaintiff not to present a defense against the charges against him. *Id.*

**B. Procedural History**

**\*4** Plaintiff filed his Original Complaint on September 16, 2011 against Defendants Chill, Ercole, and various John Does. *See* Inmate Civil Rights Complaint Pursuant to 42 U.S.C. § 1983 ("Compl.") (Dkt. No. 1), at 1, 2, 21;[6] Application to Proceed Without Full Prepayment of Fees (Dkt. No. 2), at 2.[7] On December 5, 2011, Judge McMahon issued an Order directing that the New York State Department of Corrections and Community Supervision ("DOCCS") provide assistance to Plaintiff in identifying various defendants pursuant to *Valentin v. Dinkins,* 121 F.3d 72 (2d Cir.1997). Dkt. No. 9. The Order also directed Plaintiff to file an Amended Complaint within 30 days of receiving the identification information from DOCCS. *Id.*

On February 15 and 28, 2012, defense counsel provided responses to the information sought in the *Valentin* Order. Dkt. Nos. 11, 15.[8] On March 18, 2012, Plaintiff requested a 120–day extension of time to file a "complex" motion that would address several issues, including statutory tolling; Judge McMahon denied the request. Dkt. No. 13. Plaintiff made a similar request on April 11, 2012, which was also denied. Dkt. No. 18. On June 23, 2012, four months after receiving information regarding the identity of various Defendants, Plaintiff filed an Amended Complaint, naming the rest of the Defendants listed above. *See* Dkt. No. 20, at 14.[9] Amended summonses for all Defendants except Chill and Ercole were not issued until February 13, 2013, at which time Plaintiff was sent a Rule 4 Service Package, which included a U.S. Marshals Service Process Receipt and Return form ("USM–285 form") allowing the U.S. Marshals to complete service on his behalf. *See* Dkt. Entry dated February 13, 2013. Plaintiff served the remaining Defendants between March 3, 2013 and June 13, 2013. (Dkt.Nos.63–66, 71, 72, 78, 79, 85, 88, 95).[10]

Plaintiff sought to file a second Amended Complaint on January 4, 2013. *See* Dkt. No. 40. The case was referred to me on February 7, 2013 (Dkt. No. 52), and on February 22, 2013, following a pre-trial conference, I directed that Plaintiff be permitted to file a second Amended Complaint by April 26, 2013 (Dkt. No. 58). Plaintiff subsequently requested an extension, and 1 granted him until May 31, 2013 to further amend his complaint. Dkt. No. 74.

Plaintiff failed to file a second Amended Complaint by that deadline and instead sought another extension. Dkt. No. 80. I denied Plaintiff's request on June 7, 2013. Dkt. No. 86. I also denied Plaintiff's third request for an extension on June 26, 2013. Dkt. No. 90.

On July 1, 2013, Defendants moved to dismiss Plaintiff's Amended Complaint on various grounds: failure to exhaust; failure to allege personal involvement; and failure to state a claim. Dkt. No. 91; Def. Mem., at 2. Defendants also contend that Plaintiff's action is time-barred and that his claim under the Religious Freedom Restoration Act is improper. *Id.* Plaintiff did not respond to Defendants' motion to dismiss, and instead, on August 14, 2013, requested yet again to file a second Amended Complaint. *See* Dkt. No. 104. I denied that request, and instead *sua sponte* extended Plaintiff's deadline to submit his opposition to the motion to dismiss from August 16, 2013 to September 27, 2013. *Id.* Plaintiff did not file an opposition, but on September 21, 2013 requested yet another "extension of time to file a Motion for varied relief, primarily moving for reargument/reconsideration." Dkt. No. 105 at 1. Noting that the relief sought by Plaintiff was not entirely clear, I directed that, to the extent Plaintiff was requesting an extension to file a second Amended Complaint, that request was denied. Dkt. No. 107. I instead granted Plaintiff "one last chance to file his opposition papers to the motion to dismiss and extend[ed] his deadline to November 11, 2013." *Id.* at 3. I further warned that if Plaintiff failed to "file opposition papers by November 11 (some four months after the motion to dismiss was filed), the Court will treat the motion as unopposed" and reminded Plaintiff that in his opposition "he [could] point to any information that he believes will undercut the arguments made by Defendants and [could] present any additional facts to support his claims (and, if appropriate, he [could] identify what additional discovery he still needs to fully respond to the motion or what basis exists to permit him to further amend his complaint)." *Id.* at 3–4. Finally, I declined to recuse myself from the case, despite Plaintiff's request that I do so. *Id.* at 4–6.

**\*5** On November 5, 2013, Plaintiff sought yet again to file a second Amended Complaint and I denied his request. Dkt. Nos. 108, 109. Despite many opportunities to do so, he did not file any opposition to Defendants' motion to dismiss, and on November 15, 2013, I ordered that the motion would be deemed unopposed. Dkt. No. 109. Plaintiff sought an appeal of my decision and, on

JCG v. Ercole, Not Reported in F.Supp.3d (2014)
2014 WL 1630815

November 22, 2013, Judge McMahon issued an Order stating that: "This is not an 'appealable' order. An order denying permission to file additional papers or another extension of time lies within Judge Cott's discretion. However, I agree with his decision on the merits and I will not overturn it." Dkt. No. 111. Plaintiff also sought an appeal to the Second Circuit, which was subsequently dismissed. Dkt. Nos. 113, 117.

## II. DISCUSSION

### A. Standard of Review for a Motion to Dismiss

In considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Avenue Delicatessen, Inc.,* 496 F.3d 229, 237 (2d Cir.2007); *Roth v. Jennings,* 489 F.3d 499, 510 (2d Cir.2007). A complaint need not include " 'detailed factual allegations,' " but it must contain more than mere " 'labels and conclusions' " or " 'a formulaic recitation of the elements of a cause of action.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). Therefore, unless a plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

*Pro se* complaints are held to less stringent standards than those drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also McKeown v. New York State Commission on Judicial Conduct,* 377 F. Appx. 121, 122 (2d Cir.2010). Indeed, pleadings of a pro se party should "be construed liberally 'to raise the strongest arguments [they] suggest[ ].' " *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013) (quoting *Pabon v. Wright,* 459 F .3d 241, 248 (2d Cir.2006)). Still, a *pro se* complaint, like any other, "must state a plausible claim for relief." *Id.* (citing *Harris v. Mills,* 572 F.3d 66, 73 (2d Cir.2009)). "Dismissal of a *pro se* complaint is ... appropriate where a plaintiff has clearly failed to meet minimum pleading requirements ." *Kinsey v. Bloomberg,* No. 12 Civ. 8936(PAE)(JCF), 2014 WL 630670, at *3 (S.D.N.Y. Feb. 18,2014).

In addition, although Plaintiff has not opposed Defendants' motion to dismiss, the failure to oppose a 12(b)(6) motion does not justify dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *Goldberg,* 599 F.3d at 184 (citing *McCall,* 232 F.3d at 322–23). As with all 12(b)(6) motions, in deciding an unopposed motion to dismiss, the court is to "assume the truth of a pleading's factual allegations and test only its legal sufficiency" according to the principles ordinarily applicable on a motion to dismiss. *Johnson v. Agros,* No. 10 Civ. 8312(PAE), 2012 WL 3564028, at *2 (S.D.N.Y. Aug. 20, 2012) (citing *McCall,* 232 F.3d at 322).

### B. Exhaustion of Administrative Remedies

#### 1. Legal Standard under the PLRA

**\*6** The Prison Litigation Reform Act ("PLRA") provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a). This "exhaustion requirement applies to 'all prisoners seeking redress for any prison circumstances or occurrences,' whether it was a particular episode or an ongoing circumstance." *Charles v. Gordon,* No. 12 Civ. 8332(CM)(JCF), 2013 WL 6667632, at *3 (S.D.N.Y. Dec. 17, 2013) (quoting *Porter v. Nussle,* 534 U.S. 516, 519 (2002)). "The PLRA requires 'proper exhaustion' of prison administrative remedies, which includes compliance with agency deadlines and procedural rules." *Morrison v. Stefaniak,* 523 F. App'x 51, 52 (2d Cir.2013) (quoting *Woodford v. Ngo,* 548 U.S. 81, 90 (2006)).

The Supreme Court has made clear that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216 (2007). Rather, failure to exhaust is an affirmative defense that must be raised and proven by defendants. *Id.* However, an inmate confined in a New York State prison must complete all relevant steps before he may bring a lawsuit pursuant to § 1983. *See* 42 U.S.C § 1997e(a). "[I]f it is clear from the face of the complaint that the plaintiff failed to exhaust administrative remedies, a motion to dismiss

pursuant to Rule 12(b)(6) for failure to exhaust should be granted.' " *Charles,* 2013 WL 6667632, at *3 (citing *Stevens v.. City of New York,* No. 12 Civ.1918(JPO) (JLC), 2012 WL 4948051, at *2 (S.D.N.Y. Oct. 11, 2012)). A failure to properly exhaust remedies may be excused in only three instances: (1) where administrative remedies were not actually available to the prisoner; (2) where defendants' own actions inhibited exhaustion, constituting a waiver of the defense; or (3) where special circumstances justify non-exhaustion. *Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) . [11]

The New York State Department of Corrections requires prisoners to grieve alleged misbehavior using a three-tier procedure. *See, e.g., Morrison,* 523 F. App'x at 51; *Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir.2009). First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC"); second, the inmate must appeal any adverse decision from the IGRC to the superintendent of the correctional facility within seven days; and, third, the inmate must appeal any adverse decision by the superintendent to the Central Office Review Committee ("CORC") within seven days. N.Y. Comp.Codes R. & Regs. tit. 7 ("N.Y.C.R.R."), § 701.5. Grievances alleging harassment by a corrections officer are considered under an expedited two-step procedure where the grievance is sent directly to the superintendent. *Espinal,* 558 F.3d at 125; N.Y.C.R.R. § 701.8. Then, "[i]f the grievance is a bona fide harassment issue, the superintendent must initiate or request an investigation and render a decision, after which the prisoner could then appeal to the CORC." *Espinal,* 558 F.3d at 125 (internal citation omitted). There is also a procedure ensuring that inmates in the SHU are able to file grievances. *See* N.Y.C.R.R. § 701.7 ("The following minimal standards shall be instituted to provide SHU inmates with access to the IGP.").

**2. Analysis of Plaintiff's Efforts To Exhaust**

**a. Plaintiff Failed to Complete the Exhaustion Requirements.**

**\*7** Defendants argue that Plaintiff has failed to exhaust his administrative remedies for all claims, and that he has "no plausible excuse" for that failure. Def. Mem., at 8. Plaintiff describes his attempts to exhaust in the *pro se* prisoner complaint form, which is attached to the Amended Complaint. Am. Compl., p. 15. He states:

"[w]hile in the SHU, 1 attempted to file two separate grievances, twice, but because all SHU mail is read before it goes out, my grievances were deliberately estopped by SHU officials, after receiving no responses, the 45 day limit had expired, thus precluding a grievance. Upon my arrival at the next facility, I tried to forget the incidents." *Id.* Plaintiff further contends that he complained to prison authorities about the facts alleged in the complaint, noting that "[i]n the month of August, 2011, [he] wrote a letter to [Defendant Ercole] notifying him of all the allegations herein. On Sept. 3rd, 2011, [he] again wrote him with the allegations, to which [he] requested an investigation. But, the D.S.S. there and other staff already knew of all these allegations." *Id.*

To start, it is clear that Plaintiff did not complete either the two or three-step process required to properly exhaust his claims. [12] Plaintiff does not specify which grievance procedure is applicable in his circumstances, but his efforts to exhaust are insufficient either way. Under the non-expedited three-step process, Plaintiff did file (or attempted to file) his initial grievances, but, as he acknowledges, he took no further steps because "the 45 day limit had expired" and then, once he was relocated, he chose to try and "forget the incidents," rather than pursue an appeal. Am. Compl., p. 15. Plaintiff's letter to Superintendent Ercole does not constitute a further attempt to exhaust for two reasons. First, Plaintiff himself states the purpose of the letter was to notify Ercole of the allegations in the complaint, rather than appeal his grievance. Second, Plaintiff did not send the letter within a "reasonable" amount of time after receiving no response to his grievance, waiting until nearly three years after the incident (and one month before filing his complaint in this action). *See Garcia v. Heath,* No. 12 Civ. 4695(CM), 2013 WL 3237445, at *5 (S.D.N.Y. June 25, 2013) ("[C]ourts have recognized that a prisoner who receives no response to a § 701.5 grievance must file an appeal within a reasonable time."); *Hecht v. Corr. Officer Best,* No. 12 Civ. 4154(CM), 2012 WL 5974079, at *3 (S.D.N.Y. Nov. 28, 2012) (plaintiff was obligated to appeal to the CORC "within a reasonable period of time" after failing to get a response from the superintendent). Plaintiff's letter would also be inadequate under the expedited procedure, which requires that Plaintiff submit his grievance to the Superintendent within 21 days of the alleged occurrence. *See* N.Y.C.R.R. §§ 701.5(a)(1); 701.8(a).

Moreover, even if Plaintiff's letter to the Superintendent could be construed as a proper step in the grievance process, Plaintiff still failed to complete the final exhaustion requirement—appealing the matter to the CORC. *See, e.g., Garcia,* 2013 WL 3237445, at \*4 (" '[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted.' ") (quoting *Gardner v. Daddezio,* No. 07 Civ. 7201(SAS), 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008)); *Franco v. Monroe,* No. 09 Civ. 8787(LTS)(GWG), 2012 WL 3552673, at \*3 (S.D.N.Y. Aug. 13, 2012) (finding failure to exhaust because even if plaintiff's letter to superintendent could be construed as attempt to file grievance, he filed no appeal to the CORC). Thus, given that "[P]laintiff's grievance has not been appealed to and decided by the highest body in the administrative process, [he] cannot be said to have exhausted his administrative remedies" and his claims are subject to dismissal on exhaustion grounds. *Jones v. Allen,* 08 Civ. 4003(CM), 2010 WL 3260081, at \*2 (S.D.N.Y. Aug. 9, 2010) (citing *Booth v. Churner,* 532 U.S. 731, 735 (2000)).

### b. Even Though Plaintiff Failed to Properly Exhaust, Dismissal is Not Warranted On This Ground.

**\*8** However, even though Plaintiff failed to satisfy the mandatory exhaustion procedure, viewing Plaintiff's allegations in the light most favorable to him, the Court believes that the Amended Complaint should not be dismissed for failure to exhaust administrative remedies. Defendants correctly note that the Superintendent's failure to respond to Plaintiff's grievances did not relieve Plaintiff of his duty to file an appeal. Def. Mem. at 9; *see, e.g ., Garcia,* 2013 WL 3237445, at \*5. But Plaintiff alleges that it was not merely the lack of response that caused him to improperly grieve his complaints. He maintains that his efforts to comply with the grievance requirements were stymied and that the lack of response was a result of certain Defendants impeding his access to submit grievances. Specifically, he claims that when he attempted to file two grievances while in the SHU, he was "deliberately estopped" from doing so by Green Haven officers. Am. Compl., p. 15. Though Plaintiff's remarks are certainly ambiguous, "[i]f any of the Defendants did, in fact, prevent [Plaintiff] from grieving pursuant to the [grievance program's] requirements, their exhaustion defense might be forfeited." *Gayle v. Benware,* No. 08 Civ. 8017(RMB) (FM), 2009 WL 2223910, at \*5 (S.D.N.Y. July 27, 2009); *O'Connor v. Featherston,* No. 01 Civ. 3251(HB), 2002 WL 818085, at \*2 (S.D.N.Y.

Apr. 29, 2002) (exhaustion may be excused at motion to dismiss stage if "an inmate makes a reasonable attempt to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts"). [13]

*Gayle* addressed a situation comparable to Plaintiff's. There, the Court refused to grant Defendants' motion to dismiss on the grounds of exhaustion where Plaintiff alleged that while he was in the SHU at Green Haven, he attempted to exhaust his claims by giving his grievance to an officer, but "he never received a response to [his] grievance and was concerned that the officer did not actually mail the grievance." *Gayle,* 2009 WL 2223910, at \*5. The Court held that "[w]hile [plaintiff's] assertions may ultimately not prove credible, at this preliminary stage the Court cannot say, as a matter of law, that they are implausible," *Id.* at \*6. And, "although there [was] ample reason to question the veracity of [Plaintiff's] latest representations, [the Court] reluctantly conclude[d] that the Defendants' motion must be denied." *Id.* Similarly here, if Defendants inhibited Plaintiff's ability to exhaust his claims, they have waived their right to assert an exhaustion defense at this stage, and thus the Court declines to recommend dismissal on that ground at this time. *Amador,* 655 F.3d at 103 ("A prisoner may invoke the doctrine of estoppel when 'defendants took affirmative action to prevent him from availing himself of grievance procedures.' ") (quoting *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006)); *Hemphill,* 380 F.3d at 690 (petitioner's allegations of threats may preclude defendants from asserting exhaustion defense); *DeMartino v. Zenk,* No. 04 Civ. 3880(SLT)(LB), 2006 WL 1455456, at \*5 (E.D.N.Y. May 25, 2006) (declining to find a failure to exhaust where plaintiff alleged that prison staff "misplaced some of his [grievance] documents and lost others" and denied him access to a photocopier); *Rodriguez v. Hahn,* No. 99 Civ. 11663(VM), 2000 WL 1738424, at \*2 (S.D.N.Y. Nov. 22, 2000) (refusing to dismiss on exhaustion grounds where plaintiff made "reasonable attempt" to exhaust and alleged that, while in SHU, corrections officers never mailed the grievances he gave to them). [14]

**\*9** Plaintiff's allegation that his mail was "deliberately estopped" by "SHU officials" may also preclude a failure to exhaust defense if administrative remedies were

not actually available, *Hemphill,* 380 F.3d at 686. [15] *Gayle* explains that "even if the Defendants themselves were not directly involved, interference by any Green Haven staff members would have rendered the [grievance program] constructively unavailable to [Plaintiff]." 2009 WL 2223910, at *5. Here, Plaintiff alleges that he "made a reasonable attempt to file a grievance," and that he was prevented from filing that grievance by prison officials; accordingly, grievance procedures were not available to him, and "the [PLRA] does not preclude [him] from suing in federal court." *Id.* (internal quotations omitted). *See also Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) ("[E]xhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance or otherwise prevent him from seeking his administrative remedies."); *Thomas v. New York State Dep't of Corr. Servs.,* No. 00 Civ. 7163(NRB), 2002 WL 31164546, at *2–3 (S . D.N.Y. Sept. 30, 2002) (finding issue of fact as to whether grievance procedures were available where plaintiff asserted that two officers prevented him from filing grievance).

Plaintiff's allegations that SHU officers obstructed his attempts to pursue the grievance process are far from thorough. Defendants may later prove Plaintiff's assertions to be false. However, I believe that, liberally construing his Amended Complaint, Plaintiff has presented a plausible assertion that he attempted to mail two grievance forms and his efforts were impeded. Therefore, at this stage of the proceedings, Defendants are either estopped from arguing for dismissal on exhaustion grounds or, alternatively, Plaintiff is excused from the exhaustion requirements given that administrative remedies may have been unavailable to him.

### C. The Statute of Limitations

Section 1983 actions filed in New York are subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013) (citing *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) and N.Y. C.P.L.R. § 214 (McKinney 2013)). This is true for Plaintiff's Eighth Amendment deliberate indifference claim, *Shomo v. City of New York,* 579 F.3d 176, 180–81 (2d Cir.2009), as well as his claims under the First, Fifth, and Fourteenth Amendments. *Cancel v. Mazzuca,* No. 01 Civ. 3129(NRB), 2003 WL 1702011, at *3 (S.D.N.Y. Mar. 28, 2003) (First Amendment); *Jewell v. County of Nassau,* 917 F.2d 738, 739–40 (2d Cir.1990) (Fifth and Fourteenth

Amendments). Claims brought pursuant to § 1983 accrue when the plaintiff " 'knows or has reason to know of the injury which is the basis of his action.' " *Hogan,* 738 F.3d at 518 (quoting *Pearl,* 296 F.3d at 80); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994).

There is an exception, however, to "the normal knew-or-should-have-known accrual date" in cases of a continuing violation. *Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999); *Shomo,* 579 F.3d at 181. The continuing violation doctrine provides that "[w]hen the plaintiff brings a Section 1983 claim challenging a discriminatory policy, 'commencement of the statute of limitations period may be[n] be delayed until the last discriminatory act in furtherance of it.' " *Shomo,* 579 F.3d at 181 (quoting *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994)). "To assert a continuing violation for statute of limitations purposes, the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference] and some non-time-barred acts taken in the furtherance of that policy.' " *Id.* (quoting *Harris,* 186 F.3d at 250) (alterations added).

*10 The Second Circuit in *Shomo* found the continuing violation doctrine to apply in a case where "a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs." *Id.* at 182. Other courts have found the doctrine to apply to alleged violations of an inmate's First Amendment rights. *See, e.g., Cancel,* 2003 WL 1702011, at *4 (granting leave to amend complaint to add defendant whose alleged religious discrimination lasted the duration of plaintiff's incarceration on grounds of continuing violation and rejecting defendants' argument that claims would be statutorily barred); *Williams v. Leonard,* No. 9:11 Civ. 1158(TJM)(TWD), 2013 WL 5467192, at *6 (N.D.N.Y Mar. 15, 2013) (rejecting defendants' statute of limitations argument where plaintiff alleged continuing violations of his First Amendment religious rights "both before and during the statute of limitations period"), Report and Recommendation, *adopted in part by* 2013 WL 5466191 (N.D.N.Y. Sept. 30, 2013): *Matthews v. Connecticut,* No. 3:10 Civ. 325(MRK), 2010 WL 3984645, at *6 (D.Conn. Oct. 8, 2010) (applying continuing violation doctrine to Plaintiff's First Amendment retaliation claims because "[t]he Court sees no reason why the continuing violation doctrine would apply to an Eighth Amendment deliberate indifference claim under § 1983, but not to other constitutional claims under § 1983"). *See also Wilder v. Sutton,* 310 F. App'x

10, 15 (7th Cir.2009) (rejecting untimeliness argument where plaintiff's grievances recounted a continuing infringement on his freedom of religion because "[e]ach missed opportunity to worship gives rise to a separate complaint"). [16]

### 1. The Original Complaint

Defendants argue that because Plaintiff's Original Complaint was filed against Defendants Chill and Ercole on September 16, 2011 (*see supra* n. 6), the claims against them, all of which allegedly arose before September 16, 2008, are barred by the statute of limitations. Def. Mem. at 12–13.

### a. Claims Against Defendant Chill Should Not Be Dismissed as Time–Barred.

Plaintiff claims that Defendant Chill refused to provide him kosher meals and denied him access to religious services and to a rabbi, in violation of the First Amendment. Am. Compl., ¶¶ 4–5, 32. However, Plaintiff does not provide the specific dates on which he was purportedly denied religious accommodations. Def. Mem., at 12. Defendants contend that the denials must have begun shortly after Plaintiff arrived at Green Haven, and thus "[i]t is reasonable to conclude that the denial of the religious services that Plaintiff requested occurred months before September 16, 2008." *Id.* at 12–13. Accordingly, they assert, because Plaintiff knew or should have known about the alleged injuries at a time outside the permissible statutory time period, his claims against Defendant Chill should be barred by the statute of limitations. *Id.* at 13.

**\*11** On the record before the Court, Defendants have not met their burden of establishing that Plaintiff's claims are untimely. *See, e.g., Smith v. City of New York,* No. 12 Civ. 04890(LGS), 2013 WL 6095458, at *3 (S.D.N.Y. Nov. 20, 2013)* ("Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff failed to plead timely claims."). "[I]n the statute of limitations context ... dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris,* 186 F.3d at 250; *Smith,* 2013 WL 6095458, at *3. While it may be the case that Plaintiff first became aware of Defendant Chill's actions shortly after he arrived at Green Haven, Plaintiff maintains that "[s]everal months later," Defendant Chill persisted in refusing him access to religious meals and services.

Am. Compl., ¶¶ 1–4, 6. Moreover, Plaintiff states that "[t]hroughout his *entire stay* at [Green Haven], Mr. Chill very deliberately denied [Plaintiff] his right to receive kosher, attend services, holidays and [Plaintiff's] right to a Rabbi." *Id.* at ¶ 32 (emphasis added). Plaintiff thereby adequately pleads a continuing violation of his First Amendment rights. Although Plaintiff "does not provide an exact date" for Defendant Chill's "last act" in denying his religious accommodations, *Cancel,* 2003 WL 1702011, at *4, he sufficiently alleges that Defendant Chill's denial of religious services was part of a "continuous series of events giv[ing] rise to a cumulative injury" for the duration of his time at Green Haven, extending into the relevant statutory time period. *Shomo,* 579 F.3d at 182. [17] Consequently, where the Amended Complaint alleges a continuing violation and does not clearly demonstrate that Plaintiff's claims are out of time, the Court deems it improper at this stage to dismiss claims against Defendant Chill on timeliness grounds.

### b. Claims Against Defendant Ercole Should Not Be Dismissed as Time–Barred.

Defendants assert that all claims against Defendant Ercole also took place prior to September 16, 2008, and thus should be similarly dismissed as time-barred. Def. Mem., at 13. However, Defendants only focus on one alleged incident, when Plaintiff claims that he asked Defendant Ercole to be moved for medical reasons and that the move took place "[o]n or about Sept. 8, or 11, or 15, 2008." *Id* . (quoting Am. Compl., ¶ 17). Defendants neglect to address Plaintiff's allegations against Defendant Ercole in his role as a supervisor, including that he failed to properly train and supervise his staff and did not protect Plaintiff from physical assaults. Am. Compl., ¶¶ 7, 8, 33. Specifically, Plaintiff alleges that he was denied proper medical treatment and suffered several assaults at the hands of Green Haven staff, for whom Defendant Ercole was responsible, and he alleges that these incidents occurred on or after September 23, 2008, rendering them within the statutory period. *Id.* at ¶¶ 20–26. Thus, construing Plaintiff's claims liberally, he has properly made timely allegations against Defendant Ercole which should not be dismissed on statute of limitations grounds at this juncture, given that the complaint does not "clearly show[ ] the claim[s][are] out of time." *Harris,* 186 F.3d at 250.

### 2. The Amended Complaint

**\*12** Defendants assert that all claims against the 18 new individuals named in the Amended Complaint, which was filed on June 28, 2012, are barred by the statute of limitations. Def. Mem., at 13–14. Given that Plaintiff's cover letter to the Amended Complaint was dated June 23, 2012 (*see supra* n. 9), they argue that "only events occurring after June 23, 2009 can be considered timely," and thus dismissal of all Defendants who appear for the first time in the Amended Complaint is appropriate because all of the events in the Amended Complaint occurred prior to the conclusion of December of 2008. *Id.* at 14. [18] However, Defendants fail to distinguish between two groups of Defendants: (1) those who were named as "John Does" in the caption of the Original Complaint (and were described as unknown individuals in the body of the document), and (2) those who were not "named" as Defendants in the caption, but were specifically identified and had claims asserted against them in the Original Complaint. [19] The first group is comprised of Defendants Wahlquist, Mell, Wesley, Thorpe, Martin, Iuzinni, Speed, Fitch, and Fila. [20] The second group includes Defendants Murphy (Compl.¶ 9), Benitez (Compl.¶¶ 15–19, 34–35), Monzon (Compl.¶ 18), Foroscij (Compl.¶ 27), Brothers (Compl.¶ 28), Cecilia (Compl.¶ 31), and Koskowski (Compl.¶¶ 10–14). [21] The Court will start by addressing Defendants' argument for dismissal as it pertains to the first group of Defendants-the "John Does."

### a. Plaintiffs Claims Against the "John Doe" Defendants Do Not Relate Back to the Original Complaint.

Given the Court's assumption that Plaintiff's § 1983 claims accrued at the latest by the end of December of 2008 (*see supra* n. 18), the statute of limitations expired three years later in December of 2011. *Hogan,* 738 F.3d at 517. Plaintiff filed a timely complaint, on September 16, 2011, naming Robert E. Ercole, Rabbi Chill, and other John Does at Green Haven Correctional Facility. Compl., at 1, 21. His Amended Complaint, however, was not filed until June 28, 2012, more than five months after the statute of limitations expired. Am. Compl., ¶¶ 1, 14. Therefore, Plaintiff's Amended Complaint against the newly-named Defendants may proceed only if it meets the requirements for the "relation back" of claims set forth under Rule 15(c) of the Federal Rules of Civil Procedure. *Hogan,* 738 F.3d at 517. ("Amended pleadings that meet the requirements of Rule 15(c) are considered to 'relate back' to the date of the Original Complaint.").

The Second Circuit recently reaffirmed the federal standard for relation back under Rule 15(e)(1)(C) in *Hogan v. Fischer.* There, the Court held that:

> For an Amended Complaint adding a new party to relate back under Rule 15(c)(1)(C), the following conditions must be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within 120 days of the filing of the Original Complaint, and ... the Original Complaint [was] filed within the limitations period.

**\*13** 738 F.3d at 517 (citing *Barrow v. Wethersfield Police Dept.,* 66 F.3d 466, 468–69 (2d Cir.1995)).

Defendants argue that Plaintiff cannot satisfy the third criterion because "Rule 15 relation back does not apply to the situation in which a Plaintiff files a complaint naming John Does whose identities are unknown at the time, and later seeks to amend the complaint and fill in the unknown identities." Def. Mem., at 14 (citing *Barrow,* 66 F.3d at 468). Defendants are correct with respect to the unknown John Doe Defendants. *See, e.g., Hogan,* 738 F.3d at 517 ("This Circuit has interpreted the rule to preclude relation back for Amended Complaints that add new defendants, where the newly added defendants were not named originally because the plaintiff did not know their identities."); *Moody v. Town of Greenburgh,* No. 09 Civ. 6579(GAY), 2012 WL 1174754, at \*2 (S.D.N.Y. Apr. 9, 2012) ("It is familiar law that 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued.") (quoting *Aslandis v. U.S. Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)). Although "Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning the identity of the parties ... [,] the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake."

*Barrow,* 66 F.3d at 470. Accordingly, Plaintiff's claims alleged in the Amended Complaint against the John Doe defendants do not relate back under Rule 15(c)(1)(C). [22]

However, even if a plaintiff's claims are barred by Rule 15(c) (1)(C), the Second Circuit has held that an amended pleading asserting § 1983 claims against John Doe defendants may still relate back under Rule 15(c)(1)(A). *Hogan,* 738 F.3d at 518. "Rule 15(c)(1)(A) permits an amended pleading to relate back when 'the law that provides the applicable statute of limitations allows relation back.' " *Id.* (quoting Fed.R.Civ.P. 15(c)(1)(A)). In *Hogan,* the Court explained that New York state law sets forth the applicable statute of limitations, and it "provides a more forgiving principle of relation back in the John Doe context, compared to the federal relation back doctrine under Rule 15(c)(1) (C)." *Id.* Under § 1024 of the New York Civil Practice Law and Rules ("CPLR"), a complaint can relate back if a party meets two requirements. "First, the party must exercise due diligence, prior to the running of the statute of limitations, to identify the defendant by name. Second, the party must describe the John Doe party in such form as will fairly apprise the party that [he] is the intended defendant." *Id.* at 519 (internal quotations and citations omitted). If a plaintiff fulfills these conditions, he "must then 'ascertain the identity of unknown '[John] Doe' parties, and ... serve process upon them, within 120 days from filing.' " *Williams v. United States,* No. 07 Civ. 3018(RJS)(THK), 2010 WL 963474, at *12 (S.D.N.Y. Feb. 25, 2010) (quoting *Bumpus v. N.Y.C. Transit Auth.,* 66 A.D.3d 26, 31 (2d Dep't 2009)), Report & Recommendation, *adopted by* 2010 WL 963465 (S.D.N.Y. Mar. 16, 2010). "If a Plaintiff meets these requirements, then the limitations period is tolled between the filing of his complaint and the day he serves the proper defendant." *Fisher v. County of Nassau,* No. 10 Civ. 0677(JS)(ETB), 2011 WL 4899920, at *4 (E.D.N .Y. Oct. 13, 2011) (citing *Williams,* 2010 WL 963474, at *12).

**\*14** Here, Plaintiff cannot satisfy the first requirement of § 1024, as he failed to act with due diligence in identifying the John Doe Defendants prior to filing his Original Complaint and the running of the statute of limitations. *Hogan,* 738 F.3d at 519; *Williams,* 2010 WL 963474, at *12–13. The events giving rise to Plaintiff's allegations all occurred in mid to late 2008, but "Plaintiff appears to have expended no efforts at all to identify the Individual Defendants in the three years that followed,"

waiting until the statute of limitations had nearly run to file his complaint. *Williams,* 2010 WL 963474, at *13. In that time, he could have served discovery demands upon the known parties, sought disclosures pursuant to a Freedom of Information Law ("FOIL") request, or written letters to the Attorney General's Office. *Id.* (citing *Bumpus,* 66 A.D.3d at 33–34). *Cf. Hogan,* 738 F.3d at 519 (plaintiff met first requirement under § 1024 in that he "diligently sought to identify the "John Doe defendants" by submitting "multiple discovery requests to the Attorney General's office"); *Mabry v. New York City Dept. of Corrections,* No. 05 Civ. 8133(JSR)(JCF), 2008 WL 619003, at *6 (S.D.N.Y. March 7, 2008) (allowing relation-back where plaintiff's first complaint was well within statute of limitations and she "aggressively sought the identities of the defendants"). Given Plaintiff's lack of diligence, I decline to recommend the application of the relation-back doctrine under New York law for the John Doe Defendants.

Plaintiff does briefly refer to the fact that in September 2011 he requested that Defendant Ercole conduct an investigation regarding his allegations, and notes that his "F.O.I.L.'s" were not answered. Am. Compl., p. 15. However, if this was a last-minute attempt to obtain further information about his claims, it is insufficient to establish due diligence. *See, e.g., Temple v. New York Community Hosp. of Brooklyn,* 89 A.D.3d 926, 928 (2d Dep't 2011) (finding no due diligence under § 1024 given lack of pre-filing discovery and noting that plaintiff's "limited discovery demands ... served prior to the expiration of the statute of limitations" was insufficient to show diligence because "when the responses received were less than adequate, the plaintiff failed to promptly seek further discovery"). *See also Maccharulo v. Gould,* 643 F.Supp.2d 587, 596–97 (S.D.N.Y.2009) (finding lack of diligence under federal rule where Plaintiff waited until end of statutory period to attempt to identify proper defendants).

Plaintiff also notes in his Original Complaint that he "is a neophyte of federal civil law and procedure" and thus was "unable to come up [with] meaningful facts, such as approximate dates, much less actual dates, actual names or physical description[s] of complained of staff." Compl., at p. 5. He further asserts that he was robbed of "a large amount of personal paper work, that included documents, dates and names of staff and actions at [Green Haven]." *Id.* Assuming the truth of these allegations, the

fact remains that he was allegedly deprived of pertinent information in the fall of 2008. Am. Compl., ¶¶ 17, 18, 29. Plaintiff offers no justification as to why he could not have sought additional information as to the John Doe Defendants in the subsequent three years after he was transferred from Green Haven. "While the Court recognizes Plaintiffs limitations, given his incarceration and *pro se* status, Plaintiff must show that he exercised some due diligence in an attempt to identify the [John Doe] Defendants prior to filing the Complaint." *Williams,* 2010 WL 963474, at *13.

**\*15** Finally, given Plaintiff's delay in filing his complaint, once he received the responses to the Court's *Valentin* order, the statute of limitations had run. Then, despite Judge MeMahon's December 5, 2011 Order directing him to file an Amended Complaint within 30 days of receiving the responses (*see* Dkt. No. 9)—and the Attorney General's Office having provided information to Plaintiff on February 29, 2012 (*see* Dkt. No 11) Plaintiff waited four months to do so. Thus, the John Doe Defendants should be dismissed because Plaintiff's " 'failure to act diligently to ascertain the unidentified defendant's name subjects the complaint to dismissal as to that party.' " *Fisher,* 2011 WL 4899920, at *4 (quoting N.Y. C.P.L.R. § 1024).[23]

Nor can Plaintiff rely on New York's relation-back doctrine set forth in N.Y. C.P.L.R. § 203(c). "Under New York's relation-back rule, amendments relate back to timely filed pleadings when (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well." *Fisher,* 2011 WL 4899920, at *5 (internal quotations omitted). Here, there is no unity of interest between Defendants Chill and Ercole and the newly-added individual defendants. In a § 1983 action, "each individual defendant's liability will be determined with regard to that defendant's particular acts or omissions." *Maccharulo,* 643 F.Supp.2d at 597 (citing *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978)). Thus, because "the claims against the various Defendants would not necessarily stand or fall together, the unity of interest requirement cannot be met, and relation back is unavailable to [Plaintiff] under New York law." *Id.* For these reasons, Defendants' motion to dismiss on statute of limitations grounds should be granted as to Defendants Wahlquist, Mell, Wesley, Thorpe, Iuzinni, Speed, Fitch, and Fila.

**b. Plaintiff's Claims Against Defendants Described in the Original Complaint Should Not Be Dismissed as Time–Barred.**

As stated above, Defendants Murphy, Benitez, Monzon, Foroscij, Brothers, Cecilia, and Koskowski were not named in the caption of the Original Complaint, and Defendants assert that claims against them should similarly be dismissed as time-barred. However, all of these Defendants (except Koskowski) were identified by name in the body of Plaintiff's Original Complaint, which was timely filed. While the merits of Plaintiff's allegations against these individuals may ultimately not withstand scrutiny, the Court recommends that the claims against these defendants, with the exception of Defendant Monzon, should not be dismissed as statutorily barred because Plaintiff intended them to be defendants in his Original Complaint.

**\*16** While Rule 10(a) of the Federal Rules of Civil Procedure requires that the caption of a pleading name all the parties to a lawsuit, "the caption itself is normally not determinative of the identity of the parties or of the pleader's statement of claim." *E.E.O.C. v. Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 580,* 139 F.Supp.2d 512, 525 (S.D.N.Y.2001) (internal quotations omitted). Rather, in deciding whether an entity has properly been made a party to a lawsuit, the court should consider " '[t]he caption, pleadings, service of process and other indications of the intent of the pleader.' " *Id.* (quoting *Nationwide Mut. Ins. Co. v. Kaufman,* 896 F.Supp. 104, 109 (E.D.N.Y.1995)). *See also Rice v. Hamilton Air Force Base Commissary,* 720 F.2d 1082, 1085 (9th Cir.1983) ("[T]he question of whether a defendant is properly in a ease is not resolved by merely reading the caption of a complaint. Rather, a party may be properly in a case if the allegations in the body of the complaint make it plain that the party is intended as a defendant."). Indeed, courts have found *pro se* complaints to sufficiently plead claims against defendants not named in the caption when there are adequate factual allegations to establish that the plaintiff intended them as defendants. *Ocasio v. Riverbay Corp.,* No. 06 Civ. 6455(PAC) (KNF),

Case 9:15-cv-00006-BKS-TWD Document 61 Filed 07/10/17 Page 111 of 282

2007 WL 1771770, at *7 (S.D.N.Y. June 19, 2007) (finding that text of complaint established individual as intended defendant despite lack of specificity in caption); *Gibson v. Brown,* No. 12 Civ. 622(KAM)(RLM), 2012 WL 1744845, at *1 (E.D.N.Y. May 16, 2012) (deeming caption amended to include defendants listed in body of complaint but not named in original caption); *O'Neal v. County of Nassau,* 992 F.Supp. 524, 531 (E.D.N.Y.1997) (finding plaintiff sufficiently alleged personal involvement of certain individuals even though he failed to name them as party-defendants in the caption or body of the complaint); *Trackwell v. United States Gov't.* 472 F.3d 1242, 1243–44 (10th Cir.2007) ( "[I]n a pro se case when the plaintiff names the wrong defendant in the caption or when the identity of the defendants is unclear from the caption, courts may look to the body of the complaint to determine who the intended and proper defendants are."); *Bothwell v. Brennan,* 2014 WL 953500. at *5 (N.D.Cal. Mar. 6, 2014) (finding defendant sufficiently identified in the body of the complaint and construing defendant as already named rather than dismissing with leave to amend).

Here, it is plain that Plaintiff intended to bring claims against Defendants Murphy, Benitez, Brothers, Foroscij, Cecilia, and Koskowski. With regard to Defendant Murphy, Plaintiff alleges that "Mr. Murphy, a Sgt., on or about Sept. 15, 2008, ... deliberately and negligently performed what he knew was a closed and critically deficient investigation of false allegations." Compl., ¶ 9. Plaintiff argues that "CO. Benitez" denied him medically necessary moves within Green Haven, retaliated against him by ransacking his cell, and stole various items from him. *Id.* at ¶¶ 15–19, 34–35. Defendant Brothers is also alleged to have robbed Plaintiff of his personal items. *Id.* at ¶ 28. With regard to Defendant Foroscij, Plaintiff maintains that on November 3, 2008, while he was in the SHU, Foroscij "purposely denied [him] [his] kosher breakfast tray." *Id.* at ¶ 27. Defendant Cecilia is alleged to have known that Plaintiff was assaulted and that there were false charges against him; further, Plaintiff claims, Defendant Cecilia allegedly persuaded him not to defend his administrative segregation ticket. *Id.* at ¶ 31. Finally, as to Defendant Koskowski, Plaintiff alleges that he failed to properly dismiss Plaintiff's administrative ticket, that he knew Plaintiff had been assaulted, and that he denied Plaintiff necessary medical care. *Id.* at ¶¶ 10–14, 33. [24] Thus, affording it a liberal interpretation, the Court construes Plaintiff's *pro se* pleadings to have

asserted claims against the aforementioned defendants, despite the failure to list them in the caption.

**\*17** With respect to Defendant Monzon, Plaintiff does not allege sufficient facts against him to establish that he was an intended defendant. The only time he is mentioned in the Original Complaint involves an incident where Plaintiff asked Defendant Benitez about his missing property and, in response, "C.O. Mon [z]on laughed." *Id.* at ¶ 18. Plaintiff does not allege, as he does with other Defendants, that Monzon persistently mocked or taunted him, attacked him physically or emotionally, or confiscated any of his belongings. The Court cannot infer from Plaintiff's sole allegation against Monzon that Plaintiff intended him to be held liable under § 1983. Accordingly, Monzon should not be considered a defendant named in the original complaint, and any claim against him should be dismissed for failure to relate back. [25]

### c. In the Alternative, the Claims Against the Defendants Described in the Original Complaint Should Be Deemed to Relate Back.

Even if the descriptions of Murphy, Benitez, Brothers, Foroscij, Cecilia, and Koskowski in the Original Complaint are insufficient to consider them to have been named as original defendants, Plaintiff also satisfies the relation-back requirements under Rule 15(c). *Hogan,* 738 F, 3d at 517. To start, the "new claims" clearly arose out of conduct set out in the original pleading; in fact, the Amended Complaint is virtually identical to the Original Complaint, except for the substitution of various names of defendants. Plaintiff can also satisfy the second condition—that the added parties must have received sufficient notice of the claims against them so as not to be prejudiced in mounting a defense—because these Defendants had constructive notice. Indeed, " 'the court can impute [constructive notice] of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is some showing that the attorney knew the additional defendants would be added to the existing suit.' " *Mabry v. N.Y.C. Dep't. of Corr.,* No. 05 Civ. 8133(JSR)(JCF), 2008 WL 619003, at *5 (S.D.N.Y. March 7, 2008) (quoting *Muhammad v. Pico,* No. 02 Civ. 1052(AJP), 2003 WL 21792158, at *20 (S.D.N.Y. Aug. 5, 2003)). *See also Feliciano v. Cnty. of Suffol,* No. 04 Civ. 5321(JS) (AKT), 2013 WL 1310399, at *8 (E.D.N.Y.

March 28, 2013) (" 'Constructive notice is derived from the presumed knowledge of the attorney who represents the original defendant(s) and who would represent the prospective defendant(s) if leave to amend were granted.' ") (quoting *Smith v. Westchester Cnty. Dep't of Corr.,* No. 07 Civ. 1803(SAS), 2012 WL 527222, at *4 (S.D.N.Y. Feb. 15, 2012)).

Here, the individual defendants should be deemed to have constructive notice where the New York State Attorney General's Office was aware of Plaintiff's lawsuit, having responded to the Original Complaint on behalf of the initial defendants, and was also aware that Plaintiff sought to add these new defendants, given the Court's *Valentin* Order. *Feliciano,* 2013 WL 1310399, at *8 (holding defendant had constructive notice where original complaint described John Does, "thus alerting the Suffolk County Attorney of the need to identify those individuals); *Mabry,* 2008 WL 619003, at *5 (finding notice requirement satisfied where Corporation Counsel was aware of lawsuit and knew identities of individuals that plaintiff sought to join); *Muhammad,* 2003 WL 21792158, at *20 (finding constructive notice where newly added defendant was DOCCS employee being represented, along with all other defendants, by Attorney General's office, original complaint "clearly made a claim" against unnamed defendant, and Amended Complaint merely added his name).

**\*18** Plaintiff also satisfies the third relation-back requirement: that a party "should have known that, but for a mistake of identity, the original action would have been brought against it." Plaintiff's mistake with regard to Defendants Benitez, Brothers, Murphy, Cecelia, Koskowski, and Foroscij was that he failed to list them in the caption. This is not the same as a plaintiff who does not name certain Defendants because he is unsure of their identity. *Cf. Vital v. New York,* 136 Fed. Appx. 393, 396 (2d Cir.2005) (" 'Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities .' ") (quoting *Barrow,* 66 F.3d at 470). Rather, Plaintiff did know who these individuals were, as evidenced by his descriptions of them by name or position in the text of the Original Complaint. Where a plaintiff fails to list a party in the caption, mislabels the proper defendant, or incorrectly spells his name, courts generally will grant leave to correct the mistake under Rule 15. *See, e.g., Mosley v.*

*Jablonsky,* 209 F.R.D. 48, 52–53 (E.D.N.Y.2002) (finding *pro se* plaintiff's failure to name individual defendants in caption could be characterized as mistake under Rule 15(c) where complaint set forth allegations of defendants' conduct); *Sokolski v. Trans Union Corp.,* 178 F.R.D. 393, 399 (E.D.N.Y.1998) ("Where a plaintiff mislabels the proper defendant and/or incorrectly spells its name, courts generally grant the plaintiff leave to correct the mistake.") (citing *Datskow v. Teledyne, Inc.,* 899 F.2d 1298, 1302 (2d Cir.1990)), Indeed, a plaintiff's knowledge of the proper party's existence does not preclude making a mistake within the meaning of Rule 15(c); rather, the focus is on "whether the [party to be added] knew or should have known that, absent some mistake, the action would have been brought against him." *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 548, 552 (2010). Here, as discussed above, the newly-added defendants had constructive notice that an action would be brought against them, and accordingly, Plaintiff satisfies the third relation-back requirement. *See Mosley,* 209 F.R.D. at 53 (officer defendants' attorneys "should have known that, given the deficiencies of the original complaint, [the officers] should have been named, and would, when the mispleading became evident, be added.").

Plaintiff cannot, however, satisfy the final relation-back condition requiring that the second and third criterion occurred within 120 days of serving the summons and original complaint. Defendants were not served with the Original Complaint within the 120 days mandated by Rule 4(m), nor by July 25, 2012—the extended deadline to serve Defendants Chill or Ercole. *See* Dkt, No. 19. Nonetheless, courts must extend a plaintiff's time for service upon a showing of good cause, and may grant a discretionary extension where deemed appropriate. *See* Fed.R.Civ.P. 4(m); *Zapata v. City of New York,* 502 F.3d 192, 197 (2d Cir.2007); *Songhorian v.. Lee,* No. 11 Civ. 36(CM), 2012 WL 6043283, at *3 (S.D.N.Y. Dec. 3, 2012). " 'Good cause is generally found only in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond its control.' " *Park Plus, Inc. v. Ardeon Realty Corp.,* No. 13 Civ. 6917(KPF), 2014 WL 338543, at *1 (S.D.N.Y. Jan. 28, 2014) (quoting *Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 419 (S.D.N.Y.2013)).

**\*19** Here, given the lenient standards afforded to *pro se* litigants, I recommend excusing Plaintiff's failure to timely serve the Defendants on the grounds of good cause. In

Judge McMahon's initial order of service, she directed Plaintiff to file an Amended Complaint officially naming the remaining defendants. Dkt. No. 9. She further stated that, if necessary, the Clerk of Court would issue an Amended Summons and the *Pro Se* Office would send Plaintiff an amended Rule 4 service package, at which point he would have 120 days to effectuate service for the additional defendants. *Id.* [26] Subsequently, on June 22, 2012, Judge McMahon granted Plaintiff an extension of service for Defendants Ercole and Chill. Dkt. No. 19. Within a matter of days, Plaintiff filed his Amended Complaint. Dkt. No. 20. Amended summonses were also issued, but only for Defendants Chill and Ercole, and Plaintiff was mailed forms to have the U.S. Marshals complete service for Chill and Ercole on his behalf. *See* Dkt. Entries dated July 3, 2012. Plaintiff completed those forms and service was effected upon both those Defendants. Dkt Nos. 23, 30.

However, contrary to Judge McMahon's Order, summonses were never issued for the additional Defendants after Plaintiff filed his Amended Complaint, and Plaintiff does not appear to have been sent an amended service package at that time. On October 17 and 24, 2012, Plaintiff wrote to the *Pro Se* Office of the Court requesting additional copies of various documents required for service. *See* Dkt. No. 31. No summonses were issued and no forms sent. Plaintiff renewed his request on December 21, 2012 and January 9, 2013, without result. Dkt. Nos. 39 and 41. On February 3, 2013, Plaintiff again sought the requisite service forms. Dkt. No. 54. Finally, on February 13, 2013, summonses were issued for the remaining Defendants in the case and Plaintiff was mailed a service package. *See* Dkt. Entries dated February 13, 2013. Plaintiff promptly filled out the forms, and Defendants were served thereafter.

As an initial matter. Plaintiff did technically comply with Judge McMahon's Order to serve the Amended Complaint within 120 days of the issuance of the amended summons. Moreover, his failure to serve the newly-added Defendants at an earlier point in time was not a result of his inaction, but rather due to judicial oversight. As an incarcerated *pro se* plaintiff, he relied on the Court to provide the requisite service forms so that the U.S. Marshals Service could effectuate service, and those forms were not provided for several months despite multiple requests. Cases in this district make clear that courts should excuse a prisoner's failure to effect timely service

when he is not at fault. *See, e.g., Walker v. Schult,* 717 F.3d 119, 123 (2d Cir.2013) ("[F]ailure of the U.S. Marshals Service to properly effect service of process constitutes 'good cause' for failure to effect timely service."); *Covington v. Dibiase,* No. 97 Civ 0257(TJM)(GJD), 1998 WL 760261 (N.D.N.Y. Oct. 30, 1998) (finding good cause for failure to effect service where Plaintiff maintained he was never directed to complete a USM 285 form for the named defendant in this action and completed form promptly once provided). Consequently, Plaintiff has good cause for his delay in service, thereby satisfying the final requirement for relation-back purposes. Therefore, the Court recommends denying Defendants' motion to dismiss the claims against Defendants Murphy, Benitez, Foroscij, Brothers, Cecilia, and Koskowski on the ground that they are time-barred, and granting the motion with respect to Defendant Monzon.

### D. Requirement of Personal Involvement Under § 1983

**\*20** The Court now turns to the substance of Plaintiff's claims, first setting forth the legal standard requiring personal involvement in § 1983 cases, and second, considering its applicability to Plaintiff's various claims.

" 'Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). A "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

Traditionally, supervisory personnel may be considered "personally involved" if a plaintiff plausibly alleges that the defendant:

(1) participated directly in the alleged constitutional violation;

(2) failed to remedy the wrong after being informed of it;

(3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) was grossly negligent in supervising subordinates who committed the wrongful acts; or,

JCG v. Ercole, Not Reported in F.Supp.3d (2014)
Case 9:15-cv-00006-BKS-TWD   Document 61   Filed 07/10/17   Page 114 of 282
2014 WL 1630815

(5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating there were ongoing unconstitutional acts.

*Colon v. Coughlin,* 58 F.3d 865. 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Some courts have questioned the vitality of these factors given the heightened pleading standards imposed by the Supreme Court in *Iqbal. See Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal* 's muster —a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd* 387 F. App'x 55 (2d Cir.2010); *Newton v. City of New York,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived" post-*Iqbal.*) The Second Circuit has yet to rule on the question. *See Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but declining to reach the issue).[27]

However, the majority of courts (including Judge McMahon) have held that "even after the U.S. Supreme Court's decision in *Iqbal,* these 'categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated.' " *Hernandez v. Goord,* No. 01 Civ. 9585(SHS), 2013 WL 2355448, at *7 (S.D.N.Y. May 29, 2013) (quoting *Qasem v. Toro,* 737 F.Supp.2d 147, 152 (S.D.N.Y.2010)). *See also Ramey v. Perez,* No. 13 Civ. 00017(CM), 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) (McMahon, J.) (*"Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment."); *Mercier v. Kelly,* No. 10 Civ. 7951(ALC)(JCF), 2013 WL 4452486, at *6 (S.D.N.Y. Aug. 19, 2013) ("[T]he majority view is where 'the constitutional claim does not require a showing of discriminatory intent ... the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.' ") (quoting *Shepherd v. Powers,* No. 11 Civ. 6860(LTS) (RLE), 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012)); *Martinez*

*v. Perilli,* No. 09 Civ. 6470(WHP), 2012 WL 75249, at *4 (S.D.N.Y. Jan. 5, 2012) ("[T]he five *Colon* categories still apply after *Iqbal.*" ).[28]

### E. Plaintiff's Freedom of Religion Claims

#### 1. Plaintiff Does Not Have a Viable Claim Under the RFRA.

*21 Plaintiff alleges that throughout his entire stay at Green Haven, Defendant Chill "deliberately denied [Plaintiff] his right to receive kosher, attend services, holidays and [his] right to a Rabbi ." Am. Compl. ¶ 32. He contends that these actions are in violation of the Religious Freedom Restoration Act ("RFRA"). However, Plaintiff's RFRA claim is barred by the Supreme Court's finding that the statute was unconstitutional. *City of Boerne v. Flores,* 521 U.S. 507 (1997) (overturning RFRA on the basis that Congress had exceeded the scope of the Fourteenth Amendment enforcement clause). Accordingly, Plaintiff's claim pursuant to the RFRA should be dismissed.

#### 2. Plaintiff's First Amendment Free Exercise Claim.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582. 588 (2d Cir.2003). However, the First Amendment protections for inmates are not absolute: the constitutionality of a restriction on a prisoner's religious practices is "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* In evaluating a free exercise of religion claim, courts must consider "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). *See also Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) ("Under the First Amendment ... a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy 'is reasonably related to legitimate penological interests.' ") (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)). In order to establish a violation of the First Amendment, a "prisoner must show at the threshold that the disputed

conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006)). *See also Leach v. New York City,* No. 12 Civ. 3809(PAC)(JCF), 2013 WL 3984496, at *5 (S.D.N.Y. Aug. 2, 2013) ("To establish a free exercise claim, an incarcerated plaintiff must demonstrate that the targeted policy or practice constitutes a [substantial] burden on his religious beliefs."); *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (same). "The substantial burden requirement is not met by a *de minimis* imposition on the free exercise of religion." *Leach,* 2013 WL 3984496, at *5 (citing *McEachin v. McGuinnis,* 357 F.3d 197, 203 n. 6 (2d Cir.2004) ("There may be inconveniences [regarding denial of religiously required food] so trivial that they are most properly ignored.")).

### a. Right to Receive Kosher Meals

**\*22** It is clearly established that "a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597 (citing *Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975)). *See also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights."). Absent any legitimate governmental interest, prison authorities must accommodate the right of Orthodox Jews to observe a Kosher diet. *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975) (reaffirmed in *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992)); *Butler v. Hogue,* No. 08 Civ. 264(GLS) (DRH), 2010 WL 4025893, at *4 (N.D.N.Y. Feb. 4, 2010) ("Subscription to a kosher diet constitutes a material tenet of religion consistently found entitled to protection under the Free Exercise Clause.") (citing *Jackson v. Mann,* 196 F.3d 316, 320–21 (2d Cir.1999)), Report and Recommendation, *adopted by* 2010 WL 4025886 (N.D.N.Y. Oct 13, 2010).

### i. The Motion to Dismiss the Claim Against Defendant Chill For Failure to Provide Kosher Meals Should Be Denied.

Plaintiff has pleaded the elements of a plausible claim that his sincerely held religious beliefs were substantially burdened. He contends he is "a type of Messianic Jew" who observes a Kosher diet. Am. Compl., ¶ 4.[29] Further, Plaintiff's complaint, "when viewed in the light most favorable," "alleges that [Defendant Chill] significantly interfered with [his] religious beliefs." *McEachin,* 357 F.3d at 203. Plaintiff asserts that he made multiple requests

to receive Kosher meals in accordance with his religious beliefs, only to be "deliberately ignored for months" by Defendant Chill. Am. Compl., ¶¶ 4–6. Indeed, Plaintiff claims that he was deliberately denied the right to receive Kosher meals for the entirety of his incarceration at Green Haven. *Id.* at ¶¶ 4, 32.[30] This complete deprivation, as alleged, amounts to a significant, nontrivial burden on Plaintiff's rights under the Free Exercise clause such that, at least at this stage, the Court cannot recommend dismissal of the First Amendment claim against Rabbi Chill, particularly given Defendant's failure to offer any legitimate reason for denying kosher meals. *McEachin,* 357 F.3d at 203 (reversing district court's dismissal of plaintiff's claim that First Amendment rights were violated when defendants imposed restrictive diet and deprived him of blessed food in observance of Ramadan); *Pagan v. Westchester County,* No. 12 Civ. 7669(PAE) (SN), 2014 WL 982876, at *20 (S.D.N.Y. March 12, 2014) (denying motion to dismiss where plaintiffs alleged they were denied religious accommodations because only food offered that complied with their religious requirements was "undercooked or rotten"); *Turner v. Sidorowicz,* No. 12 Civ. 7048(NSR), 2014 WL 641454, at *10 (S.D.N.Y. Feb. 14, 2014) (finding plaintiff plausibly asserted free exercise claim given allegations that kosher diet was suspended without explanation and in retaliation for grievances filed); *Modlenaar v. Liberatore,* No. 07 Civ. 6012(CJS), 2009 WL 2179661, at *4–5 (W.D.N.Y. July 22, 2009) (refusing to dismiss claim against defendant alleged to have denied kosher meals, even though kosher loaf was available, and where defendants offered no legitimate penological reason for deprivation); *Ramsey v. Goord,* 661 F.Supp.2d 370, 397 (W.D.N.Y.2009) (denying summary judgment where court found that missing more than 30 days of kosher meals constituted more than *de minimis* injury to plaintiff).

### ii. The Motion to Dismiss the Claim Against Defendant Foroscij Should Be Granted.

**\*23** Plaintiff also alleges that on November 3, 2008, Defendant Foroscij "purposely denied [him][his] kosher breakfast tray." Am. Compl., ¶ 27. This is the only allegation against Defendant Foroscij. The denial of one meal does not substantially burden Plaintiff's rights under the Free Exercise clause as it constitutes no more than a *de minimis* harm. *See, e.g., Leach,* 2013 WL 3984496, at *2 ("The intermittent failure to provide incarcerated individuals with food complying with their religious

2014 WL 1630815

dietary restrictions is a *de minimis* imposition falling far short of the substantial burden requirement."); *Phillips v. Lavalley,* No. 9:12 Civ. 609(NAM)(CFH), 2014 WL 1202693, at *7 (N.D.N.Y. March 24, 2014) (citing cases for the proposition that "[t]he denial of three kosher meals, on three separate occasions, [does] not constitute more than a *de minimis* burden"); *Washington v. Afify,* —— F.Supp.2d ——, 2013 WL 4718693, at *5 (W.D.N.Y. Sept. 3, 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim."); *Cato v. Ramos,* No. 11 Civ. 300A, 2012 WL 4113187, at *6 (W.D.N.Y. Aug. 10, 2012) (granting motion to dismiss where "at most plaintiff lost holy day meals on fifteen occasions over the two-year period alleged, and such is a *de minimis* deprivation of his religious rights"), Report and Recommendation, *adopted by* 2012 WL 4113067 (W.D.N.Y. Sept. 19, 2012). Accordingly, the claim against Defendant Foroscij should be dismissed.

### b. The Motion to Dismiss the Claim Against Defendant Chill for Denying Access to Religious Services Should Be Denied.

The Second Circuit has held that "it is well established that prisoners have a constitutional right to participate in congregate religious services .... Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citations omitted). *See also Ford,* 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock."). But as previously noted, an inmate's freedom of religion must be balanced against " 'the interests of prison officials charged with complex duties arising from administration of the penal system.' " *Id.* at 588 (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)).

Plaintiff asserts that Defendant Chill deliberately denied him his right to attend services and celebrate religious holidays for his entire stay at Green Haven. Am. Compl., ¶ 32. While Plaintiff provides no other details in support of this claim, the Court believes that this is sufficient, albeit barely, at the pleading stage to allege a substantial burden on his beliefs in that he was completely denied any occasion to worship or practice his religion, particularly given that Defendants offer no legitimate penological objective that might justify such a denial. *See Young,* 866

F.2d at 570 ("A prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is reasonably related to legitimate penological interests" and it is "incumbent upon prison officials to make such a showing in order to prevail on a motion to dismiss") (internal quotations omitted); *Washington v. Gonyea,* 538 F, App'x 23, 27 (2d Cir.2013) (finding that while plaintiffs complaint did not "specify which official denied him religious services in [the SHU], a liberal reading of the complaint gives rise to a plausible inference that [defendants] were involved either directly or indirectly, and [plaintiff] has therefore adequately pled a violation of his First Amendment rights"); *Nji v. Heath,* 13 Civ. 200(CM), 2013 WL 6250298, at *11–12 (S.D.N.Y. Dec. 2, 2013) (allowing free exercise claim to survive motion to dismiss where complaint plausibly alleged defendant was responsible for denying access to religious services, despite fact that at a later stage, defendant "may well be able to carry the 'relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct' ") (quoting *Salahuddin,* 467 F.3d at 275)); *Mecca Allah Shakur v. Bruno,* No. 3:12 Civ. 984(SRU), 2013 WL 556797, at *1, *4 (D.Conn. Feb. 8, 2013) (finding plaintiff stated plausible § 1983 claim for violation of First Amendment rights with allegation that defendants refused to permit him to engage in group religious services). [31] Accordingly, I recommend that the motion to dismiss Plaintiff's claim that he was deprived of access to religious services be denied.

### F. Eighth Amendment Violations

### 1. Plaintiff's Excessive Force Claim Should Be Dismissed.

**\*24** Plaintiff alleges that on or around September 23, 2008, he was violently assaulted while being moved from his cell. Am. Compl., ¶¶ 20–23, 26. Specifically, he maintains he was punched in the back and head, kicked, and kneed to the point where he could no longer stand or walk. *Id.* at ¶¶ 21, 23, 25. He also asserts that officers repeatedly forced him to stand up and then dropped him, and subsequently held him up by placing fingers in his nostrils. *Id.* at ¶ 26.

On their face, these allegations state a plausible claim of excessive force under the Eighth Amendment. *See e.g., Nash,* 2013 WL 6197087, at *9 (" 'It is [however] well established that whenever prison officials 'maliciously' and 'sadistically' utilize force to cause harm to inmates,

the 'contemporary standards of decency,' relevant to a determination of the objective seriousness required for an Eighth Amendment analysis, are 'always violated.' ") (quoting *Randle v. Alexander,* 960 F.Supp.2d 457, 472 (S.D.N.Y.2013)); *Brooks v. Jackson,* No. 11 Civ. 6627(JMF), 2013 WL 5339151, at *4 (S.D.N.Y. Sept. 23, 2013) ("Liberally construed, these allegations [of an officer assaulting plaintiff] raise an Eighth Amendment claim based on excessive force, where the 'core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' ") (quoting *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010)). However, because the Original Complaint alleges that these actions were committed by John Does, the claim should be dismissed as time-barred for the reasons discussed in Section II.C.2.a.

Moreover, even if the claim was deemed to be timely, Plaintiff still does not plead sufficient "factual content that allows the court to draw the reasonable inference that the defendant[s][are] liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. In the Amended Complaint, Plaintiff states that three or four officers—"very possibly" Martin, Mell, Wesley, and Thorpe—severely attacked him while he was held against a wall. Am. Compl., ¶ 20. He maintains that Brothers *or* a John Doe injured him when taking off his clothes. *Id.* at ¶ 23. Finally, he asserts that he was further assaulted by two other officers—"possibly" Iuzinni and Speed. *Id.* at ¶ 26. These allegations are simply insufficient to clear *Iqbal*'s plausibility threshold requiring "more than a *sheer possibility* that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (emphasis added).[32]

Plaintiff's only specific allegation as to Brothers is that he "physically abused" him; but Plaintiff does not contend that Brothers committed the aforementioned assaults and thus fails to give adequate detailed factual allegations to maintain a claim against him. *See id.* ("Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' ") (quoting *Twombly,* 550 U.S. at 557)) .[33]

### 2. Plaintiff's Failure to Protect Claim Should Be Dismissed.

**\*25** To withstand a motion to dismiss, an Eighth Amendment claim under § 1983 for failure to protect must satisfy a two-pronged test, with both an objective and subjective element. *Bridgewater v. Taylor,* 698 F.Supp.2d 351, 357 (S.D.N.Y.2010) (citing *Hayes,* 84 F.3d at 620 and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)). "For the objective component ..., 'the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.' Additionally, subjectively, 'the prison official [must] have a 'sufficiently culpable state of mind,' to wit, be deliberately indifferent to the harmful conditions.' " *Randle v. Alexander,* 960 F.Supp.2d 457, 473 (S.D.N.Y.2013) (quoting *Farmer,* 511 U.S. at 845). *See also Lojan v. Crumbsie,* No. 12 Civ. 0320(LAP), 2013 WL 411356, at *4 (S.D.N.Y. Feb. 1, 2013); *Miller v. Rosini,* Nos. 09 Civ. 7300(HBP), 09 Civ. 8884(HBP), 2011 WL 924230, at *6 (S.D.N.Y. March 17, 2011). In analyzing the objective prong, "the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.' " *Randle,* 960 F.Supp.2d at 474 (quoting *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997)). With regard to the subjective prong, an official acts with deliberate indifference when he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... draw[s] the inference." *Farmer,* 511 U.S. at 837. In other words, the prison official must have "ha[d] knowledge that an inmate face[d] a substantial risk of serious harm and he disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes,* 84 F.3d at 620; *Nji,* 2013 WL 6250298, at *9.

Plaintiff broadly alleges that Ercole and Koskowski's failures to protect him resulted in general physical and emotional injuries. Am. Compl., ¶¶ 7, 8, 33. But this assertion cannot satisfy the objective inquiry, as Plaintiff does not plausibly allege that the conditions of his confinement posed a substantial risk of serious harm. Courts have held that to satisfy the first prong, "a plaintiff must demonstrate that this grave harm was 'actual or imminent.' " *Dublin v. N.Y.C. Law Dep't,* No. 10 Civ. 2971(LAP), 2012 WL 4471306, at *5 (S.D.N.Y. Sept. 26, 2012) (quoting *Benjamin v. Fraser,* 343 F.3d 35, 51 (2d Cir.2003)). Some courts have even found that "a substantial risk of harm can only be demonstrated where there is evidence of a previous altercation between a plaintiff and his attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." *Id.* (citing *Desulma v. City of New York,* No. 98 Civ.2078(RMB)(RLE), 2001 WL 798002, at *6 (S.D .N.Y. July 6, 2001)).

As described above, Plaintiff asserts that he suffered injuries from the physical attacks that occurred while he was being taken to the SHU. Am. Compl., ¶¶ 20–26. He also maintains that, prior to being assaulted by Green Haven officers, he experienced "severe hostility, discrimination and illegal conduct" in the form of name-calling, having his things stolen, and having an administrative disciplinary ticket brought against him. *Id.* at ¶¶ 1–3. However, he makes no claims that there were previous altercations with officers, threats of violence, or any other indication that he faced a risk of imminent harm. He also does not allege that he lodged any complaints about feeling in danger. Consequently, the conduct he describes leading up to the attack is insufficient to establish a substantial risk of serious harm, as it does not "rise[] to the level of a wanton act of cruelty such that the inmate is in fear of instant and unexpected death at the whim of his ... custodians." *Nji,* 2013 WL 6250298, at *10 (quoting *Green v. N.Y.C. Dep't. of Corr.,* No. 06 Civ. 4978(LTS), 2008 WL 2485402, at *6–7 (S.D.N.Y. June 19, 2008)). [34]

**\*26** While it is true that an inmate need not actually suffer serious physical injury to face a substantial risk of serious harm, *see, e .g., Alsaifullah v. Furco,* No. 12 Civ. 2907(ER), 2013 WL 3972514, at *12 (S.D.N.Y. Aug. 2, 2013), there is simply nothing to suggest that there was a substantial risk from the conduct alleged. *See Dublin,* 2012 WL 4471306, at *5 (finding no substantial risk given lack of threats of violence prior to attack); *Ketterman v. City of New York,* No. 00 Civ. 1678(NRB), 2001 WL 579757, at *6 (S.D.N.Y. May 30, 2001) (finding no risk where plaintiff did not allege "that any corrections officer was specifically aware of any substantial risk of harm to him" or that "there were any general or specific threats made against him, that there was any history of violence or ill-will between himself and [anyone in the prison] or his assailants in particular, or that he perceived himself to be at any risk of harm, let alone that he informed a prison official of any perceived risk to him"). [35]

Even assuming Plaintiff could establish he was at a substantial risk for serious harm, he "has failed to plead sufficient facts to establish the actual knowledge component of the subjective prong: he has not shown why [Ercole and Koskowski] should have known that a beating was likely to occur." *Bridgewater,* 698 F.Supp.2d at 358; *see also Parris v. N.Y. State Dep't Corr. Servs.,* 947 F.Supp.2d 354, 363 (S.D.N.Y.2013) ("In this case, it is unnecessary to decide whether the plaintiff has satisfied the objective prong of *Farmer* because he has failed to satisfy the subjective prong.") (citing *Lee v. Artuz,* No. 96 Civ. 8604(JGK), 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000)).

First, Plaintiff does not claim that Ercole and Koskowski should have known that he was particularly at risk that he might suffer serious harm. He does not assert that he notified them about perceived threats to his safety, nor that they were aware of any prior attacks (threatened or actual). *See Parris,* 947 F.Supp.2d at 363 (finding no deliberate indifference where "the Complaint does not allege that the defendants knew of any threats made against the plaintiff or that the plaintiff had been involved in any prior altercations"); *Bridgewater,* 698 F.Supp.2d at 358 (finding no knowledge or awareness where plaintiff did "not claim that there was a pattern of physical beatings following verbal harassment, nor ... that [the assailant] often beat prisoners while escorting them back to their cells"); *Coronado v. Goord,* No. 99 Civ. 1674(RWS), 2000 WL 1372834, at *5 (S.D.N.Y. Sept. 25, 2000) (finding supervisors not liable given their lack of awareness that plaintiff had previously been assaulted or that he felt at risk).

Nor does Plaintiff plead facts sufficient to suggest that "prison conditions posed a generalized threat to the safety of all inmates" or that there were other attacks against prisoners when being transferred to the SHU. *Coronado,* 2000 WL 1372834 at *5. He does not "allege that the defendants knew of a history of prior ... attacks similar to the one suffered by the plaintiff and that the measures they should have taken in response to such prior attacks would have prevented the attack on the plaintiff." *Parris,* 947 F.Supp.2d at 636. Accordingly, Plaintiff's claim that Ercole and Koskowski failed to protect him should be dismissed. *See Coronado,* 2000 WL 1372834 at *4 ("If Defendants did not know of the risk to [Plaintiff]—either by receiving notice of prior attacks and a lingering threat against him personally or by their awareness that a substantial risk of attacks ... was pervasive and well-documented—then they cannot be held liable for failure to protect him under the Eighth Amendment standard.") (citing *Avers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985)). For all these reasons, Plaintiff's failure to protect claim should be dismissed.

### 3. Plaintiff's Failure to Train and Supervise Claim Should Be Dismissed.

**\*27**  Plaintiff also alleges that Defendants Ercole and Koskowski were "deliberately indifferent" in "failing to prevent discrimination, assaults, retaliations, racism, petit larceny," and grossly negligent in failing properly supervise and train prison staff. Am. Compl., ¶ 33. For the reasons discussed below, Plaintiff fails to establish any personal involvement of Ercole or Koskowski in their roles as supervisors, as there are insufficient facts pled to establish deliberate indifference, gross negligence, awareness and failure to remedy any unconstitutional behavior, or the creation or continuance of a policy under which unconstitutional acts occurred.

" '[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior.*' " *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003)). *See also, Seymore v. Dep't of Corr Servs.,* No. 11 Civ. 2254(JGK), 2014 WL 641428, at *6 (S.D.N.Y. Feb. 18, 2014) (" '[T]here is no *respondeat superior* liability in § 1983 cases .' ") (quoting *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995) (citation omitted)). "[A] defendant cannot be held liable merely because he occupied a supervisory position." *Randle,* 960 F.Supp.2d. at 477 (quoting *Harrison v. Goord,* No. 07 Civ. 1806(HB), 2009 WL 1605770, at *9 (S.D.N.Y. June 9, 2009) (citing cases); *Walker v. Schriro,* No. 11 Civ. 9299(JPO), 2013 WL 1234930, at *15 (S.D.N.Y. Mar. 26, 2013) ("A defendant's status as warden or commissioner of a prison, standing alone, is ... insufficient to support a finding of supervisory liability."). A supervisor may only "be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and her injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002)

Plaintiff asserts that Ercole and Koskowski are responsible for various constitutional violations, including theft, retaliation, discrimination, abuse, and due process violations. As discussed in other portions of this Report and Recommendation, Plaintiff does not sufficiently plead facts to establish constitutional violations on these grounds. The only plausible constitutional violation that Plaintiff describes for which Ercole and Koskowski could be responsible (with the exception of inadequate medical treatment, which is considered below) is the alleged attack on Plaintiff by various Green Haven officers. However, Plaintiff fails to plead sufficient facts to reasonably suggest that this assault was a consequence of deficient training or supervision on the part of Ercole or Koskowski, and there are also no factual allegations concerning their role in creating any custom or policy or fostering an environment under which such violations were condoned. Plaintiff's only allegations against Ercole—that Ercole knew of various constitutional violations committed by his staff and failed to properly train and supervise them are conclusory and "constitute nothing more than recitations of the applicable standard without supporting factual context." *Randle,* 960 F.Supp.2d at 479. Such "vague and conclusory allegations" that Ercole and Koskowski "failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability." *Green v. Leubner,* No. 9:07 Civ. 01035(LEK) (DEP), 2009 WL 3064749, at *4 (N.D.N.Y. Sept. 1, 2009) (finding no liability where no allegation that supervisor defendant "was at all involved in the circumstances preceding or surrounding the attack on the plaintiff" nor that defendant had any reason to know of prior verbal disagreements or reason for attack) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009)); *Walker,* 2013 WL 1234930, at *15 ("Broad, conclusory allegations that a high-ranking defendant was informed of an incident are also insufficient.") (internal quotations omitted).

**\*28**  Plaintiff does allege that, after the fact, Koskowski "fully knew that [Plaintiff] had been severely assaulted by staff," Am. Compl., ¶ 10, but there is no suggestion that Koskowski knew about or was deliberately indifferent to any risk of harm *prior* to the alleged attack. *Bridgewater,* 698 F.Supp.2d at 359–60 (finding no personal involvement for claims of failure to train and supervise when supervisor only learned of beating after it occurred); *Curtis v. Williams,* No. 11 Civ. 1186(JMF), 2013 WL 1915447, at *6 (S.D.N.Y. May 9, 2013) ("Although Plaintiff alleges in conclusory fashion that 'after learning of the actions of the herein mentioned Defendants that violated Plaintiff's rights, [the supervisor] failed to remedy the obvious wrongs,' making him 'grossly negligent in failing to adequately supervise the subordinates who violated Plaintiff's rights' he does not

allege any facts that could explain how [the supervisor's] 'gross negligence' was the cause of his injury.").

Furthermore, "[a]llegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983. *Parris,* 947 F.Supp.2d at 364 (citing *Strano v. City of New York,* No. 97 Civ. 0387(RPP), 1998 WL 338097, at *5 (S .D.N.Y. June 24, 1998)). In addition, claims regarding " 'defendants' knowledge of alleged constitutional violations [are] insufficient to impose supervisory liability' under § 1983 unless accompanied by allegations that the defendants had direct responsibility for monitoring the alleged violation or that there had been a 'history of previous episodes' putting the defendants on notice of the problem." *Id.* (quoting *Candelaria v. Coughlin,* No. 91 Civ. 1117(LBS), 1991 WL 113711, at *2 (S.D.N.Y. June 18, 1991)). Thus, Plaintiff's failure to train and supervise claim against Koskowski and Ercole are insufficient to establish personal involvement and should be dismissed.

**4. Plaintiff's Claim of Inadequate Medical Care Should Be Dismissed Against All Defendants, With the Exception of Koskowski.**

To the extent that Plaintiff also contends that Defendants were responsible for any inadequate medical care (*see* Am. Compl., ¶¶ 7–8, 13, 15), the Court will address that purported Eighth Amendment violation as well. The Eighth Amendment "imposes a duty on prison officials to ensure that inmates receive adequate medical care." *Salahuddin,* 467 F.3d at 279 (citing *Farmer,* 511 U.S. at 832). To properly plead an Eighth Amendment violation arising out of inadequate medical treatment under § 1983, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). Like the failure to protect inquiry, the test for deliberate indifference under § 1983 involves two components: (1) an objective "medical need" element, which requires that the deprivation of care is "sufficiently serious," and (2) a subjective "deliberate indifference" element based on whether the prison official acted with a sufficiently culpable state of mind. *Salahuddin,* 467 F.3d at 279–80; *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

**\*29** In analyzing the objective element, a court must determine "whether the prisoner was actually deprived of adequate medical care," and, second, "whether the inadequacy in medical care is sufficiently serious." *Salahuddin,* 467 F.3d at 279–80. A deprivation is sufficiently serious "in the sense that 'a condition of urgency, one that may produce death, degeneration or extreme pain' exists." *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 439 (S.D.N.Y.2004) (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Courts must also consider "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. This requires distinguishing whether a prisoner was denied treatment altogether, in which case courts examine the severity of the medical condition, or whether the medical treatment given was inadequate, in which case the court considers the severity of the inadequacy and effect on the inmate. *Id.* "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The subjective element requires a plaintiff to show that the defendant has "the requisite state of mind, which is the equivalent of criminal recklessness: knowledge of, and conscious disregard for, this serious risk." *Carrasquillo,* 324 F.Supp.2d at 439. Indeed, "[t]he charged official must be subjectively aware that his conduct creates such a risk" and "[a] defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Salahuddin,* 467 F.3d at 281.

Plaintiff fails to state an Eighth Amendment claim for inadequate medical care against Defendant Ercole. The only potential allegation is that on or about August 12, 2008, Plaintiff wrote a letter to Ercole requesting a "medically needed move," and he subsequently referred it to a Captain Burnett (who is not a defendant in this case). Am. Compl., ¶ 15. However, Plaintiff cannot possibly sustain a claim for deliberate indifference or gross negligence against Ercole, given his acknowledgement that he received the relief he asked for: he was ultimately moved shortly thereafter. *Id.* at ¶ 17.

Relatedly, Plaintiff asserts that prior to requesting a move from Ercole, he had been denied an opportunity to move by Benitez, who "only performed moves when inmates paid inmate Johnson to move them ." *Id.* at ¶¶ 16, 17. As an initial matter, this claim is time-barred given that the denials occurred more three years before the filing of the Original Complaint. Moreover, Plaintiff does not contend that there was a sufficiently serious deprivation of care that occurred between the time when he was allegedly denied a move by Benitez and when he changed cells. Thus, his complaint does not demonstrate he suffered a "serious medical injury" as a result of Ercole or Benitez's actions. *See, e.g., Dobbin v. Artuz,* 143 F.Supp.2d 292, 302 (S.D.N.Y.2001) (no deliberate indifference where plaintiff requested to be moved on several occasions but failed to demonstrate any medical need for such an action and holding that "inmates are entitled to reasonable treatment, not the specific treatment they desire"). [36]

**\*30** Regarding Defendant Koskowski, Plaintiff alleges that he witnessed Plaintiff's injuries multiple times and was aware that Plaintiff could not walk, as he was "hopping on one foot and hanging on to objects for balance." Am. Compl., ¶ 11. [37] When Koskowski asked what had happened, Plaintiff contends that he informed him that Plaintiff's injuries were a result of being attacked. *Id.* at ¶ 12. Plaintiff also asserts that even after seeing his injuries and learning of the attack, Koskowski failed to remove Plaintiff from the SHU to the clinic and failed to change the policy of allowing inmates in the SHU to use crutches or a cane. *Id.* ¶ 13. Plaintiff states that his condition has worsened since the time of the assault, and that "his hip (right) joint is wearing out at an extremely rapid pace, and a severe deterioration causing pain, loud cracking and up until 2011, a difficulty in moving about." *Id.* at ¶ 34.

Reading the Amended Complaint in its most favorable light, I cannot at this stage recommend dismissing Plaintiff's claim that Koskowski was personally involved in denying Plaintiff treatment for a serious medical need. While "an administrator's response to a medical issue is insufficient to establish deliberate indifference if the administrator himself never provided medical care, since prison administrators may defer to medical staff regarding medical treatment of inmates, ... an administrator who defers to medical staff may be personally involved if the inmate's grievance demonstrates that his medical treatment was egregiously inadequate."

*Lewis v. Cunningham,* No. 05 Civ. 9243(GBD) (RLE), 2011 WL 1219287, at \*5 (S.D.N.Y. Mar 14, 2011) (internal citations omitted), *adopted by* 2011 WL 1218061 (S.D.N.Y. Mar 30, 2011). In Plaintiff's case, "[r]ead in the most favorable light, [his] complaint alleges ... that the named DOC[C]S Employee[ ][was] aware of, but failed to remedy, the ongoing violations of Plaintiff's constitutional right to receive adequate medical attention for a debilitating condition." *Carrasquillo,* 324 F.Supp.2d at 440. Regarding the objective element, Plaintiff claims the assault caused severe deterioration and pain in his right hip and that following the attack he could not walk. "Such a condition counts as 'sufficiently serious' under *Hathaway,* since a risk of both degeneration and extreme pain is alleged." *Id.* at 439. Indeed, "[m]obility is fundamental to our continued health, and the denial of reasonable care that could prevent the loss of the ability to circumambulate is indeed serious." *Giambalvo v. Sommer,* No. 10 Civ. 6774(JPO), 2012 WL 4471532, at \*5 (S.D.N.Y. Sept. 19, 2012) (denying motion to dismiss where plaintiff alleged he could not walk without specific medical shoes and defendant was aware of requests). To be sure, Plaintiff has provided no medical records, but he does assert that he was not treated by a doctor and was released from the infirmary without being able to walk. The Court believes "that discovery could shed light on whether Plaintiff's medical need was of such seriousness and urgency that the failure to address it promptly amounted to a violation of Plaintiffs constitutional rights." *Id.* Accordingly, "[d]rawing all inferences in Plaintiff's favor, as the Court must, the Court concludes that Plaintiff has sufficiently alleged that he had a serious medical need" in that he "has alleged that he suffered severe and degenerative pain and that he had difficulty walking." *Id.*

**\*31** As for the subjective prong, Plaintiff clearly alleges that Koskowski knew of and consciously disregarded a serious risk to his safety. If, as Plaintiff alleges, Koskowski witnessed him in a state where he could not physically stand up, then Koskowski was clearly aware that medical staff had denied adequate medical treatment and he allowed that deprivation to continue. "That is sufficient to state a claim under § 1983." *Carrasquillo,* 324 F.Supp.2d at 440. *See also Carbonell v. Goord,* No. 99 Civ. 3208(AJP), 2000 WL 760751, at \*8 (S.D.N.Y. June 13, 2000) (denying summary judgment where plaintiff alleged that guard forced him to go down stairs with crutches because claim gave rise to inference that guard was aware that he

was placing prisoner in serious danger, but proceeded anyway); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 268–70 (W.D.N.Y.1998) (finding triable issue of fact regarding deliberate indifference because "factfinder could conclude that plaintiff's condition significantly affects his daily activities, and that he suffers chronic and substantial pain" in case where plaintiff alleged he suffered severe pain after cane was taken and that certain guards were aware cane was taken).

Indeed, as the Court explained in *Carrasquillo,* when considering a claim for inadequate medical treatment:

> Construing Plaintiff's allegations liberally and assuming they are true, as I must do when considering this motion to dismiss a *pro se* complaint, I cannot say that plaintiff could prove no set of facts that would not rise to the level of deliberate indifference under the *Hathaway* test. Of course, Plaintiff's allegations may well be exaggerated, or even false. But that is not something I can consider on a motion to dismiss.

324 F.Supp.2d at 439. Thus, taking into account Plaintiff's *pro se* status, with respect to the claim that Koskowski is liable for failing to remedy the denial of adequate medical treatment, the motion to dismiss should be denied.

### G. Other Claims

#### 1. Plaintiff's First Amendment Retaliation Claim Should Be Dismissed.

Plaintiff makes multiple allegations of retaliation, but only in a conclusory manner. Read broadly, the Amended Complaint seems to be alleging that Plaintiff was being "retaliated against" as a result of his criminal conviction for a sexual offence. *See* Am. Compl., ¶¶ 2, 3, 14, 18 (officers took plaintiff's property and called him names in retaliation for criminal case) (Koskowski condoned retaliatory assault against Plaintiff), As an initial matter, "the Second Circuit has warned that 'because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations.' " *Nji,* 2013

WL 6250298, at *7, (quoting *Smith v. Levine,* 510 F. App'x 17, 20 (2d Cir.2013)). "Accordingly, 'a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone.' " *Turner,* 2014 WL 641454, at *10 (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*32** Plaintiff does not state a plausible claim of retaliation. To survive a motion to dismiss, a prisoner asserting such a claim must "show (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009); *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). However, Plaintiff cannot meet the first prong as he has failed to allege that he has engaged in a protected activity. Having a criminal conviction of a sexual nature is hardly protected conduct, and thus his claim of retaliation should be dismissed. *See, e.g., Reeder v. Hogan,* No. 9:09 Civ. 520(NAM) (ATB), 2010 WL 3909050, at *5 (N.D.N.Y. Sept. 30, 2010) (dismissing claim that defendants retaliated against him "because he attempted to assault several corrections officers" and "attempting to assault correctional officers is not protected conduct under the First Amendment"); *Beckles v. Bennett,* No. 05 Civ.2000(JSR), 2008 WL 821827, at *19 (S.D.N.Y. March 26, 2008) ("There is, however, no First Amendment right to engage in a prison uprising or riot, and thus Plaintiff cannot satisfy the first element of a retaliation claim.").

To the extent that Plaintiff alleges he was placed under investigation in retaliation for filing a grievance against Defendant Benitez (*see supra* n. 5), that claim should be dismissed. While "[i]t is well recognized that the filing of a grievance is protected conduct and can thus satisfy the first prong of a retaliation claim," *Nji,* 2013 WL 6250298, at *7 (internal quotations omitted), Plaintiff does not allege any facts to plausibly establish a causal connection between his filing and any adverse action that was taken against him. Specifically, Plaintiff alleges that he told another prisoner that he intended to file a grievance against Benitez (it is unclear whether such a grievance was ever filed), and then that "[s]everal days later, [he] was placed under investigation." Am. Compl., ¶ 19. This is insufficient to create an inference that Plaintiff was issued a ticket because of his grievance, particularly in light of the facts that Benitez is not alleged to have been a part of the

ticket investigation and that Plaintiff also asserts he was investigated because of false inmate allegations. *Id.* at ¶ 9.

### 2. Plaintiff's Deprivation of Property Claim Should Be Dismissed.

Plaintiff alleges Defendants Benitez and Brothers confiscated a variety of items from his cell and that Ercole and Koskowski are also responsible for an "illegal depriv[ation] of property." Am. Compl. ¶¶ 17, 28, 33.[38] Such claims are improper in federal § 1983 actions. To wit, "[d]eprivation of an inmate's property by a state actor may constitute a violation of the inmate's due process rights under the Fourteenth Amendment, but only if a meaningful post-deprivation remedy is not available. New York State, however, provides inmates with a post-deprivation remedy through the Court of Claims." *Bridgewater,* 698 F.Supp.2d 351 (citing *Hudson v. Palmer,* 468 U.S. 517, 533 (1984) and *DeMaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.1995)). Thus, the existence of an adequate post-deprivation state remedy precludes a due process claim under § 1983. *Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001); *Williams v. Ramos,* No. 13 Civ. 826(VB), 2013 WL 7017674, at *8 (S.D.N.Y. Dec. 23, 2013). Accordingly, as Plaintiff cannot state a due process property violation against Defendants Benitez or Brothers, and there is thus no underlying constitutional violation for which Ercole or Koskowski would be liable as supervisors, the Court recommends dismissal of that claim.

### 3. Plaintiff's Search and Seizure Claim Should Be Dismissed.

**\*33** Plaintiff also claims that Benitez "retaliated against [him] by searching [his] cell and thrashing it." Am. Compl., ¶ 16. To start, it is not clear exactly why Plaintiff believes Benitez was retaliating against him, though it appears to be because Plaintiff requested a cell transfer for medical reasons. *Id.* at ¶ 15–16. As discussed above, to survive a retaliation claim, a plaintiff must assert that he has suffered an adverse action resulting from his exercise of a constitutionally protected right. However, "[i]t is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, and transfers among facilities do not need to be proceeded by any particular due process procedure." *Johnson v. Brown,* No. 9:09 Civ. 0002(GTS) (DEP), 2010 WL 6243352, at *16 (N.D.N.Y. Sept. 3, 2010), Report and Recommendation,

*adopted by* 2011 WL 1097864 (N.D.N.Y. Mar 22, 2011). *See also McMahon v. Fischer,* 446 F. App'x 354, 357 (2d Cir.2011) ("A prisoner has no right to housing in a particular facility and no right to process regarding a transfer to another facility."). While a prisoner may be able to state a claim of retaliation alleging that he was transferred to a facility with less medical resources in retribution for constitutionally protected speech, *see, e.g., Flemming v. Wurzberger,* 322 F. App'x 69, 71–72 (2d Cir.2009), or that he was denied a transfer because of grievances filed, *see, e.g., Johnson,* 2010 WL 6243352, at *16, there is no protected right to seek a transfer, and thus Plaintiff cannot satisfy the first prong of the test for retaliation. *Kearney v. N.Y.S. D.O.C.S.,* No. 9:11 Civ. 1281(GTS)(TWD), 2013 WL 5437372, at *14 (N.D.N.Y. Sept. 27, 2013) (finding no protected interest in plaintiff's request for medical transfer).

Moreover, "[t]he Fourth Amendment proscription against unreasonable searches 'does not apply within the confines of the prison cell,' even where the search is retaliatory in nature." *Beckles,* 2008 WL 821827, at *21 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526 (1984) (citations omitted). *See Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at *7 (S.D.N.Y. Nov. 17, 1997) ("Plaintiff's cell search allegation is dismissed in its entirety because the Supreme Court has held that searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature."). Thus, Plaintiff cannot state a plausible claim against Benitez based on any search that was conducted of his cell.

### 4. Plaintiffs Claim Regarding the Disciplinary Ticket Should Be Dismissed.

Plaintiff alleges a variety of claims arising out of an incident where he was administered a disciplinary ticket. He claims that the ticket was based on a series of false allegations by inmates and that Defendant Murphy failed to conduct an adequate investigation into the allegations, that Koskowski failed to dismiss the proceedings related to the ticket, and that Cecelia interfered with his defense. Am. Compl., ¶¶ 9–11.[39]

**\*34** To the extent that Plaintiff argues that he was falsely accused in a misbehavior report, he fails to state a claim. Allegations of a false misbehavior report "cannot support a procedural due process claim if the inmate was afforded a fair opportunity to refute the charges." *Livingston v.*

*Kelly,* 423 F. App'x 37, 40 (2d Cir.2011); *Pittman v. Forte,* No. 9:01 Civ. 0100(LEK)(GLS), 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002) ("The Second Circuit has held that 'a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.' ") (quoting *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997)). "As long as prison officials grant the inmate a hearing and an opportunity to be heard, the 'filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). Here, Plaintiff acknowledges that he was given a hearing, and thus was afforded the due process warranted under the Constitution. Am. Compl., ¶ 31.

Moreover, inmates are not constitutionally entitled to an investigation of any kind by government officials. *Nji,* 2013 WL 6250298, at *6; *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008); *Longi v. County of Suffolk,* No. 02 Civ. 5821(SJF)(WDW), 2008 WL 858997, at *5 (E.D.N.Y. Mar. 27, 2008)). In order for a constitutional violation to have occurred, the investigation itself must have resulted in a deprivation of a constitutional right. *Rodriguez v. Peguero,* No. 9:09 Civ. 1005(TJM)(ATB), 2011 WL 754123 (N.D.N.Y. Jan 27, 2011) (citing *Faison v. Hash,* No. 03 Civ. 6475P, 2004 WL 944523, at *2 (W.D.N.Y. April 23, 2004)), Report and Recommendation, *adopted by* 2011 WL 744799 (N.D.N.Y. Feb 24, 2011). Here, as previously stated, Plaintiff was granted a hearing to address the allegations in the ticket, and he states no claim that the investigation deprived him of any due process. *See* Am, Compl., ¶ 9 (alleging that Murphy's investigation was deficient because he only interviewed the accusers). Accordingly, Plaintiff fails to state a claim based on his allegations that Murphy failed to investigate prior to the hearing and that Koskowski "continued the hearing." *Id.* at ¶¶ 9–10.

Finally, Plaintiff claims that Defendant Cecelia urged him not to call witnesses or present a defense at his administrative segregation hearing. *Id.* at ¶ 31. Plaintiff does not have an absolute right to present witnesses at a disciplinary hearing. *Baxter v. Palmigiano,* 425 U.S. 308, 320 (1976) ( "The right to call witnesses ... is thus circumscribed by the necessary mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general

application.") (internal quotations omitted). *See also Walker v. McClellan,* 126 F.3d 127, 129–30 (2d Cir.1997). "Due process requires that an inmate 'has a restricted right to call witnesses' at a disciplinary hearing, though a hearing officer may 'refuse to call witnesses whose testimony may be reasonably regarded as duplicative or non probative.' " *Wright v. Escrow,* No. 10 Civ. 6502(CJS), 2013 WL 1826053, at *7 (W.D.N.Y. Apr. 30, 2013) (quoting *Feliciano v. Selsky,* 199 F.3d 1322 (2d Cir.1999)). Here, Plaintiff does not assert that Cecelia coerced witnesses not to testify or that he was prohibited from calling witnesses—he only maintains he was "urged" not to call them. Am. Compl., ¶ 31. Such allegations, without more, cannot sufficiently establish a due process violation, particularly given that Plaintiff makes no claims that he even attempted to call a witness or was prevented from doing so. *See e .g., Wright,* 2013 WL 1826053, at *7 (no due process violation where plaintiff alleged request for witness testimony was denied but evidence showed he did not attempt to call witnesses). Furthermore, Plaintiff explains that he actually presented "incontrovertible evidence" that the allegations in the ticket were "not only NOT plausible or feasible but actually impossible," thereby undermining any claim that he was somehow convinced not to present a defense. Am. Compl., ¶ 10. Accordingly, these claims should be dismissed.

**H. Leave to Amend**

**\*35** As Plaintiff is proceeding *pro se,* the Court would ordinarily recommend that he be given leave to amend his complaint to replead all factually insufficient claims. *See Grullon,* 720 F.3d at 139 (district court generally should not dismiss *pro se* complaint without granting at least one opportunity to replead factually insufficient claims); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (same). Here, however, Plaintiff has already had the opportunity to amend his complaint once (and failed to amend a second time despite being given more than three months to do so). Moreover, the Court is recommending that this case proceed on Plaintiff's First Amendment claim against Defendant Chill and his Eighth Amendment claim against Defendant Koskowski. In addition, the Court is of the view that any additional amendment would be futile for the various reasons set forth in this Report. *See, e.g ., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Where a proposed amendment would be futile, leave to amend need not be given ."). Accordingly, I recommend that the Court decline to grant Plaintiff leave to further amend his complaint.

## III. CONCLUSION

To summarize, the Court makes the following recommendations:

- Defendants Phillips and Bendheim should be dismissed under Rule 4(m) of the Federal Rules of Civil Procedure as they were never served with the Amended Complaint;

- Defendants' motion to dismiss on exhaustion grounds should be denied without prejudice to renewal as to the remaining defendants;

- Defendants Ercole and Chill's motion to dismiss on statute of limitations grounds should be denied;

- Plaintiff's claims against the defendants described as "John Does" in the Original Complaint should be dismissed as time-barred;

- Plaintiff's claims against the Defendants who were described by name or position in the original complaint should be found to be timely, except for Defendant Monzon, as to whom the complaint should be dismissed on statute of limitations grounds;

- Plaintiff's claim brought pursuant to the Religious Freedom Restoration Act should be dismissed;

- Defendant Chill's motion to dismiss the claim against him for failure to provide Kosher meals and access to religious services should be denied;

- Plaintiff's claim against Defendant Foroscij should be dismissed;

- Plaintiff's excessive force claim should be dismissed;

- Plaintiff's failure to protect claim should be dismissed;

- Plaintiff's failure to train and supervise claim should be dismissed;

- Plaintiff's claim of inadequate medical care should be dismissed against all Defendants, except Koskowski;

- Plaintiff's retaliation claims should be dismissed;

- Plaintiff's deprivation of property claims should be dismissed;

- Plaintiff's search and seizure claims should be dismissed;

- Plaintiff's claims regarding the disciplinary ticket he received should be dismissed.

**\*36** Thus, if the Court adopts these recommendations, the remaining claims will be Plaintiff's claims against Defendant Chill for violating his right to receive kosher meals and access to religious services, and his claim against Defendant Koskowski pertaining to inadequate medical treatment. Accordingly, the motion to dismiss should be granted in part and denied in part.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge McMahon.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010). If Plaintiff does not have access to cases cited herein that are reported on Westlaw or Lexis, he should request copies from Defendants. *See Lebron v. Sanders,* 557 F.3d 76, 79 (2d Cir.2009).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1630815

Footnotes

1    On February 28, 2014, Judge McMahon granted Plaintiff's request to change the caption to reflect that his name be listed as JCG, as opposed to his full name. *See* Dkt. No. 116.

2    In their Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint ("Def.Mem.") (Dkt. No. 92), at 1 n. 1, Defendants assert that Defendants Iuzzini, Bendheim, and Phillips had not been served by the date that the motion to dismiss was submitted, and are consequently not represented by the Attorney General's Office for the purposes of this motion. The United States Marshals Service did attempt to serve Defendant Bendheim on April 26, 2013, but service was not executed. (Dkt. No. 76). Moreover, despite the fact that on June 12, 2013, I directed the Clerk's Office to send Plaintiff an additional form to effect service on Bendheim (Dkt. No. 87), it does not appear that Plaintiff made any further attempts to serve him. The docket also indicates that Defendant Phillips has not been served nor has he executed a waiver of service. Accordingly, as it now past the time to have served Defendants Bendheim and Phillips, and Plaintiff has not sought an extension of time to execute service, I recommend that any claims against them be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. However, I decline to recommend dismissal of the claims against Defendant Iuzinni on this basis as Defendants are incorrect in their assertion that he was never served—to the contrary, the record reflects that service was executed on March 5, 2013. *See* Dkt. No. 63.

    The Court further notes that Defendants Foroscij and Thorpe have apparently not been served (Dkt.Nos.83, 84), nor is there any proof of service on the docket as to Defendants Brothers, Monzon, or Benitez. However, Defendants have waived service for these five individuals by moving to dismiss on their behalf (Dkt. No. 91). *See* Fed.R.Civ.P. 12(h) (1)(B).

3    While the timeline of the events described in the Amended Complaint is not entirely clear, the Court has endeavored to piece together a rough chronology of Plaintiff's allegations.

4    Though Plaintiff appears to allege that he was assaulted "due directly to the nature of the allegations in the ticket," (*id.* at ¶ 10), Plaintiff also refers to the fact that he requested a "medically needed move" and that one of the officers accused of assaulting him had "answered the emergency move request letter" (*id.* at ¶¶ 15, 20).

5    Though he was ostensibly placed under investigation because of charges made by other inmates, Plaintiff also suggests that the investigation may have been in retaliation for a grievance he either filed or intended to file against Defendant Benitez. Am. Compl., ¶ 19. (Plaintiff alleges that, when asked what he was going to do about Benitez's alleged theft of his belongings, "[Plaintiff] said he would file a grievance and claim and win because [he] still had proof of the receipts of some of the property stolen by CO. Benitez. Several days later, [Plaintiff] was placed under investigation."). *Id.*

6    Given the inconsistency of the page numbers in Plaintiff's Original Complaint, for purposes of clarity, the Court refers to the ECF page number when citing to information therein in instances where there is no paragraph number.

7    Under the prison-mailbox rule, a *pro se* prisoner's complaint is deemed filed on the date that he delivered the complaint to prison officials for transmittal to the court. *See Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (citing *Houston v.. Lack,* 487 U.S. 266, 270 (1988)). Courts in this Circuit have assumed that the prisoner "gave his petition to prison officials for mailing on the date that he signed it." *Nash v. Kressman,* No. 11 Civ. 7327(LTS)(RLE), 2013 WL 6197087, at *4 (S.D.N.Y. Nov. 27, 2013) (quoting *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D . N.Y.1998)). The signature page of Plaintiff's Original Complaint is dated September 14, 2011. *See* Compl., at 21. However, Defendants argue that "the application for *in forma pauperis* ["IFP"] status, which was contained in the same packet as the Complaint, was dated September 16, 2011. Thus ... September 16, 2011 is the earliest date that the inmate could have put the complaint packet in the mailbox." Def. Mem. at 11. There is no definitive evidence indicating the documents were "in the same packet," but both the complaint and the IFP application are identically stamped as received by the *Pro Se* office on September 27, 2011, at 9:21 a.m. (*see* Dkt. Nos. 1, 2), suggesting the two documents were mailed together on September 16, 2011. *See Nash,* 2013 WL 6197087, at *4 n. 4 (finding that filing date was date of cover letter attached to complaint as opposed to earlier date of complaint because materials were sent, stamped, and filed together). Thus, the Court presumes that the Complaint was filed on September 16, 2011. In any event, whether the filing date is September 14 or 16 is ultimately immaterial because the two-day difference does not impact any of my recommendations.

8    Defendants' supplemental letter, dated February 28, 2012, was stamped "Received" by the United States District Court S.D.N.Y on February 29, 2012, but was not docketed until May 23, 2012. Dkt. No. 15.

9    The signature page of Plaintiff's Amended Complaint is dated September 14, 2011, which is the same as the signature date in the Original Complaint. *Compare* Am. Compl., p. 13, *with* Compl., p. 21. However, the cover letter attached to the Amended Complaint, which indicates that Plaintiff was filing an Amended Complaint pursuant to a December 5, 2011

2014 WL 1630815

decision by Judge McMahon, is dated June 23, 2012. Am. Compl., p. 14. The Amended Complaint itself was not filed on the docket until June 28, 2012.

10    As discussed above, Defendants Bendheim, Phillips, Foroscij, Thorpe, Brothers, Monzon, and Benitez were not served. *See supra* n. 2.

11    The Second Circuit has reserved the question of whether this test, set forth in *Hemphill,* applies in light of the Supreme Court's interpretation of the PLRA's exhaustion requirement in *Woodford v. Ngo,* 548 U.S. 81 (2006). *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011). However, "[c]ourts in this circuit have acknowledged the tension between *Woodford* and *Hemphill,* but have continued to use the *Hemphill* test in the absence of circuit authority to the contrary." *Kasiem v. Switz,* 756 F.Supp.2d 570, 576 n. 5 (S.D.N.Y.2010); *see also Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013) ("In the absence of a clear indication that *Hemphill* has been overruled, this Court has no choice but to treat it as good law."). Thus, because the Second Circuit has not held otherwise, this Court will similarly consider the exceptions provided in *Hemphill.*

12    Plaintiff does not specify which grievance procedure was applicable in his circumstances, but his efforts to exhaust are insufficient in any event because he did not properly grieve to the superintendent, as required by step one of the expedited procedure or step two of the non-expedited procedure.

13    Though Defendants maintain that Plaintiff's "unsupported conclusion that his mail was read and suppressed" should not estop them from asserting an exhaustion defense, Def. Mem., at 9–10, the case law suggests that, at least at the motion to dismiss stage, Plaintiff's claims should be allowed to proceed. Should this case reach the summary judgment stage, Defendants will be able to re-assert the defense and may prevail if the facts are clear that there was no interference with Plaintiff's ability to file a grievance. *See, e.g., Gayle v. Benware,* 716 F.Supp.2d 293, 298–99 (S.D.N.Y.2010) (summary judgment motion granted on exhaustion grounds).

14    Defendants contend that even if certain prison officials "acted in a way to prevent [ ] Plaintiff from utilizing the grievance procedure," Defendant Chill should not be estopped from asserting an exhaustion defense given the lack of allegations that he "personally did anything to stand in [Plaintiff's] way." Def. Mem., at 10. While the Second Circuit has not explicitly opined on the issue, courts in this Circuit have held that it is not required that "the action or inaction which is the basis for the estoppel be that of the particular defendant in the prisoner's case." *Brown v. Koenigsmann,* No. 01 Civ. 10013(LMM), 2005 WL 1925649, at *2 (S .D.N.Y. Aug. 10, 2005) (finding that *Ziemba,* 366 F.3d at 163–64, "does not require a showing that [an individual defendant] is personally responsible for plaintiff's failure to complete exhaustion, as long as someone employed by DOCS is"). *See also Warren v. Purcell,* No. 03 Civ. 8736(GEL), 2004 WL 1970642, at *6 (S.D.N.Y. Sept. 3, 2004) (refusing to dismiss claims against doctor on exhaustion grounds where plaintiff received conflicting information from non-party prison officials about whether re-filing of grievance was necessary); *Gilbeau v. Pallito,* 2012 WL 2416719, at *5 (D.Vt. May 22, 2012) (citing *Brown* with approval); *Messa v. LeClaire,* 2007 WL 2292975, at *4 (N.D.N.Y. Feb. 26, 2007) (same); *but see Murray v. Palmer,* 2010 WL 1235591, at *5 (N.D.N.Y. Mar 31, 2010) (finding no forfeiture of exhaustion defense where no credible evidence presented that defendants interfered with filing grievance because "[g]enerally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals").

In a prior case before Judge McMahon involving an analysis of the PLRA exhaustion defense on summary judgment, several of the plaintiffs argued "that the theory of equitable estoppel prevents Defendants from raising the affirmative defense of non-exhaustion" because certain corrections officers made verbal threats and took retaliatory actions. *Smith v. City of New York,* No. 12 Civ. 3303(CM), 2013 WL 5434144, at *11 (S.D.N.Y. Sept. 26, 2013). Judge McMahon held that estoppel was not warranted because "[n]one of those acts was committed by the individual defendants" and "estoppel is generally understood to apply only to the defendant whose own actions inhibited the inmate from exhausting." *Id.* However, she further stated that "the allegation of threats or retaliatory acts may be relevant to an analysis of excuse on grounds other than estoppel," and directed further proceedings to address that issue. *Id.* at *11, 26–30. As discussed in the text, the Court recommends an alternative finding here that even if estoppel is not a valid excuse with regard to Defendant Chill, Plaintiff should still be excused from exhaustion given that the grievance process was constructively unavailable to him.

15    Defendants contend that Plaintiff knew administrative remedies were available because he answered "Yes" to the question "Is there a prisoner grievance procedure at this facility?" on his initial complaint form. Def. Mem., at 8–9. However, a closer look at this form reveals that this question cited by Defendants is located underneath the heading "Place of Present Confinement." Am. Compl., p. 18. At the time Plaintiff completed this form, he was housed at Wende Correctional Facility, not Green Haven, *Id.* at 17. Therefore, it is entirely plausible that Plaintiff was acknowledging his knowledge of the procedure at Wende, and not Green Haven, where the events were alleged to have taken place. Furthermore, even

if he knew that remedies were theoretically available at Green Haven, the fact remains that they may actually have been rendered unavailable as a result of actions taken by correction officers.

Defendants also argue that even assuming "officers prevented [Plaintiff's] grievances from reaching the appropriate destination," he still should have appealed to the superintendent. Def, Mem., at 9. Defendants rely on the fact that Plaintiff notified the superintendent of his complaints by letter in 2011 as evidence that he did not think such an action would be "futile." *Id.* However, Defendants fail to recognize that the perception of futility can vary under different circumstances. If officers in the SHU refused to mail Plaintiff's original grievance, it is certainly plausible that those actions led Plaintiff to believe it would be futile to seek an appeal because he had to send another letter through those same officers. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 577 (S.D.N.Y.2010) ("Estoppel is found where an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible.") (internal quotations omitted). Moreover, it is also plausible that three years later, when Plaintiff was at *another facility,* he may have considered it no longer futile to seek relief through the superintendent.

16    In an employment context, the Second Circuit has held that an employer's single rejection of an employee's proposed religious accommodation is a discrete act, as opposed to a continuing violation "measured from the latest date when the employee was still prevented from observing his religious requirements in the way he had proposed." *Elmenayer v. ABF Freight Sys.,* 318 F.3d 130, 134 (2d Cir.2003). However, the Court declined to "decide what the effect would be if the employee renews the request for an accommodation." *Id.* at 135. *Elmenayer* is thus distinguishable from any § 1983 case in which a prisoner repeatedly seeks to exercise his First Amendment religious rights.

17    Plaintiff's Amended Complaint does not specify when he arrived at Green Haven, nor have Defendants offered any evidence on that issue, but the pleadings make reference to Plaintiff being at Green Haven at least as late as November 2008 (*see id.* at ¶¶ 27–28), well within the three-year statute of limitations period.

18    The last possible date for Plaintiff's claims to have accrued is the day he was transferred from Green Haven to another facility. However, Plaintiff does not provide that date in his Amended Complaint. He does aver that he was taken to the SHU on or about September 23, 2008 and that he was held in the SHU for approximately 69 days. Am. Compl., ¶¶ 20, 30. He also states that he was told that he was going to be held in the SHU until he was transferred to his next facility. *Id.* at ¶ 31. Construing Plaintiff's claims in the broadest light possible, Defendants' assumption—that the events giving rise to Plaintiff's allegations occurred prior to December 31, 2008—is likely to be correct.

19    Bendheim and Phillips are excluded from this discussion given the Court's recommendation that they should be dismissed pursuant to Rule 4(m). *See supra* n. 2.

20    Defendant Wahlquist is not named or described in the Original Complaint, but the Amended Complaint indicates that Plaintiff was referring to Wahlquist when stating that he was the sergeant who "answered the emergency move request letter." Original Compl, ¶ 20. However, Plaintiff gives no further detail about this incident in the Original Complaint that would have served to put Walhquist on notice.

21    Defendant R. Koskowski is not identified by his last name in the Original Complaint. However, Plaintiff describes him with sufficient particularity to find that he should have been on notice of claims against him. To wit, Plaintiff names "Mr. R" and specifically identifies his position as Deputy Superintendent of Security at Green Haven. Compl., ¶ 10.

22    In addition to the 18 new Defendants, Plaintiff also includes another category of "John Doe" defendants in the caption of his Amended Complaint. Plaintiff has not made any attempt to further identify these John Does, and even had he done so, any claims against them would not relate back for the reasons set forth above. Accordingly, the Court declines to address any potential claims against these Defendants.

23    Some District Courts have held that, under the *federal* relation-back doctrine, "[w]here a plaintiff tries diligently during the limitations period to ascertain the identities of the intended defendants, failure to ascertain the correct names within the period, combined with some 'John Doe' or other generic identification in the pleading, may suffice to establish a factual 'mistake' supporting relation back." *Maccharulo,* 643 F.Supp.2d at 596–97 (S.D.N.Y.2009) (citing *Byrd v. Abate,* 964 F.Supp. 140, 145 (S.D.N.Y.1997)); *see also Twine v. Four Unknown N.Y. Police Officers,* No. 10 Civ. 6622(DAB)(JLC), 2012 WL 6184014, at *16 (S.D.N.Y. Dec. 12, 2012), Report & Recommendation, *adopted by* 2013 WL 314447 (S.D.N.Y. Jan. 25, 2013); *Gonzalez v. in Charge of Barber Shop on Duty on May 13, 1999,* No. 99 Civ. 3455(DLC), 2000 WL 274184, at *4–5 & n. 6 (S.D.N.Y. Mar. 13, 2000). To the extent this exception applies post-*Hogan,* the Court does not believe it should apply in this case, given Plaintiff's lack of diligence in ascertaining the identities of unknown defendants, as discussed above.

24    As discussed above (*see supra* n. 21), Plaintiff does not specifically name Defendant Koskowski, but clearly states that he was Deputy Superintendent of Security at the time. Compl., ¶ 10.

25    Moreover, even if Monzon were considered to be a proper Defendant, the claim against him lacks merit, as "[l]aughter, verbal harassment or even spitting by prison officials, when unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right." *Walker v. Shaw,* No. 08 Civ. 10043(CM), 2010 WL 2541711, at *12 (S.D.N.Y. June 23, 2010) (internal quotations omitted) (finding plaintiff failed to state deliberate indifference claim against two officers who laughed when he asked to be transferred).

26    Judge McMahon referred to all Defendants other than Chill and Ercole as the "John Doe" Defendants, but in Plaintiff's letters, he distinguishes between the "John Doe" Defendants and the other Defendants described in the Complaint. *See* Dkt. No. 39.

27    In a First Amendment retaliation case, the Second Circuit held that "[a] supervisory official personally participates in challenged conduct not only by direct participation, but by (1) failing to take corrective action; (2) creation of a policy or custom fostering the conduct; (3) grossly negligent supervision, or deliberate indifference to the rights of others." *Rolon v. Ward,* 345 F. App'x 608, 611 (2d Cir.2009) (citing *Hayut v. State of Univ. of New York,* 352 F.3d 733, 753 (2d Cir.2003)).

28    Courts upholding the five categories distinguish *Iqbal* from cases where the alleged underlying constitutional violation does not involve discriminatory intent. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (finding *Colon*'s personal involvement analysis to apply where plaintiff's claim does not require showing of discriminatory intent); *Jackson v. Goord, 664 F.Supp.2d 307, 324 & n. 7 (S.D.N.Y.2009)* (holding that *Colon* standard is unaffected by *Iqbal* in deliberate indifference case, because *Iqbal* "involved discriminatory intent"). To the extent that Plaintiff does seek to hold Defendants Ercole and Koskowski liable for failing to prevent "sexual orientation discrimination, conviction discrimination, [and] racial discrimination," (Am.Compl., ¶ 33), those claims should be dismissed. As a threshold matter, Plaintiff does not make any claim that he is a member of any protected class. Furthermore, even if the Green Haven staff did possess some discriminatory animus, the Supreme Court has "explicitly rejected the argument that, 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' " *Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801(SAS), 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) (quoting *Iqbal,* 556 U.S. at 677).

29    For the sake of the present motion, Defendants assume without conceding that Plaintiff's religious beliefs are genuinely held. Def. Mem., at 12.

30    Confusingly, Plaintiff also writes that he "had to go around Mr. Chill to receive his kosher food." Am. Compl., ¶ 4. It is thus unclear whether Plaintiff did in fact receive Kosher meals, in spite of Defendant Chill's alleged refusal to provide them. Liberally construing the pleadings, the Court recommends allowing this claim to proceed at this time, but notes that at a later stage, dismissal may be appropriate if evidence comes to light revealing that Plaintiff was not entirely deprived of religious meals.

31    Even had Defendants put forth an argument that, for example, Plaintiff was not permitted to attend services while in SHU, such a contention "is more properly addressed after discovery has been conducted and the Court has some basis for determining Defendants' motivation." *Loccenitt v. City of New York,* No. 12 Civ. 948(LTS)(MHD), 2013 WL 1091313, at *4 (S.D.N.Y. Mar. 15, 2013) (denying motion to dismiss where Plaintiffs were allegedly precluded from attending weekly congregational service).

32    Plaintiff does specifically allege that Defendant Wahlquist was a part of the group of officers who attacked him, but, as noted above, claims against Wahlquist should be dismissed as time-barred. *See supra* at II.C.2.a.

33    The Court also declines to recommend granting leave to amend because, as noted, any future claim against these Defendants concerning the September 23, 2008 incident would be time-barred, and thus any amendment would be futile. *See Nzomo v. Wheeler,* No. 10 Civ. 8530(RA)(JLC), 2013 WL 4713911, at *2 (S.D.N.Y. Sep 03, 2013), Report and Recommendation, *adopted by* 2014 WL 92711 (S.D.N.Y. Jan 09, 2014); *Maersk Line v. Phoenix Agro–Industrial Corp.,* No. 07 Civ. 3169(SJF)(JMA), 2009 WL 1505281, at *5 (E.D.N .Y. May 27, 2009). Nor could Plaintiff plausibly make an argument for equitable tolling, given his lack of diligence in pursuing his claims (discussed above) and his failure to provide any explanation for waiting three years to file his Original Complaint. *See Lozano v. Montoya Alvarez,* 134 S.Ct. 1224, 1231–32 (2014) ("[E]quitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action.").

34    Plaintiff also claims that he was "pushed" during "the strip and pat frisk." *Id.* at ¶ 3. Though this action constitutes more than mere verbal harassment, the Court does not believe this action created conditions in which Plaintiff faced a substantial risk of serious harm; indeed, under the Eighth Amendment excessive force objective inquiry, such incidents are routinely described as *de minimis,* particularly when in conjunction with a pat frisk. *See, e.g., Tavares v. City of New York,* No. 08 Civ. 3782(PAE)(JCF), 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011) (citing cases), Report and Recommendation, *adopted by* 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011). Moreover, even if this isolated incident was enough to pose a substantial risk of serious harm, Plaintiff still cannot satisfy the subjective prong of the failure to protect inquiry, as

there is no suggestion whatsoever that Ercole or Koskowski were aware that Plaintiff was pushed during a pat frisk, nor does Plaintiff give any indication that he tried to identify the officer or make Defendants aware of the altercation. *Parris v. New York State Dep't Corr. Servs.,* 947 F.Supp.2d 354, 363 (S.D.N.Y.2013) ("[T]he fact[s] that the plaintiff claims he is unaware of the identity of his attacker [and that there were no allegations of prior threats or altercations] make[ ] it implausible to infer that the defendants had any particular knowledge of the risk the plaintiff faced.").

35    Plaintiff's complaint broadly suggests that he suffered abuse because of his conviction for a sexual offense. Am. Compl., ¶¶ 1–3, 5, 18, 26. The Court recognizes such circumstances may pose a risk of harm given that, in some correctional centers, "inmates charged with sex crimes are removed from the general prison population because they are at greater risk of assault by other inmates." *Arnold v. Cnty. of Nassau,* 252 F.3d 599, 601 (2d Cir.2001). However, as discussed in the text, the Court need not decide the issue given that Plaintiff has not shown that Defendants were aware of a particular or general risk to him. *Alsaifullah,* 2013 WL 3972514, at *12 (finding no substantial risk where Plaintiff did not allege status exposed him to danger and citing cases for proposition that taunting absent a threat of physical harm was not enough to establish risk). Nor does he "claim that there was a pattern of physical beatings following verbal harassment," or that inmates convicted of sex offenses are consistently attacked by officers. *Bridgewater,* 698 F.Supp.2d at 358.

36    Defendants also argue that the claims against Defendant Benitez (as well as Defendant Murphy) should be dismissed on statute of limitations grounds. Def. Mem., at 17. Given that the Court recommends dismissing claims against both Benitez and Murphy (*see infra* II.G.I and 4) on the ground that Plaintiff fails to state a plausible claim against them, the Court declines to reach the question of whether claims against those Defendants would otherwise be time-barred.

37    Plaintiff asserts that he was released from the infirmary by Defendant Bendheim before seeing a doctor or being properly evaluated, and that he could not walk. Am. Compl., ¶ 25. He also alleges that Defendant Fila, a registered nurse, left him "screaming, crying, hyperventilating and unable to talk." *Id.* at ¶ 24. However, any claims against Bendheim and Fila cannot proceed, because Bendheim was not served and neither one was named in the Original Complaint. Moreover, even if the claims could go forward, Plaintiff has not alleged the requisite state of mind, *i.e.,* conscious disregard for a serious risk.

38    Plaintiff also alleges that Defendant Phillips stole items from his cell, but as discussed above, the Court recommends dismissal of Phillips under Rule 4(m).

39    Plaintiff's Amended Complaint also includes a one sentence allegation that Koskowski and Cecilia committed libel and slander. *Id.* at ¶ 36. However, the state law torts of slander and defamation are not actionable under § 1983. *See, e.g., Grogan v. Blooming Grove Volunteer Ambulance Corp.,* 917 F.Supp.2d 283, 289 n. 5 (S.D.N.Y.2013).

---

End of Document                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shihsiang Liao, a/k/a Shih-
Siang Shawn Liao, Plaintiff,

v.

Faisal Malik, [1] Defendant.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O. Box 472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, The Capitol, KEITH J. STARLIN, ESQ., Assistant Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff Shihsiang Liao, a former New York State prison inmate who has also identified himself as Shih–Siang Shawn Liao, against four employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), including its former commissioner and current acting commissioner, pursuant to 42 U.S.C. § 1983. While his complaint contains additional claims, the sole remaining cause of action in this case is asserted against defendant Faisal Malik based on allegations that he denied plaintiff due process while assisting him in preparing for a disciplinary hearing by failing to interview and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought by the defendant Malik requesting the entry of summary judgment dismissing plaintiff's remaining claim. For the reasons set forth below, I recommend that defendant's motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND* [2]

Prior to his release from prison in or about September 2014, *Dkt. No. 25,* plaintiff was an inmate held in the custody of the DOCCS. [3] *See generallyDkt. No. 1.* At the times relevant to his remaining claim, plaintiff was confined initially in the Ogdensburg Correctional Facility ("Ogdensburg"), located in Ogdensburg, New York, and later the Gouverneur Correctional Facility ("Gouverneur"), located in Gouverneur, New York. *Id.*; *Dkt. No. 41–6 at 19.*

On November 19, 2010, plaintiff was issued a series of misbehavior reports accusing him of violating prison rules arising from conduct occurring while housed in Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The charges set forth in those misbehavior reports accused the plaintiff of (1) soliciting goods or services without consent from the superintendent or his designee; (2) the unauthorized exchange of personal items without authorization; (3) possession of contraband; (4) taking state property; (5) providing incomplete, misleading, and/or false statements or information; (6) impersonation; and (7) providing legal assistance to another inmate without prior approval from the superintendent or his designee. *Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were based upon a search of plaintiff's cell, conducted on November 19, 2010, and the resulting confiscation of several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7;see alsoDkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports, plaintiff was transferred to a special housing unit ("SHU") in Gouverneur to await a Tier III disciplinary hearing concerning the pending charges. [4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as

Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.; see alsoDkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

**\*2** A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order

on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*

Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014)* (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production"

and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.).

Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at* 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

    C. *Analysis of Plaintiff's Procedural Due Process Claim*
In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g.*, *LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the

conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way, [7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence

and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id.* at 898; accord, *Samuels v. Selsky,* 166 F. App'x 552, 556 (2d Cir. 2006). [8]

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at \*9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at \*6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at \*12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report*

*and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generally Dkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao; plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.*; *see also Dkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see also Dkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the

hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form. *Id.*; Dkt. No. 41–3. Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58.* While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit.

Dkt. No. 41–6 at34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng*. Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *SeeDkt.* No. 41–2. This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt.* No. 41–6 at 99; Dkt. No. 41–8 at 2, 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

## IV. *SUMMARY AND RECOMMENDATION*

**\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Slip Copy, 2016 WL 1128245

Footnotes

1    The remaining defendant in this action is identified in plaintiff's complaint as S. Malik. *Dkt. No. 1 at 3.* It is clear from his motion papers, however, that defendant's first name is 'Faisal.' See, e.g., *Dkt. No. 41-2 at 1.* The clerk of the court is respectfully directed to adjust the court's records accordingly.

2    In light of the procedural posture of this case, the following recitation is derived from the record now before the court, with all inferences and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003).

3    It appears that following his release from prison in New York, plaintiff served time in two correctional facilities in Ohio. Dkt. Nos. 25, 30; *see alsoDkt. No. 41–6 at 129.*

4    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

5    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

6    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

7    Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

8    The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

9    At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generallyDkt. No. 41–8.*

10   In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 924464
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Reginald McFADDEN, Plaintiff,

v.

James KRALIK, William Clark, ____ Liska, Anthony
Farino, Christopher Falco, ____ Falco, Nicholas
Solfaro, Todd Layman, ____ Tracy, Defendants.

No. 04 Civ. 8135(RCC)(JCF).
|
March 28, 2007.

*REPORT AND RECOMMENDATION*

JAMES C. FRANCIS IV, United States Magistrate
Judge.

**\*1** TO THE HONORABLE RICHARD C. CASEY,
U.S.D.J.: [1]

Reginald McFadden brings this civil rights action *pro se*
pursuant to 42 U.S.C. § 1983, alleging violations of his
civil rights in connection with charges brought against him
while he was a pretrial detainee in the Rockland County
Jail (the "RCJ"). The defendants now move for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. Specifically, they argue that all of the plaintiff's
claims are time-barred.

*Background*

A. *Facts*

At the time of the incidents in question, the plaintiff was
a pretrial detainee at the RCJ awaiting trial on charges
of rape and assault. (Second Amended Complaint dated
June 10, 2005 ("2nd Am. Compl."), at 2; Brief In Support
of Defendants' Motion for Summary Judgment to Dismiss
the Complaint ("Def.Memo."), attached to Declaration
of Paul Nowicki dated July 26, 2006 ("Nowicki 7/26/06
Decl."), at 4). On March 13, 1995, defendants Tracy,
Falco, and Layman conducted a search of his cell,
supervised by defendants Solfaro, Farina, and Clark. [2]
(2nd Am. Compl. at 2). This was the latest in a series
of searches that the plaintiff claims were conducted as

part of a "campaign of harassment" by prison officials
in retaliation for his filing of a lawsuit against the
prison. (2nd Am. Compl. at 2). He further claims that
these searches were conducted at the behest of defendant
Kralik, who, according to Mr. McFadden, hoped to find
evidence linking the plaintiff to an unsolved murder. (2nd
Am. Compl. at 2).

On March 15, 1995, Mr. McFadden was issued an
Inmate Misbehavior Report, which charged that he
had attempted escape, possessed prison contraband, and
committed criminal mischief. (2nd Am. Compl. at 3). [3]
In addition, criminal charges based on the same conduct
were filed against the plaintiff. (2nd Am. Compl. at 3).
The criminal charges were dismissed on August 28, 1996
(Certificate of Disposition, attached as Exh. B to 2nd Am.
Compl.) and were sealed on July 31, 2000 by order of
Supreme Court Justice Robert R. Meehan. (Decision and
Order dated July 31, 2000, attached as Exh. A to 2nd Am.
Compl.).

Mr. McFadden was confined to the Administrative
Segregation Unit at the RCJ on March 20, 1995 and
remained in administrative segregation there and at
various state detention facilities until August 2, 2000.
(2nd Am. Compl. at 3). It appears that a hearing on
the administrative segregation order was held on April 4,
1995. (1st Am. Compl. at 7; Transcript of Administrative
Segregation Hearing ("Hearing Tr."), [4] attached as Exh.
F to Pl. Mot. Summ. Judg.). According to the plaintiff,
his placement in administrative segregation was the result
of the March 15 disciplinary charges that arose from
the search of his cell. [5] (2nd Am. Compl. at 3; 1st Am.
Compl. at 6). The defendants, by contrast, suggest that
Mr. McFadden was placed in administrative segregation
because he "repeatedly threw feces on corrections
officers, and [ ] assaulted two corrections officers" and
therefore "had to be separated from the rest of the
population." (Declaration of William Clark dated July 24,
2006 ("Clark Decl."), attached to Def. Memo.). Excerpts
from the administrative segregation hearing transcript
provide some support for the plaintiff's claim regarding
the reason for his segregation (Hearing Tr. at 82-83), but
also contain references to numerous other disciplinary
incidents involving the plaintiff. (Hearing Tr. at 67, 86-87,
91-93).

**\*2** Mr. McFadden does not appear to have appealed the disciplinary charges of March 15, 1995 or formally complained of his administrative segregation-though he claims that he was denied the right to appeal the outcome of his April 1995 administrative segregation hearing-until January 28, 2000, when he filed a grievance claiming that he was being improperly held in administrative segregation and that the sealed criminal charges had not been expunged from his Department of Correctional Services ("DOCS") file.[6] (Inmate Grievance Complaint dated Jan. 28, 2000, attached to 2nd Am. Compl.). This grievance was denied by the Inmate Grievance Resolution Committee, which ruled that "[t]he facility is within its rights to continue Admin[istrative] Segregation placement" and advised Mr. McFadden that he could obtain copies of his administrative segregation reviews via New York's Freedom of Information Law if he so desired. (Response to Inmate Grievance Complaint, dated Feb. 11, 2000 ("Response to Grievance"), attached to Plaintiff's 2nd Am. Compl.). Mr. McFadden indicated his desire to appeal the denial of his grievance, but there is no record of any such appeal. (Response to Grievance).

From January 2000 through January 2006, the plaintiff submitted numerous (and somewhat haphazard) complaints regarding the March 15 disciplinary action, his five-year placement in administrative segregation, and the alleged failure to remove the 1995 criminal charges from his DOCS file. (Inmate Grievance Complaints, attached to Plaintiff's Reply to Defendants' Answer, dated July 7, 2006 ("Reply")). In what appears to be the most recent action on Mr. McFadden's grievances, DOCS Inmate Grievance Program Central Office Review Committee on January 25, 2006 upheld the Superintendent's denial of Mr. McFadden's request to have the disciplinary charges removed from his record and advised Mr. McFadden to challenge the accuracy of his prison record via the procedure set forth in the New York Code of Rules and Regulations. (Document entitled "Grievant's Request Unanimously Denied with Clarification," attached to Reply).

### B. *Procedural History*
The plaintiff signed the initial complaint on June 25, 2003. That complaint was received in the United States District Court for the Northern District of New York on August 13, 2003 and subsequently transferred to this Court on September 26, 2003. On October 15,

2004, then-Chief Judge Michael B. Mukasey dismissed the plaintiff's complaints against various municipal and judicial defendants who he found to be immune from suit and dismissed his other complaints for failure to state a claim. He granted the plaintiff leave to amend his complaint within sixty days to name the proper parties as defendants and to further detail his allegations. (Order dated Oct. 15, 2004). The plaintiff filed an amended complaint on January 6, 2005. (1st Am.Compl.). On June 1, 2005, Chief Judge Mukasey again dismissed the complaint for failure to name proper parties as defendants and failure to allege facts sufficient to establish a violation of due process. He gave the plaintiff leave to file a second amended complaint within thirty days of the order. (Order dated June 1, 2005). On June 21, 2005, the plaintiff filed the complaint which is now before the Court. (2nd Am.Compl.).

**\*3** The current complaint alleges that the defendant officers and officials harassed him by conducting daily cell searches, placed him in administrative segregation on the basis of false disciplinary charges, denied him the opportunity to challenge evidence used against him, and filed false criminal charges against him. (2nd Am. Compl. at 2-3). Thus, I deem the plaintiff to be alleging violations of his due process rights and his rights under the Fourth Amendment, as well as constitutionally-based versions of malicious prosecution, false arrest, and false imprisonment, all stemming from the events of March 13, 1995, and his subsequent removal to administrative segregation.[7] The plaintiff also claims that DOCS's alleged refusal to expunge the sealed criminal charges from his record constitutes an ongoing violation of due process.[8] (Reply at 10).

The defendants answered on June 26, 2000 (Answer, attached as Exh. E to Pl. Mot. Summ. Judg.), denying all allegations and asserting various affirmative defenses, and the plaintiff replied on July 12, 2006. The defendants then filed a motion for summary judgment pursuant to Rule 56 on July 27, 2006. The plaintiff filed papers in opposition to that motion and filed what seems to be intended as a cross-motion for summary judgment. (Plaintiff's Letter-Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, received Aug. 15, 2006; Pl. Mot. Summ. Judg.). The defendants filed a response on October 30, 2006.[9]

McFadden v. Kralik, Not Reported in F.Supp.2d (2007)

2007 WL 924464

*Discussion*

A. *Standard of Review*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 285-86 (2d Cir.2002); *Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co.,* 189 F.3d 208, 214 (2d Cir.1999).

The party moving for summer judgment bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (internal quotations omitted). Where the moving party meets that burden, the opposing party may not "rest upon the mere allegations or denials of the adverse party's pleading," but must come forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048-49 (2d Cir.1995). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson,* 477 U .S. at 249 (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Id.* at 249-50. "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forth some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (internal quotations and citations omitted); *see also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586 (1986) (a nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)).

**\*4** Where, as here, a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not relieve a litigant from the usual requirements of summary judgment. *Feurtado v. City of New York,* 337 F.Supp.2d 593, 596 (S.D.N.Y.2004); *Fitzpatrick v. New York Cornell Hospital,* No. 00 Civ. 8594, 2003 WL 102853, at \*5 (S.D.N.Y. Jan. 9, 2003) (citing cases); *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (*pro se* party's "bald assertion, completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment").

B. *Constitutional Claims*

As noted above, Mr. McFadden appears to allege violations of his due process rights and his rights under the Fourth Amendment, malicious prosecution, false arrest, and false imprisonment, all stemming from the cell search and his subsequent removal to administrative segregation. Since all of these claims arise from the same incident and are governed by the same statute of limitations under § 1983, I will treat them together for the purpose of analyzing their timeliness. [10]

1. *Statutes of Limitations*

Section 1983 claims are governed by state statutes of limitations for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261 (1985). In New York, a § 1983 action must be brought within three years of the accrual of each claim. *Jackson v. Suffolk County Homicide Bureau,* 135 F.3d 254, 256 (2d Cir.1998) (citing *Owens v. Okure,* 488 U.S. 235, 251 (1989)). While the statute of limitations to be applied to § 1983 claims is a matter of state law, the accrual date

of such claims is determined by federal law. *Wallace v. Kato,* --- U.S. ----, 127 S.Ct. 1091, 1095 (2007); *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994). Under federal law, a cause of action generally accrues "when the plaintiff 'knows or has reason to know' of the harm." *Eagleston,* 41 F.3d at 871 (quoting *Cullen v. Margiotta,* 811 F.2d 698, 725 (2d Cir.1987)); *accord Washington v. County of Rockland,* 373 F.3d 310 317 (2d Cir.2004); *Connolly,* 254 F.3d at 41; *Saunders v. Bonstrom,* No. 05 Civ. 7350, 2006 WL 3690660, at *2 (S.D.N.Y. Dec. 13, 2006).

Mr. McFadden's claims appear to be time-barred. His due process claims related to his administrative segregation and the disciplinary charges against him accrued, at the latest, on April 4, 1995, the date of the plaintiff's administrative segregation hearing. It was at this point that the plaintiff claims his requests for counsel and records were denied. As of that date, the plaintiff unquestionably knew of the due process injury of which he now complains. Since he did not file his first complaint until 2003, more than eight years later, his claim is outside the three-year statute of limitations and is therefore barred.

**\*5** In the context of malicious prosecution, the cause of action accrues on the date that the proceedings conclusively terminate in the plaintiff's favor. *Murphy v. Lynn,* 53 F.3d 547, 548 (2d Cir.1995); *accord Ramos v. City of New York,* No. 05 Civ. 3155, 2006 WL 2871969, at *4 n. 6 (S.D.N.Y. Oct. 5, 2006). The plaintiff's malicious prosecution claim accrued on August 28, 1996, when the criminal charges against him for attempted escape, possession of prison contraband, and criminal mischief were dismissed. [11] The plaintiff argues that the date of accrual for his malicious prosecution claim is July 31, 2000, the date that the criminal charges were ordered sealed. This is simply incorrect: dismissal of charges unquestionably constitutes termination of a case in favor of the accused, and thus the statute of limitations began to run at the time of the dismissal. *See Thompson v. City of Mount Vernon,* No. 93 Civ. 4788, 1994 WL 561253, at *1 (S.D.N.Y. Oct. 12, 1994) ("The cause of action for malicious prosecution accrues at the time the charges are dismissed."); *see also Murphy,* 53 F.3d at 547-48 (holding that district court erred in dismissing claim as time-barred where charges were dismissed less than three years before filing of action); *Alvarez v. Doe,* No. 03 Civ. 7740, 2004 WL 1874972, at *1, *3 (S.D.N.Y Aug. 13, 2004) (holding

that plaintiff's malicious prosecution claims accrued when proceedings were "conclusively terminated" by dismissal of charges).

The plaintiff's false arrest and imprisonment claims are also time-barred. The Supreme Court recently established when § 1983 false arrest or false imprisonment claims accrue. In *Wallace,* --- U.S. at ----, 127 S.Ct. at 1095, the Court held that "[l]imitations begin to run against an action for false imprisonment when the alleged false imprisonment ends" and that "a false imprisonment ends once the victim becomes held pursuant to [legal] process," that is, once some process is afforded the imprisoned. "Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution." *Id.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on Law of Torts,* § 119, pp. 885-886 (5th ed.1984)). Here, application of this rule means that plaintiff's false imprisonment ended, and the statute of limitations on his false imprisonment claim began to run, at the time of his administrative segregation hearing on April 4, 1995.

### a. *Continuing Violation Doctrine*
Mr. McFadden argues, however, that his claims are not time-barred because they allege a continuing violation. (Reply at 5). He contends that because DOCS kept him in administrative segregation until August 2, 2000 and he filed suit within three years of that date, his due process and false imprisonment claims are still actionable. Moreover, he suggests that DOCS continues to use the sealed criminal charges of March 15, 1995 to deny him his "rights". (Reply at 6).

**\*6** "The continuing violation doctrine generally provides that where there is a discriminatory practice or policy, the accrual time for the statute of limitations may be delayed until the last act in furtherance of the policy." *Velez v. Reynolds,* 325 F.Supp.2d 293, 312 (S.D.N.Y.2004) (citing *Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir.1999)); *see also Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994) ("Where a continuing violation can be shown, the plaintiff is entitled to bring suit challenging all conduct that was a part of that violation, even conduct that occurred outside the limitations period."); *Annis v. County of Westchester,* 136 F.3d 239, 246 (2d Cir.1998) ( "The continuing-violation exception 'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even

2007 WL 924464

if those acts, standing alone, would have been barred by the statute of limitations.' " (quoting *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir.1997)). The doctrine has "usually-but not exclusively-been applied in the context of Title VII discrimination claims." [12] *Remigio v. Kelly,* No. 04 Civ. 1877, 2005 WL 1950138, at *6 (S.D.N.Y. Aug. 12, 2005). However, it has also been applied to "a variety of non-Title VII claims, including a range of constitutional theories." *Id.* at *7 (collecting cases).

To invoke the continuing violation doctrine, a plaintiff must show either "(1) a specific ongoing discriminatory policy or practice, or (2) specific and related instances of discrimination that are permitted to continue unremedied for so long as to amount to a discriminatory policy or practice." *Velez,* 325 F.Supp.2d at 312 (citing *Bendik v. Credit Suisse First Boston (USA), Inc.,* No. 02 Civ. 9554, 2004 WL 736852, at *6 (S.D.N.Y. Apr. 5, 2004)); *accord Cornwell,* 23 F.3d at 704 (2d Cir.1994). If the latter, then as long as the most recent in the series of related wrongful acts falls within the statute of limitations, claims concerning the earlier acts in the series will not be time-barred. *Cornwell,* 23 F.3d at 704; *Gobin v. New York City Health & Hospital Corp.,* No. 04 Civ. 3207, 2006 WL 2038621, at *3 (S.D.N.Y. July 19, 2006). However, "discrete incidents of discrimination that are not related to discriminatory policies or mechanisms" do not give rise to a continuing violation. *Cornwell,* 23 F.3d at 704; *Lightfoot,* 110 F.3d at 907 (discrete incidents of discrimination not related to identifiable policy or practice do not amount to continuing violation unless they are "specifically related and allowed to continue unremedied for so long as to constitute a discriminatory policy or practice"); *Remigio,* 2005 WL 1950138, at *6 (noting that "each discrete discriminatory act starts a new clock for filing charges alleging that act") (quoting *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)); *Smering v. FMC Corp.,* No. 01 Civ. 721, 2004 WL 2191561, at *12 (W.D.N.Y. Sept. 24, 2004) (finding no continuing violation because "[p]laintiff alleges discrete incidents of disparate treatment, not a discriminatory policy or mechanism").

*7  In addition, a continuing violation may not be based on the continuing effects of earlier unlawful conduct or on a completed unlawful act. *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1414 (S.D.N.Y.1989) (citing *Delaware State College v. Ricks,* 449 U.S. 250, 257 (1980) and

*United Air Lines v. Evans,* 431 U.S. 553, 558 (1977); *see also Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999) ("[A] continuing violation cannot be established merely because the claimant continues to feel the effects of a time-barred discriminatory act."); *Remigio,* 2005 WL 1950138, at *7 (distinguishing continuing unlawful acts from continuing effects of earlier unlawful act); *Carrasco v. New York City Off-Track Betting Corp.,* 858 F.Supp. 28, 32 (S.D.N.Y.1994) (holding that residual effects of failure to promote do not constitute a continuing violation); *Blankman v. County of Nassau,* 819 F.Supp. 198, 207 (E.D.N.Y.1993) ("[T]he mere fact that wrongful acts may have a continuing impact is not sufficient to find a continuing violation."). Nor may it be based on "the fact that the plaintiff's ongoing protests, objections, requests for reconsideration, and persistent demands for administrative and judicial review have caused the dispute to linger to the present day ." *Yip v. Board of Trustees of State University of New York,* No. 03 Civ. 00959, 2004 WL 2202594, at *5 (W.D.N.Y. Sept. 29, 2004); *see also Ricks,* 449 U.S. at 261 (in employment discrimination context, mere requests for reconsideration do not extend the normal statute of limitations period); *Morse v. University of Vermont,* 973 F.2d 122, 125 (2d Cir.1992) (continuing internal administrative review of allegedly discriminatory decision had no effect on running of statute of limitations period); *Jaghory v. New York State Department of Education,* No. 95 Civ. 3478, 1996 WL 712668, at *5 (E.D.N.Y. Dec. 5, 1996) (denial of "protests and objections" to original act not a continuing violation).

Finally, it should be noted that courts in the Second Circuit generally disfavor the continuing violation doctrine and apply it only in "compelling circumstances." *Remigio,* 2005 WL 1950138, at *8; *Nakis v. Potter,* No. 01 Civ. 10047, 2004 WL 2903718, at *10 n. 2 (S.D.N.Y. Dec. 15, 2004) (collecting cases); *Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 244 (S.D.N.Y.2000); *Blesedell,* 708 F.Supp. at 1415. Courts have found such compelling circumstances where

> the unlawful conduct takes place over a period of time, making it difficult to pinpoint the exact day the violation occurred; where there is an express, openly espoused policy that is alleged to be discriminatory; or where there is a pattern of covert conduct such that the

2007 WL 924464

plaintiff only belatedly recognizes its unlawfulness.

*Yip,* 2004 WL 2202594, at *4 (internal quotation marks and citations omitted).

The continuing violation doctrine is inapplicable to the plaintiff's claims. The plaintiff argues, reading his complaint liberally, that the series of decisions over five years by DOCS to keep him in administrative segregation were all based at least in part on the allegedly false March 15 disciplinary charges or the related criminal charges-which is hardly certain, as the excerpts from his administrative segregation hearing hint at a record littered with references to his problematic behavior as an inmate-and that all these decisions constitute one continuing violation. Rather than a continuing violation, this is a classic example of completed allegedly unlawful conduct that continues to have an impact. *See, e.g., Evans,* 431 U.S. at 558 (finding establishment of seniority system not a continuing violation because it merely "gives present effect to a past act of discrimination"); *Remigio,* 2005 WL 1950138, at *8 (if the plaintiff "had simply complained about the continuing ill effects" resulting from the complained-of property seizure, "the continuing violation doctrine could not apply"); *Carrasco,* 858 F.Supp. at 32 ("residual effects" of complained-of conduct "insufficient to support a continuing violation claim"); *LaBeach v. Nestle Co.,* 658 F.Supp. 676, 687 (S.D.N.Y.1987) (loss of income accompanying demotion was merely present effect of past discrimination and thus not continuing violation). The violations of which the plaintiff complains all concern the charges of March 1995 and the alleged deprivation of due process during the April 1995 hearing on those charges, which are clearly "discrete incidents of [alleged constitutional violation]." [13] *Cornwell,* 23 F.3d at 704; *see also Konigsberg v. Lefevre,* 267 F.Supp.2d 255, 262-63 (N.D .N.Y.2003) (citing *Moskowitz v. Board of Trustees of Purdue University,* 5 F.3d 279, 282 (7th Cir.1993)) ("A party cannot invoke the doctrine to avoid statute of limitations problems when he knew after each allegedly wrongful act that it was actionable, but chose not to file federal claims regarding them within the limitations period."). He does not allege any flaw in subsequent administrative segregation hearings, only that the results were influenced by the complained-of violations in March 1995. In addition, the facts that the plaintiff was placed in administrative segregation in multiple facilities and presumably by multiple prison administrators, and

that the decisions that he complains of thus "involv[e] different people, circumstances and location[s]," weigh against finding a continuing violation in this case. *Konigsberg,* 267 F.Supp.2d at 263; *see also Sundaram v. Brookhaven National Laboratories,* 424 F.Supp.2d 545, 561 (E.D.N.Y.2006) (finding that decisions that "occurred at different times" and "were made by different persons" were not continuing violation).

### b. *Use of Sealed Records*

**\*8** Mr. McFadden pleads certain claims that may not be time-barred. These are his contentions that DOCS used his dismissed criminal charges as a basis for keeping him in administrative segregation until August 2, 2000 and for denying him other benefits such as family visitation in violation of his due process rights. In fact, Mr. McFadden appears to believe that the dismissed criminal charges along with other "false information," including his juvenile records from Pennsylvania, continue to be used by DOCS to designate him a "central monitoring case" and to deny him other benefits such as preferential job assignments. (Letter to Superintendent Dale Artus, dated July 31, 2000, attached to Reply; Letter to Inspector General, dated Feb. 18, 2004, attached to Reply; Letter to L. McClaire, dated Sept. 23, 2004, attached to Reply). These claims, however, must be dismissed for any number of reasons. First, Mr. McFadden offers no evidence that it is DOCS' reliance on the criminal charges against him, as opposed to the DOCS disciplinary charges stemming from the same conduct, that continues to injure him. There is no evidence that the disciplinary charges were dismissed or in any way sealed or expunged from his record. Furthermore, Mr. McFadden has plainly failed to name the correct defendants, presumably the DOCS custodian of records and officials who are relying on those records in making their decisions. Finally, it seems clear that the plaintiff has failed to exhaust any claims in this regard, as the response to his last grievance indicates that he has still not contacted the proper individual to have the charges removed from his record. ("Grievant's Request Unanimously Denied with Clarification," attached to Reply). For all of these reasons, any claims related to the failure to expunge the sealed criminal charges or other inaccurate information from his record must be dismissed.

### *Conclusion*

For the reasons set forth above, I recommend that the defendants' motion for summary judgment be granted

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 145 of 282
McFadden v. Kralik, Not Reported in F.Supp.2d (2007)
2007 WL 924464

and all claims against them be dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard C. Casey, U.S.D.J., Room 1350, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 924464

Footnotes

1    Judge Casey passed away on March 22, 2007, and this case has not yet been reassigned. This Report and Recommendation is therefore drafted as if it were addressed to Judge Casey, and the parties should expect the case to be reassigned shortly.

2    The plaintiff's account of these events varies slightly from one document to another-for instance, in some versions he claims that only defendants Farina and Clark took part in the search of his cell while in others it is the full panoply of defendants-but these differences are not material to the disposition of his complaint. For the purposes of this opinion, the facts are drawn largely from the plaintiff's Second Amended Complaint.

3    The plaintiff alleges that these charges were false and retaliatory, and were made on the basis of trumped-up evidence. (2nd Am. Compl. at 3). He claims that he was charged with attempt to escape on the basis of a small, loose piece of cement in his cell and that a law book, paper clip and used-up pen were deemed "contraband." (First Amended Complaint dated Dec. 15, 2004 ("1st Am. Compl."), at 5). The plaintiff claims that, in fact, all of the incidents of which he complains are part of a larger conspiracy to connect him with another murder committed around the same time as his offense. (Plaintiff's Motion for Summary Judgment dated Oct. 4, 2006 ("Pl.Mot.Summ.Judg.") at 2-3). There is no support in the record for this allegation.

4    The plaintiff attaches what appear to be excerpts from the transcript of his administrative segregation hearing on April 4, 1995. The document is not identified by the plaintiff nor is its provenance clear. Nonetheless, drawing "all justifiable inferences" in favor of the plaintiff as the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986), I will treat the document as a true and accurate record of that proceeding.

5    The plaintiff also claims that during this hearing he was denied "the rights afford[ed] to others," including legal assistance, the right to confront witnesses and offer evidence, and the right to appeal the outcome of the hearing. (2nd Am. Compl. at 3).

6    The grievance refers to "clearly erroneous information that has been used to keep me in my present confinement." Mr. McFadden appears to believe that he was kept in administrative segregation as the result of the DOCS disciplinary charges of March 15 and the linked criminal charges, and that both should have been expunged from his DOCS file as a result of the court-ordered sealing of the criminal charges. (2nd Am. Compl. at 3; Reply at 4).

7    In addition, in his First Amended Complaint the plaintiff alleges violations of unspecified New York State regulations governing the "safe-keeping of prisoners confined to [the custody of county jails]," presumably referring to 9 NYCRR § 7000 *et seq.,* which governs the "Minimum Standards and Regulations For Management of County Jails and Penitentiaries." (1st Am. Compl. at 8). He also accuses defendant Kralik of "failing in duties imposed by" New York Criminal Procedure Law § 500 *et seq.,* "Procedures For Securing Attendance At Criminal Actions And Proceedings Of Defendants And Witnesses Under Control Of Court-Recognizance, Bail And Commitment". (1st Am. Compl. at 9). Because these claims were omitted from the plaintiff's Second Amended Complaint, and because he does not clearly make out a cause of action under these sections of state law, they will not be addressed here.

8    Various of the plaintiff's grievances also allege that the defendants and DOCS improperly relied on sealed juvenile charges in placing him in administrative segregation and in maintaining that placement. (Letter to Superintendent Dale Artus dated July 31, 2000, attached as Exh. E to Reply).

9    In addition to submitting almost wholly unrelated news items and sensational congressional testimony regarding the plaintiff's crimes, the defendants repeatedly editorialize regarding the justice system's failure to preclude the plaintiff from availing himself of the remedies available. (Def. Memo. at 7 ("It is rather appalling that plaintiff has been permitted to file this *pro se* suit."); Clark Decl, ¶ 7 ("It is troubling and frustrating [ ] that plaintiff has been permitted to file a lawsuit almost 10 years after he was an inmate in Rockland County.")). These submissions are irrelevant and the arguments unhelpful.

McFadden v. Kralik, Not Reported in F.Supp.2d (2007)

2007 WL 924464

10    While it is not clear that the plaintiff has fully exhausted his administrative remedies for any of these claims, I do not reach the exhaustion issue because the claims are clearly time-barred.

11    The plaintiff has no claim for malicious prosecution stemming from his March 15 prison disciplinary charges, as there is no evidence of any favorable termination of the proceedings related to those charges.

12    Thus, many of the cases that deal with the continuing violation doctrine refer only to "discrimination" and not to other tortious conduct.

13    This is demonstrated in part by the fact that the plaintiff names as defendants only employees of the RCJ, not of the other facilities in which he was placed in administrative segregation. In addition to meaning that this complaint would have to be dismissed for failure to name the correct parties if Mr. McFadden's claims were not time-barred, the naming of only RCJ employees is indicative of the fact that the conduct of which he complains is really that which occurred at the RCJ during March 1995, and that the link to any later occurrences is tenuous at best.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

🔖 KeyCite Yellow Flag - Negative Treatment

Distinguished by Toliver v. Fischer, N.D.N.Y., January 29, 2015

2008 WL 4426748
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Anthony MEDINA, Plaintiff,
v.
J. HUNT; W. Sprague; John Michael; and
Raymond Boyea, Each Correction Officer, Great
Meadow Correctional Facility, Defendants.

No. 9:05-CV-1460.
|
Sept. 25, 2008.

West KeySummary

1    **Constitutional Law**
     👉 Retaliation

     **Prisons**
     👉 Use of Force

     Corrections officers were not liable on a
     prisoner's claim that the officers assaulted
     him for participating in a federal court
     proceeding thereby depriving prisoner of his
     First Amendment rights. Prior to the alleged
     assault, prisoner provoked officers by calling
     one of them an expletive and grabbing a baton
     from another officer. He also grabbed two
     steam pipes to prevent officers from bringing
     him into a sergeant's office. The record clearly
     established that the sole cause of the alleged
     assault was the events leading up to the act.
     U.S.C.A. Const.Amend. 1; 42 U.S.C.A. §
     1983.

     14 Cases that cite this headnote

**Attorneys and Law Firms**

Anthony Medina, Pine City, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Christopher W. Hall, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

Anthony Medina, Alden, NY, pro se.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Anthony Medina, brought this civil
rights action pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated September 2, 2008, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that the defendants' motion for
partial summary judgment (Docket No. 28) be granted,
and denied in part in the following respects: that
plaintiff's retaliation claim under the First Amendment
be dismissed; that plaintiff's conspiracy claim against
defendant Hunt be dismissed, but that defendants' motion
otherwise be denied without prejudice; and further,
that plaintiff's claims against defendants in their official
capacities be sua sponte dismissed. Objections to the
Report-Recommendation have not been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Lowe, the Report-
Recommendation is accepted and adopted in all respects.
*See* 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. Defendants' motion for partial summary judgment
(Docket No. 54) is GRANTED in part, and DENIED in
part as follows:

2. Plaintiff's retaliation claim under the First Amendment
is DISMISSED;

3. Plaintiff's conspiracy claim against defendant J. Hunt is
DISMISSED;

4. Defendants' motion is otherwise DENIED; and

5. Plaintiff's claims against defendants in their official
capacities are *sua sponte* DISMISSED.

IT IS SO ORDERED.

## *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, Anthony Medina ("Plaintiff"), alleges that four employees of the New York State Department of Correctional Services ("DOCS")-Correction Officers J. Hunt, W. Sprague, John Michael and Raymond Boyea ("Defendants")-violated his rights under the First, Eighth and Fourteenth Amendments when, between approximately October 21, 2003, and December 5, 2003, they (1) conspired to use excessive force against him, (2) used excessive force against him, (3) used that excessive force in response to his having engaged in protected activity, and (4) were deliberately indifferent to his health and safety. (*See generally* Dkt. No. 29 [Plf.'s Am. Compl.].) Currently pending before the Court is Defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 54.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint alleges as follows:

1. On October 21, 2003, Plaintiff filed a motion for contempt against DOCS officials in a separate federal court prisoner civil rights class action in the Southern District of New York, specifically, *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.); [1]

*2 2. Between some point before the date on which he filed the referenced contempt motion and December 5, 2003, Defendants harassed Plaintiff in the following ways because of his litigation activity: (a) they verbally harassed him; (b) they physically harassed him by subjected him to

unnecessary "pat and strip frisk[s]"; and (c) they filed false misbehavior reports against him; [2]

3. In addition, on December 5, 2003, Defendants took a form of adverse action against Plaintiff in retaliation for his having filed the referenced motion for contempt: they conspired with each other to use excessive force against him, and they in fact did use excessive force against him; [3]

4. Specifically, on December 5, 2003, Defendant Hunt escorted Plaintiff from his cell for the alleged reason that Plaintiff was to attend a disciplinary proceeding; he brought Plaintiff to the disciplinary office (which was locked and uninhabited); and then intentionally left Plaintiff alone in the hallway "so that [D]efendants Boyea, Sprague, and Micheal [sic] could physically brutalize [him]"; [4] and

5. Once Plaintiff was alone in the hallway, Defendants Boyea, Sprague, and Micheal appeared and physically brutalized Plaintiff. [5]

6. As a result of injuries he experienced due to these violations, Plaintiff seeks money damages, but no injunctive relief, from Defendants. [6]

Finally, it bears noting that Plaintiff sues Defendants in both their official and individual capacities. [7]

I note that, in construing Plaintiff's Amended Complaint, I have afforded it the liberal construction that all pleadings must be afforded, under Fed.R.Civ.P. 8. *See* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice."). I have also afforded it the extra-liberal construction normally afforded to the pleadings of *pro se* civil rights litigants, out of special solicitude to them due to their general lack of familiarity with legal terminology and the litigation process. [8] I have done this with some hesitation, because it is clear that (before filing his Amended Complaint) Plaintiff had acquired considerable litigation experience. [9] Some of those actions were resolved in Plaintiff's favor, or partially so. [10] Not surprisingly, his Amended Complaint is typed, organized, articulate, and verified. (*See* Dkt. No. 29.) Moreover, his litigation skills are such that he has filed several motions in this action that have been granted (or partially granted). (*See* Dkt. Nos. 5, 7, 18, 27, 28, 32, 45, 56, 63, 64.) However,

after carefully considering the nature of his other court actions, I find that Plaintiff's litigation experience is not quite as extensive as that of the plaintiffs whose special solicitude the Second Circuit has diminished or revoked due to their obvious familiarity with the legal system and pleading requirements. [11] Plaintiff is cautioned, however, that he is fast becoming more a pro litigant than a *pro se* litigant. [12]

### B. Summary of Grounds in Support of Defendants' Motion

**\*3** Defendants' motion for partial summary judgment is premised on the following three grounds: (1) Plaintiff has failed to state a claim of conspiracy to violate his Eighth Amendment rights because he fails to allege facts plausibly suggesting that any Defendant conspired with a private or "external" party; (2) Plaintiff has failed to establish a claim for retaliation under the First Amendment because he has failed to adduce evidence that Defendants assaulted him on December 5, 2003, because Plaintiff had engaged in constitutionally protected activity between October 21, 2003, and October 5, 2003; and (3) Plaintiff has failed to establish that Defendant Hunt was personally involved in any of the constitutional violations alleged. (Dkt. No. 55, at 5-9 [Defs.' Memo. of Law].)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [13] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [14]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [15] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt

as to the material facts." [16] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [17]

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." [18] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendants. [19] However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

More specifically, where a plaintiff has failed to properly respond [20] to a defendant's statement of material facts, contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [21] to the extent that (1) those facts are supported by the evidence in the record, [22] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. [23]

**\*4** Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [24] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [25] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [26]

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [27] This is because even *pro se* plaintiffs must obey the Court's procedural rules. [28] However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit. [29] (Here, I note that Plaintiffs' Amended Complaint is verified pursuant to 28 U .S.C. § 1746. [30]) That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [31] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay. [32] In addition, such an affidavit (or verified complaint) must not be conclusory. [33] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general. [34] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [35]

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Fed.R.Civ.P. 56 is based entirely on the plaintiff's complaint, [36] such a motion is functionally the same as a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b) (6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not

advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [37] For these reasons, it is appropriate to briefly summarize the recently clarified legal standard governing Fed.R.Civ.P. 12(b)(6) motions to dismiss.

**\*5** Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a) (2); [38] or (2) a challenge to the legal cognizability of the claim. [39]

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [40] The purpose of this rule is to "facilitate a proper decision on the merits." [41] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [42]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [43] However, it is well established that even this liberal notice pleading standard "has its limits." [44] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [45]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- -----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[46] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

Of course, the Second Circuit has repeatedly recognized the controlling nature of the clarified plausibility standard that was articulated by the Supreme Court in *Twombly.* *See Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original]; *In re Elevator Antitrust Litigation,* 502 F.3d 47, 50 (2d Cir.2007) ("We affirm the district court's dismissal of the conspiracy claims because plaintiffs are unable to allege facts that would provide 'plausible grounds to infer an agreement' [under *Bell Atlantic v. Twombly]*" ); *cf. Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (*"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' " ) [internal citation omitted].[47]

**\*6** Having said all of that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ."[48] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*"[49] In other words, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with

an *extra* degree of liberality.[50] For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[51] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[52] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[53] (Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[54] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.[55] )

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings,[56] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[57] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[58] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[59]

### III. ANALYSIS

#### A. Whether Plaintiff Has Failed to State a Claim of Conspiracy to Violate His Eighth Amendment Rights

As stated above in Part I.B. of this Report-Recommendation, Defendants argue that Plaintiff has failed to state a claim of conspiracy to violate his Eighth Amendment rights because he has failed to allege facts plausibly suggesting that any Defendant conspired with a private or "external" party (which, they argue, is a requirement of stating a conspiracy claim). (Dkt. No. 55, at 5-6 [Defs.' Memo. of Law].) In response, Plaintiff argues that the external-party requirement applies only when the

actions complained of were committed by Defendants in their official capacities, and here Plaintiff sues Defendants also in their individual capacities. (Dkt. No. 67, Part 2, at 4-6 [Plf.'s Memo. of Law].)

**\*7** My analysis starts with Plaintiff's reference to the fact that he sues Defendants, in part, in their official capacities. (*Id.* at 5.) As stated above in Part I.A. of this Report-Recommendation, Plaintiff does in fact sue Defendants, in part, in their official capacities. (Dkt. No. 1, ¶ 9 [Plf.'s Am. Compl.].) Moreover, Plaintiff's Amended Complaint seeks only money damages, and no injunctive relief, from Defendants. (*Id.* at ¶¶ 55-56.) As a result, Plaintiff's claims against Defendants in their official capacities are barred by the Eleventh Amendment, under the fundamental principle of "sovereign immunity." [60] Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3). Moreover, as explained above in Part II.B. of this Report-Recommendation, the Court possesses the authority under 28 U.S.C. §§ 1915(e)(2)(B)(ii), and 1915A(b), to *sua sponte* review the pleading sufficiency of Plaintiff's claims. For these reasons, I recommend that the Court *sua sponte* dismiss Plaintiff's claims against Defendants in their official capacities.

All that is left, then, in this action are Plaintiff's claims against Defendants in their individual capacities. Returning to Plaintiff's argument that the external-party requirement (on which Defendants' conspiracy argument hinges) applies only when the actions complained of were committed by Defendants in their official capacities, Plaintiff's brief argument essentially has four parts: (1) the external-party requirement is a manifestation of what is known as the "intracorporate conspiracy" doctrine (or the "intraenterprise conspiracy" doctrine, or the "intraagency conspiracy" doctrine), which provides that officers, agents or employees of a single corporate entity are legally incapable of conspiring together; (2) the intracorporate conspiracy doctrine applies in cases where the "corporate" entity is a *government* entity; (3) the intracorporate conspiracy doctrine contains an exception (called the "scope of employment" exception) for cases when individuals pursue personal interests wholly separate and apart from the entity; and (4) here,

Plaintiff alleges that Defendants were pursuing personal interests wholly separate and apart from DOCS, in part because he has sued them in their individual capacities, and in part because he has *not* alleged that they were acting pursuant to some sort of DOCS policy. (Dkt. No. 67, Part 2, at 5-6 [Plf.'s Memo. of Law].)

After carefully reviewing the two cases cited by Plaintiff in support of his argument (and the cases that they cite and their progeny), [61] I agree with Plaintiff although for reasons other than those that he offers.

**\*8** Because I have found seven district court cases from within this Circuit in which the intracorporate conspiracy doctrine has been applied with regard to conspiracy claims against the State and only one district court case in which it has not been so applied, I will assume for the sake of argument that the intracorporate conspiracy doctrine does in fact apply to cases in which the entity is the State. *See Farid v. Bouey,* 554 F.Supp.2d 301, 324 (N.D.N.Y.2008) (Sharpe, J.); *Lewis v. Goord,* 06-CV-0504, 2008 WL 902179, at \*4 (N.D.N.Y. March 31, 2008) (Scullin, J., adopting, on *de novo* review, report-recommendation by Treece, M.J.); *Ozuno v. Vadlamudi,* 03-CV-0475, 2006 WL 1977618, at \*10, n. 7 (N.D.N.Y. July 11, 2006) (Sharpe, J., adopting, on *de novo* review, report-recommendation by Peebles, M.J.); *Colon v. Sawyer,* 03-CV-1018, 2006 WL 721763, at \*6, n. 8 (N.D.N.Y. March 20, 2006) (Kahn, J.); *Orafan v. Goord,* 411 F.Supp.2d 162, 164-65 (N.D.N.Y.2006) (Magnuson, V.J.); *Scott v. Goord,* 01-CV-0847, 2004 WL 2403853, at \*13 (S.D.N.Y. Oct.27, 2004); *Cates v. State of Conn. DOCS,* 98-CV-2232, 2000 WL 502622, at \*8 (D.Conn. Apr.13, 2000); *but see Fox v. Brown,* 05-CV-1292, 2007 WL 586724, at \*12 (N.D.N.Y. Feb.21, 2007) (Kahn, J., adopting, on *de novo* review, report-recommendation of Di Bianco, M.J.).

Even assuming that the doctrine applies to Plaintiff's conspiracy claims, his claims (liberally construed) appear to fall within the "scope of employment" exception to that doctrine. As Plaintiff correctly argues, this exception exists "when individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (Magnuson, J.) [internal quotation marks and citations omitted], *vacated and remanded on other grounds sub nom., Orafan v. Rashid,* No. 06-2951, 249 F. App'x 217 (2d Cir. Sept.28, 2007).

I note that, in order to allege that individuals were pursuing personal interests wholly separate and apart from the entity, more is required of a plaintiff than simply suing the individuals in their individual or personal capacities. [62] This is, no doubt, because an individual or "personal" capacity claim is merely an effort to obtain monetary recovery payable out of the responsible official's personal finances. [63] Moreover, in order for liability to be imposed against a defendant in an individual capacity suit, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." [64]

I note also that, in order to allege that individuals were pursuing personal interests wholly separate and apart from the entity, more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against the plaintiff. *See Peters v. City of New York,* 04-CV-9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine where, as here, the action complained of arguably served a legitimate interest of [the employer].") [internal quotation marks and citation omitted], *accord, Johnson v. City of New York,* 01-CV-1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

**\*9** Here, on the one hand, Plaintiff alleges that Defendants were DOCS employees at the time they violated his constitutional rights, and that they were acting "under the color of State law." (Dkt. No. 1, ¶¶ 5-8, 9 [Plf.'s Am. Compl.].) Moreover, he alleges facts plausibly suggesting that what caused the use of force against him was (1) the fact that he was standing alone in the hallway of the administrative offices in a maximum-security correctional facility, (2) when a correctional officer asked him his name and department identification number, Plaintiff called the man an "asshole," and (3) when two correctional officers started to take Plaintiff by force to a sergeant's office, Plaintiff initially resisted. (*Id.* at ¶¶ 20-23, 25, 27-29.)

On the other hand, Plaintiff also alleges facts plausibly suggesting that, when Defendants conspired to assault him, they were conscious that "the tax payers [would] pay any awards for [Defendants'] violation of [their victim's] constitutional rights." (*Id.* at ¶¶ 53-54.) In addition, he alleges that Defendants Sprague, Boyea and Michael were motivated by a "sadistic" desire to cause

Plaintiff pain. (*Id.* at ¶¶ 47-50.) Finally, he alleges that, during the assault, Defendant Michael "appeared to look out for possible witness[es] walking the corridor," and Defendants Michael and Boyea continued to use force against Plaintiff even when Plaintiff was in mechanical restraints and was no longer resisting. (*Id.* at ¶¶ 33-39.) In other words, Plaintiff alleges facts plausibly suggesting that Defendants Sprague, Boyea and Michael were not acting, and knew they were not acting, in the interest of DOCS but were acting in their own interests.

Under the circumstances, I find that Plaintiff has alleged facts plausibly suggesting that Defendants Sprague, Boyea and Michael were pursuing personal interests wholly separate and apart from those of DOCS and the State of New York. *See Hill v. City of New York,* 03-CV-1283, 2005 WL 3591719, at *6 (S.D.N.Y. Dec.30, 2005) ("Here, plaintiff clearly alleges that defendant Barrett acted in his own personal interest, not in the interest of the police department or the city, by conspiring with others to cover-up his alleged use of excessive force. Given that plaintiff has alleged that Barrett conspired based on a personal stake, the intracorporate conspiracy doctrine is inapplicable to the instant case.").

I note that, in *Orafan v. Goord,* Visiting Judge Magnuson, of this Court, found that the referenced exception to the intracorporate conspiracy doctrine did *not* apply because "Plaintiffs have made no allegation that Defendants were acting beyond the scope of their employment. In fact, Plaintiffs specifically allege that Defendants acted through DOCS' policies, customs, and practices ...." *Orafan,* 411 F.Supp.2d at 165 [citation omitted]. Those are not the factual allegations in this case. (*See* Dkt. No. 29 [Plf.'s Am. Compl.].) Moreover, in *Orafan,* the plaintiff was (in part) suing the defendants in their official capacities for declaratory and injunctive relief. *Id.* at 156-57. [65] In this case, Plaintiff is not so suing Defendants (since, as I have pointed out above, Plaintiff's official-capacity claim must be dismissed).

**\*10** Before concluding my analysis in this section, two points bear mentioning. First, this Court possesses the authority (and, indeed, the duty) to review the pleading sufficiency of Plaintiff's conspiracy claim *sua sponte.* To allege such a claim, Plaintiff must allege, *inter alia,* facts plausibly suggesting "a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *See Webb v. Goord,* 340

F.3d 105, 110 (2d. Cir.2003). Here, given Plaintiff's special status as a *pro se* civil rights litigant, I find, based on a *sua sponte* review of Plaintiff's conspiracy claim, that he has *just barely* alleged such facts, given his factual allegations of (1) how Defendants repeatedly started harassing him after he filed the contempt motion to which he refers in his Amended Complaint, (2) how they expressly tied their harassment to his filing of the contempt motion, (3) how Defendants told him (before the assault in question) about "continu[ing] to do as they please[ ]," and (4) the coordinated manner in which the assault was carried out. (Dkt. No. 29, ¶¶ 14-40, 53 [Plf.'s Am. Compl.].)

Second, having said that, I express no opinion as to whether or not Plaintiff would be able to establish, at trial or on a second motion for summary judgment, his conspiracy claim through evidence, since that issue has not been raised in Defendants' motion. This is because the record appears devoid of any evidence that Defendants had actually entered into an agreement, express or tacit, to assault Plaintiff on December 5, 2003. For example, Plaintiff's assertions, in his verified Amended Complaint, that there was a conspiracy against him based "[u]pon information and belief" do not constitute evidence sufficient to oppose a motion for summary judgment since those assertions are not based on personal knowledge. (Dkt. No. 29, ¶¶ 19, 24 & Verification [Plf.'s Am. Compl.].) *See also, supra,* note 32 of this Report-Recommendation.

For these reasons, I recommend that Defendants' motion for partial summary judgment be denied to the extent it requests dismissal of Plaintiff's conspiracy claim for failure to state a claim upon which relief might be granted.

### B. Whether Plaintiff Has Failed to Establish a Claim for Retaliation Under the First Amendment

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*11** This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

As stated above in Part I.B. of this Report-Recommendation, Defendants argue that Plaintiff has failed to establish a claim for retaliation under the First Amendment because he has failed to adduce evidence that Defendants took adverse action against him because Plaintiff had engaged in constitutionally

protected activity. (Dkt. No. 55, at 6-8 [Defs.' Memo. of Law].) Simply stated, their argument concerns the third element of the above-stated three-part test. [66] In support of this argument, they have asserted various facts in the fourteen paragraphs of their Rule 7.1 Statement, and have supported each of those factual assertions with accurate citations to record evidence. [67]

In his response to Defendants' motion, Plaintiff offers a Rule 7.1 Response. (Dkt. No. 67, Part 1, at 1-4 [Plf.'s Rule 7.1 Response].) In that Response, Plaintiff admits five of the fourteen factual assertions of Defendants' Rule 7.1 Statement. (*Id.* at ¶¶ 3-4, 8, 10-11.) Furthermore, he partially admits three of the fourteen factual assertions of Defendants' Rule 7.1 Statement. (*Id.* at ¶¶ 5-6, 9.) With regard to the nine factual assertions that Plaintiff attempts to dispute or partially dispute, generally his response is deficient in one or more of four ways (which deficiencies are explained generally, above in Part I.B. of this Report-Recommendation): (1) it fails to deny *each* of the factual assertions contained in Defendants' Rule 7.1 Statement; (2) it fails to support denials with specific citations to the record where the factual issue arises; (3) it is argumentative and non-responsive in nature, and attempts to create factual disputes that are *immaterial* in nature; and/or (4) it merely criticizes the form or veracity of Defendants' affidavit testimony rather than citing any admissible record evidence contradicting that testimony. (*Id.*) [68]

**\*12** These failures need not be overlooked simply out of special solicitude to Plaintiff due to his special status as a *pro se* civil rights litigant. [69] (As both the Supreme Court and Second Circuit have repeatedly recognized, even *pro se* plaintiffs must obey the Court's procedural rules.) [70] Nor *should* these failures be overlooked under the circumstances, since (1) Plaintiff was specifically advised of the potential consequences of failing to respond to Defendants' motion for partial summary judgment, [71] and (2) he clearly understood those consequences since he *twice* requested (and was granted) an extension of the deadline by which to respond to Defendants' motion. [72] Under the circumstances, I decline, and I recommend that the Court decline, to *sua sponte* search the record for proof of a dispute of material fact with regard to Plaintiff's retaliation claim. [73]

The net effect of Plaintiff's admissions and *ineffective* denials in his Rule 7.1 Response is that, pursuant to the Local Rules of Practice for this Court, the following seven factual assertions must be deemed to be true for purposes of Defendants' motion:

(1) The contempt motion to which Plaintiff refers in his Amended Complaint was filed on October 21, 2003, in the class action of *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.); [74]

(2) Before the incident in question on December 5, 2003, no Defendant in this action had any specific knowledge that Plaintiff had filed a contempt motion in, or had otherwise participated in, *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.), or the related proceeding of *Medina v. NYS DOCS,* 03-CV-9249 (S.D.N.Y.); [75]

(3) Plaintiff alleges that, between some point before the date on which he filed his contempt motion (i.e., October 21, 2003), and the date on which the alleged assault occurred (i.e., December 5, 2003), "unnamed officers and named [D]efendants would harass Plaintiff," but Plaintiff has adduced no evidence of precisely when such harassment occurred, or that any *Defendant* committed any such harassment *because* of (or even with knowledge of) Plaintiff's participation in the lawsuit of *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.); [76]

(4) To the best of Defendant Hunt's recollection, the reason he escorted Plaintiff from his cell to the facility "courthouse" on December 5, 2003, was that he had been ordered to do so by non-party Hearing Lieutenant DiBiase so that Plaintiff could attend a scheduled disciplinary hearing; [77]

(5) The reason Defendant Hunt left Plaintiff's side at the door to the facility courthouse was that the doors to the courthouse were closed, and Defendant Sprague had entered the area and agreed to watch Plaintiff while Defendant Hunt retrieved the courthouse keys; [78]

(6) The use of force against Plaintiff was precipitated by the fact that, when Defendant Sprague had asked Plaintiff for identification so that he could file a disciplinary charge against him (for failing to face the wall as ordered), Plaintiff had responded by calling Defendant Sprague an "asshole"; [79] and

**\*13** (7) The use of force against Plaintiff escalated when, once Defendants Boyea and Michaels got hold of Plaintiff, Plaintiff grabbed a baton from one of the Defendants, threw it down the corridor, and further resisted Defendants Boyea and Michaels by grabbing onto two steam pipes in order to prevent Defendants Boyea and Michaels from bringing him into a sergeant's office. [80]

Based on these undisputed facts, I find that no rational fact-finder could conclude that any Defendant in this action retaliated against Plaintiff by assaulting him on December 3, 2005, *because* he had engaged in protected activity by participating in a federal court proceeding between October 21, 2003, and December 5, 2003. Rather, the record rather clearly establishes that the *sole* cause of the alleged assault was the events of December 5, 2003, not because of Plaintiff's having participated in a federal court litigation (a fact that Defendants did not even know at the time).

For these reasons, I recommend that Defendants' motion for partial summary judgment be granted to the extent it requests dismissal of Plaintiff's retaliation claim for failure to adduce record evidence establishing the causation element of such a claim.

### C. Whether Plaintiff Has Failed to Establish that Defendant Hunt was Personally Involved in any of the Constitutional Violations Alleged

As stated above in Part I.B. of this Report-Recommendation, Defendants argue that Plaintiff has failed to establish that Defendant Hunt was personally involved in any of the constitutional violations alleged. (Dkt. No. 55, at 5-9 [Defs.' Memo. of Law].) In support of this argument, they have asserted various facts in the fourteen paragraphs of their Rule 7.1 Statement, and have supported each of those factual assertions with accurate citations to record evidence. [81] In his response to Defendants' motion, Plaintiff offers a Rule 7.1 Response that is generally deficient for the reasons described above in Part II.B. of this Report-Recommendation. (Dkt. No. 67, Part 1, at 1-4 [Plf.'s Rule 7.1 Response].) The net effect of Plaintiff's admissions and *ineffective* denials in his Rule 7.1 Response is that, pursuant to the Local Rules of Practice for this Court, the following five factual assertions must be deemed to be true for purposes of Defendants' motion:

(1) Before the incident in question on December 5, 2003, Defendant ==Hunt== had no specific knowledge that Plaintiff had filed a contempt motion in, or had otherwise participated in, *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.), or the related proceeding of ==*Medina v. NYS DOCS,*== 03-CV-9249 (S.D.N.Y.); [82]

(2) To the best of Defendant Hunt's recollection, the reason he escorted Plaintiff from his cell to the facility "courthouse" on December 5, 2003, was that he had been ordered to do so by non-party Hearing Lieutenant DiBiase so that Plaintiff could attend a scheduled disciplinary hearing; [83]

(3) The reason Defendant Hunt left Plaintiff's side at the door to the facility courthouse was that the doors to the courthouse were closed, and Defendant Sprague had entered the area and agreed to watch Plaintiff while Defendant Hunt retrieved the courthouse keys; [84] and

**\*14** (4) The use of force against Plaintiff was precipitated by the fact that, when Defendant Sprague had asked Plaintiff for identification so that he could file a disciplinary charge against him (for failing to face the wall as ordered), Plaintiff had responded by calling Defendant Sprague an "asshole"; [85]

(5) The use of force against Plaintiff escalated when, once Defendants Boyea and Michaels got hold of Plaintiff, Plaintiff grabbed a baton from one of the Defendants, threw it down the corridor, and further resisted Defendants Boyea and Michaels by grabbing onto two steam pipes in order to prevent Defendants Boyea and Michaels from bringing him into a sergeant's office. [86]

In addition, based on the current record, I find that another fact is undisputed for purposes of Defendants' motion: Defendant Hunt did not conspire with anyone to cause the assault alleged to have been committed against Plaintiff on December 5, 2003. [87]

Based on these undisputed facts, I find that no rational fact-finder could conclude that Defendant Hunt was personally involved in any conspiracy to violate Plaintiff's Eighth Amendment rights by causing him to be assaulted on December 5, 2003. Similarly, I find that no rational fact-finder could conclude that Defendant Hunt was

personally involved in any retaliation to which Plaintiff was subjected through the assault alleged to have been committed against him on December 5, 2003, in response to his having engaged in protected activity by participating in a federal court proceeding between October 21, 2003, and December 5, 2003. (Indeed, I have already found, in Part II.B. of this Report-Recommendation, that no record evidence exists from which a rational fact-finder could conclude that there occurred retaliation in which *any* Defendant could have been personally involved.)

With regard to the remaining issue of whether Defendant Hunt was personally involved in the alleged use of excessive force against Plaintiff on December 5, 2003, that issue is more complicated. In their Rule 7.1 Statement, Defendants assert that, in his deposition, Plaintiff testified that Defendant Hunt was not present during the alleged assault. [88] This assertion is accurate. [89] Indeed, Plaintiff made this sworn assertion not only in his deposition, but in his sworn Amended Complaint. [90] However, as Plaintiff correctly points out in his Rule 7.1 Response, the record also contains several pieces of evidence supporting a finding that, at some point after Plaintiff called Defendant Sprague an "asshole," Defendant Hunt in fact returned to the scene, where the following events took place: (1) Defendant Michaels (a correctional sergeant) directed Defendants Hunt and Sprague to escort Plaintiff into a sergeant's office, (2) Plaintiff resisted by taking hold of steam pipers in the corridor, (3) Defendants Hunt and Sprague worked together to remove Plaintiff's hold of the steam pipes and bring Plaintiff down to the floor, (4) Defendant Hunt grabbed Plaintiff's right arm, which Plaintiff had used to gain control of Defendant Hunt's baton, and (5) Defendant Hunt secured Plaintiff's arm behind his back so that hand restrains could be applied. [91]

**\*15** Even if true, these events alone would not appear to me to constitute excessive force by Defendant Hunt. However, Plaintiff also alleges (and adduces sworn testimony) that (1) when his grasp of the steam pipes was being pulled loose, he was punched in the body and head, (2) while he was handcuffed and lying face down on the floor, he was repeatedly kicked in the forehead and face by correctional officers (whom he identifies as Defendants Boyea and Michael), and (3) after he was lifted to his feet and placed against the wall, an officer (whom he identifies as Defendant Boyea) started slamming Plaintiff's head into a wall. (Dkt. No. 29, ¶¶ 29, 33-39 [Plf.'s Am. Compl.].)

Given the genuine issue of material fact that exists regarding whether Defendant Hunt was one of the three correctional officers who used force against Plaintiff on December 5, 2003, I find that a genuine issue of material fact also exists regarding whether Defendant Hunt was one of the officers who used the sort of force described in the preceding paragraph. Having said that, I express no opinion as to whether or not Defendant Hunt would be protected from liability at trial or on a second motion for summary judgment (for example, by the doctrine of qualified immunity), especially given the apparent fact that (1) Defendant Hunt was not present at the scene when the events occurred (or did not occur) giving rise to the use of force against Plaintiff, (2) Defendant Hunt was complying with a direct order of a superior officer (namely, Defendant Michaels, a correctional sergeant) to bring Plaintiff into an office, (3) Defendant Hunt fell to the floor with Plaintiff as Plaintiff resisted Defendant Hunt's efforts to bring him into the office, and (4) Plaintiff grabbed Defendant Hunt's baton during the struggle between Plaintiff and Defendant Hunt.

For these reasons, I recommend that Defendants' motion for partial summary judgment be granted to the extent it requests dismissal of Plaintiff's conspiracy claim against Defendant Hunt due to the lack of record evidence establishing his personal involvement in the alleged conspiracy against Plaintiff. I also recommend that Defendants' motion for partial summary judgment be granted to the extent it requests dismissal of Plaintiff's retaliation claim against Defendant Hunt due to the lack of record evidence establishing his personal involvement in the alleged retaliation against Plaintiff. However, I recommend that Defendants' motion for partial summary judgment be denied to the extent it requests dismissal of Plaintiff's excessive force claim against Defendant Hunt due to the (purported) lack of record evidence establishing his personal involvement in the alleged use of excessive force against Plaintiff.

### D. Denial of Any Request by Plaintiff, During any Appeal from this Report-Recommendation, to Supplement the Record on Defendants' Motion

In the event that, during any objections to this Report-Recommendation, Plaintiff attempts to supplement the record on Defendants' motion for partial summary Judgment, I respectfully recommend that the Court, in

exercising its discretion on the matter, decline to permit him to do so.

**\*16** The Second Circuit recognizes that the decision of whether or not to accept such evidence rests in the sound discretion of the district court. *See, e.g., Hynes v. Squillance,* 143 F.3d 653, 656 (2d Cir.1998) ("[W]e have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's *de novo* review.") (affirming decision by Scullin, J.) [citations omitted]. In deciding whether or not a district court has abused that discretion in denying the supplementation of the record on appeal, the Second Circuit considers factors such as efficiency and fairness. *See Hynes v. Squillance,* 143 F.3d at 565 ("Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration ....").

With regard to the efficiency consideration, I find that permitting Plaintiff (on appeal) to adduce evidence that was not presented before me would be an inefficient use of judicial resources, and indeed would frustrate the purpose of the Magistrates Act." *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992).

With regard to the fairness consideration, I note that the Fifth Circuit has suggested four factors that a court might consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued:

> (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted.

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F.3d 847, 862 (5th Cir.2003) [citation omitted]. Generally, these fairness factors are considered by Courts within the Second Circuit (and outside of the Second Circuit). [92] Here, of course, I cannot make any finding regarding the first two fairness factors since Plaintiff has not requested permission to supplement the record on Defendants' motion for summary judgment. However, I find that, should he request that permission, the third and fourth factors would weigh decidedly against granting him that permission. Plaintiff has had a full and fair opportunity to be heard on his claims, including a full and fair opportunity to (1) conduct discovery in this matter, [93] and (2) respond with evidence and argument to Defendants' motion for partial summary judgment. [94] Defendants are entitled to have their motion decided on a level playing field, based on evidence and arguments to which they could properly *reply* (and possibly refute with further record evidence), under the Federal Rules of Civil Procedure and Local Rules of Practice. [95]

**\*17** For these reasons, I recommend that the Court, in exercising its discretion on the issue, deny any request by Plaintiff to supplement the record on Defendants' motion for partial summary judgment, during any objections to this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 54) be *GRANTED* **in part and** *DENIED* **in part,** in the following respects:

(1) that Plaintiff's retaliation claim under the First Amendment be **DISMISSED;** and

(2) that Plaintiff's conspiracy claim against Defendant Hunt be **DISMISSED;** but

(3) that Defendants' motion otherwise be **DENIED** without prejudice; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendants in their official capacities be *sua sponte DISMISSED* pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A(b), Fed.R.Civ.P. 12(b)(6), and Fed.R.Civ.P. 12(h)(3).

ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day). *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.[96]

BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4426748

Footnotes

1    (Dkt. No. 29, ¶¶ 52-53 [Plf.'s Am. Compl.]; Dkt. No. 67, Part 2, at 7, 9-11 [Plf.'s Opp. Memo. of Law, identifying the name and case number of the action].) *See also Clarkson v. Coughlin,* 91-CV-1792, Plf.'s "Reply Memorandum" (S.D.N.Y. filed Oct. 21, 2003) (civil rights class action), *related proceeding, Medina v. NYS DOCS,* 03-CV-9249 (S.D.N.Y.).

2    (Dkt. No. 29, ¶¶ 22, 52-53 [Plf.'s Am. Compl.].)

3    (*Id.* at ¶¶ 19, 46-49, 52-53.)

4    (*Id.* at ¶¶ 14-20, 46.)

5    (*Id.* at ¶¶ 20-40, 47-49.)

6    (*Id.* at ¶¶ 55-59.)

7    (*Id.* at ¶ 9.)

8    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted]; *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citation omitted]; *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) ("In evaluating whether a plaintiff has met the[ ] requirements [under Rule 12(b)(6) ], we hold complaints prepared *pro se* 'to less stringent standards than formal pleadings drafted by lawyers.' ") [quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) ] ).

9    Specifically, before Plaintiff filed his Amended Complaint in this action on February 5, 2007, he had filed at least **twelve** federal or state court actions or appeals regarding his imprisonment. (*See* Dkt. No. 1, ¶ 11 [Plf.'s Compl., listing most of his previous litigations filed before Sept. 1, 2005] .) *See also Medina v. N.Y.S. DOCS,* 03-CV-9249 (S.D.N.Y. filed Nov. 21, 2003) (prisoner civil rights proceeding); *Medina v. McGinnis,* 04-CV-2515 (S.D.N.Y. filed March 31, 2004) (habeas corpus proceeding), *appeal dismissed,* No. 04-6433 (2d Cir. June 29, 2005); *Medina v. Senkowski,* 309 A.D.2d 1122, 766 N.Y.S.2d 915 (N.Y.S.App.Div., 3d Dept., 2003) (Article 78 proceeding); *Medina v. Goord,* Index No. 001767/2005 (N.Y. Sup.Ct., Chemung County) (Article 78 proceeding filed June 6, 2005); *Medina v. New York,* Claim No. 109170 (N.Y. Ct. Claims, filed Apr. 9, 2004) (prisoner action alleging inadequate prison conditions); *Medina v. New York,* Claim No. 111093 (N.Y. Ct. Claims, filed July 1, 2005) (prisoner action alleging assault and loss or destruction of personal property); *Medina v. New York,* Claim No. 106664, Decision (N.Y. Ct. Claims, filed March 2, 2007) (awarding Plaintiff $1,500 at trial in prisoner action for assault, filed before September of 2005); *Medina v. New York,* Claim No. 109178, Decision (N.Y. Ct. Claims, filed Feb. 28, 2007) (granting in part Plaintiff's motion to compel discovery in prisoner action alleging abuse, retaliation and confiscation of personal property, filed before September of 2005); *Medina v. New York,* Claim No. 110990, Decision (N.Y. Ct. Claims, filed Jan. 7, 2008) (awarding Plaintiff $112 at trial on Nov. 28, 2007, in prisoner action for loss of personal property during prison transfer, filed before September of 2005); *Medina v. New York,* Claim No. 111940 (N.Y. Ct. Claims, filed Feb. 2, 2006) (prisoner action alleging wrongful confinement); *Medina v. Selsky,* 29

A.D.3d 1238, 814 N.Y.S.2d 828 (N.Y.S.App.Div., 3d Dept., 2006) (Article 78 proceeding); *Medina v. Selsky,* 28 A.D.3d 898, 812 N.Y.S.2d 384 (N.Y.S.App.Div., 3d Dept., 2006) (Article 78 proceeding).

10   *See Medina v. New York,* Claim No. 106664, Decision (N.Y. Ct. Claims, filed March 2, 2007) (awarding Plaintiff $1,500 at trial in prisoner action for assault, filed before September of 2005); *Medina v. New York,* Claim No. 109178, Decision (N.Y. Ct. Claims, filed Feb. 28, 2007) (granting in part Plaintiff's motion to compel discovery in prisoner action alleging abuse, retaliation and confiscation of personal property, filed before September of 2005); *Medina v. New York,* Claim No. 110990, Decision (N.Y. Ct. Claims, filed Jan. 7, 2008) (awarding Plaintiff $112 at trial on Nov. 28, 2007, in prisoner action for loss of personal property during prison transfer, filed before September of 2005).

11   *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2-3 & nn. 8-15 (N.D.N.Y. Oct. 18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *appeal dismissed,* No. 07-1014, Order (2d Cir. filed Nov. 9, 2007) (finding Plaintiff's appeal to be frivolous where he objected to, *inter alia,* the district court's revocation of his special solicitude based on his extraordinary litigation experience).

12   For example, I note that, after filing his Amended Complaint in this action on February 5, 2007, and before filing his opposition to Defendants' motion for partial summary judgment on March 1, 2008, he appears to have filed at least *five* more federal or state court actions or appeals regarding his imprisonment. *See Medina v. Gonzalez,* 08-CV-1520, Complaint (S.D.N.Y. filed Feb. 14, 2008) (prisoner civil rights action); *Medina, et al. v. Napoli,* 07-CV-0497, Complaint (W.D.N.Y. filed July 30, 2007) (prisoner civil rights action); *Medina v. Wright,* Index. No. 001929/2007 (N.Y. Sup.Ct., Chemung County) (Article 78 proceeding filed June 7, 2007); *Medina v. Napoli,* Index No. 001931/2007 (N.Y. Sup.Ct., Chemung County, filed June 7, 2007) (Article 78 proceeding, subsequently transferred to Third Dept., *see Medina v. Napoli,* 49 A.D.3d 1145, 856 N.Y.S.2d 889 [N.Y.S.App. Div., 3d Dept., 2008] ); *Medina v. New York,* Claim No. 114230 (N.Y. Ct. Claims, filed Sept. 13, 2007) (prisoner action alleging improper release of medical records).

13   A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

14   *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

15   Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

16   *Matsushita,* 475 U.S. at 585-86 [citations omitted]; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....").

17   *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

18   *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

19   *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

20      *See* N.D.N.Y. L.R. 7.1(a)(3) ("The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statements of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."). To create a dispute of material fact, it is not sufficient that the non-movant merely challenge the veracity or form of one or more of the movant's supporting affidavits. *See Chemical Bank v. Hartford Acc. & Indem. Co.,* 82 F.R.D. 376, 378 (S.D.N.Y.1979); *Hofmann v. John Hancock Mu. Life. Ins. Co.,* 400 F.Supp. 827, 831, n. 5 (D.Md.1975).

21      *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

22      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ( "A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment be "made *and supported* as provided in this rule") [emphasis added].

23      *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

24      N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

25      *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2 (N.D .N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

26    *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b] [3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

27    *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that *Fed.R.Civ.P. 56* does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

28    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted].

29    *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

30    (Dkt. No. 29, at 11 [Plf.'s Am. Compl.].)

31    *Fed.R.Civ.P. 56(e)* ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

32    *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief .... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

33    *See Fed.R.Civ.P. 56(e)* (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

34    *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

35    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

36    (*See, e.g.,* Dkt. No. 55, at 5-6 [Defs.' Mem. of Law, arguing that Plaintiff's Amended Complaint has failed to state a claim of conspiracy to violate his Eighth Amendment rights because it fails to allege facts plausibly suggesting that any Defendant conspired with a private party].)

37    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis*] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

38    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

39    *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370

(S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

40    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

41    *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

42    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

43    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

44    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

45    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions except from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz.* *See, e.g., Salvador v. Adirondack Park Agency of the State of N. Y.,* No. 10-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001 ] ).

46    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

47    I note that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way diminished by the Supreme Court's subsequent decision in *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). In *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not deserve mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. The decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from

hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not also allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

48  *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

49  *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

50  *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

51  "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

52  *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

53  *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

54  *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

55  *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M .J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV0912, 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

56  *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[T]he obligation to construe the pleadings of pro se litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

57  *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ) ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition

cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

58  *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

59  *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 04-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

60  *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *5 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) ("Since the only relief sought herein is compensatory and punitive monetary relief, Plaintiff's claims against all Defendants in their official capacities should be dismissed.").

61  *See Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66 (2d Cir.1976); *Orafan v. Goord,* 411 F.Supp.2d 153 (N.D.N.Y.2006) (Magnuson, J.), *vacated and remanded on other grounds sub nom., Orafan v. Rashid,* No. 06-2951, 249 F. App'x 217 (2d Cir. Sept.28, 2007).

62  *See Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976) ("Simply joining corporate officers as defendants in their individual capacities is not enough to make them persons separate from the corporation in legal contemplation. The plaintiff must also allege (and prove) that they acted other than in the normal course of their corporate duties ....") [internal quotation marks omitted] [citing *Cole v. Univ. of Hartford,* 391 F.Supp. 888, 893 (D.Conn.1975) ].

63  *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

64  *Hafer,* 502 U.S. at 25 [emphasis in original, and citation omitted].

65  *See also Orafan v. Goord,* 95-CV-0318, Order, at 3 (N.D.N.Y. filed Nov. 17, 2003) (Magnuson, J.) (clarifying that "Plaintiff's claims for declaratory and injunctive relief against Defendants Goord, Portuondo, Bennett, Duncan and Donnelly ... [are] reinstate[d]").

66    I note that Defendants also briefly challenge the second element of the above-stated three-part test when they argue (in passing) that Plaintiff has failed to adduce record evidence establishing that the "verbal harassment" to which he was subjected (at some point between October 21, 2003, and December 5, 2003) was anything more than *de minimis*. (Dkt. No. 55, at 9 [Page "7" of Defs.' Memo. of Law].) However, I do not even liberally construe Plaintiff's Amended Complaint as alleging facts plausibly suggesting that the adverse action taken by Defendants against Plaintiff included this vaguely identified "verbal harassment." (Dkt. No. 29, ¶¶ 52-54 [Plf.'s Am. Compl.].) Rather, I liberally construe Plaintiff's Amended Complaint as alleging facts plausibly suggesting that this adverse action consisted solely of the alleged assault on December 5, 2003. (*Id.*) Plaintiff asserts allegations of the referenced "verbal harassment" only to show that Defendants *knew* (before December 5, 2003) that Plaintiff had participated in *Clarkson v. Coughlin*, 91-CV-1792 (S.D.N.Y.). This reading of Plaintiff's Amended Complaint is confirmed by Paragraph 13 of his Rule 7.1 Response. (Dkt. No. 67, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response, asserting, "The plaintiff did not note the date of such harassment as it occurred frequently (a part of being in prison) and it is not a focal point of the claims. It is only given for historic purposes and its cumulative effect."].) Finally, even if Plaintiff's Amended Complaint were construed as including a claim that Defendants retaliated against Plaintiff by subjecting him to the referenced "verbal harassment" (and the unnecessary "frisk" searches referenced in Paragraph 53 of his Amended Complaint), I would agree with Defendants that Plaintiff has failed to adduce record evidence establishing that those particular actions were anything more than *de minimis*. I would also find that Plaintiff has failed to adduce record evidence establishing a *causal link* between his participation in *Clarkson v. Coughlin* and that adverse action, for the reasons stated below.

67    (Dkt. No. 54, Part 8, ¶¶ 1-14 [Defs.' Rule 7.1 Statement, providing accurate record citations].)

68    This is not surprising since, in his Memorandum of Law, Plaintiff indicates that he is "conced[ing]" Defendants' factual assertions (except for their assertion that they did not know of Plaintiff's litigation activity before December 5, 2003). (Dkt. No. 67, Part 2, at 2-3 [Pages "1" to "3" of Plf.'s Memo. of Law].)

69    For example, this Court has rather consistently enforced Local Rule 7.1(a)(3) (and its predecessor, Local Rule 7.1[f] ), by deeming facts set forth in a moving party's statement to have been admitted where the party opposing party has failed to properly respond to that Statement-even where the opposing party was proceeding *pro se* in a civil rights case. *See, e.g., DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.) (*pro se* civil rights case); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1, n. 1 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.) (*pro se* civil rights case); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV-1812, 1998 WL 566773, at *1, n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.) (*pro se* civil rights case); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1[a][3], in *pro se* civil rights case).

70    *See, supra,* note 28 of this Report-Recommendation.

71    (Dkt. No. 54, Part 1 [Defs.' Notice of Motion].)

72    (Dkt. No. 56, 60 [Orders extending Plaintiff's time to respond to Defs.' Motion].)

73    *See, supra,* note 27 of this Report-Recommendation.

74    (*Compare* Dkt. No. 54, Part 8, ¶ 11 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response, admitting asserted facts].) *See also Clarkson v. Coughlin,* 91-CV-1792, Plf.'s "Reply Memorandum" (S.D.N.Y. filed Oct. 21, 2003) (civil rights class action).

75    (*Compare* Dkt. No. 54, Part 8, ¶ 12 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, failing to cite any admissible record evidence establishing referenced knowledge by Defendants, and citing only unspecified allegation of such knowledge contained in Plaintiff's Amended Complaint].) To the extent that Plaintiff is attempting to cite the allegation contained in Paragraph 19 of his Amended Complaint, that allegation (though sworn) does not constitute evidence sufficient to create a dispute of fact, since the allegation was based only on Plaintiff's "information and belief," not on his personal knowledge. (Dkt. No. 29, ¶ 19 & Verification [Plf.'s Am. Compl.].) *See also, supra,* note 32 of this Report-Recommendation. To the extent that Plaintiff is attempting to cite the allegation contained in Paragraphs 52 and 53 of his Amended Complaint, that allegation (though sworn) does not constitute evidence sufficient to create a dispute of fact, since the allegation is so vague as to be entirely conclusory. (Dkt. No. 29, ¶¶ 52-53 [Plf.'s Am. Compl.].) *See also, supra,* notes 33-34 of this Report-Recommendation. In particular, the allegation is vague as to when the alleged harassment occurred and who committed the harassment. (*Id.*) In any event, even if the allegation were deemed to be sufficiently specific, the allegation actually asserts that the offending correctional officers told Plaintiff that they would "continue to do as they pleased" regardless of whether or not he won his lawsuit, indicating there was no causal connection between Plaintiff's protected activity and the adverse actions. (*Id.* at ¶ 53.) Finally, it should be noted that the record evidence to which Plaintiff cites in his Opposition Memorandum of Law-i.e., Exhibit C to his Opposition Affidavit-does not create a dispute of material fact on the issue of whether Defendants knew

about Plaintiff's litigation activity before December 5, 2003. (*See* Dkt. No. 67, Part 1, at 27-29 [Ex. C to Plf.'s Opp. Affid., attaching misbehavior reports issued to Plaintiff on Nov. 19, 2003, by "C. La Croix," and on Dec. 2, 2003, by "R. Bardin".].)

76    (*Compare* Dkt. No. 54, Part 8, ¶¶ 13-14 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶¶ 13-14 [Plf.'s Rule 7.1 Response, failing to specifically deny each of the facts asserted in these two paragraphs and, in any event, citing only pages 24 and 25 of his deposition transcript in support of his implicit denial of certain of those facts].) Pages 24 and 25 of Plaintiff's deposition transcript do *not* constitute evidence that, before December 5, 2003, Defendants harassed Plaintiff *because* he had participated in the lawsuit of *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.). Rather, those pages contain, in pertinent part, the following testimony: "When I started [filing] the grievance and the lawyers started coming and taking the deposition [Defendants and other officers from the law library] started harassing me.... I was coming back from the law library ... [and] then they would take me off the line [and] search me, and [the *other* correctional officers] would always say stuff sarcastic to me [about prisoner lawsuits]." (Dkt. No. 54, Part 5, at 24-25 [Ex. A to Roth Affid., attaching pages 24 and 25 of Plf.'s Depo. Trans.] [emphasis added].) I will assume that by "grievance," Plaintiff meant to say "contempt motion." In any event, again, there is no record evidence that any Defendant in this action *knew* of Plaintiff's participation in *Clarkson v. Coughlin,* at any time before December 5, 2003. I note that it *appears* unlikely that the deposition to which Plaintiff refers in fact occurred before December 5, 2003. That deposition occurred not in *Clarkson v. Coughlin,* but the related proceeding of *Medina v. NYS DOCS,* 03-CV-9249 (S.D.N.Y.); and that related proceeding was not even *filed* until November 21, 2003. *See Clarkson v. Coughlin,* 91-CV-1792, Order (S.D.N.Y. filed Nov. 17, 2003) (directing that Plaintiff's request for Order of contempt should be granted separate docket number and filed as separate proceeding); *Medina v. NYS DOCS,* 03-CV-9249, Plf.'s Notice of Motion (S.D.N.Y. filed Nov. 21, 2003). Finally, I note that the two misbehavior reports adduced by Plaintiff as Exhibit C to his Opposition Affidavit also do not constitute evidence that Defendants took adverse action against Plaintiff as a result of his having engaged in protected activity, since those misbehavior reports were issued by correctional officers other than Defendants in this action, and because the reports in no way mention any Defendant in this action. (*See* Dkt. No. 67, Part 1, at 27-29 [Ex. C to Plf.'s Opp. Affid., attaching misbehavior reports issued to Plaintiff on Nov. 19, 2003, by "C. La Croix," and on Dec. 2, 2003, by "R. Bardin".].)

77    (*Compare* Dkt. No. 54, Part 8, ¶ 1 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶ 1 [Plf.'s Rule 7.1 Response, admitting that Defendant Hunt escorted Plaintiff from his cell but merely *challenging the credibility* of Defendant Hunt's sworn statement that, to the best of his recollection, he did so because he had been ordered to do so by Hearing Lieutenant DiBiase so that Plaintiff could attend a disciplinary hearing].) To create a dispute of material fact, it is not sufficient that the non-movant merely challenge the veracity of the movant's supporting affidavit. *See Chemical Bank v. Hartford Acc. & Indem. Co.,* 82 F.R.D. 376, 378 (S.D.N.Y.1979). Furthermore, I note that Defendant Hunt's sworn statement is, indeed, supported by Paragraphs 2 through 4 of his Declaration and his Response to Plaintiff's Interrogatory No. 12. (Dkt. No. 54, Part 7, ¶¶ 2-4 [Hunt Decl.]; Dkt. No. 67, Part 1, at 16 [Ex. A to Plf.'s Opp. Papers, attaching Defendant Hunt's response to Plaintiff's Interrogatory No. 12].) Finally, I note that the two misbehavior reports adduced by Plaintiff as Exhibit C to his Opposition Affidavit actually bolster Defendant Hunt's sworn assertion that he had been ordered to bring Plaintiff to the facility's "courthouse" so that he could attend a disciplinary hearing on a misbehavior report that he had previously received. (*See* Dkt. No. 67, Part 1, at 27-29 [Ex. C to Plf.'s Opp. Affid., attaching misbehavior reports issued to Plaintiff on Nov. 19, 2003, by "C. La Croix," and on Dec. 2, 2003, by "R. Bardin".].)

78    (*Compare* Dkt. No. 54, Part 8, ¶ 2 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response, failing to deny any factual assertion contained in this paragraph except whether it was Defendant Hunt's idea that Defendant Sprague watch Plaintiff, or whether that was Defendant Sprague's idea-which fact is not material to Defendants' motion].) I note that the fact that Defendant Hunt did not leave Plaintiff alone but left Plaintiff with Defendant Sprague is supported by Paragraphs 3 and 4 of Defendant Hunt's declaration, and by an Interdepartmental Report authored by Defendant Hunt. (Dkt. No. 54, Part 7, ¶¶ 3-4 [Hunt Decl.]; Dkt. No. 67, Part 1, at 23-24 [Ex. B to Plf.'s Opp. Papers, attaching Interdepartmental Report from Defendant Hunt to Lt. Gosselin, dated December 5, 2003].)

79    (*Compare* Dkt. No. 54, Part 8, ¶¶ 3-4 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶¶ 3-4 [Plf.'s Rule 7.1 Response, admitting asserted facts].) I note that the very fact that Defendant Sprague had to ask Plaintiff his name is consistent with the fact that Defendant Sprague did not know that Plaintiff had participated in *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.).

80    (*Compare* Dkt. No. 54, Part 8, ¶ 6 [Defs.' Rule 7.1 Statement, providing accurate record citations] *with* Dkt. No. 67, Part 1, ¶ 6 [Plf.'s Rule 7.1 Response, admitting the bulk of the facts asserted in this paragraph, and only asserting that he was justified in grabbing the referenced baton-which fact is not material to this portion of Defendants' motion, which

regards whether Defendants took the action they did because Plaintiff had participated in *Clarkson v. Coughlin,* 91-CV-1792 (S.D.N.Y.) or because of other reasons].) I note that, in addition to being supported by Paragraph 27 of Plaintiff's verified Complaint, and pages 35 through 39 of Plaintiff's deposition transcript, the referenced fact is supported by the Interdepartmental Reports authored by Defendants Hunt, Sprague, and Michael. (Dkt. No. 67, Part 1, at 23-26 [Ex. B to Plf.'s Opp. Papers, attaching Interdepartmental Reports from Defendants Hunt, Sprague, and Michael to Lt. Gosselin, dated December 5, 2003].)

81    (Dkt. No. 54, Part 8, ¶¶ 1-14 [Defs.' Rule 7.1 Statement, providing accurate record citations].)

82    *See, supra,* note 75 of this Report-Recommendation.

83    *See, supra,* note 77 of this Report-Recommendation.

84    *See, supra,* note 78 of this Report-Recommendation.

85    *See, supra,* note 79 of this Report-Recommendation.

86    *See, supra,* note 80 of this Report-Recommendation.

87    (*Compare* Dkt. No. 65, Part 7, ¶ 4 [Hunt Decl., swearing that "I did not ... conspire with anyone to escort plaintiff [to the facility courthouse] for the purpose of subjecting him to force of any kind" *with* Dkt. No. 29, ¶ 19 [Plf.'s Am. Compl., alleging that Defendant Hunt conspired with the other Defendants to cause the alleged assault based "[u]pon information and belief"].) A sworn allegation does not constitute evidence sufficient to create a dispute of fact, where (as here) that sworn allegation is based upon only the declarant's "information and belief," not on his personal knowledge. *See also, supra,* note 32 of this Report-Recommendation.

88    (Dkt. No. 54, Part 8, ¶ 6 [Defs.' Rule 7.1 Statement, citing page 36 of Plaintiff's deposition transcript].)

89    Specifically, in his deposition, Plaintiff testified as follows: "There was [sic] only three officers involved [in the assault on December 5, 2003]. [Defendant] Hunt is trying to say he was involved in this. He wasn't there at all. Once he placed me against the wall, he left. That was the only of his involvement in this [sic]. It was Sprague, [Boyea] and ... Michael. Those are the only three involved in the incident." (Dkt. No. 54, Part 5, at 33 [Ex. A to Roth Affid., attaching page 33 of Plaintiff's deposition transcript.)

90    (Dkt. No. 29, ¶¶ 17, 20, 46 [Plf.'s Am. Compl.].)

91    (Dkt. No. 67, Part 1, at 15-17 [Ex. A to Plf.'s Opp. Papers, attaching Defendant Hunt's response to Plaintiff's Interrogatory Nos. 11 and 17]; Dkt. No. 67, Part 1, at 22 [Ex. B to Plf.'s Opp. Papers, attaching Misbehavior Report against Plaintiff authored by Def. Sprague, dated Dec. 5, 2003]; Dkt. No. 67, Part 1, at 23-26 [Ex. B to Plf.'s Opp. Papers, attaching Interdepartmental Reports from Defendants Hunt, Sprague, and Michael to Lt. Gosselin, dated December 5, 2003].) I note that conspicuously missing from Defendant Hunt's affidavit is any sworn assertion that he was not, in fact, present during the use of force against Plaintiff on December 5, 2003, or that he did not use any force at all against him at that time. (*See generally* Dkt. No. 54, Part 7 [Hunt Decl.].)

92    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

93    (*See, e.g.,* Dkt. No. 16 [Pretrial Scheduling Order filed Aug. 9, 2006, establishing six and-a-half months until expiration of discovery period, on Feb. 28, 2007]; Dkt. No. 18 [Order filed Sept. 6, 2006, extending discovery deadline to Apr. 27, 2007]; Dkt. No. 27 [Order filed May 10, 2007, extending discovery deadline to June 8, 2007]; Dkt. No. 32 [Order filed June 21, 2007, extending plaintiff's time to seek discovery from Def. Boyea through Aug. 22, 2007]; Dkt. No. 63 [Order filed Feb. 11, 2008, granting in part Plaintiff's motion to compel discovery].)

94    (*See* Dkt. No. 64 [Order filed Feb. 15, 2008, granting Plaintiff an extension of time by which to file his opposition to Defendants' motion].) I note this action has been pending now since October 3, 2005, long past the eighteen months

envisioned by Congress when the Civil Justice Reform Act of 1990 was passed. *See Adelman v. Hobbie,* 03-CV-0032, 2006 WL 2639359, at *8 (N.D.N.Y. Sept.13, 2006) (Sharpe, J., adopting Report-Recommendation by Treece, M.J.) (dismissing *pro se* civil rights action for failure to prosecute under Rule 41[b] in part because "[o]ver three years has passed since this litigation was commenced, well past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was instituted").

95    It should be noted that, under the Local Rules of Practice for this Court, when a party files a dispositive motion (such as a motion for summary judgment), the non-moving party is afforded an opportunity to file an opposition or "response," and then the moving party is afforded an opportunity to file a "reply." N.D.N.Y. L.R. 7.1(b)(1). "A surreply [by the non-moving party] is not permitted." *Id.* This rule is not a mere technicality, but a well-reasoned procedure premised, in part, on the fact that it is the movant who is shouldered with the ultimate burden on the motion and who therefore should be (for reasons of judicial efficiency and simple fairness) afforded the last word on the motion.

96    *See, supra,* note 92 of this Report-Recommendation.

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 8492472
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Hasan Mohamed, Plaintiff,
v.
M. Powers, et al., Defendants.

9:14-CV-1389 (TJM/TWD)
|
Signed 12/10/2015

**Attorneys and Law Firms**

Hasan Mohamed, 09-A-0677, Fishkill Correctional
Facility, P.O. Box 1245, Beacon, New York 12508, pro se.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior United States District
Judge

**\*1 I. INTRODUCTION**

Plaintiff Hasan Mohamed commenced this action by filing
a pro se civil rights complaint pursuant to 42 U.S.C.
§ 1983 (" Section 1983"), together with an application
to proceed in forma pauperis ("IFP application"). Dkt.
No. 1 ("Compl."), Dkt. No. 5 ("IFP Application").
By Decision and Order filed on January 21, 2015, the
Court granted plaintiff's IFP application, but found that
plaintiff's claims were barred by the three-year statute
of limitations applicable to claims under § 1983, and
therefore subject to dismissal pursuant to 28 U.S.C. §
1915(e)(2)(B) and 28 U.S.C. § 1915A. Dkt. No. 7 (the "
January Order"). In light of his pro se status, plaintiff was
afforded an opportunity to submit an amended complaint
with facts demonstrating why his claims are timely, or
if untimely, why the Court should toll the applicable
limitations period. Id. at 9. On February 23, 2015, plaintiff
filed an amended complaint. Dkt. No. 8. In a Decision
and Order filed on April 6, 2015, the Court dismissed
plaintiff's action as time-barred, Dkt. No. 9 (the "April
Order"), and Judgment was entered. Dkt. No. 10. Plaintiff
appealed the Judgment and on September 22, 2015, the
Second Circuit vacated the dismissal and remanded the
matter to the Court for "factual findings on the length
of the administrative exhaustion period, its effect on the

applicable statute of limitations, and such further action
as may be appropriate." Dkt. No. 16. On September 23,
2015, the Court issued an Order directing plaintiff to
file a second amended complaint with, "facts sufficient
for the Court to determine the period during which the
statute of limitations on plaintiff's claims was tolled as
he exhausted his administrative remedies." Dkt. No. 17.
Currently before the Court is plaintiff's second amended
complaint. Dkt. No. 18.

**II. Legal Standard**

The legal standard governing the dismissal of a complaint
for untimeliness pursuant to 28 U.S.C. §§ 1915(e)(2)(B)
and 1915A was discussed at length in the January Order
and will not be restated here. See January Order at 8-10.

**III. Review of the Second Amended Complaint** [1]

Taking into account plaintiff's pro se status, the Court
construes the allegations in plaintiff's second amended
complaint with the utmost leniency. See, e.g., Haines v.
Kerner, 404 U.S. 519, 521 (1972) (holding that a pro
se litigant's complaint is to be held "to less stringent
standards than formal pleadings drafted by lawyers."). On
August 5, 2011, plaintiff received a misbehavior report,
prepared by defendant Sergeant M. Powers ("Powers").
See Sec. Am. Compl. at 3. The report listed the incident
date as August 4, 2011 and the location was described
as "facility compound." See id. In the report, Powers
described the incident as follows:

> **\*2** ... on 08/03/11, you inmate Mohamed
> Hassan, persuaded several members of the Muslim
> Community to refuse participation in the Ramadan
> evening services of 08/03/11. Your actions put's [sic]
> you in violation of rule 104.12 that states "you shall
> not lead, organize or urge others to participate in any
> action which may be detrimental to the order of the
> facility."

Dkt. No. 18-1 at 2.

As a result of the misbehavior report, a Tier III
Superintendent Hearing commenced on August 10, 2011
with defendant, D. Phelix ("Phelix") presiding. See Sec.
Am. Compl. at 3. Plaintiff objected to the misbehavior
report and argued that it was vague and incorrect and
thus, failed to provide proper notice. See id. at 4. On
August 17, 2011, plaintiff was found guilty of violating

Case 9:15-cv-00006-BKS-TWD   Document 61   Filed 07/10/17   Page 172 of 282

the DOCCS rule related to demonstrations. *See id.* at 8. Plaintiff was sentenced to six months in the Special Housing Unit ("SHU"), loss of recreation, commissary, packages and phone privileges. Phelix also recommended a six month loss of good time. *See id.*; Dkt. No. 18-1 at 8. Plaintiff was confined to the SHU for 115 days and deprived of commissary, recreation, library, phone privileges and the right to worship. *See* Sec. Am. Compl. at 10. During his SHU confinement, plaintiff was confined to his cell for twenty-three hours each day and received smaller portions of food. *See id.*

On September 6, 2011, plaintiff filed an appeal of his Tier III disposition. *See* Sec. Am. Compl. at 10; Dkt. No. 18-1 at 9. On September 29, 2011, plaintiff wrote to the Director of Special Housing for the status of his appeal. *See* Dkt. No. 18-1 at 18. On October 5, 2011, plaintiff received a letter from Albert Prack ("Prack") advising that an appeal was not received. *See id.* at 20. Therefore, the September 29, 2011 letter was accepted as an appeal and plaintiff was afforded the opportunity to submit supplementary material. *See id.* On October 25, 2011, plaintiff re-submitted his appeal. *See id.* at 22. On November 15, 2011, the decision rendered at the August 2011 hearing was reviewed and reversed. *See* Dkt. No. 18-1 at 30.

Construed liberally, the second amended complaint contains the following claims: (1) Powers prepared a "false business record;" (2) defendants violated plaintiff's due process rights under the Fourteenth Amendment; (3) defendants denied plaintiff equal protection; and (4) the conditions of confinement violated plaintiff's Eighth Amendment rights. *See* Sec. Am. Compl. at 11. With respect to the timeliness issue, plaintiff, "has an aggregate of 90 days tolled, his exhaustion period extended from August 17, 2011 until November 15, 2011, which is the date of his administrative appeal". *See* Sec. Am. Compl. at 9.

## V. ANALYSIS

### A. Statute of Limitations

In the January Order, the Court discussed the statute of limitations for claims brought pursuant to § 1983:

In *Section 1983* actions, the applicable statute of limitations is the State's "general or residual [state] statute [of limitations] for personal injury actions[.]"

*Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, a three-year statute of limitations applies for personal injury actions and thus to *Section 1983* actions. *Id.*; *see also* N.Y. C.P.L.R. § 214(5). Although state law provides the relevant limitations period, federal law determines when a *Section 1983* action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (quotation omitted); *see also Covington v. City of New York*, No. 94 Civ. 4234, 916 F. Supp. 282, 285 (S.D.N.Y. Feb. 9, 1996) (quotation omitted) (same). "Thus, in determining when the statute begins to run, the proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful." *Covington*, 916 F. Supp. at 285 (quotation omitted).

**\*3** Dkt. No. 7 at 8.

Here, plaintiff's due process claims arise from a disciplinary hearing that concluded on August 17, 2011. After the hearing, Phelix sentenced plaintiff to SHU confinement and recommended a six month loss of good time. *See* Dkt. No. 18-1 at 8. "The Second Circuit has held that if the length of a plaintiff's confinement is affected by the result of a disciplinary hearing, the plaintiff's cause of action does not accrue until the guilty determination is reversed." *McEachin v. Drefus,* No. 06-CV-1489 (GLS/ GJD), 2008 W L 686812, at \*2 (N.D.N.Y. March 10, 2008) (*citing Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996)). Based upon the facts asserted in the second amended complaint and exhibits annexed thereto, the accrual date for plaintiff's procedural due process claims related to his disciplinary hearing occurred on November 15, 2011, the date when the disciplinary determination was reversed. *See* Dkt. No. 18-1 at 30; *see McEachin*, 2008 WL 686812, at \*2 (finding that because plaintiff suffered a recommended loss of good time, his cause of action accrued when the disciplinary determination was reversed on appeal). The statute of limitations expired on November 15, 2014 and thus, plaintiff's claims are not time-barred. *See* Dkt. No. 7 at 8.

### B. False Misbehavior Report

In the January Order, the Court dismissed plaintiff's claims based upon the filing of a false misbehavior report holding:

It is well settled that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982 (1988)); *accord, Pittman v. Forte*, No. 9:01-CV-0100 (LEK/GLS), 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002); *see also Santana v. Olson*, No. 07-CV-0098, 2007 WL 2712992, at *2 (W.D.N.Y. Sept. 13, 2007) ("[T]he filing of a false behavior report by a correctional officer does not state a claim for relief."). "The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing." *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (rejecting prisoner's "but for" argument as to guard who prepared misbehavior report but was not involved in Tier III hearing) (citation omitted).

Dkt. No. 7 at 12.

The Court has reviewed the second amended complaint and finds that plaintiff's claims related to the filing of a false misbehavior report suffer from the same infirmities as the original pleading. For the reasons set forth in the January Order, these claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

**C. Fourteenth Amendment**

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). " Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)); *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

**1. Liberty Interest**

**\*4** In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' ") (quoting *Sandin,* 515 U.S. at 484). W hen assessing the severity of the hardship imposed, a court should take into account both the duration and the conditions of the confinement, where appropriate. *See Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (finding that while not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*).

Specifically, while under certain circumstances confinement in the SHU of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon,* 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions,[2] for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz,* 380 F.3d at 654; *Colon,* 215 F.3d at 231. It is the length of the actual punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and not the length of the sentence imposed. *Scott v. Albury*, 156 F.3d 283, 287–88 (2d Cir. 1998) (" No right to due process is implicated in the prison context unless a liberty interest has been deprived, and we read *Sandin [v. Conner]* to

require that we look to actual punishment in making this determination.").

In order to state a viable cause of action for a violation of due process arising from the hearing, plaintiff must first plead facts to establish that he had a liberty interest in being free from confinement in the SHU. As a result of the disciplinary hearing, plaintiff was sentenced to six months in the SHU. *See* Sec. Am. Compl. at 8. In total, plaintiff was confined to the SHU for 115 days and that he suffered "atypical and substantial hardships." *See id.* at 10. At this juncture, plaintiff has sufficiently plead a liberty interest subject to due process protection.

### 2. Procedural Due Process

In the context of a prison disciplinary hearing, inmates possess due process rights under the Fourteenth Amendment, but "the full panoply of rights" due a defendant in a criminal proceeding does not apply. *Applewhite v. Sheahan*, No. 08-CV-6045, 2013 W L 144957, at *10 (W.D.N.Y. Jan. 11, 2013) (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)). The Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff*, 418 U.S. at 539. Specifically, with respect to a disciplinary hearing, the Fourteenth Amendment requires that (1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him; (2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals;" (3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken. *Id.* at 563-66.

**\*5** Construing the complaint liberally, plaintiff claims that during the course of his Tier III disciplinary hearing Phelix, the hearing officer, failed to provide plaintiff with documents necessary to present a defense, including a copy of the sign-out sheet for the B-2 Dorm for August 3, 2011. *See* Dkt. No. 18-1 at 4. Plaintiff also objected to the misbehavior report because it failed to provide plaintiff

with notice as required by 7 NYCRR § 251-3.1(c)(1)(2) (3). [3] *See id.* at 5; *see* Sec. Am. Compl. at 4, 6. Plaintiff also claims that Phelix improperly conducted "off the record" interviews of witnesses. *See* Dkt. No. 18-1 at 10.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's Fourteenth Amendment due process claim against Phelix survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed motion to dismiss or for summary judgment.

The Court reaches a different conclusion with respect to plaintiff's Fourteenth Amendment due process claim against Powers. Plaintiff does not have a constitutional protection against false testimony by a corrections officer at a hearing. *See Davis v. N.Y.*, No. 99-CV-0307, 1999 W L 1390247, at *2 (W.D.N.Y. Dec. 14, 1999) (holding that the alleged constitutional violations are based upon the conduct of the hearing not on the truth or falsity of any misbehavior report or testimony). Plaintiff's allegations against Powers do not implicate the due process in the proceeding itself and thus, are dismissed for failure to state a claim.

### D. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). " In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Chaney v. Koupash*, No. 04-CV-0126 (LEK/DRH), 2008 W L 5423419, at *20 (N.D.N.Y. Dec. 30, 2008) (citing *Myers v. Barrett*, No. 95-CV-1534 (RSP/GJD), 1997 W L 151770, at *3 (N.D.N.Y. Mar. 28, 1997)). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis f or the difference in treatment."

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir.2005).

Plaintiff fails to allege any facts to suggest how he was treated any differently than similarly situated inmates. Vague and conclusory allegations, are insufficient to plausibly suggest an equal protection violation. *See De Jesus v. Sears Roebuck & Co.*, Inc., 87 F.3d 65, 70 (2d Cir.1996); *see Byng v. Delta Recovery Servs., LLC.*, No. 13-0733 (MAD/ATB), 2013 WL 3897485, at *15, n. 5 (N.D.N.Y. July 29, 2013) (finding that Attica inmate alleged no facts in the complaint to indicate he was similarly situated to any one or that someone else was treated differently than he was). Accordingly, plaintiff's Fourteenth Amendment Equal Protection claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**E. Eighth Amendment – Conditions of Confinement**

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). T he Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir.1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.' " *Id.* (citation omitted). Although the Constitution does not mandate a comfortable prison setting, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Brown v. Doe*, No. 13 Civ 8409, 2014 W L 5461815, at *6 (S.D.N.Y. Oct. 28, 2014) (quoting, *inter alia, Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted). With respect to the subjective element,

plaintiff must "demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly*, 76 F.3d at 480 (citation omitted). To constitute deliberate indifference, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Walker*, 717 F.3d at 125.

In this case, plaintiff's alleged deprivations fall far short of satisfying the objective element of the Eighth Amendment. *See McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D.Conn. January 18, 2000) (holding that the totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation)); *see also Thomas v. Smith*, 559 F.Supp. 223, 224 (W.D.N.Y. 1983) (dismissing the complaint alleging unconstitutional denial of basic hygiene items such as deodorant, soap, shampoo while confined in Attica's SHU).

Moreover, even assuming plaintiff's allegations are sufficient to satisfy the objective prong of the Eighth Amendment analysis, the complaint lacks facts establishing which correctional officers were responsible or personally involved in the alleged unconstitutional conditions. It is well settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). Plaintiff has not sufficiently alleged that any defendant acted with a deliberate state of mind. *See Gaston v. Coughlin*, 249 F.3d 156, 157 (2d Cir. 2001). Consequently, plaintiff's Eighth Amendment claims related to his conditions of confinement are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim. *See Gomez v. Sepiol*, 2014 WL 1575872, at *9 (W.D.N.Y. April 11, 2014); *see also Toliver v. Dep't of Corrs.*, No. 10 Civ. 6298, 2012 W L 4510635, at *9 (S.D.N.Y. Apr.

10, 2012) (dismissing the deliberate indifference claim for failure to plead facts identifying a responsible official who acted with a sufficiently culpable state of mind).

## VI. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the claims that Powers filed a false misbehavior report and provided false testimony are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**\*7 ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) f or failure to state a claim upon which relief may be granted; (1) equal protection claims; (2) Fourteenth Amendment claims against Powers; and (3) Eighth Amendment claims based upon plaintiff's conditions of confinement; and it is further

**ORDERED**, that Powers is **DISMISSED** as a defendant herein; and it is further

**ORDERED**, that the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon remaining defendant. The Clerk shall forward a copy of the summonses and amended complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the complaint be filed by defendant, or his counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. Plaintiff is required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; plaintiff's failure to do so may result in the dismissal of this action; and it is further;

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 8492472

---

Footnotes

1   Plaintiff annexed exhibits to the second amended complaint including, *inter alia*, an Inmate Misbehavior Report, Hearing Disposition and copies of plaintiff's appeals of the decision rendered at a Tier III hearing. *See* Dkt. No. 18-1. To the extent that these documents are relevant to the incidents described in the second amended complaint, the Court will consider the exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference)

2   Under the "normal conditions of SHU confinement in New York," the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited. *Palmer v. Richards*, 364 F.3d 60, 65 n. 3 (2d Cir. 2004) (citation omitted).

3   7 N.Y.C.R.R. § 251-3.1 is entitled "Misbehavior Report." The relevant sections provide:
    (c) The misbehavior report shall include the following:
        (1) a written specification of the particulars of the alleged incident of misbehavior involved;
        (2) a reference to the inmate rule book number allegedly violated by the inmate, and a brief description of the rule;
        (3) the date, time and place of the incident
    7 N.Y.C.R.R. § 251-3.1

2015 WL 8492472

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Murray v. Arquitt, Not Reported in F.Supp.3d (2014)

2014 WL 4676569

2014 WL 4676569
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James O. MURRAY, III, Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate
Correctional Facility; Norman Bezio, Director
Special Housing, Inmate Disciplinary Programs,
New York State Department of Correctional
Services; B. Bogett, Correction Officer, Upstate
Correctional Facility; B. Clark, Correction
Officer, Upstate Correctional Facility; B. Fischer,
Commissioner, New York State Department
of Correctional Services; B. Grant, Correction
Officer, Upstate Correctional Facility; J. Herbert,
Sergeant, Upstate Correctional Facility; J. Laramay,
Lieutenant, Upstate Correctional Facility; F.
Manley; J. McGaw, Correction Officer, Upstate
Correctional Facility; Albert Prack, Acting Director
Special Housing, Inmate Disciplinary Program,
New York State Department of Correctional
Services; T. Ramsdell, Correction Officer, Upstate
Correctional Facility; D. Rock, Superintendent,
Upstate Correctional Facility; C. Rowe, Correction
Officer, Upstate Correctional Facility; Stanley
Tulip, Correction Officer, Upstate Correctional
Facility; Uhler, Deputy Supt. of Sec. Serv., all in
their Individual and Official Capacities, Defendants.

No. 9:10–CV–1440 (NAM/CFH).
|
Signed Sept. 17, 2014.
|
Filed Sept. 18, 2014.

**Attorneys and Law Firms**

James O. Murray, III, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**INTRODUCTION**

**\*1** Plaintiff, an inmate in the custody of the New
York State Department of Corrections and Community
Supervision ("DOCCS"), brought this *pro se* action under
42 U.S.C. § 1983. Defendants' motion for partial summary
judgment (Dkt. No. 103) was referred to United States
Magistrate Judge Christian F. Hummel for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c). In his Report–Recommendation
and Order (Dkt. No. 117) Magistrate Judge Hummel
recommends that the motion be granted.

Plaintiff has filed objections to the Report–
Recommendation and Order (Dkt. No. 124). Pursuant to
28 U.S.C. § 636(b)(1)(C), this Court reviews *de novo* those
parts of a report and recommendation to which a party
specifically objects. Where a party interposes only general
objections to a report and recommendation, the Court
reviews for clear error or manifest injustice. *See Davis v.
Chapple,* 2010 WL 145298, \*2 (N.D.N.Y. Jan. 8, 2010),
*Brown v. Peters,* 1997 WL 599355,\*2–\* 3 (N.D.N.Y.), *aff'd
without op., 175 F.3d 1007 (2d Cir.1999).* As set forth
below, the Court accepts the Report–Recommendation
and Order and grants the motion.

**STANDARD ON SUMMARY JUDGMENT MOTION**

Summary judgment is appropriate when there is no
genuine issue with regard to any material fact, and the
moving party is entitled to judgment as a matter of law.
*See Celotex Corp. v.Catrett,* 477 U.S. 317, 322 (1986).
Stated otherwise, summary judgment is appropriate
"[w]here the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party [.]"
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574, 587 (1986). When deciding a summary judgment
motion, the Court must "resolve all ambiguities and draw
all factual inferences in favor of the party opposing the
motion." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d
Cir.1999). Where, as here, the nonmovant is proceeding
pro se, the Court must read that party's papers liberally

and interpret them "to raise the strongest arguments that they suggest." *Id.* (citation omitted).

## DISCUSSION

Plaintiff raises two objections to the Report–Recommendation and Order. First, he objects to dismissal of the Eighth Amendment claims against Corrections Officer T. Ramsdell on the ground of lack of personal involvement. Officer Ramsdell testified at the Tier III hearing that when he arrived at the scene of the altercation in the infirmary, the use of force was over and all he did was "relieve the officers that were holding [plaintiff]." Officer Ramsdell further stated that plaintiff was then placed in a cell with no additional use of force. Officer Ramsdell's testimony is consistent with that of other corrections officers and the various reports of the incident. The Court agrees with Magistrate Judge Hummel that plaintiff's single conclusory statement at the Tier III hearing that at some point during the incident he saw Officer Ramsdell is insufficient under all the circumstances to raise a question of fact on excessive force or failure to intervene, particularly in light of plaintiff's deposition testimony that he named Officer Ramsdell as a defendant solely because his name appeared on the use of force report. Plaintiff's objection cites to no other evidence supporting his claim against Officer Ramsdell. On *de novo* review, reading plaintiff's papers liberally, interpreting them to raise the strongest arguments that they suggest, and resolving all ambiguities and drawing all factual inferences in plaintiff's favor, the Court grants summary judgment dismissing the Eighth Amendment claims against Officer Ramsdell for lack of personal involvement.

**\*2** Plaintiff's second specific objection to the Report–Recommendation and Order concerns the recommendation that summary judgment be granted dismissing the due process claims against the following defendants: Deputy Superintendent Uhler, who conducted the Tier III hearing; Director of Special Housing/Inmate Discipline Bezio; Acting Director of Special Housing/Inmate Discipline Albert Prack; Superintendent Rock; and Commissioner Brian Fischer. In his objection, plaintiff argues that his due process rights were violated at the Tier III hearing because Deputy Superintendent Uhler should have considered a videotape of plaintiff's medical examination on the day following the

alleged incident, and because the following people should have been called as witnesses: Lt. Laramy; Corrections Officers Ramsdell, Manley, and Bogett; Dr. Weisman; Inmates Robertson and Gillard. On *de novo* review, after reading the transcript of the Tier III hearing and reviewing the record, and giving plaintiff all the deference to which he is entitled as a *pro se* litigant, the Court finds as a matter of law that plaintiff was afforded due process at the Tier III hearing. Further, there is no basis to find personal involvement in any infringement of plaintiff's rights on the part of Director Prack, Superintendent Rock, or Commissioner Fischer.

In addition to the two above-discussed objections, plaintiff merely states that he "objects to the Report–Recommendation and Order in its entirety." In response to this general objection, the Court reviews the remaining issues for clear error or manifest injustice. There is no error or manifest injustice, and the Report–Recommendation and Order is accepted in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 117) is accepted; and it is further

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that summary judgment is granted dismissing all claims against the following defendants: Corrections Officer T. Ramsdell; Director Norman Bezio; Commissioner Fischer; Director Albert Prack; Superintendent Rock; and Deputy Superintendent Uhler; and it is further

ORDERED that summary judgment is granted dismissing the claims against Officer Tulip and Sergeant Herbert for allegedly filing false misbehavior reports against plaintiff; and it is further

ORDERED that all claims against all defendants in their official capacities are dismissed; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

2014 WL 4676569

IT IS SO ORDERED.

JAMES O. MURRAY, III,

Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate Correctional
Facility; NORMAN BEZIO, Director Special Housing,
Inmate Disciplinary Programs, New York State
Department of Correctional Services; B. BOGETT,
Correction Officer, Upstate Correctional Facility; B.
CLARK, Correction Officer, Upstate Correctional
Facility; B. FISCHER, Commissioner, New York State
Department of Correctional Services; B. GRANT,
Correction Officer, Upstate Correctional Facility; J.
HERBERT, Sergeant, Upstate Correctional Facility;
J. LARAMAY, Lieutenant, Upstate Correctional
Facility; F. MANLEY; J. McGAW, Correction Officer,
Upstate Correctional Facility; ALBERT PRACK,
Acting Director Special Housing, Inmate Disciplinary
Program, New York State Department of Correctional
Services; T. RAMSDELL, Correction Officer, Upstate
Correctional Facility; D. ROCK, Superintendent,
Upstate Correctional Facility; C. ROWE, Correction
Officer, Upstate Correctional Facility; STANLEY
TULIP, Correction Officer, Upstate Correctional
Facility; UHLER, Deputy Supt. of Sec. Serv., all in their
Individual and Official Capacities,

**\*3** Defendants. [1]

## REPORT–RECOMMENDATION AND ORDER [2]

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

Plaintiff *pro se* James O. Murray, III ("Murray"), an
inmate currently in the custody of the New York State
Department of Correctional and Community Supervision
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants, sixteen DOCCS employees,
violated his rights under the Eighth and Fourteenth
Amendments. Compl. (Dkt. No. 1). Presently pending
is defendants' motion for partial summary judgment
pursuant to Fed.R.Civ.P. 56. Dkt. No. 103. Murray
opposes. Dkt. No. 116. For the following reasons, it is
recommended that defendants' motion be granted.

## I. Background

The facts are related herein in the light most favorable
to Murray as the non-moving party. *See* subsection II(A)
*infra.* At all relevant times, Murray was an inmate at the
Upstate Correctional Facility ("Upstate").

## A. Assault—Plaintiff's Account

On December 3, 2009, Murray was experiencing chest
pains and requested emergency call out. Murray Dep.
(Dkt. No. 103–15) at 12–13. Non-party Nurse Travers
brought Murray to the infirmary for an EKG. Murray
Dep. at 14–18; Dkt. No. 103–11 at 15–16. At the
infirmary, medical personnel gave Murray an EKG
and concluded that Murray's symptoms resulted from
indigestion. Murray Dep. at 24–25; Dkt. No. 103–11
at 20. Non-party Dr. Weissman examined Murray and
concluded that there was nothing wrong with Murray.
Murray Dep. at 32.

Defendants and Corrections Officers Arquitt and Tulip
escorted Murray back to the cellblock. Murray Dep. at
32–33. Murray was handcuffed in the front and had on a
waist chain. *Id.* at 23; Dkt. No. 103–11 at 28; *see* Compl.
§§ 1–2. Tulip walked behind Murray and Arquitt walked
in front of Murray. Dkt. No. 103–11 at 63, 72; *see* Dkt.
No. 103–11 at 21. Murray contends that while Arquitt
was opening a door, Tulip hit him on the back the head.
Murray Dep. at 34–35; *see* Compl. §§ 1–2. Murray believes
Tulip then tackled him. Murray Dep. at 53. Murray
thought to go through the door because that area was
visible to a video camera. *Id.* at 35, 55; Dkt. No. 103–11 at
21. Several corrections officers arrived and proceeded to
assault Murray. Murray Dep. at 36. Specifically, Arquitt
twisted Murray's ankle. Dkt. No. 103–11 at 21.

Murray was then escorted to the infirmary holding pen.
Murray Dep. at 53–54. Murray alleged that, while still in
a waist chain and handcuffed, defendants assaulted him in
the holding pen. *Id.* at 51–52, 55; Dkt. No. 103–11 at
22. Specifically, Grant pressed down on Murray to the
point that Murray could not breathe. Murray Dep. at 52–
53. Murray reacted by trying to bite Grant's hand. *Id.*
at 66. The officers stood Murray up against a wall. Dkt.
No. 103–11 at 23. An unidentified officer ran a finger

down Murray's back, hit Murray in the kidney area, spun Murray around, and attempted to hit Murray with his knee. Murray Dep. at 57, 59–60. Murray brought his own knee upward to block his groin area. *Id.* at 60. The officer attempted to hit Murray a few times before Murray fell to the ground. *Id.* at 60–61. The officers proceeded to kick and hit Murray on the floor while calling Murray racial slurs. *Id.* at 63. Defendant Laramay told the officers to knock out Murray's teeth because of Murray's grievance activities. *Id.* at 67. The officers then sat Murray on a bench. *Id.* at 64. Defendant and Sergeant Hebert arrived, called Murray racial and religious slurs, stated "we'll kill you," and complained about the lawsuits and grievances that Murray had filed. *Id.* Hebert did not use force against Murray. *Id.* at 65.

**\*4** On December 4, 2009, Murray requested sick call. Murray Dep. at 72–73. On December 8, 2009, Murray was taken to the Alice Hyde Medical Center ("Alice Hyde") for medical treatment. *Id.* at 73. Murray alleged that at Alice Hyde, he received surgery, had a tube inserted into him to "suck[ ] the blood out," was prescribed pain medication, and was admitted for three to four days. *Id.* at 73–74. As a result of the assaults, Murray alleges that he sustained broken ribs, a collapsed lung, cuts, bruises, swelling, extreme pain in the back, neck, hip, shoulder, head, mental distress, fear of death, nightmares, flashbacks, sleeping problems, and depression. [3] Compl. ¶¶ 5–6.

### B. Assault—Defendants' Account

Defendants proffer a different account of the use of force incidents. Arquitt and Tulip were escorting Murray from the infirmary and as they approached the fire door, Murray turned around and kicked Tulip in the groin area. Dkt. Nos. 103–7 at 7 (misbehavior report), 8 (unusual incident report), 11 (use of force report), 20, 103–11 at 55, 75. Arquitt had turned his head slightly and saw Murray kicking Tulip. Dkt. No. 103–11 at 75. Murray continued kicking and the three men fell through the door and onto the ground. Dkt. No. 103–7 at 20. Tulip fell onto Murray in an attempt to control Murray's feet but became "incapacitated" and rolled on the ground. Dkt. No. 103–7 at 17; *see* Dkt. No. 103–11 at 55, 65–66. Murray attempted to bite Arquitt, who was at that point positioned around Murray's head and shoulder area. Dkt. No. 103–11 at 76.

Arquitt, along with defendants and Corrections Officers Bogett, Clark, and Grant, forced Murray to the floor using body holds. Dkt. No. 103–7 at 8, 11. Arquitt held down Murray's head with his left hand and applied pressure to Murray's left shoulder with his right hand. *Id.* at 8, 11, 20. Bogett controlled Murray's waist chain with his left hand and placed his left knee on Murray's back. *Id.* at 8, 11, 15. Clark bent Murray's left leg across the back side of the right leg then bent the right leg up into a figure four leg hold. *Id.* at 8, 11, 17.

Hebert arrived and ordered the officers to carry Murray into the infirmary holding pen because Murray was non-complaint. Dkt. No. 103–7 at 8, 11. Bogett grabbed Murray's shirt with his left hand and controlled Murray's right arm with his right hand. *Id.* at 8, 11, 15. Grant took control of Murray's left arm with both hands to carry him while Arquitt took Murray's legs in his left arms. *Id.* at 8, 11, 20–21. Clark attended to Tulip. *Id.* at 17.

Hebert was in the infirmary holding pen with Murray. Dkt. No. 103–7 at 6 (misbehavior report). Murray refused to comply with staff and attempted to bite and kick Grant. Dkt. Nos. 103–7 at 6, 8, 11, 21, 103–11 at 114. Hebert gave several direct orders to Murray but Murray refused to comply. Dkt. No. 103–7 at 6. Hebert ordered Bogett and Grant to take Murray to the ground and Grant pushed on Murray's upper body while Bogett held onto Murray's legs. Dkt. Nos. 103–7 at 11, 21, 103–11 at 97. Once Murray became complaint, Hebert ordered non-party Corrections Officer McGaw to videotape Murray in the holding pen. Dkt. Nos. 103–7 at 11, 103–11 at 106–07.

**\*5** Defendants and Corrections Officers Manley and Ramsdell responded to the incident, relieved Bogett and Grant, and escorted Murray to see medical personnel. Dkt. No. 103–7 at 18–19. Murray refused to remove his clothing. *Id.* at 8. Medical personnel examined Murray fully-clothed, and noted discoloration at the base of Murray's neck and minor lacerations over the right clavicular area, on and above the bridge of the nose and left eye, to the mid-lower lip, above and below the left eye, and on the anterior of the left ear. *Id.* at 8, 12–13. Defendant and Sergeant Rowe supervised Manley and Ramsdell escorting Murray to his cell block. *Id.* at 14, 18–19. Photographs were taken of Murray's injuries on December 3 and 4, 2009. Dkt. Nos. 103–7 at 8, 14, 27–29, 103–10. [4]

Grant and Tulip were transported to Alice Hyde. Dkt. No. 103–7 at 8, 103–9 at 19. Tulip had an injury to the groin and Grant had swelling in the left hand. Dkt. No. 103–7 at 8. Grant and Tulip were out of work for four days. Dkt. Nos. 103–7 at 14, 103–11 at 56. Tulip considered his injury was moderate to severe. Dkt. No. 103–11 at 56. Arquitt had pain in the middle finger and remained on duty. Dkt. Nos. 103–7 at 14, 103–9 at 18.

### C. Tier III Disciplinary Hearing and Appeals

On December 4, 2009, Murray received misbehavior reports from Hebert and Tulip. Compl. ¶ 8. Hebert charged Murray with violent conduct, interference with employee, and refusing direct orders. Dkt. No. 103–7 at 3. Tulip charged Murray with violent conduct, assault on staff, and interference with employee. [5] *Id.*

Murray was provided with non-party Corrections Officer Fish as an inmate assistant. Dkt. No. 103–7 at 5, 66. Fish met Murray on December 7, 2009. Dkt. No. 103–11 at 4. Fish denied Murray the videotape of the holding pen area for December 4, 2009. Dkt. No. 103–7 at 5. Murray's witness request list included: non-party Inmate Bonaparte; non-party Inmate Robertson; Arquitt; Clark; Grant; Hebert; Tulip; non-party Nurse Administrator Smith; and Travers. *Id.*

On December 17, 2009, defendant Captain Uhler commenced a Tier III disciplinary hearing that concluded on December 30, 2009. Dkt. Nos. 103–11 at 2, 103–12 at 88. Uhler stated that all documents generated from the use of force incidents were provided to Murray. Dkt. No. 103–11 at 9. Such documents included: unusual incident reports; use of force reports; to-and-from memoranda; log book entries; watch commander's log; and misbehavior reports. *Id.*

On December 21, 2009, Murray submitted a written complaint to Uhler. Dkt. No. 103–7 at 33–51. Murray asserts that he received inadequate inmate assistance, was denied the opportunity to present documentary evidence, and Uhler should not have conducted the hearing because Uhler had issued a restraint order against Murray and conducted the investigation. *Id.* at 33; Murray Dep. at 77. Uhler stated that he was not involved in the investigation of the charges. Dkt. No. 103–12 at 87.

### i. Documentary Evidence

**\*6** At the disciplinary hearing's inception, Murray asked for a copy of Directive # 4940, which provides that when an anticipated use of force incident occurs, a video camera would be dispatched to record the incident. Dkt. No. 103–11 at 6. Uhler explained that despite language in the Directive, the area sergeant was first obligated to secure and move Murray to an area that did not jeopardize the safety and security of the facility. *Id.* at 7.

Uhler explained that he would use his discretion in producing any grievances, complaints, and lawsuit correspondences that Murray had filed with respect to the assault incidents as well as medical reports of corrections personnel. Dkt. No. 103–11 at 4–6. Uhler stated there was a video recording of the area outside the infirmary but no recording of the area inside the door. *Id.* at 6. There was handheld camera footage of the escort to the holding pen then back to the prison block, which could be introduced. *Id.*

Uhler stated that the non-audio video recording of the infirmary shows a door abruptly opening with Tulip at one side of the door, bent over on his hands and knees. Dkt. No. 103–11 at 23–24. An officer assisted Tulip. *Id.* at 24. Four staff members tried to force Murray to the ground. *Id.* at 25. Uhler watched the video several times with Murray. *Id.;* Dkt. No. 103–12 at 73–74. Murray contends that Tulip was not in pain before coming out of that door. Dkt. No. 103–11 at 24. It is undisputed that the officers used force against Murray in the hallway but Uhler did not see anyone kicking or punching Murray. *Id.* at 25, 27. This incident lasted approximately one minute. *Id.* at 27–28.

Uhler denied Murray's videotape request of a medical exam that took place on December 4, 2009 because the videotape contained no evidence of the December 3, 2009 incidents. Dkt. No. 103–7 at 59.

### ii. Witnesses

Uhler proceeded to allow ten witnesses to testify. Arquitt, Grant, Hebert, and Smith testified. Dkt. Nos. 103–11 at 71, 96, 103–12 at 5–6, 65.

Bogett testified that he was walking to the infirmary area when he witnessed Murray kicking Tulip. Dkt. No. 103–12 at 43. Murray was on the ground when Bogett responded and Bogett assisted in controlling Murray by holding the waist chain. *Id.* Murray was removed from the area because it was not secure. *Id.* at 44. Bogett assisted in moving Murray to the holding pen and stood him up against a wall. *Id.* at 44–45. Murray attempted to bite Grant and struggled. *Id.* at 45. Hebert ordered Bogett to take down Murray and shortly thereafter Bogett was relieved. *Id.* at 45.

Bonaparte testified that before the December 3, 2009 incidents, he heard Gettman and other nurses talk to Murray, insinuating that Murray would be assaulted. Dkt. No. 103–12 at 48–50.

Clark testified that when he responded to the scene, Murray and other officers were on the ground, Murray was kicking his feet, and an officer was lying across Murray's legs. Dkt. No. 103–12 at 28. Clark did not carry Murray to the holding pen. *Id.* at 29. Clark testified that Murray was removed from that area, which was considered unsecured. *Id.* at 31, 35.

**\*7** Ramsdell testified that he did not use force on Murray. Dkt. No. 103–12 at 81. When Ramsdell arrived at the scene, the use of force incident was completed and he relieved the officers who held Murray. *Id.* at 82. Ramsdell did not witness the incident itself. *Id.*

Nurse Travers testified that based on Murray's complaints and symptoms on December 3, 2009, she ordered an EKG for Murray. Dkt. No. 103–11 at 39. Travers advised Murray that the nurse at the infirmary would give him an EKG and take a full set of his vital signs. *Id.* at 42. Travers did not speak with Tulip in the infirmary. *Id.* Tulip testified that he did not have a conversation with Travers in the infirmary where Travers stated, "I'd like to get a car started for this [Murray]." *Id.* at 53.

Uhler denied Murray's witness request for: (1) Laramay because he only responded to the first incident and assisted Tulip, was not present during the use of force incident, and did not give any orders to staff; (2) Manley because he was not present at either incident and was only directed to escort Murray following the incidents; (3) Dr. Weissman because she had retired, attempts to contact her were futile, and she was not present during the incidents; (4)

Robertson because he was on parole and stated that he did not want to testify; (5) non-party Inmate Gillard because he was contacted and declined to testify. [6] Dkt. Nos. 103–7 at 12, 14, 56–58, 103–12 at 58, 62–64. Uhler indicated he would allow Murray's request to question Rowe; however, Rowe was not produced. Dkt. No. 103–12 at 61–62.

### iii. Warnings

At the disciplinary hearing's inception, Murray asked to call his lawyer as a witness and Uhler denied that request, warning that "[o]utbursts and continued outbursts by yourself are going to result in me giving you a final warning and the next step will be I will remove you from this hearing." Dkt. No. 103–11 at 7–8. However, Uhler stated that his intent was not to remove Murray from the hearing. *Id.* at 8.

At one point, because Murray was having difficulty asking cogent questions, Uhler offered Murray additional time to formulate questions. Dkt. No. 103–11 at 68. Uhler explained that Murray "needed to prepare a defense" as Murray was "badgering" witnesses. *Id.* However, Murray declined the offer. *Id.* at 69–70. At another point, Uhler stated,

> I warned you on all three days that, do not state policy that's not true. And you expect me to ask the witness about a policy that doesn't exist. I'm not going to discredit staff, and belittle staff based on some makeup believe policy that you believe exists when I ruled on it already telling you it doesn't exist.

Dkt. No. 103–12 at 39.

During the inception of Bogett's testimony, Uhler ejected Murray, stating, "I am not going to continue you to stare down and try to intimate the witnesses of this hearing. I've explained this to you in detail, in detail, alright? So I'll have you removed from this hearing at this time." Dkt. No. 103–12 at 40. After Bogett's testimony, Uhler spoke with Murray and returned Murray to the hearing. *Id.* at 46.

### iv. Disposition and Appeals

**\*8** On December 30, 2009, Uhler issued a hearing disposition. Dkt. No. 103–7 at 4. Uhler relied on: reports written by Hebert and Tulip; review of two unusual incident reports; testimony from eight staff members and one inmate; and a video tape of the infirmary door area showing staff tackling Murray to the floor. *Id.* Uhler concluded that all staff testimony was consistent with each other and the video evidence. *Id.* Uhler considered Tulip's testimony that he had moderate to serious injuries from Murray's kicking and was out of work for four days per a doctor's order. *Id.* at 4, 14. Grant was out of work for four days as well. *Id.* at 14. Travers and Smith testified that care given was appropriate. *Id.* at 4. Further, Uhler considered testimonies that Murray had attacked staff. *Id.* Uhler wrote, "[t]his type of behavior will not be allowed. Inmate caused serious harm to staff and placed many others in grave danger." *Id.* A copy of the disposition was given to Murray. *Id.* Uhler ordered that Murray be placed in the Special Housing Unit ("SHU") [7] for sixty months. Compl. ¶ 9; Dkt. Nos. 103–7 at 3, 103–12 at 90–91. Uhler also gave Murray sixty months loss of privileges for packages, commissary, phone, and good time credits. Dkt. Nos. 103–7 at 3, 103–12 at 90–91.

On March 8, 2010, defendant Director of SHU/Inmate Discipline Bezio modified Murray's sentence to twenty-four months in SHU, to begin on June 28, 2014. Dkt. No. 103–6 at 2–3; Murray Dep. at 12. [8] By letter dated June 3, 2010, Murray's attorney at Prisoners' Legal Services sought reconsideration of the disciplinary hearing disposition. Dkt. No. 103–14 at 9–12. By letter dated August 18, 2010, defendant Acting Director of SHU/Inmate Disciplinary Programs Prack denied reconsideration. *Id.* at 13.

As of February 17, 2012, Murray has approximately seventeen years of prison time left to serve in SHU from other misbehavior reports. Murray Dep. at 11. Murray alleges that SHU confinement causes him mental distress. Compl. ¶ 15; Murray Dep. at 76. Murray does not seek reinstatement of good time credits. Compl. ¶ 16.

## II. Discussion

Murray alleges that his Eighth Amendment rights were violated when: (1) defendants Arquitt, Bogett, Clark, Grant, Hebert, Laramay, Manley, McGaw, Ramsdell, Rowe, and Tulip either used excessive force against him and failed to intervene on his behalf; (2) defendants Bezio and Prack exhibited deliberate indifference to his safety in denying his appeals; and (3) defendants Fischer and Rock exhibited deliberate indifference in failing to train subordinates. Compl. ¶¶ 2–7, at 27. Murray further alleges that his Fourteenth Amendment rights were violated when: (1) defendants Hebert and Tulip issued false misbehavior reports against him; (2) defendants Bezio, Prack, and Rock denied his appeals and failed to remedy the alleged constitutional violations; and (3) defendant Uhler failed to provide him with due process. *Id.* ¶¶ 8–13, 17, at 27. Murray seeks monetary damages and injunctive and declaratory relief. *Id.* at 28.

**\*9** Defendants seek summary judgment of certain claims, contending that Murray's: (1) claims against them in their official capacities for monetary damages are barred by the Eleventh Amendment; (2) Eighth Amendment claims against Ramsdell and Fourteenth Amendment claims against defendants Fischer, Prack, and Rock must fail because they were not personally involved in the alleged constitutional violations; (3) Fourteenth Amendment procedural due process claim against defendants Bezio, Fischer, Prack, Rock, and Uhler must fail because Murray received all process that was due; (4) Fourteenth Amendment claims against defendants Hebert and Tulip based on the filing of false misbehavior reports must fail; and (5) defendants Bezio, Fischer, Prack, Rock, and Uhler are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 103–16) at 4–5.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242,

248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*10** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

**B. Eleventh Amendment**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because Murray seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

**C. Personal Involvement**

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74

(2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*11**  (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [9]

### 1. Ramsdell

Murray has failed to establish the personal involvement of Ramsdell for the claims of excessive force and failure to protect. Murray believes that Ramsdell was present and assaulted him during the second incident on December 3, 2009 but does not know if Ramsdell had struck him. Contrary to Murray's assertion, Ramsdell testified that his involvement did not commence until he arrived at the scene after Bogett and Grant used force on Murray. Further, Ramsdell only escorted Murray to seek medical attention. Ramsdell's version of the events is consistent with use of force reports, unusual incident reports, and internal memoranda. *See* Dkt. Nos. 103–7 at 14, 18–19, 103–8, 103–9 at 1–5.

While "an [inmate']s 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims" Murray does not point to any record evidence establishing that Ramsdell was at scene of Murray's assault either before or during the time of the alleged use of excessive force. *De Michele v. City of New York,* No. 09–CV–9334 (PGG), 2012 WL 4354763, at \*16 (S.D.N.Y. Sept. 24, 2012) (citations omitted). [10] Despite Murray's conclusory and speculative assertions, it is fair to conclude that a rational factfinder could not find in

favor of Murray as the record is devoid of any evidence indicating that Ramsdell was present at either assault. *See, e.g., Coleman v. Hauck,* No. 09–CV–1391 (GTS) (GHL), 2012 WL 4480684, at \*9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene where Plaintiff was repeatedly struck and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied).

Furthermore, Murray failed to proffer any evidence showing that Ramsdell had "a realistic opportunity to intervene to prevent the harm from occurring." *De Michele,* 2012 WL 4354763, at \*17 (citing *inter alia Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)) (internal quotation marks omitted). As Murray does not provide even a scintilla of evidence that Ramsdell was present at the time of the alleged assaults, Murray cannot show that Ramsdell had directly participated in the assaults or failed to intervene in the misconduct. Moreover, Murray does not allege, and the record does not reflect the contrary, that Ramsdell had created a policy or custom under which unconstitutional practices occurred or was grossly negligent in his supervision. *Colon,* 58 F.3d at 873. Therefore, Murray cannot establish the personal involvement of Ramsdell in the alleged unconstitutional actions.

**\*12**  Accordingly, defendants' motion on this ground should be granted.

### 2. Fischer

Murray claims that Commissioner Fischer was negligent in managing his subordinates. The gravamen of Fischer's complaints against Fischer is that he was in a position of power, thus always involved with anything occurring in conjunction with Murray's incarceration. However, attempts to establish personal involvement based upon the supervisory role this defendant occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Drawing every favorable inference in Murray's favor, Murray contends that he notified Fischer of the alleged constitutional violations through letters and grievances. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

The only correspondence which referenced any involvement by Fischer was a letter addressed to Fischer from Murray for an extension to appeal the Tier III hearing disposition. Dkt. No. 103–14 at 4–5. A letter from Bezio explained to Murray that the letter was received and Murray's letter request satisfied the thirty-day time period for submitting an appeal. *Id.* at 3. Here, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Moreover, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement.

Accordingly, defendants' motion on this ground should be granted.

### 3. Prack

Murray claims that Prack violated his Fourteenth Amendment rights by denying his appeals and failing to remedy the alleged constitutional violations. The only correspondence referencing Prack's involvement is a

letter denying reconsideration of Bezio's reduced penalty for the disciplinary hearing. The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement. *See Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (discussing cases and concluding that affirming or modifying, as opposed to vacating and remedying, an allegedly constitutionally infirm disciplinary proceeding can satisfy various prongs of *Colon* and, regardless of *Iqbal's* impact on the *Colon* factors, results in a constitutional violation of which the defendant had knowledge, failed to remedy, and allowed to continue). However, as discussed *infra,* Murray's disciplinary hearing passes constitutional muster. As such, Murray cannot establish Fourteenth Amendment due process claims against Prack based on the affirmance of a constitutional disciplinary hearing.

 **\*13**  Accordingly, defendants' motion on this ground should be granted.

### 4. Rock

Lastly, Murray contends that Superintendent Rock violated his Fourteenth Amendment by denying his appeals, failing to remedy the alleged constitutional violations, and failing to train subordinates. The record is devoid of any reference to Rock's personal involvement. Before the Court is a superintendent decision dated January 25, 2010 that denied Murray's grievance. Nevertheless, that decision was signed by Deputy Superintendent Otis, not Superintendent Rock. As previously discussed, it is within the purview of a superior officer to delegate responsibility to others. *See Vega,* 610 F.Supp.2d at 198 (citation omitted). As such, Murray has failed to establish Rock's personal involvement in the alleged due process violations. *Colon,* 58 F.3d at 873.

Accordingly, defendants' motion on this ground should be granted.

### D. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize

2014 WL 4676569

that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*14** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed

record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F .3d at 65–66).

Defendants contend that Murray has failed to show the deprivation of a liberty interest because he has yet to serve the assigned SHU time. Courts in this District have held that where the plaintiff had not yet served the sentence imposed at the time he filed his complaint, the Court is unable to determine whether the confinement conditions of SHU were atypical or significant. *See, e.g., Chavis v. Kienert,* No. 03–CV–0039 (FJS/RFT), 2005 WL 2452150, at \*12 (N.D .N.Y. Sept. 30, 2005). However, Murray was sentenced to twenty-four months of SHU confinement, which amounts to 730 days. This length of confinement is sufficient to establish atypicality. *Palmer,* 364 F.3d at 64. Even though Murray has yet to serve the penalty, he is scheduled to serve it on June 28, 2014, and there is no evidence before the Court indicating otherwise. Given the length of the sentence and the imminent date for commencement of that sentence, the Court is not persuaded that Murray has failed to establish a liberty interest for purposes of his procedural due process claims. *Cf. Benitez v. Mailloux,* No. 05–CV–1160, 2009 WL 1953847, at \*10–11 (N.D.N.Y. Mar. 25, 2005), *report and recommendation adopted in part, rejected in part on other grounds,* No. 05–CV–1160 (NAM/RFT), 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (concluding no liberty interest in 2009 when sentence was to be served in 2012). As such, the Court proceeds with the understanding that Murray has in fact established a liberty interest.

**\*15** Defendants alternatively argue that Murray's procedural due process claims against defendants Bezio, Fischer, Prack, Rock, and Uhler should be dismissed

because Murray was given all process that was due. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, the issue of a written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. *Wolff,* 418 U.S. at 563–64. Murray was provided with a written notice of the Tier III disciplinary hearing. On December 4, 2009, Murray received the misbehavior reports authored by Hebert and Tulip. Those reports charged Murray with violent conduct, interference with employee, and refusing direct order, and assault on staff for the December 3, 2009 incidents. The disciplinary hearing commenced on December 17, 2009. As such, Murray was provided with written advance notice. *Sira,* 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Murray contends that he was deprived of an opportunity to call all witnesses and present certain documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted). Uhler permitted ten individuals to testify at Murray's disciplinary hearing. Gillard and Robertson did not testify because they declined to do so and Murray has not alleged, and the record does not reflect the contrary, that intimidation by prison officials resulted in the witnesses' refusals. *Webb v. Selsky,* No. 01–CV–149S, 2008 WL 796179, at *6 (W.D.N.Y. Mar. 24, 2008) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.") (citing *Johnson v. Doling,* No. 05–CV–376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y.Oct.17, 2007)). There is nothing in the record indicating that either Gillard or Robertson would have provided evidence favorable to Murray beyond what was given by Bonaparte. *Livingston v. Kelly,* 423 F. App'x 37, 40 (2d Cir.2011) (citation omitted). Furthermore, while Laramay, Manley, Weissman, and Rowe did not testify, they did not observe what transpired during the use of force incidents on December 3, 2009. Thus, their testimonies would not assist Uhler in arriving at a decision regarding the appropriateness of the misbehavior reports.

**\*16** The same is true for the evidence which was denied. Uhler denied Murray's request to watch footage of Murray on December 4, 2009 because it was irrelevant to the events on December 3, 2009. Further, Murray was provided all documents generated from the use of force incidents as well as review of a video recording showing what occurred after Arquitt, Murray, and Tulip fell through the door. Moreover, Uhler ultimately granted Murray the opportunity to watch handheld footage of his escort from the examination room to his cell. "Courts have long recognized ... that the right to know evidence supporting prison disciplinary rulings is not absolute." *Sira,* 380 F.3d at 74 (citations omitted). Accordingly, in light of all documentary evidence that was provided to Murray, discovery of irrelevant documents regarding medical records and video surveillance would be of no value in determining the validity of the disciplinary tickets.

Murray was provided with an opportunity to extensively question his witnesses through Uhler. "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N .Y.2002). Thus, Uhler retained the authority and discretion to administer the questioning in a manner he saw fit. While Uhler did not permit Murray to ask every question, a review of the hearing transcript shows that he did permit Murray to question the witnesses rather extensively. Moreover, when Uhler denied Murray's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.

Accordingly, Murray was provided with an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

**c. Fair and Impartial Hearing Officer**

Murray contends that Ulher was not an impartial hearing officer because Uhler had personally investigated the matter, already decided on the credibility of witnesses, and ejected Murray from the hearing during Bogett's testimony. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer]." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

**\*17** It was clear that Uhler was objective and carefully listened to the testimony and arguments presented by Murray as Uhler reversed his prior decision about allowing Bonaparte to testify as well as offering Murray an opportunity to adjourn the hearing so that Murray may formulate more cogent questions to support and present his defense. Throughout the hearing, Uhler reiterated that he had yet to determine whether Murray was guilty of the prison violations charged. *See, e.g.,* Dkt. No. 103–12 at 83. Moreover, Uhler offered to make personal inquiries as to certain witnesses to confirm their intention to decline appearing at the disciplinary hearing.

Murray specifically claims that Uhler had stated Traver's credibility was not at issue. However, this assertion is misplaced. In context, Uhler stated, "[h]er credibility is not on[.] here's the problem[,] it is my job to determine the credibility of any witness whether it is employee or inmate is good or bad at this hearing." Dkt. No. 103–11 at 45. Uhler continued, explaining that in order to show a witness was providing false allegations, Murray should submit evidence to substantiate his position. *Id.* at 49.

Murray asserts that Uhler should not have conducted the hearing because Uhler had investigated the charges against him and issued a restraint order for Murray after the alleged assault on staff. These conclusory assertions remain unsubstantiated. Uhler stated that he did not investigate the incidents. In fact, Uhler further explained,

> you've stated that you were assaulted[.] I can tell you as the Dep. of Security at this facility[,] I am aware of those complaints prior to coming down here today to do this hearing. I am aware that you have made allegations of abuse. I have not been part of the investigation that is being done by someone else at this point ... and that's outside of this hearing room.

Dkt. No. 103–11 at 35. Moreover, Uhler explained that he had only signed a recommendation from a sergeant, which was recommended by the watch commander for full restraints based on allegations against Murray. Dkt. No. 1–3–12 at 87. There is no record evidence showing the contrary; thus, Murray's contention on this point is unsubstantiated and without merit.

Murray also asserts that Uhler violated his due process rights when Uhler removed him from the hearing during Bogett's testimony. However, "inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding." *Harmon v. Escrow,* No. 08–CV–6381 (CJS), 2012 WL 3560812, at \*4 (W.D.N.Y. Aug. 16, 2012) (citing *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), *Hidalgo v. Hopin,* No. 01–CV–0057(Sr), 2009 WL 4803689 (W.D.N.Y. Dec. 9, 2009) (stating inmates do not have "a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings)). As such, Murray's due process rights were not violated when Uhler took Bogett's testimony in Murray's absence.

**\*18** Lastly, it is clear that Murray's disciplinary disposition was based on reliable evidence of his guilt. Arquitt and Tulip testified that they were escorting Murray from the infirmary when Murray turned around and kicked Tulip in the groin area. In response, Arquitt and Tulip tackled Murray to the ground and in doing so, fell through a door. Tulip denied having hit Murray in

the head prior to being kicked. Hebert testified that after Murray was placed in the holding pen, Murray continued to struggle with Bogett and attempted to bite Grant. Clark was working in the infirmary and responded a loud noise in the entrance where he found Murray on the ground with officers attempting to restrain him. Clark assisted Tulip, who appeared injured. These officers' testimonies are consistent with each others' account of the events, a video tape of the infirmary's entrance way, and are supported by internal memoranda and the use of force and usual incident reports. As for Bonaparte's testimony regarding Travers and other prison staff, these individuals are not parties to this action. Uhler carefully considered the competing evidence, namely the testimonies, reports, video recording, and injuries suffered by Tulip and Grant, with Murray's contention that he did not provoke the use of force incidents. Ultimately, Uhler reasoned that Murray's behavior caused harm to staff, and given the environment of prisons, such behavior should and would not be tolerated.

Accordingly, despite Murray's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Murray was provided. As such, defendants' motion should be granted on this ground.

### d. Written Statement of Disposition

It is undisputed that Murray received a written statement of the hearing disposition. On December 30, 2009, Murray voluntarily left his disciplinary hearing before Uhler rendered his decision on the two misbehavior reports. Dkt. No. 103–12 at 88–89. The record indicates that Murray received a written statement of the evidence relied upon and reasons for the disciplinary action. Thus, Murray was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.'" *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)).

**\*19** Here, Murray was confined in SHU from December 3, 2009 onward and thus is entitled to an inmate assistant. Dkt. No. 103–5 at 3; *see also Murray v. Goord,* 668 F.Supp.2d 344, 350 (N.D.N.Y.2009) ("Upstate ... [is] a maximum security prison comprised of special housing unit ("SHU") cells in which inmates are confined ....") (citation omitted). Murray alleges that he was generally deprived of adequate inmate assistance. Murray first met with his Inmate Assistant Fish on December 7, 2009. Fish assisted Murray with completing the assistant form to identify witnesses and documentary evidence. Fish also assisted Murray with contacting potential witnesses to testify at the disciplinary hearing. Dkt. No. 103–11 at 5, 14. Fish denied Murray any complaints or legal correspondence with respect to Murray being assaulted in the infirmary area. Dkt. No. 103–11 at 5. However, Uhler stated at the disciplinary hearing that he may produce such records if during the hearing, he determines that those records are relevant. *Id.* As for video footage of what occurred on December 3, 2009 inside the door, Uhler explained that such footage did not exist. *Id.* Further, Uhler denied Murray video footage of him on December 4, 2009 because it was irrelevant to the December 3, 2009 incidents.

Even assuming Fish had provided inadequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Murray was prejudiced as a result. *Gallo,* 22 F.3d at 1223–24. The record shows that Uhler took steps to provide Murray with the requested evidence. Uhler also offered Murray more time to prepare for the hearing, which Murray declined. There is no indication that the result of Murray's hearing would be different had Fish provided Murray with all requested evidence. *See Chavis v. vonHagn,* No. 02–CV–0119 (Sr), 2009

WL 236060, at *53 (W.D.N.Y. Jan. 30, 2009) (finding due process claim based on denied employee assistant to prepare for disciplinary hearings was without merit because the record showed that "plaintiff was indeed able to present evidence (and often did), both oral and documentary, in his own defense) (citation omitted). As such, Murray's due process claim based on inmate assistance must fail.

Accordingly, defendants' motion on this ground should be granted.

### 2. False Misbehavior Report

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). Even so, a due process claim predicated upon a false misbehavior report issued in retaliation against an inmate still fails to state a claim if the inmate received all the procedural process protections that was due to him. *Livingston,* 423 F. App'x at 40 (citing *inter* alia *Freeman,* 808 F.2d at 952). Here, Murray alleges that defendants Hebert and Tulip filed false misbehavior reports against him in retaliation for Murray lodging grievances and complaints. *Boddie,* 105 F.3d at 862; *see* Murray Dep. 38–39. However, as discussed above, Murray received all the procedural process protections that he was due.

**\*20** Moreover, to allege a claim based on the issuance of false misbehavior reports as retaliatory conduct, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Murray does not allege any facts going to establishing a causal connection. Murray does not proffer any

information with regard to grievances or complaints he filed against either Hebert or Tulip. Murray further testified that he believes Tulip retaliated against him because he insulted Tulip. Murray Dep. at 41. However, such insults do not constitute protected speech. *Doe v. Selsky,* No. 08–CV–6199L, 2013 WL 5311221, at *3 (W.D.N.Y. Sept. 20, 2013) (citing *Lockett v. Suardini,* 526 F.3d 866, 874 (6th Cir.2008) (finding inmate's insulting comments to a disciplinary hearing officer was not protected speech), *Chevalier v. Schmidt,* No. 11–CV–788(JTC), 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012) ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment")). As such, Murray has failed to allege a due process claim based on the issuance of false misbehavior reports as retaliatory conduct.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants Bezio, Fischer, Prack, Rock, and Uhler contend that even if Murray's Fourteenth Amendment claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed

with respect to Murray's Fourteenth Amendment claims against these defendants because, as discussed *supra,* it has not been shown that defendants violated Murray's Fourteenth Amendment rights.

**\*21** Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for partial summary judgment (Dkt. No. 103) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed April 22, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4676569

Footnotes

1    In his acknowledgment of receipt of summons and complaint, defendant"Herbert" spelled his name as "Hebert." Dkt. No. 22. The Court notes the discrepancy as mere error on Murray's part and proceeds with the latter spelling in this Report–Recommendation.

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    In his deposition, Murray generally contends that defendants used excessive force against him as part of a conspiracy to retaliate against him for his filing of grievances and lawsuits against them. *See, e.g.,* Murray Dep. at 38–39, 44–46, 50–52. Retaliation and conspiracy claims were neither alleged in Murray's complaint nor response to defendants' motion for summary judgment. In any event, Murray's attempt to allege either claim has failed.

     To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Murray proffers only conclusory testimony that defendants had violated his constitutional rights in retaliation for the filing of grievances and lawsuits. Murray proffers nothing more going to when and against whom he filed such grievances and lawsuits, the results of the grievances and lawsuits, or his prior disciplinary history. *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted) ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."). As such Murray has failed to assert a potential First Amendment retaliation claim against the defendants.

     In order to support a claim for conspiracy under §§ 1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Here, Murray fails to provide evidence sufficient to support a viable conspiracy claim among the defendants. There is nothing in the record to establish that defendants had any

type of agreement between them. There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred. *Warren,* 33 F.Supp.2d at 177. Murray fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants. *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). As such, Murray has failed to allege any potential conspiracy claims in this action.

Accordingly, Murray's potential conspiracy and retaliation claims must fail.

4    Photos taken by non-party Corrections Officer Gettman on December 4, 2009 of Murray indicate that Murray had red marks on his shoulder blades and neck and cuts between his eyebrows and on his nose. Dkt. No. 103–10 at 2–13.

5    The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted). On December 6, 2009, Murray filed a grievance claiming the defendant corrections officers used excessive force against him while also failing to intervene on his behalf. Dkt. No. 103–13 at 6. On January 25, 2010, non-party Deputy Superintendent Otis denied Murray's grievance. *Id.* at 2. On March 10, 2010, CORC affirmed the superintendent's decision. *Id.* at 1.

6    Uhler stated that he would conduct a secondary inquiry into the reason behind Gillard's refusal. Dkt. No. 103–11 at 14.

7    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

8    Defendant Bezio also reduced the punishment from twenty-four months of other privileges and good time credits to begin on April 22, 2011. Dkt. No. 103–6 at 2–3.

9    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

10    All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, David L. Cochran, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

*1 This *pro se* civil rights action, brought pursuant to
42 U.S.C. § 1983, was referred to the Hon. George H.
Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008
recommended that Defendants motion to dismiss be
granted in part and denied in part. Specifically,
Judge Lowe recommended that Plaintiff's Fourteenth
Amendment procedural due process claim against
Defendant Varkiar regarding his disciplinary hearing
be dismissed if, within thirty (30) days from the
filing of this Final Order, Plaintiff does not file
an Amended Complaint that successfully states a
Fourteenth Amendment procedural due process claim.
It was recommended that Plaintiff's remaining claims be
dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation,
essentially raising the same arguments presented to the
Magistrate Judge.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Lowe for the reasons stated in the
Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be
**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
by the Honorable Thomas J. McAvoy, Senior United
States District Judge, for Report and Recommendation
with regard to any dispositive motions filed, pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally,
in his Complaint, Raymond Robles ("Plaintiff") alleges
that three employees of the New York State Department
of Correctional Services ("DOCS"), as well as DOCS
itself, violated his rights under the Eighth and Fourteenth
Amendments when they (1) required him to submit to
a random urinalysis test when they knew he was taking
a medication that would prevent him from providing a
urine sample, and (2) charged, convicted, and punished
him with eighty-seven days in a Special Housing Unit for
refusing to provide a urine sample. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Currently pending before the Court is

Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom

at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

Case 9:15-cv-00006-BKS-TWD   Document 61   Filed 07/10/17   Page 197 of 282
**Robles v. Bleau, Not Reported in F.Supp.2d (2008)**
2008 WL 4693153

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's

own hearing testimony (which Defendant Varkiar stated was not credible); [22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007; [23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there. [24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief. [25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

### II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); [26] or (2) a challenge to the legal cognizability of the claim. [27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of

course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the

2008 WL 4693153

complaint is submitted *pro se.*" [39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality . [40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [49]

### III. ANALYSIS

#### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States

Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket"; [50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ...." [51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice. [52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities. [53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

#### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending

the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the

three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

2008 WL 4693153

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9**  For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10**  Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his

medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

   **\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural

due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be ***GRANTED* in part** and ***DENIED* in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be ***DISMISSED*** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be ***DISMISSED*** **with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,*

984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

**Footnotes**

30    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1     *See, infra,* note 41 of this Report-Recommendation (citing cases).

2     (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4     (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8     (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9     (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10    (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11    (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (*Id.*)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

22    (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26    *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the plaintiff is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27    *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WC 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 31136 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28    *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29    *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31    *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32    2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33    *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary

2008 WL 4693153

affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

**34** The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

**35** *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

**36** *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

**37** For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under *Fed.R.Civ.P. 8* and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

**38** *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

**39** *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**40** *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted];

*McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41    "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45    *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46    *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8 ) ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49    *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe,

M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to

2008 WL 4693153

urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59  *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60  *See, supra,* note 44 of this Report-Recommendation.

61  *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62  *See, supra,* note 44 of this Report-Recommendation.

63  *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64  *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

2008 WL 4693153

65    *See* *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States.*") (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States.*") [emphasis added].

66    *See* *Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67    *See* *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68    *See* *Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3004670

2016 WL 3004670
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Jeremie Smith, Plaintiff,

v.

Brian Fischer, et al., Defendants.

Case # 13-CV-6127-FPG
|
Signed 05/23/2016

DECISION AND ORDER

HON. FRANK P. GERACI, JR., Chief Judge

*1 Before the Court is a motion to dismiss filed by various defendants in this case. ECF No. 36.

## BACKGROUND

This case is made up of two separate actions. The Court previously consolidated the action bearing case number 6:13-cv-6208 into the present action, which bears case number 6:13-cv-6127. ECF No. 35. Thus, for purposes of the pending motion to dismiss (ECF No. 36), two complaints are at issue.[1]

As the Court said in its consolidation order, the two complaints filed by Plaintiff Jeremie Smith ("Smith") are "extraordinarily long and prolix"—they add up to about 230 pages along with about 160 pages of exhibits. Id. at 1. Additionally, Smith has filed roughly 250 pages of letters, affidavits, and exhibits that either repeat allegations in the complaints or duplicate exhibits attached to the complaints. ECF Nos. 4; 5; 7; 11; 15; 18; 25; 26; 27; 28; 29; 31.[2] Based on the complaint's captions, Smith is suing about 60 different defendants.[3]

A global factual narrative of the complaints is not feasible as Smith's claims are based on a litany of separate factual scenarios. By way of brief background, at the time Smith filed his complaints, he was a prisoner at Five Points Correctional Facility ("Five Points") in Romulus, New York. Smith has since been released from prison. He brought this action pro se for money damages as well as declaratory and injunctive relief under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act. The defendants all appear to be officials who work for the New York State Department of Corrections and Community Supervision ("DOCCS"); almost all of them work specifically at Five Points. Smith has sued all of them in their official and individual capacities.

Generally speaking, Smith's allegations revolve around confinement conditions at Five Points and various uses of force by Five Points officials. For example, Smith consistently references his "psychogenic dysphagia"—which is essentially a persistent fear of choking when eating—and asserts that officials at Five Points did not feed him an appropriately "soft" diet for 14 to 18 months. ECF No. 1 at, e.g., ¶¶ 50-57, 60-67, 73, 136. Accordingly, Smith alleges that he could not eat the food he was served and thus suffered from malnutrition.[4] Id. at, e.g., ¶¶ 60-67. Smith also alleges that, for instance, his in-cell toilet was broken for five days (id. at ¶¶ 101—05) and that he was denied access to a razor for shaving for "over a month" (id. at ¶ 112). As for the excessive force claims, Smith alleges in one instance that an official struck his leg with an extraction shield after Smith, by his own words, "urinated out of his feed up slot in his cell door... [and] [t]hen stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. In another separate instance, Smith alleges that after he "began to verbally curse and threaten [an officer]," the officer applied a metal waist chain excessively tight, causing Smith pain and suffering. ECF No. 1 at ¶ 109.

*2 These allegations will be discussed in detail below.

## DISCUSSION

In the pending motion, 24 of the defendants move to dismiss the claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. ECF No. 36 at 2-16. Additionally, the defendants have asked the Court to dismiss both complaints without prejudice for failure to comply with Rule 8 of the Federal Rules of Civil Procedure. Id. at 1.

Before addressing these arguments, the Court raises two preliminary issues sua sponte. These issues relate to, first,

Smith's claims for injunctive and declaratory relief, and second, to his claims for money damages under the ADA and Rehabilitation Act.

### I. Claims for Injunctive and Declaratory Relief

Smith makes several claims for declaratory and injunctive relief. Specifically, he requests a declaratory judgment stating that the defendants' medical care and uses-of-force violated the Eighth and Fourteenth Amendments. ECF No. 1 at ¶ 152(A); 6208, ECF No. 1 at p. 120. He also requests injunctive relief in the form of a visit to an outside hospital, a dietary consultation, an audiological consultation, an orthopedic consultation, and a psychiatric assessment. ECF No. 1 at ¶ 152(B); 6208, ECF No. 1 at p. 120-21.

The docket reflects that Smith has been released from prison since the time he requested this declaratory and injunctive relief. It is settled in the Second Circuit that an inmate's release from prison moots his claims for declaratory and injunctive relief against the prison's officials. *See Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006); *Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976); *see also Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) ("Where a prisoner has *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot.") (emphasis in original). Accordingly, Smith's claims for declaratory and injunctive relief, all of which are based on the conditions at Five Points, are now dismissed as moot.

### II. Claims for Money Damages Under the ADA and Rehabilitation Act

The Court next addresses Smith's claims for money damages under the ADA and Rehabilitation Act, both of which are specifically cited in one of Smith's complaints. ECF No. 1 at p. 2. Generally speaking, Title II of the ADA and Section 504 of the Rehabilitation Act protect disabled individuals from being excluded from public services. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794. Both provisions apply to inmates in state prisons. [5] *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998) (ADA); *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1035-36 (S.D.N.Y. 1995) (Rehabilitation Act).

Neither the ADA nor the Rehabilitation Act, however, provide for liability against defendants in their individual

capacities. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). Accordingly, to the extent Smith is suing any defendants in their individual capacities under the ADA or Rehabilitation Act, those claims are dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the action fails to state a claim).

**\*3** As for Smith's official-capacity claims under the ADA and Rehabilitation Act, the Court observes that "the State is the real party in interest for ... claims against... individual defendants in their official capacities." *Fox v. State Univ. of N.Y.*, 497 F.Supp.2d 446, 451 (E.D.N.Y. 2007). Stated differently, a judgment against a public official in his official capacity imposes liability on the entity he represents, provided that the entity received notice and an opportunity to respond. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985).

Here, the entity represented by the defendants in this case is DOCCS, and DOCCS has, of course, received notice and an opportunity to respond to Smith's complaints. Because DOCCS is the real party in interest for the official-capacity claims, the Court hereby dismisses the the ADA and Rehabilitation Act claims against the individual defendants in their official capacities. *See Hallett v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 199-200 (S.D.N.Y. 2000) ("Because plaintiff is able to assert his ADA and Rehabilitation Act claims against DOCS directly ... there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against the individual defendants in their official capacities."); *see also B.D.S. v. Southold Union Free Sch. Dist.*, No. CV-08-1319 SJF WDW, 2009 WL 1875942, at \*21 (E.D.N.Y. June 24, 2009). DOCCS is now substituted as the sole defendant for the ADA and Rehabilitation Act claims.

### III. Dismissal Under Rule 8

The Court now turns to the arguments in the defendants' motion to dismiss. The defendants first argue that both of Smith's complaints should be dismissed without prejudice because they fail to comply with Rule 8 of the Federal Rules of Civil Procedure.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint present a "short and plain statement of the claim showing that the pleader is entitled to relief." Shortness and plainness are prescribed because

the purpose of a complaint is simply to provide the adverse party with fair notice of the plaintiff's claim. *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1998). "Unnecessary prolixity in [the complaint] places an unjustified burden on the district judge and the party who must respond to it because they are forced to ferret out the relevant material from a mass of verbiage." 5 C. Wright & A. Miller, *Fed. Prac. & Proc. Civ.* § 1281 (3d ed. 1998).

There is no doubt that Smith has included a vast amount of unnecessary detail in his two complaints. As will become clear momentarily, Smith writes at length about what appear to be, frankly, the relatively minor inconveniences associated with prison life. The Second Circuit has been clear, however, that there is a difference between a complaint that simply includes a large amount of unnecessary detail and a complaint that is wholly "unintelligible" and "defie[s] comprehension." *Shomo v. State of New York*, 374 Fed.Appx. 180, 183 (2d Cir. 2010) (citations and internal quotations omitted). Dismissal under Rule 8 is generally warranted only in the second category of cases where, in short, the complaint is so rambling that it is incomprehensible. *See id.* at 182-83. The case that the defendants rely on in seeking dismissal under Rule 8, *Ceparano v. Suffolk Cty.*, No. 10-CV-2030-SJF-ATK, 2010 WL 5437212, at *2 (E.D.N.Y. Dec. 15, 2010), is also clear on this point: "[D]ismissal of a complaint in its entirety should be reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any is well disguised." *Id.* at *3 (citations and internal quotations omitted).

**\*4** By contrast, where a complaint "enunciate[s] recognizable unconstitutional behavior" despite its unnecessary length and detail, a district court should not dismiss the complaint, even without prejudice. *See Shomo*, 374 Fed.Appx. at 182. Here, Smith's two complaints clearly fall into the first category of complaints; while they are certainly not models of clarity or brevity, they are also not "unintelligible" nor "a labrynthian prolixity of unrelated and vituperative charges that def[y] comprehension." *Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972). Smith has described, in clear handwriting and in a relatively understandable manner, multiple uses of force by Five Points officials and, more generally, "the day-to-day events ... [that] concern the activities of his daily living." *Shomo*, 374 Fed.Appx. at 183. It is clear to the Court that his claims "center[ +] around his

disability and the alleged deliberate indifference to his serious medical needs," and that is enough at this stage in the litigation. *Id.* It is acknowledged, of course, that Smith's lengthy complaints place a heavy burden on both the New York Attorney General's Office, which represents all of the defendants in this action, and this Court. The law is, however, unambiguous on this point—dismissal under Rule 8 is not warranted for these types of complaints.

### IV. Claims for Money Damages Under Section 1983

The Court now addresses Smith's claims for money damages under 42 U.S.C. § 1983. This statute imposes liability on anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In other words, to recover under this provision, a plaintiff must show a violation of a federal constitutional or statutory right.

In the pending motion, as stated above, 24 of the defendants now move to dismiss the Section 1983 claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter ... 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this standard, the factual allegations must permit the court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

Because Smith is proceeding *pro se*, the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that it suggests." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotations omitted). "Even in a *pro se* case, however, ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citations and internal quotations omitted). So while the Court will draw the most favorable inferences that the complaint supports, it will not "invent factual allegations that [the plaintiff] has not pled." *Id.*

The Court makes one final preliminary point before turning to the individual defendants. As stated previously,

Smith has sued all of the defendants in their official and individual capacities. ECF No. 1 at p. 2; ECF No. 1 at p. 2; 6208. To the extent Smith seeks damages from the DOCCS officials in their official capacities under Section 1983, those claims are barred by the Eleventh Amendment. *See Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under § 1983] for money damages against state officials in their official capacities."). Accordingly, all official capacity claims for money damages brought under § 1983 are hereby dismissed. *See* 28 U.S.C. § 1915(e)(2)(B)(iii) (mandating dismissal of *in forma pauperis* actions "at any time" if the court determines that the defendants are immune from monetary relief).

Below, the Court addresses the arguments of each defendant, and occasionally groups together those defendants who make similar arguments for dismissal.

### A. Defendants Abbott, Lt. Gardener, and Patches

**\*5** Defendants Abbott, Lt. Gardener, [6] and Patches are all corrections officials at Five Points. The only claims against them are straightforward. Smith alleges that on December 1, 2011, he was on "in cell 'water deprivation,' +" (ECF No. 1 at ¶ 101) (internal quotations in original) which—as is apparent from other parts of the complaints —is where officials turn off an inmate's in-cell sink and toilet water after the inmate is accused of intentionally flooding his cell (*id.* at ¶¶ 58-59). Smith alleges that on December 1, 2011 he asked Officer Filighera, another Five Points corrections official who is a defendant in this case, to turn his in-cell water back on. ECF No. 1 at ¶ 101. Filighera turned on Smith's sink water but "walked off... without turning on the [his] toilet water." *Id.* Later that day, Smith informed Officer Patches that his toilet water was still off, and Patches apparently came back to Smith's cell shortly therafter with Filighera. *Id.* at ¶ 102. Both officers made "several attempts to turn on the plaintiff[']s toilet water to no avail." *Id.* at ¶ 102. Patches told Smith that the valve on Smith's toilet was broken, and that he would place a work order for Smith's toilet to be fixed. *Id.* at ¶ 103.

The next day, December 2, 2011, Smith informed Officers Abbott and Lt. Gardener that his toilet was still broken. *Id.* at ¶ 103. "After several attempts were made to fix the plaintiff[']s toilet," Lt. Gardener and another official in

this case [7] informed Smith once again that his toilet valve was broken and that they would place another work order for Smith's toilet to be fixed. *Id.* at ¶ 104. On December 5, 2011, a plumber fixed Smith's toilet. *Id.* at ¶ 105.

In sum, Smith alleges that for five days from December 1, 2011 to December 5, 2011, he was left inside his cell "with accumulated waste and a broken toilet." *Id.* at ¶ 105.

Plaintiff is effectively attempting to state a conditions-of-confinement claim against the three officials at issue under the Eighth Amendment, which prohibits "cruel and unusual punishments. U.S. Const. amend. VIII. To state a valid conditions-of-confinement claim, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind ..., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotations omitted) (ellipses in original).

Smith's conditions-of-confinement claim against Abbott, Lt. Gardener, and Patches fails to pass the motion-to-dismiss threshold. In short, regardless of whether a broken toilet with "accumulated waste" is an objectively serious condition under the Eighth Amendment, Smith has failed to show how he could satisfy the subjective prong of the test. In other words, Smith has failed to allege that Abbott, Lt. Gardener, or Patches were deliberately indifferent to his health and safety. By Smith's own words, Abbott, Lt. Gardener, and Patches were actually quite diligent in trying to fix Smith's toilet: On the same day Smith told Officer Patches about the broken toilet, Patches made "several attempts to turn on the plaintiff[']s toilet water" before then placing a work order for the toilet to be fixed. On the next day, when Smith told Defendants Abbott and Lt. Gardener about his broken toilet, Abbott and Gardener also made "several attempts ... to fix the plaintiff's toilet" before placing yet another work order for it to be fixed. The toilet was then fixed five days after Smith's original complaint.

On these allegations, Smith has not at all indicated that Abbott, Lt. Gardener, or Patches were deliberately indifferent to this admittedly unfortunate condition. For this reason, the motions to dismiss by Abbott, Lt. Gardener, and Patches are GRANTED.

### B. Defendant Atwood

**\*6** Defendant Atwood is another corrections official at Five Points. Smith attempts to state an excessive force claim against Atwood by alleging as follows: On March 20, 2012, Smith "became mentally unstable and urinated out of his feed up slot in his cell door. The plaintiff then stuck his leg out through the food slot in his cell door and refused to pull his leg back into his cell." 6208, ECF No. 1 at ¶ 53. Atwood then allegedly "authorized" another official in this case to "sneak up along side of the plaintiff[']s cell to 'strike' the plaintiff in the leg with the N.Y.S. DOCCS extraction shield without any warning to the plaintiff." *Id.* (quotations in original).

Smith's claim for excessive force also arises under the Eighth Amendment. To state an excessive force claim, an inmate must allege that: (1) "the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions," and (2) "the defendant acted with a subjectively sufficiently culpable state of mind," which is "characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, ___ F.3d ____, No. 14-2957, 2016 WL 963904, at * 10-12 (2d Cir. Mar. 15, 2016) (citations and internal quotations omitted).

In his motion to dismiss, Defendant Atwood skips the excessive force analysis altogether by attempting to neatly parse Smith's allegations. In short, Atwood argues that Smith never alleged in the complaint that another official actually struck Smith in the leg with an extraction shield; rather, Smith merely alleged that Atwood "authorized" another officer to strike Smith in the leg with a shield. ECF No. 36-1 at 3-4. Atwood thus asserts that because a mere verbal threat in a prison setting cannot rise to the level of a constitutional violation, the § 1983 claim against him must be dismissed. *Id.*

While it is generally true that verbal harassment does not rise to the level of a constitutional violation, the Court finds that the claim against Atwood can be dismissed more directly. Even if an officer followed Atwood's order and struck Smith in the leg, Smith has failed to make sufficient allegations to state an excessive force claim. First, as for the objective prong, Smith has failed to allege that he suffered any sort of injury or harm from the incident. *Pesola v. City of New York*, No. 15-CV-1917 (PKC)(SN), 2016 WL 1267797, at *7 (S.D.N.Y. Mar.

30, 2016) ("Courts in this Circuit regularly hold that a plaintiff must have sustained some injury to maintain a claim of excessive force. That injury, however, need not be severe.") (internal citations omitted) (collecting cases). Thus, Smith fails to satisfy the first prong of the excessive-force test.

As for the subjective prong, Smith admits that the entire situation resulted from him urinating out of the feed-up slot in his cell door, sticking his leg out of the slot, and then refusing to pull his leg back into his cell. 6208, ECF No. 1 at ¶ 53. Given that the subjective prong is characterized by "wantonness *in light of the particular circumstances*," *Harris*, 2016 WL 963904 at * 10 (emphasis added) (citations and internal quotations omitted), these particular circumstances show that the force used used was not malicious or wanton; rather, it was an understandable effort to exert control over an out-of-control inmate. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (observing that a "a good-faith effort to maintain or restore discipline" does not support an excessive force claim). Given that, once again, Smith has not alleged that he suffered any injury, it also appears to have been a proportional effort exert such control. This sort of force is antithetical to an excessive force claim.

**\*7** For these reasons, the motion to dismiss by Defendant Atwood is GRANTED.

### C. Defendants Bellnier, Koenigsmann, and Van Buren

Defendants Bellnier, Koenigsmann, and Van Buren are all DOCCS supervisory officials. Bellnier is the Deputy Commissioner for Correctional Facilities, Dr. Koenigsmann is the Deputy Commissioner/Chief Medical Officer, and Van Buren is the Assistant Commissioner.

As for Dr. Koenigsmann, Smith alleges that he "sent numerous complaints of medical neglect and abuse" to Koenigsmann. ECF No. 1 at ¶ 134. Smith alleges that Koenigsmann simply assigned the investigations of these complaints to subordinates without investigating the complaints himself. *Id.*

The Court deals with these allegations briefly. As will be revisited throughout this Decision, for a plaintiff to receive a damages award under § 1983, he must show that the defendant in question was personally involved in the alleged constitutional deprivation. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). There are a variety

of ways that a defendant can be personally involved in a deprivation, *see Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), but as a general rule, an official does not become personally involved by merely forwarding a prisoner's complaint to a subordinate. *See Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter."). Here, Koenigsmann's only alleged involvement in the alleged "medical neglect and abuse" was his receipt and forwarding of Smith's letters. This is not enough to support a § 1983 claim, and thus, Smith's claim regarding the matters raised in the letters he sent to Dr. Koenigsmann is dismissed.

Additionally, to the extent Smith is seeking to hold Koenigsmann liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *See McCloud v. Prack*, 55 F. Supp. 3d 478, 481 (W.D.N.Y. 2014) (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

Smith makes similar allegations against Bellnier, Koenigsmann, and Van Buren as a group. By way of brief background, Smith asserts throughout the 6:12-cv-6127 complaint that he is afflicted with "psychogenic dysphagia," which essentially is a persistent fear of choking when eating. ECF No. 1 at, *e.g.*, ¶¶ 47-57. Smith further asserts throughout this complaint that Five Points officials did not feed him an appropriately "soft" diet over a period of 14 to 18 months, and thus he suffered from malnutrition. *Id.* at, *e.g.*, ¶¶ 60-67, 136.

With this background in mind, Smith asserts that an attorney at Prisoners' Legal Services of New York wrote to Bellnier, Koenigsmann, and Van Buren in November 2011 regarding Smith's inadequate diet. *Id.* at ¶ 135. Smith alleges that despite this letter, Bellnier, Koenigsmann, and Van Buren "did not intervene ... to prevent the abuse and neglect of the plaintiff." ECF No. 1 at ¶ 136. In short, Smith alleges that they ignored the letter and did not provide him with a suitable diet. *Id.*

**\*8** Smith has once again failed to adequately allege that Bellnier, Koenigsmann, or Van Buren were personally involved in the diet-related deprivation. In short, as a

general rule, an "allegation that a supervisory official ignored a prisoner's letter protesting unconstitutional conduct is not itself sufficient to allege the personal involvement of the official so as to create liability under § 1983." *Richardson v. Coughlin*, 101 F. Supp. 2d 127, 132 (W.D.N.Y. 2000) (citations and internal quotations omitted). Notably, the fact that this letter was written *on behalf of the prisoner* as opposed to *by the prisoner himself* is not legally significant. Whether an official becomes personally involved in a deprivation after receiving a letter turns on the degree to which the official "personally look[ed] into the matters raised in the letter." *Rivera*, 655 F. Supp. 2d at 238. Here, there are no allegations that Bellnier, Koenigsmann, or Van Buren "personally look[ed] into" the matters raised in the letter or responded in any way. Without these types of allegations, Smith has not stated a claim against Bellnier, Koenigsmann or Van Buren.

Accordingly, Bellnier, Koenigsmann, and Van Buren's motions to dismiss are GRANTED.

### *D. Defendant Bianconi*

Defendant Bianconi is a mental health therapist at Five Points. In a single paragraph of one of the complaints, Smith makes the following brief allegations against Bianconi: "Bianconi [was] well aware of the plaintiff's psychiatric [d]iagnosis of 'psychogenic dysphagia.' +" ECF No. 1 at ¶ 137 (internal quotations in original). Despite Bianconi's alleged awareness of Smith's condition, Bianconi "allowed [him] to be placed on an in cell 'hunger strike' from 12-25-2011-4-3-2012 without being properly monitored by [t]he [Five Points] medical and mental health staff." *Id.* (internal quotations in original). Here, the Court notes that Smith's allegation that he was "placed on ... hunger strike" refers to the fact that Five Points officials placed him on hunger-strike status as a precautionary measure because he was unwilling or unable to eat the food he was served. *Id.* at, *e.g.*, ¶ 72 (internal quotations omitted); *see also supra* note 4.

Smith is effectively attempting to state a claim for deliberate medical indifference against Bianconi. Once again, however, Smith has failed to sufficiently alleged that Bianconi was personally involved in the diet-related deprivation, so Bianconi cannot be liable for damages under § 1983. *See Gaston*, 249 F.3d at 164. In short, the only allegation against Bianconi—she was "well aware" of Smith's problem yet did not nothing to resolve it—

is exactly the type of bare, conclusory allegation that cannot be credited on a motion to dismiss. *Iqbal*, 556 U.S. at 680 (disregarding as conclusory allegations that officials "knew of" yet "condoned" harsh conditions of confinement); *see also Bellamy v. Mount Vernon Hosp.*, No. 07 CIV. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd sub nom. Bellamy v. Mount Vernon Hosp.*, 387 Fed.Appx. 55 (2d Cir. 2010) ("[The plaintiff's] conclusory allegations that [the prison official] must have known about [the plaintiff's] plight is not enough to impute section 1983 liability").

For these reasons, Bianconi's motion to dismiss is GRANTED.

### E. Defendant Bradley

Defendant Bradley is a corrections official at Five Points. Smith alleges that on March 28, 2012, Bradley came to Smith's cell to pass out his dinner. 6208, ECF No. 1 at ¶ 68. Bradley allegedly ordered Smith to go to the back of his cell, face the wall, get down his knees, and place his hands on his head. [8] *Id.* Smith, by his own admission, refused Bradley's order, and thus Bradley declined to give Smith his dinner that night. *Id.* Smith also alleges that Bradley told a nurse not to give Smith his nutritional supplement and psychiatric medications. *Id.*

**\*9** Smith also adds that his cell on March 28, 2012 was "completely bare," that is, it was missing sheets and toiletries. [9] *Id.* (internal quotations omitted). Accordingly, Smith asked Bradley to provide him with certain items including bed sheets, a blanket, toilet paper, soap, and toothpaste. *Id.* Bradley allegedly "denied the plantiff these [items], and advised the plaintiff to speak with RMHU Security Captain P. Piccolo in order to receive [them]." *Id.*

The Court first addresses Bradley's alleged failure to give Smith his dinner and nutritional supplement (which Smith drinks as a sort of meal replacement). In short, even assuming this allegation is true, it is clear in this Circuit that the failure to receive one or two meals in prison is a *de minimis* deprivation that does not support constitutional claim. *See, e.g., Parker v. Peek-Co*, No. 06-CV-1268, 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("While plaintiff alleges that he was deprived of two meals on that date as a result of the defendant's actions, such a deprivation, while not to be condoned, is *de minimis* and

does not rise to a level of constitutional significance."); *Cagle v. Perry*, No. 9:04CV1151 (TJM/GHL), 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007), *report and recommendation adopted*, No. 9:04CV1151(TJM/ GHL), 2007 WL 3124806, at *14 (N.D.N.Y. Oct. 24, 2007) ("[T]wo meal deprivations ... [are] not sufficiently numerous, prolonged or severe to rise to the level of an Eighth Amendment violation.") (emphasis omitted). Thus, the claim against Bradley regarding his failure to give Smith his dinner and nutritional supplement on March 28, 2012 is dismissed.

Similarly, Bradley's alleged refusal to provide Smith with bed sheets, a blanket, and toiletries also falls squarely within the realm of a *de minimis* deprivation. Notably, Smith has not even alleged that he was without these items for the night of March 28, 2012; he has merely alleged that Bradley told him to talk to another official about the items. However, even assuming Smith was without bed sheets, a blanket, and certain toiletries on the night of March 28, 2012, such a brief and intermittent deprivation of these sorts of items is *de minimis. See, e.g., Phelan v. Zenzen*, No. 10-CV-6704 CJS, 2012 WL 5420423, at *5 (W.D.N.Y. Nov. 6, 2012) (holding that the denial of a pillow and razor for several nights did not violate constitutional rights); *Loadholt v. Lape*, No. 9:09-CV-0658, 2011 WL 1135934, at *4 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted*, No. 9:09-CV-0658 LEK RFT, 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011) ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or better shoes, as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment."). Simply put, "the Constitution does not require comfortable prison conditions." *Walker*, 717 F.3d at 125 (2d Cir. 2013) (citations and internal quotations omitted).

Finally, the Court addresses Bradley's alleged directive to a nurse to not provide Smith with his psychiatric medications on March 28, 2012.

Smith has effectively attempted to state a deliberate indifference claim against Bradley for a temporary interruption in medical treatment. The deliberate indifference standard under the Eighth Amendment has two components: "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the charged official must act with a sufficiently culpable state

of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal citations and quotations omitted). Notably, the Second Circuit has provided guidance on the first prong when the basis for the claim is a temporary disruption in medical treatment. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). In short, instead of focusing on the inmate's "*underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' +" the Court must focus on the "challenged *delay* or *interruption* in treatment." *Id.* (emphasis in original) (quoting *Chance*, 143 F.3d at 702). Consequently, to satisfy the objective prong, a plaintiff who temporarily did not receive his medication cannot just allege that he has an objectively serious medical condition like depression. Rather, the Court will look to, most importantly, the "actual medical consequences that flow from the alleged denial of care" in determining whether the prong is satisfied. *Smith*, 316 F.3d at 187.

*10 Here, Smith has failed to identify a single medical consequence that resulted from his alleged failure to receive his psychiatric medications on March 28, 2012. He has simply alleged, without any other detail, that he failed to receive his medications on a single night. Furthermore, even apart from his failure to identify a medical consequence flowing from this interruption, the complaint is devoid of any other "relevant facts and circumstances" regarding the deprivation that might allow him to survive a motion to dismiss. *Id.* (observing broadly that courts should examine the "specific factual context of each case" to determine whether the interruption in treatment is sufficiently serious). Notably, Smith also does not identify what drugs he was actually denied, and, more generally, he does not even say what psychiatric problems he was suffering from on March 28, 2012. Without providing this sort of information, Smith has failed to adequately allege that the interruption in treatment was sufficiently serious. Accordingly, Bradley's motion to dismiss is GRANTED.

### F. Defendant Burri

Defendant Burri is a corrections official at Five Points. All of the events involving Burri occurred on December 30, 2011.

First, Smith alleges that while he was lying on a medical examination table with his shirt unbuttoned, Burri made the following remarks: "Smith! You should get your nipples pierced, I had mine done;" and "If I was locked in a cell all day long all I would do is beat off and smoke weed." ECF No. 1 at ¶¶ 96-97. Additionally, while Burri and Parish—another officer who is a defendant in this case—were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my fluids come out of my dick and I get dehydrated." *Id.* at ¶ 99. Burri and the other officers allegedly laughed at this comment. *Id.* Finally, Smith alleges that during the same walk back to his cell, Burri intentionally stepped on the back of Smith's shoe, causing the shoe to fall off. *Id.* at ¶ 100. Smith apparently tried to turn around to pick up the shoe, but another officer tightly gripped Smith's waist chain and ordered Smith to face forward. *Id.*

First, as for Burri's comments to Smith and his laughing at another officer's comments, it is well-settled that verbal harassment by a corrections official is not a constitutional violation. *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Jones v. Harris*, 665 F. Supp. 2d 384, 396 (S.D.N.Y. 2009). Accordingly, the claims related to Burri's comments to Smith and his laughing at another officer's comments are dismissed.

Second, Burri stepping on the back of Smith's shoe does not rise to the level of a constitutional claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000) ("[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). This is especially true as Smith has not alleged that he suffered "discernible injury" from the incident. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Finally, the Court notes that to the extent Smith is trying to hold Burri liable for participating in an incident where another officer tightened Smith's waist chain, that allegation is also not actionable. It is a general rule in this Circuit that in a prison setting, an assertion that an official tightened handcuffs or waist chains is insufficient to support an excessive force claim "unless it causes some injury beyond temporary discomfort." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F.Supp.2d 459, 468 (S.D.N.Y. 2008); *Rosenberg v. Coon*, No. 12 CV 3803 VB, 2013 WL 1223516, at *3 (S.D.N.Y. Mar. 27, 2013) (treating as legally equivalent the tightening of handcuffs and the tightening of waist chains). Here, Smith has not even alleged that he suffered temporary discomfort from the waist-chain tightening incident. Accordingly, the claim against Burri related to waist-chain tightening on December 30, 2011 is also dismissed.

For the reasons above, Burri's motion to dismiss is GRANTED.

### G. Defendant Colvin

Defendant Colvin is the Deputy Superintendent for Security at Five Points. Colvin is a supervisory official, and Smith makes a variety of allegations against Colvin in his supervisory capacity.

**\*11** First, Smith alleges that he filed a grievance on December 21, 2011 regarding a nurse failing to wear gloves while pouring his nutritional supplement into a Styrofoam cup. ECF No. 1 at ¶¶ 78-79. Colvin apparently responded to the grievance as follows: "The investigation reveals that the pouring of Jevity [nutritional supplement] into a styrofoam cup does not require the use of a sterile procedure. The grievant has the right to refuse the Jevity. Grievance [d]enied." *Id.* at ¶ 79.

Second, Smith alleges that he filed a grievance on January 6, 2012 regarding a "destructive cell search." *Id.* at ¶ 113. Smith further alleges, without any elaboration, that Colvin denied the grievance. *Id.*

Third, Smith alleges that he wrote a letter to Defendant Sheahan, another supervisory official, on January 30, 2013 regarding his request for a kosher diet. *Id.* at ¶ 141. Sheahan apparently forwarded the letter to Colvin, who then forwarded the letter to another official. *Id.* That offical then responded to Smith unfavorably. *Id.*

As for the first allegation, Smith has adequately alleged that Colvin was personally involved in the underlying incident. In short, Smith alleges that Colvin responded to Smith directly about his grievance regarding a nurse not wearing gloves while handling a nutritional supplement. In his response, Colvin allegedly indicated that he had conducted an "investigation" into the nurse not wearing gloves. That is enough to establish Colvin's personal involvement in the incident at this stage. *See Walker v. Pataro*, No. 99CIV.4607(GBD)(AJP), 2002 WL 664040, at * 13 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official receives and acts on a prisoner's grievance (or substantively reviews and responds to some other form of inmate complaint), personal involvement will be found ....").

Smith has not, however, alleged any Eighth Amendment claim underlying the grievance in question. Construed liberally, Smith is attempting to a state a claim for inadequate medical care. Such a claim must satisfy (1) an objective component, where "the alleged deprivation of adequate medical care must be sufficiently serious," and (2) a subjective component, where the "official must act with a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 279 (citations and internal quotations omitted).

To satisfy the objective prong on a motion to dismiss, an inmate typically must allege that he suffered some actual harm due to the inadequate medical care. *See Goolsby v. Cicconi-Crozier*, No. 13-CV-822-A, 2014 WL 1279066, at *4 (W.D.N.Y. Mar. 27, 2014) ("[P]laintiff's allegations fail to satisfy the objective component of a deliberate indifference claim because he does not allege that any actual harm resulted ...."). *Salahuddin*, 467 F.3d at 280. At the very least, the inmate can satisfy the objective prong by alleging that future harm was likely or "very likely" to result from the inadequate care. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993). Here, Smith has not anywhere alleged that he suffered actual harm from a nurse not wearing gloves while handling his nutritional supplement; he also has not alleged that he was likely to suffer any future harm from the nurse not wearing gloves. Smith has merely alleged that the nurse's "completely bare" hands were "germ infested" as a result of the nurse "rub[bing] his face and eyes" and touching other prisoners' medications. ECF No. 1 at ¶ 79. This is not nearly enough to show that the care Smith received was objectively inadequate. Accordingly, there is no underlying constitutional deprivation related to the grievance filed on December 21, 2011, and thus, that claim against Colvin is dismissed.

**\*12** As for Smith's other allegations against Colvin, Smith has not adequately alleged Colvin's personal involvement in any underlying deprivation. Smith alleges in one instance that Colvin denied his grievance relating to a destructive cell search. Smith has not, however, provided any further detail about Colvin's denial of the grievance. Without any allegation that Colvin looked into the matters raised in the grievance or responded to the grievance in detail, Smith has not established that Colvin was personally involved in the cell search. *See McClenton v. Menifee*, No. 05 CIV.2844(JGK), 2006 WL 2474872, at *10 (S.D.N.Y. Aug. 22, 2006) ("[A] supervisor's mere denial of a grievance is insufficient to establish personal

involvement. ...”); *see also Brooks v. Chappius*, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) (“[W]hile there is some authority from within this circuit that a supervisory official's denial of a grievance can suffice to show personal involvement, in general personal involvement will not be found unless the supervisor's response is detailed and specific ....”) (internal citations and quotations omitted).

Similarly, Cohan's forwarding of Smith's letter about a kosher diet to another official does not show that Colvin was personally involved in the underlying incident. *See supra* Part IV.C; *Rivera*, 655 F. Supp. 2d at 238 (“[I]f an official receives a letter from an inmate and passes it on to a subordinate for response or investigation, the official will not be deemed personally involved with respect to the subject matter of the letter.”). In short, the claims regarding Colvin's involvement in both the destructive cell search and Smith's kosher diet are also dismissed.

For the reasons stated above, Colvin's motion to dismiss is GRANTED.

### *H. Defendants Crance and O'Connor*

Defendants Crance and O'Connor are corrections officials at Five Points. Smith alleges that on May 23, 2012, Crance and O'Connor came to Smith's cell to take him to a disciplinary hearing and to see a nurse. 6208, ECF No. 1 at ¶ 75. The officials first shackled Smith's ankles (*id.*), which Smith contends they were not authorized to do (*id.* at ¶ 78). They then asked Smith to put his arms through the slot of his cell door to be handcuffed. *Id.* at ¶ 75. After Smith put his hands through the food slot, Smith, by his own admission, “refused to be placed into handcuffs and ... refused to pull his arms back into his cell to allow N.Y.S. DOCCS staff to shut his food slot hatch.” *Id.* O'Connor subsequently grabbed Smith's arm and both O'Connor and Crance “used force on the plaintiff and began to pull the plaintiff[']s right arm through the feed up slot in the plaintiff[']s cell door.” *Id.* at ¶ 76. Crance and O'Connor then brought Smith to the nurse, who “documented the plaintiff[']s injuries on a medical entry form” yet cleared Smith without ever filing an official injury report. *Id.* at ¶¶ 76-77.

Smith further alleges that O'Connor fabricated a misbehavior report regarding the incident. *Id.* at ¶ 79. O'Connor's allegedly false report stated that O'Connor and Crance grabbed Smith's arm because Smith made an “aggressive movement” towards the officers with his arm.

*Id*, The misbehavior charge resulting from this report was apparently later dismissed by a hearing officer. *Id.*

The Court first addresses the excessive force claim against both O'Connor and Crance. A claim for excessive force requires a showing that (1) “the conduct was objectively harmful enough or sufficiently serious to reach constitutional dimensions,” and (2) “the defendant acted with a subjectively sufficiently culpable state of mind.” *Harris*, 2016 WL 963904 at * 10-12. (citations and internal quotations omitted). The clear implication from this standard is that “not ... every malevolent touch by a prison guard gives rise to a federal cause of action.” *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). In short, *de mimimis* uses of force do not support excessive force claims. *Id.* at 9-10.

**\*13** The force used here, which amounts to a pull of an arm, was *de minimis. See, e.g., Brown v. Busch*, 954 F. Supp. 588, 597 (W.D.N.Y. 1997) (holding that officers who “pushed, shoved and struck [inmate] while forcing him back into his cell” used *de minimis* force); *DeArmas v. Jaycox*, No. 92 CIV. 6139 (LMM), 1993 WL 37501, at * 1, 4 (S.D.N.Y. Feb. 8, 1993), *aff'd*, 14 F.3d 591 (2d Cir. 1993) (holding that force used was *de minimis* where officers punched inmate in the arm and kicked him in the leg, causing the inmate to fall down); *Anderson v. Sullivan*, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (holding that officers did not use excessive force when they pulled inmate's arms behind his back and pushed his face into cell bars). Notably, Smith has not alleged that he suffered any specific injury from the arm grab; he makes only a vague reference to “injuries” in alleging that the nurse “only documented the plaintiff[']s injuries on a medical entry form” instead of an “inmate injury report.” 6208, ECF No. 1 at ¶ 76 (internal quotations omitted). This sort of bare, conclusory allegation need not be credited on a motion to dismiss. *See Iqbal*, 556 U.S. at 680.

Moreover, Smith admits that the arm-grabbing incident was triggered by his refusal to allow O'Connor and Crance to handcuff him. In other words, the arm grab was quite clearly not the result of malice, but rather the result of a “good faith effort to maintain or restore discipline.” *Hudson*, 503 U.S. at 6 (citations and internal quotations omitted). Accordingly, the force used was by no means excessive, and the claim that arises out of it against Crance and O'Connor is dismissed.

Smith v. Fischer, Slip Copy (2016)

2016 WL 3004670

As for Smith's allegation that O'Connor and Crance did not have the proper authorization to place him in foot shackles, this allegation does not support any sort of constitutional claim. The Court observes that as a general matter, prison officials are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (1992) (citations and internal quotations omitted). The decision by officials to place an inmate in foot shackles for a walk down the hall certainly does not implicate constitutional rights.

Finally, the Court briefly addresses Smith's allegation that O'Connor filed a false report in connection with the arm-grabbing incident. In short, the law is clear that "the issuance of false misbehavior reports against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009) (citations and internal quotations omitted); *see also Moore v. Casselberry*, 584 F. Supp. 2d 580, 582 (W.D.N.Y. 2008) ("There is no basis for a constitutional claim alleging the mere filing of a false report."). An inmate may, however, maintain a claim against an official for filing a false report if (1) he "was disciplined without adequate due process, as a result of the report," or (2) "the report was issued in retaliation for exercising a constitutionally protected right." *Sital v. Burgio*, 592 F. Supp. 2d 355, 357 (W.D.N.Y. 2009). Here, Smith has failed to make any allegation that satisfies either prong. As for the first prong, Smith acknowledges that the charge resulting from the allegedly false report was later dismissed and, thus, he was not disciplined for the incident. As for the second prong, Smith has not at all alleged that O'Connor issued the false report with a retaliatory motive.

For the reasons above, Crance's motion to dismiss is GRANTED. Additionally, although O'Connor did not file a motion to dismiss, the Court *sua sponte* dismisses the claims against him with prejudice.

### I. Defendants Fischer and Lempke

Defendant Fischer was the Commissioner of DOCCS during Smith's incarceration at Five Points. Defendant Lempke was the Five Points Superintendent when Smith arrived at Five Points.

**\*14** Smith's allegations against these two defendants are straightforward. Smith alleges that he sent numerous written complaints to Fischer and Lempke. ECF No. 1 at ¶ 54, 133. These letters generally concerned "physical abuse, medical neglect and staff mistreatment" (*id.* at ¶ 133) as well Smith's allegedly inadequate diet (*id.* at ¶ 54). Smith alleges that Fischer and Lempke simply forwarded the letters to other officials without investigating the complaints themselves. *Id.* at ¶ 54, 133.

These allegations are not enough to show that either Fischer or Lempke were personally involved in the underlying deprivations. An official does not become personally involved in the matters raised in a prisoner's written complaint by simply forwarding the complaint to a subordinate. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C; Part IV.G. Accordingly, Smith has not stated a § 1983 claim for damages related to the matters in these letters against either Fischer or Lempke.

Additionally, to the extent Smith is seeking to hold Fisher and Lempke liable for simply failing to investigate his complaints, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *McCloud*, 55 F. Supp. 3d at 481. (citations and internal quotations omitted). Accordingly, any claim based on a failure to investigate is dismissed.

For these reasons, Fischer and Lempke's motions to dismiss are GRANTED.

### J. Defendant Levac

Defendant Levac is a Five Points official who acted as the hearing officer in one of Smith's disciplinary proceedings. Levac apparently found Smith guilty of cursing at a nurse on May 22, 2012, and thus he sentenced Smith on June 5, 2012 to an "additional 30 days of keeplock cell confinement, [10] [and] 30 days loss of commissary, package and phone privileges." ECF No. 1 at ¶¶ 84, 89. The Court notes here that it is unclear what Smith means by his assertion that he was sentenced to an "*additional* 30 days" of keeplock confinement. *Id.* at ¶ 89 (emphasis added). Construed in its strongest (that is, harshest) possible terms, Smith means that he was placed in keeplock immediately following the incident on May 22, 2012, and then Levac sentenced him to an *additional* 30 days in keeplock on June 5, 2012.

Smith appears to allege that during the disciplinary hearing, Levac violated his rights by crediting false testimony. *Id.* at ¶¶ 85-88. For context, the supposedly false testimony relates to a peripheral issue—at the hearing, Smith and two nurses disputed whether the nurse in question, before arriving at Smith's cell, touched a neighboring inmate's infection without wearing gloves. *Id.* at ¶¶ 81-88.

Construed liberally, Smith is arguing that Levac did not grant him due process at the disciplinary hearing. In evaluating an inmate's due process claim when the punishment is segregated confinement within prison, a court must consider "(1) whether the plaintiff had a protected liberty interest in not being [so] confined and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations, internal quotations, and internal alterations omitted).

As for the first prong, a court determines whether a plaintiff has a protected liberty interest by looking at "how long the confinement lasted, along with the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population." *Nieves v. Prack*, ___ F. Supp. 3d ____, No. 6:15-CV-06101 EAW, 2016 WL 1165820, at *3 (W.D.N.Y. Mar. 24, 2016) (citations and internal quotations omitted). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*15** There is no bright-line duration of time in segregated confinement that qualifies as a loss of a protected liberty interest. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days, under normal keeplock or special housing unit ("SHU")[11] conditions, does not qualify as an "atypical and significant hardship" that implicates due process. *Sealey*, 197 F.3d at 589 (citations and internal quotations omitted); *see also Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (observing that SHU confinement of 90 days or less implicates a liberty interest only if the conditions are more severe than normal SHU conditions). Moreover, there is broad agreement in this Circuit that "that keeplock or SHU confinement of 30 days or less in New York prisons" does not implicate due

process. *Williams v. Keane*, No. 95 CIV. 0379 AJP JGK, 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (collecting cases).

Here, Smith appears to allege that as a result of the flawed disciplinary proceeding, he was sentenced to keeplock for 30 days, and he lost his "commissary, package and phone privileges" for the same amount of time. ECF No. 1 at ¶ 89. These allegations are not enough to support a due process claim because, in short, 30 days in keeplock generally does not qualify as the loss of a protected liberty interest. Furthermore, Smith has not made any sort of allegation that his 30 days in keeplock were characterized by "especially harsh conditions." *Sealey*, 197 F.3d at 586. He has merely alleged that the confinement was coupled with the loss of some other minor privileges that are typically associated with general population confinement. Accordingly, Smith's due process claim must fail.

The Court makes one additional note to this analysis. Even if Smith, in alleging that he was sentenced to an *"additional* 30 days" of keeplock confinement (*id.* at ¶ 89 (emphasis added)), means that he was already in keeplock for the incident at the time of the hearing, the conclusion here would be the same. To restate the relevant timeline, Smith allegedly cursed at the nurse on May 22, 2012 and the ensuing disciplinary hearing took place on June 5, 2012. ECF No. 1 at ¶¶ 84, 89. Accordingly, interpreting Smith's "additional 30 days" allegation in the strongest (or harshest) possible light, Smith was placed in keeplock for the nurse-cursing incident on the very day he cursed at the nurse, May 22, 2012. He then remained in keeplock until his June 5, 2012 hearing, where he was sentenced to an "additional 30 days" in keeplock. This would mean he stayed in keeplock for 44 days as a result of cursing at a nurse. Even assuming this were true, a 44-day confinement still would not qualify as the loss of a protected liberty interest. Once again, courts generally treat 100 days of segregated confinement as the lower bound for triggering a protected liberty interest. *See Sealey*, 197 F.3d at 589; *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004) (observing that when inmates are confined to SHU or keeplock for an "intermediate duration," *i.e.*, "between 101 and 305 days," courts must take a close look at a "detailed record of the conditions of the confinement" to determine whether a liberty interest is implicated) (citations and internal quotations omitted). Accordingly, in light of the fact that Smith has not alleged that his stay in keeplock confinement was unusually harsh, a 44-day

2016 WL 3004670

keeplock confinement still does not implicate due process rights.

For the reasons above, Smith has not stated a due process claim against Levac, and thus Levac's motion to dismiss is GRANTED.

### K. Defendant Mosko

**\*16** Defendant Mosko is a corrections official at Five Points. Defendants' counsel has understandably missed Smith's allegations against Mosko in the morass of the complaints, arguing that Mosko should be dismissed because "[a]s best Defendants can determine,... [Mosko] is not alleged to have committed any wrongdoing." ECF No. 36-1. The Court directs defendants' counsel to paragraphs 99-100 of the complaint filed in the 6:12-cv-6208 action. Here, Smith alleges that he was beaten by Mosko and another officer. 6208, ECF No. 1 at ¶ 99-100.

Mosko's motion to dismiss is DENIED.

### L. Defendant Parish

Defendant Parish is a corrections official at Five Points. Smith makes a variety of allegations against him.

First, Smith alleges that on October 8, 2011, Parish instituted an "in cell water deprivation" by shutting off Smith's in-cell sink and toilet water. ECF No. 1 at ¶ 58. Parish apparently shut off Smith's cell water because Smith was accused of flooding his cell earlier that day. *Id.* at ¶ 59. Smith further asserts that Parish did not provide him with either a "formal misbehavior report" or a hearing before shutting off his water. *Id.* As a result of both the in-cell water deprivation and his ongoing dietary issues, Smith alleges that he "physically deteriorate[d] from severe malnutrition and dehydration." *Id.* at ¶ 60. Furthermore, while Smith appears to allege in the complaint that his water was only shut off for one day (*id.* ¶ 59) ("The imposition of this 10-8-2011 in cell water deprivation ... violated the plaintiff[']s 8th Amendment... rights ...."), Smith notes in his reply papers that while he does not exactly know how long his in-cell water was turned off, it was for "a lot longer than just [a] twenty four hour period." ECF No. 38 at 4.

Second, Smith alleges that on December 30, 2011, while Parish and other officers were escorting Smith back to his cell, Parish said, "Smith! Whenever I jerk off all my

fluids come out of my dick and I get dehydrated." [12] *Id.* at ¶ 99. Parish and the other officers then laughed at this comment.

Finally, Smith alleges that on January 18, 2012, two officers came to his cell to take him to the infirmary. 6208, ECF No. 1 at ¶ 44. One of the officers allegedly squeezed Smith's waist chain in an excessively tight manner, and then pushed Smith into a cell door. *Id.* at ¶ 48. Parish responded to the scene, and Smith told Parish that his waist chain was too tight. *Id.* at ¶ 50. Parish checked the waist chain and "disregarded" Smith's complaint. *Id.*

As for the allegations related to Parish shutting off Smith's water, Smith appears to be making both a conditions-of-confinement claim and a due process claim. Each claim is addressed in turn.

With regard to the conditions-of-confinement claim, as the Court has already indicated, Smith must allege that (1) the deprivation was objectively serious in that Smith was "denied the minimal civilized measure of life's necessities," and (2) Parish acted with deliberate indifference to Smith's health and safety. *Walker,* 717 F.3d at 125 (citations and internal quotations omitted).

Here, Smith has failed to allege that the in-cell water deprivation was an objectively serious deprivation. In a Northern District of New York case that also addressed an inmate's temporary loss of in-cell water privileges, the court stated that "[n]owhere has it been held that prisoners are entitled to complete and unfettered access to water or showers." *Beckford v. Portuondo,* 151 F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (holding that a six day suspension of in-cell water privileges, instituted after the prisoner had flooded his cell, did not constitute an objectively serious deprivation); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F. Supp. 1071, 1072-74 (S.D.N.Y. 1988) (holding that an in-cell sink that was inoperable for nine days did not establish a conditions-of-confinement claim under the Eighth Amendment). The Court stands by this statement. Notably, Smith has not at all alleged that he was without access to water for any period of time; he has merely alleged that his *in-cell water* was turned off after he was accused of flooding his cell. This sort of deprivation does not constitute a denial of the "minimal civilized measure of life's necessities." *Walker,* 717 F.3d at 125 (citations and internal quotations omitted). Accordingly, the conditions-

of-confnement claim against Parish related to the in-cell water deprivation is dismissed.

 **\*17**  Furthermore, Smith has failed to state any sort of due process violation with regard to the in-cell water deprivation. Once again, as a threshold matter, a valid due process claim requires the loss of a "protected liberty interest." *Tellier*, 280 F.3d at 79-80 (citations and internal quotations omitted). A "protected liberty interest" is, in turn, implicated if the alleged deprivation was "atypical and significant." *Id.* Here, the Court determines that Smith did not have a protected liberty interest in continuous, uninterrupted access to running water in his cell. *See Beckford*, 151 F. Supp. 2d at 219 ("In light of the minimal amount of time that Plaintiff's dietary, water, and plastic shield restrictions were put in place, the Court holds, as a matter of law, that his confinement was not sufficiently atypical to implicate a protected liberty interest."). Considering that there is a broad agreement in this Circuit that 30 days in segregated confinement— which typically means the inmate is locked in a cell for 23 hours a day—does not qualify as the loss of a protected liberty interest (*see supra* Part IV.J), the brief loss of in-cell water privileges certainly does not qualify as the loss of a protected liberty interest. Consequently, Smith was not entitled to due process before Parish shut off his in-cell water, and thus his due process claim fails.

As for Smith's allegation that Parish made a lewd comment toward him, the Court has already observed that verbal harassment by a corrections official is not a constitutional violation. *See Purcell*, 790 F.2d at 265; *supra* Part IV.F.

Similarly, as for the tightening of Smith's waist chain, the Court has also previously explained that the the tightening of handcuffs and waist chains does not support an excessive force claim unless the tightening causes injury beyond temporary discomfort. *See Rosenberg*, 2013 WL 1223516 at \*3, *supra* Part IV.F. Smith has not alleged that he suffered any injury from the waist-chain tightening on January 18, 2012.

For the foregoing reasons, Parish's motion to dismiss is GRANTED. Notably, Parish did not specifically move to dismiss the claim regarding his involvement in the tightening of Smith's waist chain on January 18, 2012. The Court *sua sponte* dismisses that claim with prejudice.

### M. Defendant Piccolo

Defendant Piccolo is a corrections official at Five Points.

The allegations against Piccolo revolve around Smith's dietary issues. Smith first alleges that a supervisory official, L. Jones, approved his request for a kosher diet on January 30, 2013. ECF No. 1 at ¶ 141. He next alleges that even though his request was approved on January 30, corrections officers did not immediately serve him with the diet. ECF No. 1 at ¶ 141. Accordingly, Smith wrote a letter of complaint, presumably on January 30, to an official who soon forwarded the letter to Piccolo. Piccolo wrote back to Smith in a February 6, 2013 memorandum, saying that Smith's kosher-diet request "was still pending approval from the Deputy Superintendent of Programs." *Id.* Smith then began receiving the kosher diet on February 8, 2013. ECF No. 1 at ¶ 146.

Construed liberally, Smith is attempting to state a First Amendment claim against Piccolo for the delay in serving him a kosher diet. There is a colorable basis for such a claim. The Second Circuit has long recognized that the right of the people to freely exercise religion under the First Amendment includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson*, 527 F.2d 492, 495-96 (2d Cir. 1975). Therefore, an inmate is "entitled to a reasonable accommodation of his ... religious dietary practices." *Davidson v. Murray*, No. 92-CV-0283C, 2005 WL 1123756, at \*3 (W.D.N.Y. May 10, 2005).

Traditionally, an inmate establishes a violation of his free exercise rights by showing "[1] that he has a sincerely held religious belief, [2] that it was substantially burdened, and [3] that defendants' conduct was not reasonably related to some legitimate penological interest." *Barnes v. Furman*, 629 Fed.Appx. 52, 55 (2d Cir. 2015).

Notably, the Second Circuit has recently observed that it is actually an open question whether an inmate must still show that the challenged practice "substantially burdened" his religious beliefs. *See Barnes*, 629 Fed.Appx. at 55 n.3. ("We have not decided whether the substantial burden test remains viable in our Circuit. ..."). However, the Second Circuit has also noted that even "[r]ejecting the substantial burden test" would not mean that "every possible restriction on religious practices is a violation" of free exercise rights. *McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004). In other words, regardless of

whether the prong still applies, *de minimis* violations of free exercise rights are not actionable under § 1983. *See id.*

**\*18** In this vein, district courts in this Circuit have found that where a delay in serving an inmate a religious diet is brief and caused by "typical and acceptable institutional delay," the inmate's religious rights are not violated. *Davidson*, 2005 WL 1123756 at \*4 (citations and quotations omitted) (finding that a 10-day delay in receiving a religious diet after the inmate transferred prisons did not violate free exercise rights); *Tapp v. Stanley*, No. 04-CV-6400 CJS, 2008 WL 4934592, at \*1,7 (W.D.N.Y. Nov. 17, 2008) (finding that a 77-day delay in inmate receiving a special diet that was caused by administrative processing did not violate religious rights); *see also Dove v. Broome Cnty. Corr. Facility*, No. 9:10-CV-0002 DNH/DEP, 2011 WL 1118452, at \*2, 8-9 (N.D.N.Y. Feb. 17, 2011), *report and recommendation adopted*, No. 9:10-CV-02, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011) (finding that a 30-day discontinuance of a kosher diet after inmate violated policy by eating non-kosher food did not violate free exercise rights). This is understandable as prison officials, while accommodating the beliefs of inmates, are also "charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citations and internal quotations omitted).

Here, Smith has effectively attempted to hold Piccolo liable for causing, at most, a nine-day delay in the distribution of his kosher diet. To restate the relevant allegations, Smith alleges that he wrote to Piccolo on January 30, 2013 about not receiving his kosher diet. Piccolo wrote back on February 6, 2013, apparently believing that Smith's request was still pending approval. In any event, Smith then received his kosher diet on February 8, 2013, nine days after he wrote the letter that reached Piccolo. Notably, before January 30, 2013, there is no indication that Piccolo had any knowledge of Smith's request for a kosher diet, so that delay cannot be attributed to Piccolo. In short, this brief nine-day delay caused by Piccolo, without any kind of allegation that it was more than a reasonable processing-related delay, is the sort of *de minimis* deprivation that does not implicate the First Amendment.

For these reasons, Piccolo's motion to dismiss is GRANTED.

*N. Defendant Seidel*

Defendant Seidel is a corrections official at Five Points. Smith first alleges that on April 2, 2012, Seidel and another officer placed Smith on a "shaving razor deprivation order." ECF No. 1 at ¶ 112. Thus, Smith could not shave for over a month. *Id.*

Second, Smith alleges that on October 5, 2011, Seidel wrote Smith a misbehavior report after Smith, by his own admission, urinated on his cell floor. *Id.* at ¶ 139. Smith then alleges that Seidel did not provide him with any cell-cleaning supplies in order to clean up the urine for two days, so Smith and his neighboring inmates were "fed [their] breakfast, [l]unch and dinner meals with the lingering odor of urine in the air, from the uncleaned urine in front of the plaintiff[']s cell and on the plaintiff[']s floor." *Id.*

As for the claim regarding Seidel's failure to provide Smith a razor for shaving, this is the sort of *de minimis* deprivation that does not concern the Constitution. *See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("[A] failure to provide razors for shaving [does not] rise to the level of constitutional concern").

Smith has also attempted to state a conditions-of-confinement claim arising out of Smith urinating on his cell floor. As for such a claim related to the exposure to waste, the Court observes a distinction in this Circuit between an inmate's "continuous and chronic exposure to waste" versus "intermittent or brief exposure." *Ortiz v. Dep't of Corr. of City of New York*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638137, at \*8 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, No. 08 CIV. 2195 RJSHBP, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). Chronic exposure to waste qualifies as an objectively serious condition that implicates the Eighth Amendment. *See Gaston*, 249 F.3d at 165 (vacating summary judgment where plaintiff asserted that for "several consecutive days ... his cell was filled with human feces, urine and sewage water"); *LaReau v. MacDougall*, 473 F.2d 974, 977-79 (2d Cir. 1972) (finding that inmate who spent five days in small cell that contained only a grate-covered hole in the floor for a toilet was deprived of Eighth Amendment rights). On the other hand, brief or intermittent exposure to waste does not does not qualify as an objectively serious condition. *See Ortiz*, 2011 WL 2638137 at \*8 (dismissing claim where inmate was exposed to "sewage overflow" on the three

separate occasions but for "probably less than 24 hours" total time); *Evans v. Fogg*, 466 F.Supp. 949, 950 (S.D.N.Y. 1979) ("To be kept in a refuse-strewn cell for 24 hours and in a flooded cell (a condition resulting from [plaintiff's] own acts) for two days is a rough experience, but, since neither condition persisted for more than a limited period of time, it cannot be said that the condition amounted to cruel and unusual punishment.").

**\*19** After comparing the postures of these cases to the facts at hand, it is apparent that Smith's exposure to his own urine for two days is the type of brief or intermittent exposure to waste that fails to satisfy the objective element of a conditions-of-confinement claim. Bolstering this conclusion is the fact that Smith has failed to allege that he suffered any harm or health problems from the condition.

For these reasons, Seidel's motion to dismiss is GRANTED.

### O. Defendants Scranton and Trombly
Defendants Scranton and Trombly are corrections officials at Five Points. Smith alleges that on March 20, 2012, a nurse at Five Points diagnosed him with dehydration, placed him on " +'hunger strike' observation," and ordered that he be sent to the infirmary. ECF No. 1 at ¶ 73 (internal quotations in original). Smith then went to the infirmary where another nurse allegedly failed to "provide [him] with any fluids or nourishment." *Id.* Officers Scranton and Trombly subsequently "had the plaintiff discharged from the medical infirmary and sent back to his [mental health unit] cell without any proper medical clearance." *Id.*

Construed liberally, Smith is making a claim against Scranton and Trombly for deliberate indifference for discharging him from the infirmary. In general, to state a claim for medical indifference, Smith must allege that (1) objectively, the deprivation of medical care was sufficiently serious, and (2), subjectively, the officials in question acted with deliberate indifference to his health. *Salahuddin*, 467 F.3d at 279-80.

Here, Scranton and Trombly are both non-medical personnel. As the Supreme Court has noted, deliberate indifference by non-medical personnel is manifested by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

On the allegations in the complaint, Smith has not sufficiently pled that Scranton or Trombly denied or delayed access to medical care or otherwise interfered with a prescribed course of treatment. They certainly did not deny or delay access to care—Smith was sent promptly to the infirmary for his dehydration where a nurse on duty apparently decided he was not in need of immediate care. Only at this point did Scranton and Trombly discharge him from the infirmary. They also did not interfere with any course of treatment—once again, there was no immediate course of treatment. The Court also notes that to the extent that Smith's placement on "hunger strike observation" is a form of care or course of treatment, Scranton and Trombly also did not at all interfere with that treatment—upon Smith's discharge from the infirmary, he returned to the mental health unit of the prison (*id.* at ¶ 74) where he remained on hunger-strike status until the next month, April 2012 (*id.* at ¶ 72). In short, Smith has not shown that Scranton or Trombly were deliberately indifferent to either his dehydration on March 20, 2012 or his hunger-strike status.

Thus, Scranton and Trombly's motions to dismiss are GRANTED.

### P. Defendant Sheahan
Defendant Sheahan is the Superintendent at Five Points. Smith makes various allegations against Sheahan in his supervisory capacity.

First, Smith alleges that he filed a grievance regarding an incident of "physical abuse and torture" that he suffered at Five Points on November 2, 2012. *Id.* at ¶ 130. Sheahan apparently "took no action to investigate" this grievance *Id.* Similarly, Smith alleges that he filed "numerous" grievances regarding his inadequate diet. ECF No. 1 at ¶ 64. He notes, without elaboration, that Sheahan and the grievance committee denied all of these grievances. *Id.*

**\*20** The Court addresses these allegations in short order. Smith has not sufficiently alleged that Sheahan was personally involved in any of the alleged deprivations raised in these grievances. First, it is well-settled that the "receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement." *Jones v.*

*Fischer*, No. 9:11-CV-774 GLS/CFH, 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013). Similarly, a supervisor's denial of a grievance—without any further allegation that the supervisor provided a detailed or specific response to the prisoner—is generally not enough to establish personal involvement. *See Brooks*, 450 F. Supp. 2d at 226; *supra* Part IV.G. Without personal involvement, there can be no damages award under § 1983. *See Gaston*, 249 F.3d at 164. Accordingly, to the extent Smith is trying to hold Sheahan personally responsible under § 1983 for matters raised in these grievances, those claims are dismissed.

The Court also notes that to the extent Smith is attempting to state a due process claim based on Sheahan "t[aking] no action to investigate" his grievance, that claim is also dismissed. In short, "[i]t is well established ... that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F. Supp. 2d 437, 445-46 (W.D.N.Y. 2008). In other words, Sheahan had no responsibility under the Constitution to investigate Smith's grievances.

The rest of Smith's allegations against Sheahan are also straightforward. Smith alleges that on June 5, 2012, he was found guilty at a disciplinary hearing for cursing at a nurse. ECF No. 1 at ¶¶ 81-89, *see supra* Part IV. J. Smith appealed the decision to Sheahan, who forwarded it to another official, who then affirmed the decision. ECF No. 1 at ¶ 90. Similarly, Smith alleges that he wrote a letter to Sheahan in 2013 regarding his kosher-diet request. *Id.* at ¶ 141. Sheahan forwarded the letter to another official, who responded unfavorably to Smith. *Id.*, *see supra* Part IV.M.

As the Court previously explained, the fact that Sheahan forwarded a disciplinary decision or correspondence to another official also does not establish that he was personally involved in the underlying matters. *See Rivera*, 655 F. Supp. 2d at 238; *supra* Part IV.C, Part IV.G; Part IV.I. Accordingly, he cannot be liable for damages for these matters under § 1983. *See Gaston*, 249 F.3d at 164. Thus, these claims against Sheahan are also dismissed.

For the reasons stated above, Sheahan's motion to dismiss is GRANTED.

*Q. Defendant Terry*

Defendant Terry is a corrections official at Five Points. Smith's first allegation against Terry is that he, along with three other officers, failed to fix Smith's toilet in December 2011. ECF No. 1 at ¶¶ 102-05. The Court already discussed this incident in Part IV.A and dismissed the conditions-of-confinement claims against the three other officers involved. For the same reasons, it now dismisses the conditions-of-confinement claim against Terry. *See supra* Part IV.A. In short, all of the officers appear to have been quite diligent, as opposed to indifferent, in dealing with the broken toilet.

Smith references Terry in one other incident. By way of brief background, Smith alleges that on November 2, 2012, he fell unconscious behind his cell toilet. ECF No. 1 at ¶ 123. Multiple officers allegedly dragged Smith out from behind the toilet and "shoved" his face into the floor. *Id.* at ¶ 124. A nurse then "shoved one smelling salt packet up each one of the plaintiff's nostrils." *Id.* at ¶ 126. Smith alleges that he suffered a bloody nose and "visible facial injuries" from the incident. *Id.* at ¶¶ 127-28. Immediately following the incident, he was taken to the infirmary where the nurse cleaned his bloody nose and conducted a brief checkup. ECF No. 1 at ¶ 127; 38-2 at 49.

*21 As for Terry's involvement, Smith alleges that after he was discharged from the infirmary later that day, he informed Terry about the "physical abuse" he had just endured. *Id.* at ¶ 128. Terry, however, "refused to take the plaintiff['s] complaint of physical abuse seriously and refused to have photographs taken of the plaintiff['s] face." *Id.*

As an initial observation, it is unclear what exactly Smith means by his assertion that Terry "refused to take [his] complaint of physical abuse seriously." *Id.* If Smith means that Terry ignored his injuries and thus Smith was denied adequate medical care following the incident, that is contradicted by both the complaint and by the exhibits Smith attached to his response to the motion to dismiss. In short, Smith received prompt medical care after the incident. ECF No. 1 at ¶ 127 ("[M]y bleeding nose was then cleaned by medical nurse Kim Cheasman and [my] vital signs were checked."); 38-2 at 49 (medical record showing that a nurse checked Smith's blood pressure, pulse, and oxygen saturation following the incident). Nowhere else in the complaint does Smith complain about the supposed injuries he suffered during the incident, so he has not alleged or otherwise implied that he was ever

in need of any further medical care. Thus, there is no claim for deliberate medical indifference arising from this incident against Terry.

If Smith means that Terry failed to appropriately respond to a complaint of excessive force, Smith has not sufficiently alleged that Terry was personally involved in the underlying use-of-force. Once again, a defendant must be personally involved in the alleged constitutional deprivation to be liable for damages under § 1983. *See Gaston*, 249 F.3d at 164. Personal involvement of a supervisory defendant may be shown in a variety of ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

The Court observes at the outset that Terry did not directly participate in this incident—Smith asserts that Terry showed up in his cell after the incident was over. ECF No. 1 at ¶ 128.

Likewise, the rest of the *Colon* possibilities for personal involvement are not supported by the allegations. In short, Smith's interaction with Terry appears to be isolated; with the exception of this incident and the problem with Smith's toilet, Terry is not referenced a single other time in either complaint. Thus, there is no indication that Terry was informed of a wrong prior to the incident in question and failed to remedy it or, similarly, was deliberately indifferent by failing to act on certain information. For the same reason, Smith has failed to allege that this problem

was caused by Terry's grossly negligent supervision of subordinates or that Terry created or tolerated a policy which allowed this incident to happen. Once again, Smith has merely alleged that he complained to Terry once about a use-of-force after it happened, and that Terry "refused to take the ... complaint... seriously." ECF No. 1 at ¶ 128. That is not enough to show that Terry was personally involved in the incident.

**\*22** Finally, the Court briefly addresses Smith's allegation that Terry "refused to have photographs taken of the plaintiff[']s face" following the alleged assault. *Id.* at ¶ 128. Smith is essentially asserting here that Terry failed to conduct a proper investigation of the alleged assault after it occurred. As the Court has previously stated, the law is settled that "that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *See McCloud*, 55 F. Supp. 3d at 481 (citations and internal quotations omitted). Accordingly, any claim against Terry arising from a failure to investigate is dismissed.

For the above reasons, Terry's motion to dismiss is GRANTED.

### R. Defendant Wuest

Defendant Wuest is a corrections official at Five Points. Smith alleges that on November 20, 2011, Wuest came to Smith's cell after Smith made an emergency sick call request. ECF No. 1 at ¶ 108. Wuest placed handcuffs on Smith and then ordered Smith to turn around in his cell. *Id.* at ¶ 109. In Smith's own words, Smith "became seriously upset and began to verbally curse and threaten C.O.D. Wuest." *Id.* Wuest then allegedly applied Smith's waist chain in an excessively tight manner "and began to twist the plaintiff[']s metal waist chain with his hand, therefore causing the metal waist chain to[ +] dig into the plaintiff[']s waist causing the plaintiff pain and suffering." *Id.*

Smith has effectively attempted to state another claim of excessive force for the tightening of a waist chain. In general, an allegation that an official tightened handcuffs or waist chains is insufficient to state an excessive force claim unless it causes injury beyond temporary discomfort. *See Rosenberg*, 2013 WL 1223516 at *3, *supra* Part IV.F, Part IV.L. Smith has not alleged that he suffered any injury beyond temporary discomfort from

this incident. Therefore, the claim fails, and Wuest's motion to dismiss is GRANTED.

## CONCLUSION

For the reasons stated above, the Court dismisses the following claims *sua sponte*: (1) all claims for injunctive and declaratory relief, (2) the ADA and Rehabilitation Act claims for money damages against the defendants in their individual capacities, (3) the ADA and Rehabilitation Act claims for money damages against the defendants in their official capacities, and (4) the § 1983 claims for money damages against the defendants in their official capacities. Notably, the Court substitutes DOCCS as the defendant for the official-capacity claims for money damages under the ADA and Rehabilitation Act.

Additionally, the motions to dismiss by the following defendants are GRANTED, and thus, they are dismissed from the case: Abbott, Atwood, Bellnier, Bianconi, Bradley, Burri, Colvin, Crance, Fischer, Lt. Gardener, Koenigsmann, Lempke, Levac, Parish, Patches, Piccolo, Scranton, Seidel, Sheahan, Terry, Trombly, Van Buren, and Wuest. Additionally, the Court *sua sponte* dismisses O'Connor from the case. The motion to dismiss by Mosko is DENIED.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 3004670

Footnotes

1    The Court will cite documents filed in the 6:13-cv-6208 action prior to consolidation in the following form: "6208, ECF No. ___." Documents filed in the 6:13-cv-6127 action, both before and after consolidation, will be cited in the Court's usual form: "ECF No. ___."

2    Smith has also filed multiple letters and declarations concerning both an alleged retaliatory transfer from Five Points to Great Meadow Correctional Facility ("Great Meadow"), and then various problems he had while at Great Meadow. ECF Nos. 6; 9; 17; 33. The issues in these letters and declarations are not properly before the Court, and it will correspond with Smith about these issues in a separate letter.

3    Smith is proceeding *in forma pauperis*, and thus his complaints were subject to screening under 28 U.S.C. § 1915. In a previous screening order, the Court dismissed a few of these defendants. 6208, ECF No. 7.

    The Court also notes that, based on the bodies of the complaints, Smith may actually be making claims against even more individuals than just those listed in the complaints' captions.

4    The voluminous exhibits Smith has filed are illuminating as to the types of soft foods Smith believed he could eat without choking. For example, he requested at various times hot chocolate, peanut butter, ice cream, jelly, apple sauce, pudding, and sugar. ECF Nos. 1 at p. 127; 12 at 42; 38-1 at 18. By contrast, he did not want meals like the one he was served on June 16, 2012, which consisted of a "salad, a burnt piece of meat loaf and mashed potatoes with skins mixed in them." ECF No. 29 at 16.

    Due to Smith's alleged inability to eat the food he was served, he was placed on "hunger strike" status at Five Points. ECF No. 1 at ¶ 72. He remained on hunger-strike status for an extended period of time because, as a nurse recounted in a medical record that Smith filed along with his response to the motion to dismiss, "[Smith] believes that his hunger strike status is part of the 'proof that he needs to win a lawsuit against the State of New York that he is being mistreated in prison." ECF No. 38-1 at 55.

5    As a slight qualification that does not affect this analysis, the Rehabilitation Act applies to inmates in state prisons as long as the prison is accepting federal funding. *See Clarkson v. Coughlin*, 898 F.Supp. 1019, 1035-36 (S.D.N.Y. 1995).

6    There appears to be both a "Gardener" who is a nurse and a "Gardener" who is a corrections officer. This analysis refers to the Gardener who is a corrections officer.

7    The claims against this official, Officer Terry, are discussed in Part IV.Q, *infra*.

8    Based on exhibits Smith attached to a motion for a preliminary injunction he previously filed in this case, Smith was required to get in this position before receiving meals "[d]ue to numerous instances of unhygienic acts ... as well as obstructing the closing of feed-up hatches with property or hands or feet." ECF No. 12 at 62.

2016 WL 3004670

9    It appears that Smith's cell was "completely bare" on March 28, 2012 due to concerns over his mental health. Smith had spent the previous five days, from March 23, 2012 to March 28, 2012, in the Residential Crisis Treatment Program at Five Points. 6208, ECF No. 1 at ¶¶ 66-67.

10   "Keeplock" or "Keep Lock" generally refers to confinement where an inmate is locked in his cell for 23 hours per day.

11   SHU confinement is another form of segregated confinement where an inmate is typically locked in his cell for 23 hours per day.

12   This incident was previously detailed with respect to Defendant Burri, *see supra* Part IV.F.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 1424725
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Injah TAFARI, Petitioner,

v.

David A. ROCK, Superintendent, Respondent.

No. 11–CV–0057(MAT).
|
April 24, 2012.

**Attorneys and Law Firms**

Injah Tafari, Malone, NY, pro se.

**ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Background**

**\*1**  Injah Tafari ("Tafari"), an inmate at Upstate Correctional Facility, filed a pleading in the Northern District of New York captioned "Petition for a Writ of Habeas Corpus", seeking to overturn and expunge nine disciplinary rulings in 2002 and 2003 imposing confinement in the special housing unit, keeplock, and loss of privileges. [1] The petition was transferred to this Court on January 21, 2011.

On August 23, 2011, the Court (Larimer, D.J.) issued an order denying Tafari's application to proceed *in forma pauperis* ("IFP") without prejudice and directing him to show cause why the petition should not be re-characterized as a civil action under 42 U .S.C. § 1983. *See* Dkt. # 7. On August 30, 2011, Tafari filed a response, stating in conclusory terms that his pleading in fact was properly characterized as a habeas petition. *See* Dkt. # 8. He again sought leave to proceed as a poor person, asserting that the "three strikes" provision of the Prison Litigation Reform Act ("PLRA") did not apply because he was seeking habeas relief. *See id.*

On January 17, 2012, Tafari filed a motion to convert his petition into a complaint pursuant to 42 U.S.C. § 1983, and requested "15 days to draft up the complaint[ ]" "so that the defendants could be served properly herein."

Motion to Convert Petition ("Mot. to Convert") at 1 (Dkt.# 9). Tafari also requested that the within action be consolidated with the petition pending in *Tafari v. Rock,* 1:10–CV–0729 (W.D.N.Y.), which he also requested be re-characterized as a § 1983 complaint. *Id.* at 1–2. Finally, Tafari requested that this matter and 1:10–CV–0729 be consolidated with *Tafari v. Rock,* 1:11–CV–0217(MAT) (W.D.N.Y.), another self-styled § 2254 habeas petition which is also pending in this Court.

For the reasons that follow, Tafari's motion for IFP status is denied. If Tafari wishes to proceed with this matter as a § 1983 action, he is ordered to remit the filing fee of $350 to the Clerk of the District Court within twenty (20) days. Tafari is also ordered to show cause within twenty (20) days as to why the complaint is not barred by the three-year statute of limitations applicable to § 1983 actions. The Court reserves decision on Tafari's motions to consolidate until he pays the filing fee.

**II. *In Forma Pauperis* Application**

As amended by the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915 allows indigent prisoners to enter into a structured payment plan with regard to the filing fees. *See* 28 U.S.C. § 1915(b). Section 1915(g) denies this option to "frequent filers", like Tafari, who have repeatedly instituted lawsuits that have been dismissed as frivolous, malicious, or lacking an arguable basis in law or fact. *See* 28 U.S.C. § 1915(g). Tafari has had at least four federal actions or appeals dismissed for these reasons prior to instituting the present case. *See Tafari v. Aidala,* No. 1:00–CV–405 (W.D.N.Y. Sept. 28, 2001) (dismissing complaint with prejudice for failure to state claim, and certifying that any appeal would not be taken in good faith); *Tafari v. Aidala,* No. 01–0279 (2d Cir. Apr. 5, 2002) (dismissing appeal from *Tafari v. Aidala,* 1:00–CV–0405 (W.D.N.Y. Sept. 28, 2001, as frivolous); *Tafari v. France,* No. 06–1876 (2d Cir. Nov. 2, 2006) (dismissing appeal from *Tafari v. France,* 1:01–CV–0011 (W.D.N.Y. Mar. 10, 2006, as frivolous); *Tafari v. Stein,* 09–0710–pr(L), 09–2288–pr (Con.) (2d Cir. Nov. 13, 2009) (dismissing appeal from *Tafari v. Stein,* 1:01–CV–0841 (W.D.N.Y. Feb. 12, 2009), as lacking an arguable basis in law or fact).

**\*2**  Pursuant to 28 U.S.C. § 1915(g), Tafari's application for *in forma pauperis* status must be denied unless he can demonstrate that he is in "imminent danger." Tafari has not made such an allegation, and indeed his pleadings contain no suggestion that this is the case. His application

Tafari v. Rock, Not Reported in F.Supp.2d (2012)

2012 WL 1424725

to proceed *in forma pauperis* is therefore denied with prejudice.

**III. Statute of Limitations**

The United States Congress has not set forth a federal statute of limitations for actions pursuant to 42 U.S.C. §§ 1981, 1983, and 1985(3), and therefore this Court must borrow the most analogous state law statute of limitations, provided that the period is not inconsistent with federal law. *See* 42 U.S.C. § 1988; *Board of Regents v. Tomanio,* 446 U.S. 478, 484–485, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The Second Circuit has held that for § 1983 actions, the applicable limitations period is found in the state statute of limitations for personal injury actions. *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997) (citing *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)); *accord Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002). Accordingly, New York's three-year statute of limitations for "an action to recover damages for a personal injury," New York Civil Practice Law and Rules § 214(5), governs § 1983 actions in New York. *Ormiston,* 117 F.3d at 71.

"Courts in this District have generally set the accrual date for procedural Due Process claims related to disciplinary hearings either at the date of the disciplinary hearing or at the date the prisoner's final administrative appeal is decided." *Williams v. Roberts,* 2011 WL 7468636, at *5 (N.D.N.Y. Dec.15, 2011) (citing, *inter alia, Odom v. Calero,* No. 06 Civ. 15527(LAK)(GWG), 2008 WL 449677, at *6–7 (S.D.N.Y. Feb. 19, 2008); *see also Lenihan v. Keane,* No. 93 Civ. 8914(MGC), 1995 WL 28513 at *2 (S.D.N.Y. Jan.25, 1995) (holding that § 1983 action in which prisoner alleged denial of due process in connection with a disciplinary hearing accrued on the day of his disciplinary hearing; claim was dismissed as time-barred); *McCoy v. Coughlin,* No. 90 Civ. 6657(JSM), 1991 WL 130939, at *3 & n. 8 (S.D.N.Y. July 10, 1991) (holding that due process claim accrued as of date that prisoner was found guilty of violation charged and disciplinary report was rendered; claim dismissed). In this case, the dates of Tafari's allegedly unconstitutional disciplinary hearings were as follows: September 20, 2002; November 20, 2002; May 15, 2003; May 20, 2003; May 26, 2003; July 22, 2003; July 23, 2003; September 16, 2003; and September 3, 2003. *See* Petitioner's Memorandum of Law at 2, ¶ 1 (Dkt.# 1). It therefore appears that this action is untimely under the applicable three-year statute of limitations.

The Second Circuit has frowned upon the *sua sponte* dismissal of a *pro se* litigant's complaint on untimeliness grounds without giving the litigant notice and an opportunity to be heard. *Abbas v. Dixon,* 480 F.3d 636, 640 (2d Cir.2007) ("The pleading requirements in the Federal Rules of Civil Procedure, however, do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses.") (citing *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (holding that 28 U.S.C. § 1915A does not require prisoners affirmatively to plead that they have exhausted their administrative remedies)). In light of *Abbas,* the Court hereby gives notice to Tafari that his complaint is subject to dismissal on the basis of untimeliness unless he can demonstrate that he is entitled to tolling of the statute of limitations for each of the disciplinary rulings. *See Abbas,* 480 F.3d at 640.

**V. Conclusion**

 **\*3** For the foregoing reasons, Tafari's motion (Dkt.# 9) to have his petition (Dkt.# 1) re-characterized as a complaint pursuant to 42 U.S.C. § 1983 is **granted.** Tafari's application to proceed *in forma pauperis* (Dkt.# 2) is **denied with prejudice.**

Tafari is ordered to submit a pleading *within twenty (20) days* establishing that the complaint is timely as to *each* of the disciplinary rulings that he challenges. If any of the claims are untimely under the applicable three-year statute of limitations, he must show that he is entitled to tolling of the limitations period as to *each* of the disciplinary rulings.

Tafari is **ordered** to pay the $350 filing fee the next time he files **any** pleading in this Court. **If Tafari fails to pay the $350 filing fee when he responds to this order, the Court will dismiss the complaint (Dkt.# 1) in its entirety with prejudice for failure prosecute and for Tafari's wilful disregard of an order of this Court.** *See* FED. R. CIV. P. 41(b).

The Court reserves decision on Tafari's motions to consolidate asserted in the complaint (Dkt.# 1) until Tafari pays the filing fee and responds to this order which, as noted above, is due *within twenty (20) days.*

**ALL OF THE ABOVE IS SO ORDERED.**

2012 WL 1424725

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1424725

Footnotes

1    Tafari failed to provide any citations to the relevant state court appellate decisions affirming the outcomes of the disciplinary proceedings that he challenges.

**End of Document**                               © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 191212
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Milton THOMPSON, Plaintiff,

v.

Darwin LaCLAIR, Superintendent;
A. Mckee, Correctional Officer; and
N. Irwin, Lieutenant, Defendants.

No. 9:08-CV-37 (FJS/DEP).
|
Jan. 22, 2008.

**Attorneys and Law Firms**

Milton Thompson, Malone, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.

**I. BACKGROUND**

*1  The Clerk of the Court has sent Plaintiff Milton
Thompson's civil rights complaint, his application to
proceed *in forma pauperis,* and a fully executed inmate
authorization form to the Court for its review. *See* Dkt.
Nos. 1-3. Plaintiff has also filed a motion for injunctive
relief. [1]

In his *pro se* complaint, Plaintiff alleges, among other
things, the denial of a constitutionally cognizable liberty
interest without having been afforded procedural due
process, as required under the Fourteenth Amendment
to the United States Constitution, cruel and unusual
punishment in violation of his rights under the Eighth
Amendment, and a third cause of action, denominated as
the second, based upon the loss of certain of his property
and the denial of an internal claim for reimbursement to
compensate him for that loss. *See, generally,* Complaint
("Dkt. No. 1"). Plaintiff's due process claim, the sole
cause of action implicated in his motion for injunctive
relief, stems from an August 2007 disciplinary hearing
that resulted in a finding of guilt and the imposition of
a penalty of thirty days in keeplock confinement with a

corresponding loss of recreation, package, commissary,
and phone privileges. *See id.*

**II. DISCUSSION**

**A. *In forma pauperis application***
After reviewing Plaintiff's *in forma pauperis* application,
*see* Dkt. No. 2, and in light of his filing of a signed inmate
authorization form, the Court finds that Plaintiff may
properly proceed with this matter *in forma pauperis.*

**B. Injunctive relief**
In support of his motion for injunctive relief, Plaintiff
alleges that, as a result of his confinement in the special
housing unit ("SHU"), he was removed from an Alcohol
Substance Abuse Treatment program ("ASAT") before
he completed that program. [2] *See* Dkt. No. 4. Plaintiff
requests that the Court direct Defendants to expunge his
record regarding the disciplinary penalty and credit him
for the five-and-one-half months of the ASAT program
that he completed prior to his confinement in keeplock
and, presumably, further direct Defendants to permit him
to complete the program as soon as possible. *See id.; see
also* Dkt. No. 1 at 10 (requesting that Plaintiff receive
credit for all the time that he invested in the ASAT
program and be permitted to complete that program).
To establish that he will suffer irreparable harm, absent
the injunctive relief he seeks, Plaintiff states that he is
due to appear before the New York State Parole Board in
February, 2008, at which time he will be required to
demonstrate that he has completed the ASAT program or
risk denial of parole. *See* Dkt. No. 4.

The standard that a court must use when considering
whether to grant a request for injunctive relief is
well-settled in this Circuit. To warrant the issuance
of a preliminary injunction, a movant must show (a)
irreparable harm and (b) either (1) a likelihood of success
on the merits of the claim or (2) sufficiently serious
questions going to the merits and a balance of hardships
tipping decidedly toward the party seeking injunctive
relief. *See D.D. ex rel. V.D. v. New York City Bd. of Educ.,*
465 F.3d 503, 510 (2d Cir.2006) (quotation omitted).

*1. Irreparable harm*

**\*2** Where an alleged deprivation of constitutional harm is involved, courts generally do not require that the party seeking injunctive relief make a further showing of irreparable harm. *See Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984) (quotation and other citations omitted). In this case, Plaintiff alleges that, in spending thirty days in the SHU as a result of his disciplinary infraction, he lost the five-and-one-half months of credit he earned while he was enrolled in the ASAT program and was unable to complete that program. According to Plaintiff, he is due to appear before the New York State Parole Board in February, 2008, and his failure to complete the ASAT program may result in the denial of parole. Accepting Plaintiff's allegations as true **for the sole purpose of considering this motion,** the Court finds that, to the extent that Plaintiff might be denied parole because of his failure to complete the ASAT program as a result of his thirty-day SHU confinement in August, 2007, the Plaintiff **may** suffer irreparable harm related to his alleged due process claim should the Court deny his request for injunctive relief. [3]

### 2. Likelihood of success on the merits or sufficiently serious questions regarding the merits and a balance of hardships tipping decidedly toward Plaintiff

Even assuming, for the sake of argument, that a movant has established the possibility of irreparable harm, a party is not entitled to the issuance of interim injunctive relief absent proof of the likelihood of succeeding on the merits of a claim or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992) (citation omitted).

In the present case, Plaintiff has submitted only his own affidavit containing his request for injunctive relief and outlining briefly the reasons why he believes the Court should grant his request. Based upon the Court's review of these materials, in conjunction with Plaintiff's complaint, it is evident that the record lacks any proof that Plaintiff is likely to succeed on the merits of his due process claim or any evidence that establishes sufficiently serious questions going to the merits of that claim and a balance of the hardships tipping distinctly toward Plaintiff.

Plaintiff's motion for injunctive relief is rooted in his claim that he was denied a constitutionally cognizable liberty interest without being afforded the procedural due process that the Fourteenth Amendment requires. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both possessed an actual liberty interest and that he was deprived of that interest without being afforded sufficient process. [4] *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (quotation omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998) (citation omitted); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996) (citation omitted)

**\*3** In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest, a plaintiff must sufficiently demonstrate that the State actually created a protected liberty interest in being free from segregation and that the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *see also Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Since the prevailing view is that by its regulatory scheme New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor, *see, e.g., LaBounty v. Coombe,* No. 95 CIV 2617, 2001 WL 1658245, \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, \*6 (N.D.N.Y. Feb. 6, 2001), the Court must determine whether the conditions of Plaintiff's SHU confinement as alleged rise to the level of an atypical and significant hardship under *Sandin.* If they do not, then Plaintiff is not likely to succeed on the merits of his due process claim.

Atypicality in a *Sandin* inquiry is normally a question of law. [5] *See Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including an analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. *See Hynes,* 143 F.3d at 658; *Arce,* 139 F.3d at 336.

Although not the only factor to be considered, the duration of a disciplinary keeplock confinement remains

significant under *Sandin. See Colon,* 215 F.3d at 231. Significantly, although under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin, see id.* at 232 n. 5, the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.[6] *See id.* at 231-32 (305 days of SHU confinement constitutes an atypical and "sufficient departure from ordinary incidents of prison life").

It is likely that Plaintiff's due process claim is deficient because of his failure to establish that he possessed, but was deprived of, a cognizable liberty or property interest; courts have consistently held that disciplinary confinement for periods similar to those involved in this instance do not rise to a level sufficient to support a procedural due process claim. *See Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) ("[T]he decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin."* (internal quotation omitted)); *Zimmerman v. Seyfert,* No. 9:03-CV-1389, 2007 WL 2080517, *21 (N.D.N.Y. July 19, 2007) (noting that the plaintiff's "thirty-day disciplinary sentence in SHU does not rise to the level of an atypical and significant deprivation sufficient to create a liberty interest"); *Fullwood v. Vosper,* No. 9:99CV1586, 2007 WL 119456, *5 (N.D.N.Y. Jan. 9, 2007) (holding that "thirty-day keeplock confinement and loss of phone, package, and commissary privileges, where [the plaintiff] fails to delineate 'abnormal' conditions, is insufficient to qualify as an atypical and significant hardship"). Therefore, the Court finds that Plaintiff's thirty-day commitment in the SHU did not constitute a constitutionally cognizable liberty deprivation.

**\*4** It is possible that Plaintiff is contending that his removal from the ASAT program deprived him of a liberty interest. Likewise, the Court could construe Plaintiff's complaint to allege that the potential for the denial of parole due to his failure to complete the ASAT program amounts to a liberty interest deprivation. Inmates, however, do not have a constitutional right to be released on parole or to participate in prison programs. *See Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979) (no constitutionally protectable expectation of parole entitling inmate to due process safeguards); *Gissendanner*

*v. Menifee,* 975 F.Supp. 249, 251 (W.D .N.Y.1997) (holding that " 'a prisoner does not hold a protected interest in [prison] programs' " (quoting *Deutsch v. United States,* 943 F.Supp. 276 (W.D.N.Y.1996))). Since an essential element of a § 1983 claim is that "the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States," *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) (citation omitted), any due process challenge grounded in either of these theories fails to state an actionable claim under 42 U.S.C. § 1983.

Based upon its review of Plaintiff's motion for injunctive relief, the Court finds that Plaintiff has failed to allege facts that demonstrate any likelihood of success on the merits of his Fourteenth Amendment claim or any serious questions related to the merits of that claim.

### III. CONCLUSION

Accordingly, after reviewing the entire file in this matter and the applicable law and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's *in forma pauperis* application is **GRANTED.**[7] The Clerk of the Court shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service on Defendants. The Clerk of the Court shall forward a copy of the summons and complaint by mail to the Office of the Attorney General of the State of New York, together with a copy of this Order; and the Court further

**ORDERS** that the Clerk of the Court shall provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's authorization form and notify that official that Plaintiff has filed his action and is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and the Court further

**ORDERS** that the Clerk of the Court shall provide a copy of Plaintiff's authorization form to the Financial Deputy of the Clerk's Office; and the Court further

**ORDERS** that Defendants or their counsel shall file a response to Plaintiff's complaint as provided for in the

Federal Rules of Civil Procedure after service of process on Defendants; and the Court further

**ORDERS** that Plaintiff's motion for injunctive relief is **DENIED** without prejudice to renewal following service of the complaint and an appearance on behalf of Defendants; and the Court further

**\*5 ORDERS** that the parties shall file all pleadings, motions and other documents relating to this action with the clerk of the United States District Court, Northern District of New York, 7th Floor, James Hanley Federal Building and Courthouse, 100 South Clinton Street, Syracuse, New York 13261-7367. **A party must accompany any paper that it files with the Clerk of the Court or the Court with a certificate showing that the party has mailed a true and correct copy of that paper to all opposing parties or their counsel. The Clerk of the Court will return, without processing, any document that it or the Court receives which does not include a certificate of service showing that the party served a copy of that document on all opposing parties or their attorneys.** Plaintiff must comply with any requests

of the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which they must make returnable before the assigned Magistrate Judge with proper allowance for notice as the Rules require. **Plaintiff must also promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.** The Court will decide all motions based upon the submitted papers without oral argument unless the Court orders otherwise; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Court's Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 191212

Footnotes

1    The Court notes that Plaintiff has failed to submit his motion for injunctive relief in the form that the Court's Local Rules require. Specifically, he has neglected to file a memorandum of law in support of his motion. *See* L.R. 7.1(a), (f). In light of the lack of clarity surrounding Plaintiff's application and his *pro se* status, the Court will overlook this deficiency and will consider Plaintiff's motion for a temporary restraining order at this time.

2    According to Plaintiff's complaint, the disciplinary keeplock sanction also caused his expulsion from an Aggression Replacement Training program ("ART") shortly before its completion. *See* Dkt. No. 1 at 9.

3    The Court makes **no** finding at this time that Plaintiff has **actually** suffered irreparable harm.

4    Although Plaintiff argues primarily that he possessed and was deprived of an actual liberty interest, he fails to disclose the nature of the insufficient process he received during the course of his disciplinary hearing, as the second prong of the relevant inquiry requires. The Supreme Court articulated the contours of the procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest in *Wolff v. McDonnell,* 418 U.S. 539, 564-67 (1974), that is, (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; (3) a written statement from the hearing officer explaining his decision and the reasons for the action being taken; and (4), in some circumstances, the right to assistance in preparing a defense. *See id.; see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). Given Plaintiff's lack of allegations regarding the nature of the process violated, the Court makes no finding as to whether the procedural requirements of the Fourteenth Amendment were met under *Wolff* during the course of Plaintiff's hearing.

5    In cases in which there is a factual dispute concerning the conditions or duration of confinement, however, it may be appropriate to submit those disputes to a jury for resolution. *See Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999).

6    In fact, in *Colon,* a Second Circuit panel split markedly about whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. *See Colon,* 215 F.3d at 232-34 (Newman, J.), 235-37 (Walker & Sack, J.J., concurring in part).

7    The Court notes that, although it has granted Plaintiff's application to proceed *in forma pauperis,* he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**Thompson v. LaClair, Not Reported in F.Supp.2d (2008)**

2008 WL 191212

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 403133
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael TOLIVER, Plaintiff,

v.

Brian FISCHER, et al., Defendants.

No. 9:12–CV–00077 (MAD/ATB).
|
Signed Jan. 29, 2015.

**Attorneys and Law Firms**

Michael Toliver Wallkill, NY, Plaintiff pro se.

Office of the New York, State Attorney General, Cathy Y. Sheehan, AAG Albany, NY, Attorneys for Defendants (except Defendant North).

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 *1  On January 17, 2012, Plaintiff commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that twenty employees of the New York State Department of Corrections and Community Supervision ("DOCCS") violated his constitutional rights during his confinement at the Shawangunk Correctional Facility ("Shawangunk"). Dkt. No. 1. By Decision and Order dated May 3, 2012, this Court dismissed, *sua sponte,* Defendants Schneiderman, Bellamy, and Prack from the action because the complaint did not state facts suggesting their personal involvement in the alleged violations of Plaintiff's constitutional rights. Dkt. No. 9 at 8–10.

On June 28, 2012, Plaintiff filed an amended complaint (Dkt. No. 27), which, by Decision and Order dated December 6, 2012 (Dkt. No. 85), this Court accepted for filing against seventeen of the original Defendants, as well as Correction Officer ("C.O.") North, who was not named in the original complaint. Liberally construed, the surviving claims in Plaintiff's amended complaint include (1) a First Amendment claim, based on Defendants' alleged filing of false misbehavior reports against Plaintiff, in retaliation for his pursuit of complaints, grievances, appeals, and Article 78 actions; (2) an equal protection claim based on alleged discrimination against Plaintiff because of his race, disability, and/or sexual orientation; (3) a conspiracy claim related to the retaliation and discrimination claims; (4) a Fourteenth Amendment claim alleging denial of procedural due process in connection with various disciplinary proceedings; and (5) an Eighth Amendment claim for failure to provide adequate medical care. Dkt. No. 27 at 8–9, 35. Plaintiff seeks both monetary and injunctive relief. Dkt. No. 27 at 14.

Defendants filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), seeking dismissal of Plaintiff's amended complaint in its entirety, on behalf of all but one of the remaining Defendants. *See* Dkt. No. 134. [1] Plaintiff responded to the motion to dismiss, and defense counsel chose not to file a reply. Dkt. No. 145; Dkt. No. 150. On November 17, 2014, Magistrate Judge Baxter issued a Report–Recommendation recommending that the Court grant-in-part and deny-in-part Defendants' motion to dismiss. Dkt. No. 155.

Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's Report–Recommendation. Dkt. No. 159. Also before the Court are Plaintiff's requests for a temporary restraining order, requests for sanctions, and an order against further retaliation resulting from the current lawsuit. Dkt. Nos. 161, 163, 167 & 168. Defendants have opposed Plaintiff's motions. Dkt. No. 166.

**II. BACKGROUND**

**A. Facts and Contentions**
For an overview of the facts and contentions, refer to Magistrate Judge Baxter's Report–Recommendation. *See* Dkt. No. 155 at 3–5.

**B. Magistrate Judge Baxter's November 17, 2014 Report–Recommendation**
In his Report–Recommendation, Magistrate Judge Baxter recommended that the Court should grant Defendants' motion to dismiss in regard to Defendants Fischer, Maly, and LeClaire, and as to Plaintiff's conspiracy claim. *See* Dkt. No. 155. Magistrate Judge

Baxter further recommended that the remainder of the motion to dismiss be denied. *See id.*

**\*2** Specifically, Magistrate Judge Baxter recommended that Defendants Fischer, LeClaire, and Maly should be dismissed "because [P]laintiff has not adequately alleged that they were personally involved in any constitutional violations. However, the allegations of personal involvement with respect to [D]efendants Smith and Pingott are adequate ....." Dkt. No. 155 at 6–7. Next, Magistrate Judge Baxter recommends that the retaliation charge involving Defendant Budziszewski stand, because "[t]he allegations ... state a plausible claim of retaliation that cannot be dismissed under Rule 12(b)(6)." *Id.* at 18. The Report–Recommendation did not address the retaliation charge against Defendant North, because "[D]efendant North has not appeared in this case and is not a party to the pending Rule 12(b)(6) motions ....." *Id.* at 18 n. 17.

Additionally, Magistrate Judge Baxter found that Plaintiff's equal protection claim is adequate to survive a Rule 12(b)(6) motion because Plaintiff's allegations "are sufficient to state a 'class of one' equal protection claim, and perhaps a discrimination claim based on race and/or sexual orientation." *Id.* at 22. Magistrate Judge Baxter recommended that the conspiracy claim be dismissed under the "intracorporate conspiracy doctrine," because conclusory allegations by Plaintiff of Defendants' " 'personal' agenda" are not sufficient to plausibly suggest that Defendants acted outside the scope of their employment. *Id.* at 25.

Due to Plaintiff's allegations, including that the hearing officer said to Plaintiff "[e]very time you get a ticket you will be found guilty regardless.... I ain't fair and impartial[,]" Magistrate Judge Baxter found Plaintiff has stated a plausible denial of procedural due process claim. *Id.* at 27; Dkt. No. 27 at 57. Finally, Magistrate Judge Baxter recommended that the Court deny the motion to dismiss in regard to Plaintiff's deliberate indifference claim because, at this stage, Plaintiff's allegation "that he suffered extreme pain for approximately 30 minutes before the identified defendants allowed him to get medical attention[,]" is sufficient to survive the motion. Dkt. No. 155 at 31.

**C. Plaintiff's objections**

Plaintiff first objects to the dismissal of Defendant Maly from the lawsuit. Dkt. No. 159 at 2. He "seeks to supplement the complaint to detail [additional] constitutional deprivations." *Id.* According to the Report–Recommendation, "[t]he only specific allegation in the amended complaint regarding [D]efendant Maly is that, as Acting Superintendent, he denied one of [P]laintiff's grievances...." *Id.* at 9. Plaintiff wishes to add that "Defendant [Maly] sent plaintiff to 'S.H.U.' for *90 days* in direct retaliation to this lawsuit .... " Dkt. No. 159 at 2.

Plaintiff next objects to the dismissal of Defendant Fischer from the lawsuit. *Id.* at 3. Plaintiff has not introduced any new arguments and simply repeats arguments Magistrate Judge Baxter's Report–Recommendation has already addressed. *Id.* This includes "allowing a pattern o[f] retaliation and discrimination by ignoring plaintiff's various grievances and Article 78 proceedings." *Id.*

**\*3** Third, Plaintiff objects to the dismissal of Defendant LeClaire from the lawsuit. Dkt. No. 159 at 4. Plaintiff alleges Defendant LeClaire condoned the retaliatory conduct of officers under his command, and that he "knew or should have known of the continued constitutional violations...." *Id.*

Finally, Plaintiff objects to the dismissal of the conspiracy claim, and alleges that Defendants "had a meeting of the minds in their individual capacities for a common goal." *Id.* at 5. Plaintiff further claims that "Defendants ... conspire[d] with each other to hurt plaintiff, to keeplock plaintiff, to place plaintiff in SHU, [and] to take all privileges away from plaintiff ....." *Id.*

**D. Plaintiff's December 22, 2014, and December 29, 2014 requests for preliminary injunctive relief and sanctions**

Plaintiff requests a preliminary injunction to place him in protective custody, and he requests sanctions against Defendants for each day he remains outside protective custody. Dkt. No. 161 at 3–4. Plaintiff claims he "is in danger [and he has] been forced to live in general population where [his] enemies are." *Id.* at 3. He also claims that Defendants refused to place Plaintiff back in protective custody so that he "can get physically assaulted." *Id.* at 2. Finally, Plaintiff seeks an order against further retaliation resulting from this lawsuit. *Id.* at 4.

2015 WL 403133

In a submission filed seven days later, Plaintiff again requests sanctions, a temporary restraining order, and an order against further retaliation due to the current proceedings. Dkt. No. 163 at 1. Plaintiff states that on December 18, 2014, "Defendants Keys, Sarkowicz, Korines, and co-working 'friends' " came to his cell and threatened his life, continued to file false misbehavior reports, and threatened to break his neck due to his participation in a hunger strike. *Id.* at 2. Plaintiff also claims that inmates who remember him from before his placement in protective custody "reminded [him] that 'the first opportunity to get [him] for snitching [he] will be "done off." ' " *Id.* at 3.

Defendants oppose Plaintiff's requests injunctive relief. Specifically, Defendants argue that "Plaintiff's request should be denied because the requested relief does not relate to any of the allegations of the underlying amended complainant or the proposed second amended complaint." Dkt. No. 166 at 1. Defendants further argue that Plaintiff's allegations are entirely speculative, and that these complaints "should be addressed through administrative channels at Shawangunk Correctional Facility ...." *Id.* at 2.

**E. Plaintiff's January 5 and 11, 2015 requests for sanctions and injunctive relief**
In a letter request dated January 5, 2015, Plaintiff requests "additional sanctions for "further" retaliation ... as [he] was thrown out of [his] wheelchair[,] punched in the face and slapped and kicked by C.O. Stokes on December 22, 2014." Dkt. No. 167 at 2. Plaintiff also requests that the Court order his transfer from his current facility due to the alleged assault by C.O. Stokes, who is not a Defendant in this matter. *Id.* at 3. Plaintiff notes that Defendant Gardner "has recently issued a disposition placing [him] in keeplock with 30 days loss of all privileg[es] without" the required procedural due process. *Id.* at 4. Finally, Plaintiff alleges that the prison medical personnel refuse to examine him, and he "is in pain-sick call is being denied to [him] by medical staff when [they] make their tours." *Id.* at 5.

**\*4** In a letter dated January 11, 2015, Plaintiff cites a Supreme Court case for the proposition that an inmate "may seek injunctive relief based on the claim that defendant corrections officials are knowingly and unreasonably disregarding an objectively intolerable risk of harm and will continue absent a court order directing otherwise." Dkt. No. 168 at 8. Finally, Plaintiff objects to

his current placement in the general prison population due to his status as "victim prone" of being victimized by other inmates, as defined under 7 N.Y.C.R.R. § 1701.5(c)(4)(i).

**III. DISCUSSION**

**A. Standard of Review**

*1. Review of a report-recommendation*
When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). When a party, however, files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011)* (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2006).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A pro se litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b) (1) and Rules 72, 6(a) and former 6(e) of the Federal Rules of Civil Procedure).

*2. Motion to dismiss standard*

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc .,* 282 F.3d 147, 152–53 (2d Cir.2002)).

**\*5** To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly,* 550 U.S.] at 557, 127 S.Ct.1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[,]" *id.* at 570.

Despite this recent tightening of the standard for pleading a claim, complaints by *pro se* parties continue to be accorded more deference than those filed by attorneys. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quotation omitted). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to " 'construe [a complaint]

broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " *Weixel v. Bd. of Educ.,* 287 F.3d 138, 146 (2d Cir.2002) (quotation omitted); *Lopez v. Jet Blue Airways,* 662 F.3d 593, 596 (2d Cir.2011) (citation omitted).

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted).

### *3. 42 U.S.C. § 1983*

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such, for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

### B. Plaintiff's motion to amend and supplement the amended complaint

**\*6** On December 18, 2014, the Court received a motion from Plaintiff seeking to supplement the amended complaint, which included the proposed supplemental amended pleading. *See* Dkt. No. 158. The motion seeks to add additional claims and Defendants, several of whom are employed at Upstate Correction Facility. *See* Dkt. No. 158–2.

Toliver v. Fischer, Not Reported in F.Supp.3d (2015)
Case 9:15-cv-00006-BKS-TWD Document 61 Filed 07/10/17 Page 242 of 282
2015 WL 403133

"Federal Rule of Civil Procedure 15(a) provides that any time after a responsive pleading is served a party must seek leave from the court to amend a pleading. Rule 15(a) specifically states that leave shall be freely given when justice so requires." *LaBarbera v. Audax Const. Corp.,* 971 F.Supp.2d 273, 284 (E.D.N.Y.2013) (citing Fed.R.Civ.P. 15(a)). "However, in *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court stated that denial of a Rule 15(a) motion may be appropriate in instances of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc.' " *Id.* The decision to grant or deny a Rule 15(a) motion to amend is committed to the sound discretion of the district court. *See id.*

"Federal Rule of Civil Procedure 15(d) provides that a party must obtain leave from the court to supplement a pleading setting forth transactions or occurrences or events that have happened since the date of the pleading sought to be supplemented. Rule 15(d) allows a party to supplement the complaint in order to present subsequent material that is related to the claims presented in the original complaint." *LaBarbera,* 971 F.Supp.2d at 284 (citing *Argus, Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589, 602 (S.D.N.Y.1982); 3 Moore's Federal Practice ¶ 15.16[1], at 15176 (2d ed.1982)). Matters stated in a supplemental complaint should have some relation to the claim set forth in the original pleading. *See id.* (citing 3 Moore's Federal Practice ¶ 15.16[3], at 15183 (2d ed.1989)). As with Rule 15(a), the decision to grant or deny a Rule 15(d) motion is within the sound discretion of the district court. *See id.*

In the present matter, the Court finds that Plaintiff should not be permitted to supplement and amend his amended complaint. Plaintiff commenced this action on January 17, 2012, alleging violations that occurred exclusively at Shawangunk C.F. *See* Dkt. No. 1. Then, on June 28, 2012, the Court received Plaintiff's eighty-one (81) page amended complaint. *See* Dkt. No. 27. Thereafter, Plaintiff submitted several additional motions to amend and supplement his complaint. In a Decision and Order dated February 13, 2013, this Court denied the motions on several grounds. *See* Dkt. No. 98. First, the Court noted that the motions failed to comply with Local Rule 7.1(a)

(4) in that it was not a complete, cohesive pleading, but rather a piecemeal compilation of prior submissions. *See id.* at 7–8. The Court found it to be an unreasonable task to ask the Court and Defendants to attempt to interpret and respond to such a pleading. *See id.* Additionally, the Court noted that the proposed amended pleading sought to add claims relating to events that occurred at Upstate C.F. and were unrelated to the claims and Defendants in this action.

**\*7** For many of the same reasons discussed in its February 13, 2013 Decision and Order, the Court finds Plaintiff's motion to amend and supplement his amended complaint must be denied. First, the proposed supplemental amended complaint is not a complete submission. In fact, in a letter dated January 11, 2015, Plaintiff indicates that he "merely submitted the 'supplemental' amended complaint as to be attached" to the amended complaint and admits that he *"did not* submit the *'supplemental amended complaint'* to supercede the ... amended complaint; but, to be an added attachment to the ... amended complaint." Dkt. No. 168 at 2–3 (emphasis in original).

Additionally, permitting supplementation and amendment at this point, nearly three years after Plaintiff commenced this action would be unduly prejudicial and would cause undue delay in the resolution of this action. *See Lopez v. Smiley,* 375 F.Supp.2d 19, 30 (D.Conn.2005). Finally, permitting amendment Plaintiff to amend and supplement to add claims and Defendants entirely unrelated to the claims in this case would be inappropriate. *See Klos v. Haskell,* 835 F.Supp. 710, 715–16 (W.D.N.Y.1993), *aff'd,* 48 F .3d 81 (2d Cir.1995) (denying motion to supplement the complaint to include claims occurring at subsequent correctional facility).

### C. Personal involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)).

2015 WL 403133

Courts have repeatedly found personal involvement is not established when a supervisory official receives letters regarding a plaintiff's grievances and simply refers that grievance to other personnel for investigation. *See Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009); *see also Sealy v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). Rather, personal involvement must be established by either proving (1) the defendant directly participated in the alleged conduct; (2) the defendant knew of the circumstances establishing the complaint and failed to remedy the situation; (3) the defendant created a policy that allowed the unconstitutional practice; (4) the defendant acted grossly negligent; or (5) the defendant demonstrated deliberate indifference to the rights of the plaintiff by not acting on the plaintiff's complaints. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

In his Report–Recommendation, Magistrate Judge Baxter found that Plaintiff has not adequately alleged that Defendants Fischer, LeClaire, and Maly should be dismissed because Plaintiff failed to adequately allege that they were personally involved in any constitutional violations. *See* Dkt. No. 155 at 6–11. In his objections, Plaintiff simply repeats arguments that he made in response to Defendants' motion to dismiss and which were properly rejected by Magistrate Judge Baxter. *See Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008); *Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009).

 **\*8** Having reviewed the Report–Recommendation and Plaintiff's submissions, the Court finds that Magistrate Judge Baxter correctly determined that Plaintiff failed to allege facts plausibly suggesting that Defendants Fischer, Maly and LeClaire were personally involved in the alleged constitutional deprivations.

### D. Conspiracy
The amended complaint alleges that Defendants conspired to "discriminate, harass, and retaliate" against Plaintiff by pursuing false disciplinary charges against him over a period of more than one year. *See* Dkt. No. 27 at 8. Magistrate Judge Baxter agreed with Defendants that this claim should be dismissed under the "intracorporate conspiracy doctrine." Dkt. No. 155 at 22–25.

The intra-corporate conspiracy doctrine, which applies to conspiracy claims pursuant to both 42 U.S.C. § 1983, *see Dilworth v. Goldberg,* No. 10 Civ. 2224, 2012 WL 4017789, \*30 (S.D.N.Y. Sept. 13, 2012); *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 603–04 (S.D.N.Y.2006), and 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978), "posits that officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other." *Jefferson v. Rose,* 869 F.Supp.2d 312, 317–18 (E.D.N.Y.2012) (quotations and citations omitted); *see also Smith v. Town of Hempstead Department of Sanitation Sanitary District No. 2,* 798 F.Supp.2d 443, 461 (E.D.N.Y.2011) (citation omitted). The intra-corporate conspiracy doctrine "extends to public corporate bodies, including municipalities." *Nimkoff v. Dollhausen,* 751 F.Supp.2d 455, 466 (E.D.N.Y.2011) (citation omitted); *see also Michael v. County of Nassau,* No. 09–cv–5200, 2010 WL 3237143, \*5 (E.D.N.Y. Aug. 11, 2010) (holding that the intra-corporate conspiracy doctrine applies to municipalities).

Contrary to Plaintiff's conclusory objections, Magistrate Judge Baxter correctly determined that the intra-corporate conspiracy doctrine mandates dismissal of Plaintiff's conspiracy claims. The allegations in the amended complaint and Plaintiff's objections make clear that all Defendants were employed by the same public entity and that they were working in the scope of their public employment during the alleged unconstitutional conduct. *See Richard v. Fischer,* —— F.Supp.2d ——, 2014 WL 3974158, \*8–\*9 (W.D.N.Y.2014) (applying the intracorporate conspiracy doctrine to bar the plaintiff's conspiracy claims brought against DOCCS employees who were acting within the scope of their employment during the alleged unconstitutional conduct).

Having reviewed this claim and Magistrate Judge Baxter's Report–Recommendation, the Court finds that Magistrate Judge Baxter correctly determined that Defendants' motion to dismiss as to Plaintiff's conspiracy claims should be granted.

### E. Preliminary injunctive relief

#### *1. Governing Legal Standard*
 **\*9** A party seeking injunctive relief must demonstrate 1) irreparable harm; and 2) either a) a likelihood of success on the merits of the claims, or b) existence of serious questions going to the merits of the claims, and a balance of hardships tipping decidedly in the moving party's favor. *See D.D. ex rel. V.D. v. N.Y. City Bd. of Educ.,* 465 F.3d

503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* No. 00–CV–012E, 2006 WL 618576, *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)).

A higher standard than ordinarily required must be met "where an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act ." *Phillip v. Fairfield Univ.,* 118 F.3d 131, 133 (2d Cir.1997) (citation omitted). To meet such a higher standard, the moving party must "show[ ] 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from a denial of the injunction." *Id.* at 133 (other citations omitted). Additionally, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167 (W.D.N.Y.1997) (citing *Farmer v. Brennan,* 511 U.S. 825, 846–47, 114 S.Ct. 1970, 1983–84, 128 L.Ed.2d 811 (1994)) (other citations omitted).

Finally, when a party seeks preliminary injunctive relief, "the relief ... must relate to the allegations contained in the underlying complaint." *McAllister v. Goord,* No. 9:06–CV–0442, 2009 WL 5216953, *2 (N.D.N.Y. Dec. 30, 2009) (internal citations omitted).

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.,* 437 Fed. Appx. 57, 58 (2d Cir.2011) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 118 (2d Cir.2009)). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12 (1983). Rather, a plaintiff seeking to satisfy the irreparable harm requirement must demonstrate that " 'absent a preliminary injunction [he or she] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm .' " *Bisnews AFE (Thailand),* 437 Fed. Appx. at 58 (quoting *Faiveley,* 559 F.3d at 118).

*2. Analysis*

In the first request, Plaintiff contends that "Defendants are refusing [to place him in protective custody] so that [he] can get physically assaulted [,]" and that he "is in danger" and has "been forced to live ... where enemies are." Dkt. No. 161 at 3. However, these claims are entirely speculative and relate to possible future injury, and therefore are not sufficient to show irreparable harm. [2] *Salvatierra v. Connolly,* No. 09 Civ. 3722, 2010 WL 5480756, *24 (S.D.N.Y. Sept. 1, 2010) ("Plaintiff's general fear of future retaliation by Defendants is too speculative to warrant injunctive relief") (citation omitted), report and recommendation adopted by 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Ward v. LeClaire,* No. 9:07–CV–0026, 2007 WL 1532067, *2 (N.D.N.Y. May 24, 2007) ("Plaintiff's request for injunctive relief against future threats or harassment by inmates and/or prison officials is too speculative to meet the irreparable harm requirement. Although Plaintiff claims that he will face future threats and harassment, Plaintiff cannot claim with any certainty how, when, or where he will be retaliated against, or that the retaliation will result in irreparable harm to Plaintiff") (citation omitted).

*10 In his second request, Plaintiff alleges "Defendants Keys, Sarkowicz, Korines, and co-working 'friends' " threatened his life and threatened to break his neck. Dkt. No. 163 at 2. There are no Defendants by the names of Sarkowicz and Korines in this lawsuit, and therefore this Court has no power to enforce an injunction based on their conduct. Fed.R.Civ.P. 65(d). In regard to Defendant Keys, "allegations of future injury without more do not establish a real threat of injury." *Slacks v. Gray,* No. 9:07–CV–0510, 2008 WL 2522075, *1 (N.D.N.Y. June 25, 2008) (citation omitted). Plaintiff has not alleged a real threat of injury, and any future threats should be reported to prison staff, so as not to "immerse the federal judiciary in the management of state prisons." *Fischer,* 981 F.Supp. at 167.

Plaintiff also seeks an order against "further retaliation resulting from this lawsuit." Dkt. No. 163 at 1. Plaintiff's repeated requests for this type of relief are entirely conclusory and far too speculative to meet the irreparable harm standard. *See Ward v. LeClaire,* No. 9:07–cv–26, 2007 WL 1532067, *2 (N.D.N.Y. May 24, 2007) ("Although Plaintiff claims that he will face future threats and harassment, Plaintiff cannot claim with any certainty how, when, or where he will be retaliated against, or that the retaliation will result in irreparable harm to Plaintiff").

In his third request for injunctive relief and sanctions, Plaintiff again asks the Court to order Defendants to transfer him to a different facility because of Defendants' alleged conduct. *See* Dkt. No. 164. Plaintiff alleges that, absent a transfer, he will suffer physical harm but claims that he does not feel comfortable providing more detail because he fears that his letter will be intercepted and not reach the Court. *See id.* at 2–3. Again, these conclusory assertions regarding speculative future threats and injury are insufficient to establish irreparable harm. *See Fischer, 981 F.Supp. at 167.* [3]

Plaintiff requests additional sanctions and restates his request for a TRO based on the alleged conduct of C.O. Stokes, who Plaintiff claims threw him out of his wheelchair, and then proceeded to punch and slap him in the face. Dkt. Nos. 167 & 168. Plaintiff claims that "nearby Defendants" witnessed this conduct. *See id.* at 7. Again, any sought after relief against C.O. stokes must fail because he is not a party to this action. Further, Plaintiff's conclusory assertion that "nearby Defendants" witnessed this conduct is insufficient to warrant the Court granting the requested relief for this alleged past harm.

Finally, the Court also finds that Plaintiff is not entitled to the requested relief because he has made no showing that he is likely to succeed on the merits of his underlying claims.

Based on the foregoing, the Court denies Plaintiff's motions for preliminary injunctive relief (Dkt. Nos. 161, 163, 164, 167 & 168).

### F. Request for sanctions against Defendants

**\*11** Included in his motions seeking injunctive relief, Plaintiff "request [s] that [Defendants] are sanctioned $10,000.00 a day" for failing to place Plaintiff in protective custody. *See, e.g.,* Dkt. No. 161 at 4. Plaintiff has not specified the legal basis for the motion for sanctions.

Sanctions may be imposed against a party to an action under Fed.R.Civ.P. 11 ("Rule 11") or 37 ("Rule 37"), 28 U.S.C. § 1927, or the Court's inherent power, none of which are applicable here. In particular, Rule 11, by its terms, is the vehicle by which sanctions may be obtained in connection with the filing in court of pleadings, motion

papers, or other documents that are baseless, filed in bad faith, or intended to harass, unnecessarily delay, or needlessly increase the cost of litigation. *See* Fed.R.Civ.P. 11(b)-(c). Since Plaintiff does not seek sanctions based on any pleadings, motion papers, or other documents filed by Defendants in this action, Rule 11 provides no basis for the requested sanctions.

Sanctions against a party are also available under Rule 37(b) for failing to comply with a court order or to respond to discovery. *See* Fed.R.Civ.P. 37(b). Again, this rule provides no basis for the requested relief. Sanctions may also be ordered under 28 U.S .C. § 1927 against "an[y] attorney or other party admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously [ .]" Accordingly, by its terms, section 1927 applies to attorneys and parties "admitted to conduct cases" in a federal court. Since they are not attorneys, sanctions under section1927 are not available as against Defendants.

Finally, the Court finds that there is no basis to support invoking the Court's inherent power to sanction Defendants based on the alleged conduct. Rather, a careful reading of Plaintiff's requests for sanctions establishes that Plaintiff, rather than seeking true sanctions, offers argument in support of what may become Plaintiff's damages should he ultimately succeed in this action.

Based on the foregoing, Plaintiff's motions for sanctions are denied.

### G. Plaintiff's appeals

Plaintiff has appealed several orders issued by Magistrate Judge Baxter. *See* Dkt. Nos. 144, 149, 153 and 154. In his first appeal, Plaintiff argues that Magistrate Judge Baxter should have sanctioned Defendants for failing to submit a responsive pleading by a certain date and that a motion to dismiss is not a responsive pleading. *See* Dkt. No. 144 at 2–3. Contrary to Plaintiff's assertions, the Rule 12(a)(4) of the Federal Rules of Civil Procedure, a motion to dismiss resets the time for filing the defendant's responsive pleading as follows: "if the court denies the motion ..., the responsive pleading must be served within 14 days after notice of the court's action [.]" Since the Court had not acted on Defendants' motion to dismiss until the filing of this Memorandum–Decision and Order, Defendants were in compliance with Magistrate Judge

Toliver v. Fischer, Not Reported in F.Supp.3d (2015)
2015 WL 403133

Baxter's order. Moreover, Magistrate Judge Baxter was well within his authority to rescind his previous order requiring Defendants to respond to Plaintiff's motion for sanctions and to *sua sponte* deny that motion as frivolous, which it was.

 *12  Next, Plaintiff appeals Magistrate Judge Baxter's May 27, 2014 Decision and Order in which he denied Plaintiff's fifth motion to amend the amended complaint. *See* Dkt. Nos. 147 & 149. Magistrate Judge Baxter properly denied that motion based on Plaintiff's failure to attached a proposed amended pleading or to include any factual support for the claims and defendants Plaintiff was seeking to add. *See* N.D.N.Y. L.R. 7.1(a)(4).

In a submission dated August 9, 2014, Plaintiff appeals Magistrate Judge Baxter's Text Order denying his motion to preserve and compel Defendants to turn over a video tape of an incident unrelated to the facts of this case. *See* Dkt. Nos. 152 & 153. As Magistrate Judge Baxter correctly determined, the video in question is entirely unrelated to the present matter as it allegedly captures the actions of a non-defendant on June 26, 2014, long after this action was filed. Moreover, the video tape in question allegedly depicts the actions of a corrections officer at Five Points C.F., while the conduct relevant to this case allegedly occurred at Shawangunk C.F. [4]

Finally, in a letter dated October 1, 2014, Plaintiff again asks the Court to sanction Defendants for their failure to file a responsive pleading. *See* Dkt. No. 154. For the reasons discussed above, Plaintiff's appeal is denied as frivolous.

Based on the foregoing, the Court denies Plaintiff's appeals (Dkt. Nos. 144, 149, 153 and 154).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, Magistrate Judge Baxter's Report–Recommendation and the applicable law, the Court hereby

**ORDERS** that Magistrate Judge Baxter's November 17, 2014 Report–Recommendation is **Adopted** in its entirety for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 134) is **GRANTED** in part and DENIED in part; and the Court further

**ORDERS** that Defendants' motion to dismiss is **GRANTED** as to Defendants Fischer, Maly, and LeClaire, and as to Plaintiff's conspiracy claim; and the Court further

**ORDERS** that Defendants' motion to dismiss is otherwise **DENIED;** and the Court further

**ORDERS** that Plaintiff's motions for injunctive relief and for sanctions (Dkt. Nos. 161, 163, 164 & 167) are **DENIED;** and the Court further

**ORDERS** that Plaintiff's appeals (Dkt. Nos. 144, 149, 153 & 154) are **DENIED;** and the Court further

**ORDERS** that Plaintiff's motion to amend/supplement his amended complaint (Dkt. No. 158) is **DENIED;** and the Court further

**ORDERS** that all future pretrial matters are referred to Magistrate Judge Baxter; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

 *13  On January 17, 2012, plaintiff commenced this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that 20 employees of the New York State Department of Correctional and Community Services ("DOCCS") violated his constitutional rights during his confinement at the Shawangunk Correctional Facility ("Shawangunk"). (Compl., Dkt. No. 1). By Decision and Order dated May 3, 2012, the Honorable Mae A. D'Agostino, United States District Judge, dismissed, *sua sponte,* defendants Schneiderman, Bellamy, and Prack from the action because the complaint did not state facts suggesting their personal involvement in the alleged violations of plaintiff's constitutional rights. (Dkt. No. 9 at 8–10).

On June 28, 2012, plaintiff filed an amended complaint (Dkt. No. 27), which, by Decision and Order dated December 6, 2012 (Dkt. No. 85), Judge D'Agostino accepted for filing against 17 of the original defendants, as well as Correction Officer ("C.O.") North, who was not named in the original complaint.[1] Liberally construed, the surviving claims in plaintiff's amended complaint include a First Amendment claim, based on the defendants' alleged filing of false misbehavior reports against plaintiff, in retaliation for his pursuit of complaints, grievances, appeals, and Article 78 actions; an equal protection claim based on alleged discrimination against plaintiff because of his race, disability, and/or sexual orientation; a conspiracy claim related to the retaliation and discrimination claims; a Fourteenth Amendment claim alleging denial of procedural due process in connection with various disciplinary proceedings; and an Eighth Amendment claim for failure to provide adequate medical attention. (Dkt. No. 27 at 8–9, 35).[2] Plaintiff seeks both monetary and injunctive relief. (Dkt. No. 27 at 14).

The Attorney General's Office has filed a motion, pursuant to Fed.R.Civ.P. 12(b)(6), seeking dismissal of plaintiff's amended complaint in its entirety, on behalf of all but one of the remaining defendants.[3] (Dkt. No. 134). Plaintiff has responded to the motion to dismiss (Dkt. No. 145), and defense counsel chose not to file a reply (Dkt. No. 150). The motion to dismiss has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by Judge D'Agostino.

## I. *Facts and Contentions*

When plaintiff was transferred to Shawangunk in February of 2011, he required the assistance of a walker when inside his cell, and otherwise needed a wheelchair to ambulate, because of back problems. (Am. Compl., Dkt. No. 27 at 17).[4] He was assigned to a housing unit that was not wheelchair accessible so that he could attend a mandatory program available only in that cell block. (Dkt. No. 27 at 19). Plaintiff was told that his wheelchair had to be kept in a bin in a storage room and retrieved from that location whenever he required it to move around the facility. (Dkt. No. 27 at 17). Plaintiff alleges that he suffered substantial pain, and was injured on several occasions while attempting to store or

retrieve his wheelchair, and that the defendants ignored these serious medical issues and delayed his referral for treatment. (Dkt. No. 27 at 17–18, 21–24). Plaintiff further claims that his repeated requests for inmate assistance with storing and retrieving his wheelchair were denied. (Dkt. No. 27 at 17–20).

**\*14** Plaintiff alleges that, between March 2011 and May 2012, he filed a number of grievances, implicating various defendants, regarding the conditions of his confinement, including issues relating to the storage and retrieval of his wheelchair and his ability to take extended showers because of his medical issues. (Dkt. No. 27 at 11–13, 40–41, 72–81). Plaintiff claims that defendants filed numerous false misbehavior reports against him in retaliation for pursuing grievances (Dkt. No. 27 at 24–26, 41–59), and because of his race and sexual orientation (as overtly gay) (Dkt. No. 27 at 35, 58–59). Plaintiff further alleges that he was denied due process in connection with the disciplinary hearings against him because he was found guilty by a biased hearing officer on many misbehavior reports, despite overwhelming evidence of his innocence or other mitigating circumstances. (Dkt. No. 27 at 25, 42, 49, 51–52).

Defendants contend that defendants Fischer, Smith, Maly, Pingott, and LeClaire should be dismissed because the amended complaint does not adequately allege their personal involvement in any constitutional violation. (Def.s' Mem. of Law at 5–6, Dkt. No. 134–1). Defense counsel argues that plaintiff does not plausibly allege a causal connection between plaintiff's grievances and the misbehavior reports filed against him by various defendants, as required to support a retaliation claim. (*Id.* at 13–15). The defendants further assert that plaintiff's claim of discrimination fails because it is based on allegations of verbal harassment that are not actionable. (*Id.* at 6–7). Plaintiff's conspiracy claim is barred, according to defense counsel, by the intracorporate conspiracy doctrine. (*Id.* at 7–8). The defendants contend that plaintiff's conclusory assertion that the disciplinary hearing officer was biased do not support a due process claim. (*Id.* at 11–13). Finally, defense counsel argues that plaintiff's medical care claim does not adequately allege facts satisfying the subjective and objective elements of an Eighth Amendment violation. (*Id.* at 9–11).

For the reasons set forth below, this court recommends that the defendants' motion to dismiss be granted in part

Toliver v. Fischer, Not Reported in F.Supp.3d (2015)
Case 9:15-cv-00006-BKS-TWD   Document 61   Filed 07/10/17   Page 248 of 282
2015 WL 403133

and denied in part. In particular, this court recommends that defendants Fischer, Maly, and LeClaire be dismissed based on a lack of personal involvement, and that plaintiff's conspiracy claim be dismissed pursuant to the intracorporate conspiracy doctrine. This court otherwise recommends that defendants' motion be denied.

## II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (*citing Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

 *15 When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999). In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

## III. *Personal Involvement*

For the reasons set forth below, plaintiff's claims against defendants Fischer, LeClaire, and Maly may be dismissed because plaintiff has not adequately alleged that they were personally involved in any constitutional violations. However, the allegations of personal involvement with respect to defendants Smith and Pingott are adequate, at least in the context of a Rule 12(b)(6) motion.

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). "The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (*citing, inter alia, Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). [5]

### B. Analysis

#### 1. Defendants Fischer and LeClaire

The only specific allegation in the amended complaint suggesting the personal involvement of former DOCCS Commissioner Fischer andDep. Com. LeClaire relates to the latter's April 26, 2011 letter to plaintiff. (Dkt. No. 27 at 29, 31, 63, 64, 67). In the letter, defendant LeClaire states that defendant Fischer asked him to respond to plaintiff's letter regarding misbehavior reports. Defendant LeClaire then advises that he was referring plaintiff's letter to Supt. Smith for investigation and any appropriate action because there was no basis for review of the Tier II disciplinary proceeding against plaintiff above the level of the facility superintendent. (Dkt. No. 27 at 63). The personal involvement of a supervisory official cannot be established if his only involvement is to refer an inmate's complaint to the appropriate staff for investigation. *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N .Y.2008); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response

to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*16** Plaintiff also makes conclusory claims about the failure of defendants Smith and LeClaire to oversee subordinate DOCCS employees, and the role of these two defendants in allowing a pattern or retaliation and discrimination by ignoring plaintiff's various grievances and Article 78 proceedings. Such unsupported allegations are not adequate to establish their personal involvement. *See Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Pagan v. Correctional Medical Services,* No. 11–CV–1357, 2012 WL 2036041, at \*6–7 (S.D.N.Y. June 6, 2012) (courts in this district have repeatedly held that affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983).[6]

### 2. Defendant Maly
The only specific allegation in the amended complaint regarding defendant Maly is that, as Acting Superintendent, he denied one of plaintiff's grievances claiming that plaintiff had been denied several physical therapy appointments because of discrimination in October 2011. (Dkt. No. 27 at 12, 30, 31). According to the plaintiff, Mr. Maly's letter denying the grievance stated that Sgt. Lutz had spoken with the plaintiff and the physical therapist and determined that the plaintiff had missed several physical therapy appointments. (Dkt. No. 27 at 30).

In *McKenna v. Wright,* 386 F.3d 432, 437–38 (2d Cir.2004), the Second Circuit noted that it was "questionable [as to] whether an adjudicator's rejection of a grievance would make him liable for the conduct" of which the inmate complained.[7] The district courts within this Circuit "are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (collecting cases). The *Burton* court noted that district courts have found personal involvement based on denying a grievance where (1) the official undertakes some kind of investigation into the initial denial; (2) the official provides

a detailed and specific response to the grievance rather than a *pro forma* denial; or (3) the grievance involves an ongoing violation "such that the 'supervisory official who reviews the grievance can remedy it directly.' " *Id.* (quoting *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)); *Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at \*15 (D.Conn. Mar. 13, 2014) (a supervisory official confronted with an "ongoing" constitutional violation who reviews a grievance or appeal regarding that violation, is "personally involved" if he or she can remedy the violation directly).

By delegating the investigation of this grievance to Sgt. Lutz and merely reporting Sgt. Lutz's findings in his letter to plaintiff, defendant Maly did not become personally involved in any alleged constitutional violation. *Sealey v. Giltner,* 116 F.3d at 51. Moreover, the amended complaint does not suggest that, despite his many complaints and grievances, plaintiff had any further problems with respect to physical therapy appointments. Absent allegations of an ongoing violation that Mr. Maly could have remedied, his denial of this one grievance is not sufficient to establish his personal involvement in any alleged infringement of plaintiff's constitutional rights.[8]

### 3. Defendant Smith
**\*17** With respect to Shawangunk Superintendent Smith, plaintiff alleges that he affirmed the denial of at least one grievance, filed on May 6, 2011, relating to staff denials of plaintiff's requests for assistance in moving his wheelchair. (Dkt. No. 27 at 20). Plaintiff alleges that various defendants continued to engage in retaliatory and discriminatory conduct relating to the storage and retrieval of plaintiff's wheelchair.[9] Based on the authority cited immediately above, plaintiff's allegations adequately allege that the Superintendent was personally involved, in that he failed to remedy an ongoing violation that was within his power to address.

Moreover, defendant Smith affirmed guilty dispositions on a number of misbehavior reports against plaintiff, despite plaintiff's allegations that hearing officer Gardner was biased and that he ignored evidence establishing plaintiff's innocence. (Dkt. No. 27 at 45–46, 49, 57).[10] In the context of a Rule 12(b)(6) motion, these allegations are sufficient to support a claim that defendant Smith was personally involved in the retaliation and due process violations alleged against defendant Gardner. *See, e.g.,*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Toliver v. Fischer, Not Reported in F.Supp.3d (2015)
Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 250 of 282
2015 WL 403133

*Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (concluding that the plaintiff had "sufficiently alleged that Superintendent Smith was personally involved in depriving him of his due process right to call witnesses" at the disciplinary hearing when Smith affirmed the guilty finding on appeal); *Friedland v. Otero,* No. 3:11cv606, 2014 WL 1247992, at *10–11 (D.Conn. Mar. 25, 2014) (defendant Choinski's review of plaintiff's due process claims in connection with the appeal of the disciplinary proceeding report constituted sufficient personal involvement, in that he failed to remedy the underlying procedural defects associated with the disciplinary hearing) (collecting cases).

**4. Defendant Pingott**

Plaintiff documents that Capt. Pingott investigated and denied at least one of his grievances about the storage and retrieval of plaintiff's wheelchair and related injuries sustained in March 2011. (Dkt. No. 27 at 11–12, 45, 61). Plaintiff further alleges that he filed a grievance about defendant Pingott's response. (Dkt. No. 27 at 11–12). Finally, plaintiff claims that Capt. Pingott told his subordinates to "write [plaintiff's] ass up" on misbehavior reports in retaliation for his grievances. (Dkt. No. 27 at 65). Plaintiff's amended complaint adequately alleges Capt. Pingott's personal involvement in constitutional violations, at least in the context of a Rule 12(b)(6) motion.

**IV.** *Retaliation*

**A. Legal Standards**

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380.

*\*18* A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if the defendant initiated false disciplinary charges against plaintiff in retaliation for his exercise of a constitutionally protected right, plaintiff's First Amendment rights are implicated even if the plaintiff was entitled to, and did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Filing prison grievances and lawsuits are clearly constitutionally protected activities in the context of a retaliation claim. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* In the context of a disciplinary hearing, the type of evidence required to establish a causal connection between plaintiff's protected activity and the defendant's alleged adverse action includes: temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing, and statements from the defendants regarding their motives. *Santiago v. Whidden,* No. 3:10–CV–1839, 2012 WL 668996, at *7 (D.Conn. Feb. 29, 2012) (citing *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007)).

**B. Analysis**

Defense counsel argues that plaintiff's "conclusory" allegations that various defendants retaliated against him, for pursuing various grievances, by filing numerous misbehavior reports against him during the same time period are insufficient to state a "plausible" claim of retaliation. (Def.s' Mem. of Law at 14–15). Defendants contend that plaintiff fails to allege, with specificity, that the defendants who filed misbehavior reports against him had knowledge of prior grievances, or other facts suggesting a causal link between plaintiff's protected activities and the defendants' alleged adverse actions. (*Id.*) While many of plaintiff's allegations of retaliation may not withstand a well-documented motion for summary judgment, they are adequate to survive a motion to dismiss under Rule 12(b)(6).

Plaintiff alleges that, on March 9 and 10, 2011, he "circulated ... to the above-named defendants" his first grievances against defendant Kane, and perhaps also against defendants Peterson and Keys, relating to their orders that plaintiff store and retrieve his wheelchair. (Dkt. No. 27 at 11, 33–34). [11] Plaintiff claims that five false misbehavior reports, relating to his problems with moving his wheelchair and related physical limitations, were then filed against him in retaliation for those first grievances. On March 10th, two misbehavior reports were filed against plaintiff-one issued by defendant Peterson and witnessed by his "partner," defendant Kane, and one issued by defendant Keys-defendant Kane's "friend." (Dkt. No. 27 at 33–34, 43–44). On March 13, 2011, defendant Kane's "partner," defendant Stefinik filed disciplinary charges relating to plaintiff's failure to properly store his wheelchair. (Dkt. No. 27 at 32, 45–46). Defendant Cutler filed a misbehavior report against plaintiff on March 14th, because he would not get up to go get his medications, purportedly because plaintiff could not move due to back pain and spasms. (Dkt. No. 27 at 24, 47) . [12] On March 25, 2011, defendant DeGraff charged plaintiff with having contraband-two Motrin pills for which plaintiff had a prescription-charges on which plaintiff was ultimately found not guilty by hearing officer Gardner. (Dkt. No. 27 at 24, 34–35, 48). [13]

**\*19** A well-documented summary judgment motion might well establish that the March 10 misbehavior reports were filed **before** plaintiff submitted his first grievances. The defendants who filed the misbehavior reports in the days following plaintiff's first grievance(s) might be in a position to file affidavits documenting that they were not then aware of the grievances, notwithstanding plaintiff's claim that he "circulated" them to the defendants. Moreover, a summary judgment motion might clarify who was named in plaintiff's first grievances and persuade the court that no rational fact finder would conclude that correction officers not implicated in the grievances had any cause to retaliate against plaintiff. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (*citing Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another

corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in). However, the court cannot, based solely on the amended complaint, liberally construed, find that these allegations of retaliation should be dismissed under Rule 12(b)(6).

Plaintiff alleges that defendant Stone issued a misbehavior report against him on October 3, 2011, relating to plaintiff's refusal to use a filthy towel provided by C.O. Bucci, [14] even though C.O. Stone was not present for the incident. (Dkt. No. 27 at 51). During the disciplinary hearing, plaintiff asked C.O. Stone why he constantly called plaintiff a "Homo Niggerette." Plaintiff alleges that C.O. Stone retaliated against plaintiff, for his question during the hearing and for filing unspecified "grievances of discrimination based on plaintiff's race and sexual orientation" (Dkt. No. 27 at 35), by issuing another misbehavior report relating to plaintiff's use of his wheelchair, on October 14, 2011. (Dkt. No. 27 at 25–26, 35–36, 52–54). Plaintiff claims that, at some point, C .O. Stone "promised to 'make up for his mistakes at the previous hearing' " and told plaintiff" "[i]f I have to write your ass up every day I will—so prepare." (Dkt. No. 27 at 53). While plaintiff's allegations are conclusory in some respects, his amended complaint adequately alleges retaliation by C.O. Stone in connection with this sequence of events.

On July 25, 2011, defendant Budziszewski filed a misbehavior report against plaintiff for disobeying an order to get off the phone and return to his cell. Plaintiff alleges that he was found guilty notwithstanding the fact that phone records showed that he made no call at the relevant time. (Dkt. No. 27 at 25, 49). Ultimately, the disposition was expunged as a result of an Article 78 proceeding plaintiff pursued in state court. (Dkt. No. 145–1 at 14–16). Plaintiff alleges that, on October 17, 2011, he filed a grievance against defendant Budziszewski, who retaliated by filing misbehavior reports against plaintiff relating to the duration of his showers on December 12, 2011, February 6, 2012, and March 7, 2012. [15] Plaintiff was convicted on the disciplinary charges although he purported to have a medical pass for an extended, 25–minute shower. (Dkt. No. 27 at 55–59). Plaintiff claims that, at the time of one of the disciplinary hearings, defendant Gardner told him "keep poking the Bear with

these ... grievances ... and watch what happens to your ass. Every grievance you get a ticket you will be found guilty regardless." (Dkt. No. 27 at 57). [16] Ultimately, at least one of the disciplinary dispositions was reversed as a result of an Article 78 proceeding. (Dkt. No. 145–1 at 24). The allegations regarding defendant Budziszewski state a plausible claim of retaliation that cannot be dismissed under Rule 12(b)(6). [17]

## V. *Discrimination/Equal Protection*

**\*20** The amended complaint alleges that defendants discriminated against plaintiff on the basis of his disability, sexual orientation, and/or race. (Dkt. No. 27 at 9, 35–36, 52, 56, 58–59). Defendants argue that verbal harassment of the plaintiff, including the use of the term "Homo Niggerette" by defendants Stone and Budziszewski to taunt plaintiff, does not constitute actionable discrimination under Section 1983. (Def.s' Mem. of Law at 6–7). While verbal harassment alone does not support a claim of unconstitutional discrimination, the amended complaint alleges an adequate equal protection claim.

### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (*citing City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985)). A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as race or religion. *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Then, the plaintiff must establish that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

" 'In applying the Equal Protection Clause to most forms of state action, [courts] ... seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose.' " *Pedersen v. Office of Personnel Management,* 881 F.Supp.2d 294, 309 (D.Conn.2012) (*quoting Plyler v. Doe,* 457 U.S. 202, 216 (1982)). Courts apply heightened equal protection scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national

origin, or sex. *Id.* (*citing, inter alia, Romer v. Evans,* 517 U.S. 620, 629, 631 (1996)).

Certain "suspect" classifications, including those based on race, are subject to strict judicial scrutiny, and must further a compelling state interest and be narrowly tailored to accomplish the purpose. *Pyke v. Cuomo,* 567 F.3d 74, 77 (2d Cir.2009). The Second Circuit has held that homosexuality is "quasi-suspect (rather than suspect)" category, that is subject to heightened or intermediate judicial scrutiny, [18] but not strict scrutiny. *Windsor v. U.S.,* 699 F.3d 169, 185 (2d Cir.2012), *judgment aff'd, U.S. v. Windsor,* —— U.S. ——, 133 S.Ct. 2675 (2013). [19] "The Equal Protection Clause permits distinctions which are based on a person's disability, if they are rational and serve a legitimate end." *Wiggins v. N.Y. City Dep' of Corr.,* No. 06 Civ.1946, 2008 WL 3447573 at \*8 (S.D.N.Y. Aug. 12, 2008) (*citing Garcia v. State Univ. of N.Y. Health Scis. Ctr.,* 280 F.3d 98, 109 (2d Cir.2001)).

Alternatively, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination, but instead claims that he has been irrationally singled out as a "class of one." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). The Equal Protection Clause "secure[s] every person .... against intentional and arbitrary discrimination" by state officials. *Willowbrook v. Olech,* 528 U.S. 562, 564, (2000). Thus, in a "class of one" claim, the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.*

**\*21** Mere verbal harassment, profanity, or even racial epithets, " 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *See, e.g., Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (collecting cases); *Webster v. Fischer,* 694 F.Supp.2d 163, 187 (N.D.N.Y.2010). However, when alleged harassment amounts to more than verbal taunts and includes other more serious, ongoing constitutional deprivations, a plaintiff should be given an opportunity to pursue his constitutional claims. *Toliver v. City of New York,* 530 F. App'x 90, 92–93 (2d Cir.2013) (reversing district court's granting of defendants' Rule 12(b)(6) based on the lower court's erroneous conclusion that plaintiff alleged mere

verbal harassment which did not support an actionable constitutional deprivation).

**B. Analysis**

Plaintiff alleges that, unlike four other handicapped inmates who were allowed to take extended showers with impunity, he was disciplined for trying to take longer showers, despite having medical authorization. (Dkt. No. 27 at 13, 58–59). Plaintiff also claims that defendant Budziszewski, who filed multiple, retaliatory misbehavior reports against plaintiff relating to the length of his showers, was one of the correction officers who consistently referred to plaintiff as "The Homo Niggerette." (Dkt. No. 27 at 59). Based on the authority cited above, plaintiff's allegations of racist taunts, combined with the more serious, related claims of unconstitutional retaliation, are sufficient to state a "class of one" equal protection claim, and perhaps a discrimination claim based on race and/or sexual orientation. In the context of a summary judgment motion, defendants may be able to document a rational, or even compelling penological interest in how they treated plaintiff vis à vis other handicapped inmates in connection with use of the shower. However, the equal protection claim in the amended complaint is adequate to withstand a Rule 12(b)(6) motion. [20]

**VI. *Conspiracy***

The amended complaint alleges that all of the defendants conspired to "discriminate, harass, and retaliate" against plaintiff by pursuing false disciplinary charges against him over a period of more than one year. (Dkt. No. 27 at 8). Defense counsel argues that plaintiff's conspiracy claim should be dismissed under the "intracorporate conspiracy doctrine." This court agrees, and recommends that the duplicative and conclusory conspiracy claim in the amended complaint be dismissed.

**A. Legal Standards**

"To survive a motion to dismiss, a conspiracy claim under 42 U.S .C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal.... Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed." *Vega v. Artus,* 610 F.Supp.2d 185,

202–03 (N.D.N.Y.2009) (*citing, inter alia, Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002)).

**\*22** "The intracorporate conspiracy doctrine provides that 'if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... employees, each acting within the scope of his employment[,] there can be no actionable conspiracy.' ... The intracorporate conspiracy doctrine 'bars conspiracy claims against employees of entities such as [DOCCS] (when those employees are alleged to have conspired solely with each other) unless, pursuant to the doctrine's 'scope of employment' exception, the employees were pursuing personal interests wholly separate and apart from the entity by whom they were employed." *Richard v. Fischer,* No. 11–CV–6013, 2014 WL 3974158, at *8 (W.D.N.Y. Aug. 7, 2014) (collecting cases).

**B. Analysis**

The Second Circuit has not yet validated the "intracorporate conspiracy doctrine" in the context of a section 1983 action. *Rahman v. Fischer,* No. 9:10–CV–1496 (LEK/TWD), 2012 WL 4492010, at *13 (N.D.N.Y. Sept. 28, 2012) ("[t]he Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, ... but has not extended its application of the doctrine to conspiracy claims under § 1983) (citations omitted). However, numerous district courts have applied the doctrine to dismiss conspiracy charges, under Rule 12(b)(6), relating to Section 1983 claims of retaliation and discrimination similar to those raised in this case. *See, e.g .,* *Vega v. Artus,* 610 F.Supp. at 193, 205–06 (dismissing intracorporate conspiracy claim relating to allegations that defendants harassed, discriminated against, and retaliated against plaintiff (*inter alia,* by filing false misbehavior reports), because of plaintiff's perceived sexual orientation); *Graham v. Peters,* No. 13–CV–705JTC, 2013 WL 5924727, at *1, 5 (W.D.N.Y. Oct. 31, 2013) (dismissing, under intracorporate conspiracy doctrine claim that defendants conspired to retaliate against plaintiff for exercising his First Amendment rights, by subjecting him to excessive force and false disciplinary charges); *Richard v. Fischer,* 2014 WL 3974158. at *8–9 (dismissing conspiracy claim under intracorporate conspiracy doctrine based on allegations that the defendants discriminated in making inmate work assignments based on race and religion); *Rahman v. Fischer,* 2012 WL 4492010, at *1, 13 (dismissing, based on the intracorporate conspiracy doctrine, claims that

defendants conspired to retaliate against plaintiff, by denying him access to classes and a locker, to punish him for pursuing his First Amendment rights to exercise his religion and access the courts).

Some district courts in this Circuit have declined to apply the intracorporate conspiracy doctrine to dismiss conspiracy claims based on more egregious constitutional violations, such as unprovoked assaults, finding there was at least an issue of fact as to whether defendant correction officers were acting, not in the scope of their employment, but for purely personal reasons.[21] However, given the nature of the underlying alleged constitution claims in this case, plaintiff's conclusory allegations that the defendants were clearly pursuing a "personal" agenda (Dkt. No. 145–1 at 74), are not enough to state a plausible claim that the defendants were not acting within the scope of their employment. *See, e.g., Vega v. Artus,* 610 F.Supp. at 205 ("in order to allege facts plausibly suggesting that individuals were pursuing personal interests wholly separate and apart from the entity" to overcome the intracorporate conspiracy doctrine, "more is required of a plaintiff than simply alleging that the defendants were motivated by personal bias against the plaintiff"). Based on the authority above, this court recommends that plaintiff's conspiracy claim be dismissed under the intracorporate conspiracy doctrine.[22]

## VII. *Due Process*

### A. Legal Standards

**\*23** To begin a due process analysis relating to prison disciplinary proceedings, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[23]

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*citing, inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

### B. Analysis

Liberally construed, the amended complaint alleges that defendant Gardner, who presided at most of plaintiff's disciplinary hearings, was not fair and impartial and found plaintiff guilty in the absence of even "some" evidence. For example, plaintiff alleges that he was found guilty by defendant Gardner of disobeying an order to get off the telephone, even though records indicated that plaintiff was not using the phone during the relevant time period; the disposition was later expunged in an Article 78 proceeding. (Dkt. No. 27 at 25, 49; Dkt. No. 145–1 at 14–16). Similarly, plaintiff was found guilty on several misbehavior reports relating to the duration of his showers despite having medical orders allowing extended showers; at least one of those dispositions was allegedly reversed in an Article 78 proceeding. (Dkt. No. 27 at 5559; Dkt. No. 145–1 at 24). Plaintiff claims that, on one occasion, hearing officer Gardner told plaintiff "Every time you get a ticket you will be found guilty regardless.... I ain't fair and impartial." (Dkt. No. 27 at 57).

The allegations in the amended complaint are sufficient to state a plausible claim that plaintiff was denied procedural due process in connection with at least some of his disciplinary proceedings because the hearing officer was not impartial and/or because of the lack of "some" supporting evidence. The court does not decide whether this due process claim could withstand a summary judgment motion, properly-documented with hearing transcripts and supporting documents and affidavits.

## VIII. *Denial of Medical Care*

### A. Legal Standards

**\*24** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (*citing, inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (*citing, inter alia, Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the

official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**B. Analysis**

**\*25** Because of back injuries, plaintiff used a walker to ambulate short distances and needed a wheelchair otherwise. (Dkt. No. 27 at 17). He allegedly complained to various defendants, including Aube, Peterson, Kane, Stefinik, Gaye, Keys, and Cutler that storing and retrieving his wheelchair was causing him pain; but they denied him the assistance of other inmates. (Dkt. No. 27 at 18–20). On May 9, 2011, while trying to move his wheelchair, plaintiff "felt a ... 'needle sharp' pain" in his spine and leg, collapsed on the floor, and could not move. (Dkt. No. 27 at 21). [24] Plaintiff was treated in the hospital and, upon his return to his housing unit, defendants Peterson and Kane continued to require that plaintiff move his wheelchair without assistance, notwithstanding his protests that he could not do so, given his pain. (Dkt. No. 27 at 22). As plaintiff struggled to store his wheelchair, he again collapsed on the floor. Plaintiff claims that C.O. Stefinik told the nurse "Nothing's wrong with him, he just ... laid down on the floor[,]" and Sgt. Aube stated "leave his ass on the floor." (Dkt. No. 27 at 23). The defendants did not allow plaintiff to be taken for medical attention for "approximately half an hour" by which time, plaintiff's pain was so intense that he cried. (Dkt. No. 27 at 23). [25]

Plaintiff does not state that the delay in his treatment following his "second" collapse (Dkt. No. 27 at 45) resulted in any substantial deterioration of his medical condition. However, the amended complaint, liberally construed, alleges that he suffered extreme pain for approximately 30 minutes before the identified defendants allowed him to get medical attention. While a summary judgment motion, supported by plaintiff's medical records, may well establish that the one, relatively brief delay in allowing plaintiff medical attention was not

sufficiently "serious" to satisfy the objective prong of the Eighth Amendment standard, this court cannot make that determination in the context of a Rule 12(b)(6) motion. Similarly, while the court concludes that plaintiff has adequately alleged that the named corrections officers were deliberately indifferent to plaintiff's medical needs on at least one occasion, a summary judgment motion supported by affidavits from the defendant may establish that no rational fact finder could conclude that plaintiff satisfied the subjective prong necessary to establish an unconstitutional delay in medical care.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 134) be **GRANTED** as to defendants Fischer, Maly, and LeClaire, and as to plaintiff's conspiracy claim, and it is further

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 134) be otherwise **DENIED,** and it is further

**ORDERED,** that if the District Court adopts this recommendation, she shall return the case to me to set a schedule for discovery and any further substantive motions with respect to the surviving claims and defendants.

**\*26** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (*citing Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Nov. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 403133

Footnotes

1    C.O. North, who is no longer an active DOCCS employee (Dkt. No. 91), has not been served with the amended complaint and is not currently represented in this action.

2    The Court agrees with Defendants' response to Plaintiffs request that "Plaintiff's allegations in all three motions are purely speculative [,]" and that his "issues ... should be addressed through administrative channels ...." Dkt. No. 166 at 2.

3    Throughout the course of this litigation, Plaintiff has filed no less than eighteen (18) separate applications seeking injunctive relief. *See* Dkt. Nos. 7, 54, 64, 67, 71, 80, 83, 95, 101, 112, 121, 122, 123, 132, 161, 163, 164, & 167. The vast majority of these applications discuss the same conclusory allegations and speculation regarding threats to his physical safety. Noticeably lacking from these applications, which span almost three years, is any indication that Plaintiff has actually been subjected to any physical violence during his time at Shawangunk, that in any way relates to this litigation.

4    Plaintiff claims that he is seeking this video because he is concerned that Defendants and other corrections officers are tampering with his mail and that it is not reaching the Court. *See* Dkt. No. 151 at 1–2. One need only glance at the docket in this matter and in the numerous other cases Plaintiff has commenced to know that the vast majority, if not all of Plaintiff's submissions to the Court, have actually been mailed to the Court. Despite the fact that this case has not yet progressed beyond the motion to dismiss stage, there are nearly 170 docket entries in this matter, the vast majority of which are submissions by Plaintiff.

1    Judge D'Agostino again dismissed all claims against defendants Schneiderman, Bellamy, and Prack because the amended complaint did not adequately allege their personal involvement. (Dkt. No. 85 at 3–5).

2    Plaintiff has subsequently attempted to file two motions to further amend or supplement his complaint (Dkt.Nos.77, 146); but this court has denied both motions because of plaintiff's failure to support his motions with a proposed amended pleading, and because his submissions were " 'exceedingly confusing,' piecemeal, and lengthy." (Dkt. No. 147 at 4 (citing Dkt. No. 98 at 7–8), 7).

3    C.O. North, who is no longer an active DOCCS employee (Dkt. No. 91), has not been served with the amended complaint and is not currently represented in this action. The Attorney General's Office represents former DOCCS Commissioner Brian Fischer, Supt. Joseph T. Smith, Dep. Supt. W. Maly, C.O. J. Stefinik, Lt. J. Gardner, C.O. Stone, Dep. Com. Lucien LeClaire, Sgt. Aube, C.O. Gaye (John Doe), C .O. Keys, Cpt. L. Pingott, C.O. DeGraff, Sgt. Preston, C.O. R. Cutler, C.O. Budziszewski, C.O. R. Kane, and C.O. J. Peterson. (Def .s' Mem. of Law at 1, Dkt. No. 134–1). Plaintiff apparently

misspelled the names of defendants Pingott and Peterson in his papers; the court will use the spellings from defense counsel's papers.

4    Because the pages of the amended complaint are not all consecutively numbered, the court will refer to the pages in the header added, upon filing, by the court's CM–ECF system.

5    Many courts in this Circuit have discussed whether all of the personal involvement factors, set forth in *Colon,* are still viable after *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). *See, e.g., Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). See also *Young v. Choinski,* 15 F.Supp.3d 172, No. 3:10–CV–606, 2014 WL 962237, at *10–12 (D.Conn. Mar. 13, 2014) ("Although *Iqbal* does arguably cast doubt on the viability of certain categories of supervisory liability, where the Second Circuit has not revisited the criteria for supervisory liability, this Court will continue to recognize and apply the *Colon* factors.").

6    In his response to the Rule 12(b)(6) motion, plaintiff attempts to bolster his claim that former Com. Fischer was "personally involved" in violations of plaintiff's constitutional rights. Plaintiff claims that, while the Commissioner was visiting Shawangunk "during this period," plaintiff overheard him comment "Oh, that's Toliver[;] good job with him." (Dkt. No. 145–1 at 58–59). While it is not clear when plaintiff claims defendant Fischer made this remark, it is recounted in the context of plaintiff's discussion about incidents in late 2013, well after his filing of the amended complaint. This ambiguous remark, if it was indeed made by defendant Fischer, would not seem probative of his personal involvement in the alleged constitutional violations recounted in the amended complaint. In any event, generally one cannot amend a complaint in a response to a motion to dismiss. *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 390 n. 19, (S.D.N.Y.2013) (*citing Wright v. Ernst & Young, LLP,* 152 F .3d 169, 178 (2d Cir.1998)).

7    The Second Circuit concluded, however, that "[w]hen allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." 386 F.3d at 438.

8    In his response to the motion to dismiss, plaintiff tried to bolster his showing of personal involvement of Dep. Supt. Maly by making allegations about his oversight of a disciplinary hearing in July 2012, after Maly had been served with the amended complaint in this action. (Dkt. No. 145–1 at 61–62). Based on the authority stated above, the court cannot decide the pending motion to dismiss based on plaintiff's attempt to rely on new allegations outside of the time frame of the operative amended complaint, without making a proper motion to supplement.

9    For example, plaintiff alleges that after denying plaintiff's grievance in July 2011 (Dkt. No. 27 at 20), the Superintendent affirmed the guilty disposition on a misbehavior report issued by C.O. Stone in October 2011 alleging that plaintiff failed to obey an order with respect to getting out of his wheelchair and storing it (Dkt. No. 27 at 52–54).

10    *See* section VII B, below.

11    Plaintiff's 81–page amended complaint is disorganized and often unclear about significant factual details. The court has construed plaintiff's pro se pleading liberally, as required by Second Circuit authority.

12    In plaintiff's response to the Rule 12(b)(6) motion, he asserted that defendant Cutler was another "co-worker and friend" who worked on the same housing unit as the other defendants. (Dkt. No. 145–1 at 11–12).

13    Plaintiff asserted, in his response to the Rule 12(b)(6) motion, that defendant DeGraff was a "friend of Defendants Stef[i]nik, Pet[ ]erson, K[ ]ane, Cutler and Keys." (Dkt. No. 145–1 at 13). The amended complaint also alleges that plaintiff filed another grievance, on March 22, 2011, alleging, *inter alia,* that unspecified officers tampered with his food. (Dkt. No. 27 at 11). Plaintiff alleges that he filed additional 2011 grievances on March 25, March 30, April 22, and May 6 implicating defendants Pingott, DeGraff, and unspecified others, the last of which was denied by Supt. Smith. (Dkt. No. 27 at 11–12, 20–21, 29).

14    C.O. Bucci is not named as a defendant in the amended complaint.

15    Plaintiff alleges he filed another grievance with respect to the duration of his showers on December 12, 2011, but the amended complaint does not specify whether defendant Budziszewski was named in that grievance. (Dkt. No. 27 at 12–13).

16    Plaintiff, in his response to the Rule 12(b)(6) motion, claimed that, at some point before the February 6, 2012 misbehavior report was filed, defendant Budziszewski, promised to " 'get plaintiff again' for the grievances." (Dkt. No. 145–1 at 22).

2015 WL 403133

**17**     Because defendant North has not appeared in this case and is not a party to the pending Rule 12(b)(6) motion, the court will not address the allegations of retaliation against C.O. North.

**18**     "To withstand intermediate scrutiny, a classification must be 'substantially related to an important government interest.' ... 'Substantially related' means that the explanation must be 'exceedingly persuasive.' " 699 F.3d 185 (citations omitted).

**19**     The Supreme Court in *Windsor* did not consider whether homosexuals constitute a suspect class. 133 S.Ct. at 2695–96.

**20**     In his response to the Rule 12(b)(6) motion, plaintiff also argues that he was denied equal protection because, by requiring him to store and retrieve his wheelchair under physically difficult circumstances, the defendants treated plaintiff differently from "similarly situated inmates using wheelchairs and/or walkers." (Dkt. No. 145–1 at 19). While this equal protection claim is more difficult to discern from the amended complaint, the court will not preclude plaintiff from pursuing this claim, without prejudice to the defendants challenging it in a subsequent summary judgment motion.

**21**     *See, e.g., Medina v. Hunt,* No. 9:05–CV–1460, 2008 WL 4426748, at *8–10 (N.D.N.Y. Sept. 25, 2008) (a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleged that officers assaulted him in retaliation for participating in a federal lawsuit); *Hill v. City of New York,* No. 03 CV 1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (finding that the personal interest exception applies, and allowing conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force); *Randle v. Alexander,* 960 F.Supp.2d 457, 475 (S.D.N.Y.2013) (there is no fair interpretation of plaintiff's allegations that suggests that the defendants were acting within the scope of their responsibilities as prison guards when they forced plaintiff and another inmate to fight each other in the mantrap area, and then tried to cover up the fight).

**22**     The courts notes that, as in *Rahman v. Fischer,* 2012 WL 4492010, at *13 n. 18, plaintiff's conspiracy claim "appears largely duplicative of many of the other claims raised in his [Amended] Complaint."

**23**     Most, if not all, of the disciplinary proceedings against plaintiff involved "Tier II" hearings, for which the maximum possible confinement was 30 days of segregated housing or keeplock. *See* N.Y. Comp.Codes R. & Regs. tit. 7 § 253.7(a)(1)(iii). The federal district courts in New York, applying *Sandin,* have consistently held that terms of special housing or "keeplock" of approximately 30 days, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement. *See, e.g., Brown v. Secore,* 9:08–CV–085, 2010 WL 980233, at *5 (N.D.N.Y. Mar. 15, 2010) (collecting cases); *Pilgrim v. Bruce,* 9:05–CV–198 (GLS/GHL), 2008 WL 2003792, at *15 (N.D.N.Y. May 7, 2008) (plaintiff's conclusory allegations, which notably do not include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subjected to more severe conditions than in normal restrictive confinement); *Holland v. Goord,* 05–CV–6295, 2006 WL 1983382, at *7 (W.D.N.Y. July 13, 2006) (77 days in keeplock during which plaintiff was deprived of TV, phone, packages, and commissary, and was unable to go to Muslim services and classes, did not create a protected liberty interest). However, defendants' pending motion does not challenged plaintiff's due process claim on the basis that he was not deprived of a liberty interest (perhaps because he received multiple, sequential disciplinary sentences); so the court will not address that issue.

**24**     Elsewhere in the amended complaint, plaintiff seems to allege that his physical collapses while storing or retrieving his wheelchair happened in March 2011, not May 2011. (Dkt. No. 27 at 45).

**25**     The amended complaint seems to allege that plaintiff collapsed under similar circumstances on at least one subsequent occasion. (Dkt. No. 27 at 23–24).

End of Document                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 782500

2017 WL 782500
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

The Town of Ramapo, New York; Ellen
Stack; Sean Stack; Patricia Hendrick;
Dan Daly; and Mendel Taub, Plaintiffs,
v.
The Town of Clarkstown by its Town
Board; and John Does "1-5", Defendants.

No. 16 Civ. 2004 (NSR)
|
Signed 02/27/2017

**Attorneys and Law Firms**

Dennis E. A. Lynch, Patrick Andrew Knowles, Feerick
Lynch MacCartney, South Nyack, NY, for Plaintiffs.

Harold Y. MacCartney, Jr., Law Offices of Harold Y.
MacCartney, Jr., Upper Nyack, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

*1 Plaintiffs the Town of Ramapo, New York
("Ramapo"), Ellen Stack, Sean Stack, Patricia Hendrick,
Dan Daly, and Mendel Taub (collectively "Plaintiffs")
initiate this action pursuant to 42 U.S.C. §§ 1981,
1982, 1983, and 1985(3), the Fair Housing Act, 42
U.S.C. § 3604(a) and § 3617 ("FHA"), the First
and Fourteenth Amendments to the United States
Constitution, New York Civil Rights Law § 40-c
("NYCRL"), Section 291 of the New York State Human
Rights Law, N.Y. Exec. Law § 291(2) ("NYSHRL"),
and the New York State Constitution, against the
Town of Clarkstown ("Clarkstown") and John Does 1-5
(collectively "Defendants"), alleging claims of interference
with Plaintiff's federal right to interstate and intrastate
travel, right to association, right to equal protection
of the laws, right to assemble, and claims of religious
discrimination and retaliation against Plaintiffs in the
housing context. Defendants have moved to dismiss
the complaint pursuant to either Federal Rule of Civil
Procedure 12(b)(1) or 12(b)(6) on various grounds,

including that the action is procedurally barred by res
judicata or that the causes of action alleged in the
complaint are time-barred by the applicable statutes
of limitations. For the following reasons, Defendants'
motion is GRANTED in part and DENIED in part.

FACTUAL BACKGROUND

The following facts are derived from the Amended
Complaint unless otherwise noted, and are accepted as
true for purposes of this motion.

Since 1940, Ramapo has experienced greater population
growth than Clarkstown. (*Id.* ¶¶ 34-40.) Within Ramapo,
there is also a growing population of individuals
practicing the Jewish faith, and a substantial increase
in the population of Orthodox and Hasidic Jewish
individuals, as compared with a relatively smaller growth
of this subpopulation within Clarkstown. (*Id.* ¶ 41, 42.)
In addition to a substantially more religiously diverse
population, a larger population of more economically
disadvantaged individuals also reside in Ramapo as
compared to Clarkstown. (*Id.* ¶ 44.) Ramapo also differs
from Clarkstown in that it has a larger number of areas
where low income residents reside, and villages consisting
almost entirely of Hasidic families. (*Id.* ¶ 46.)

Defendants have undertaken numerous activities to
prevent Orthodox and Hasidic Jewish individuals from
moving from Ramapo to Clarkstown. (*Id.* ¶ 47.) Plaintiff
alleges that these measures include the closing of Samuel
Road, which connects Ramapo and Clarkstown. (*Id.* ¶
49.) Plaintiff contends that a physical barricade was placed
along the area where Samuel Road intersects Ramapo
and Clarkstown, under the pretext that the closure was
meant to address a concern that cars were exceeding
the speeding limit. (*Id.* ¶ 50.) Clarkstown and other
Defendants did not undertake road safety practices or
provide for traffic enforcement activities before placing
the barrier on Samuel Road. (*Id.* ¶ 51, 52.) The initial
barrier was primarily composed of "plastic with a break-
away chain locking device" which allowed for the passage
of emergency vehicles. (*Id.* ¶ 55.) Later, the plastic
barricades were replaced with cement "jersey barrier"
barricades, which allowed for the passage of emergency
vehicles from Clarkstown to Ramapo with delay caused
by the need to remove the barrier. (*Id.* ¶ 56.)

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

**\*2** Defendants have also taken other measures to prevent Jewish individuals from traveling to or residing in Clarkstown, including by appearing at town meetings held in Ramapo, and objecting to the development of a multi-family residential facility on the border of Clarkstown, which would provide "affordable and less affluent housing that would attract Orthodox and Hasidic residents." (*Id.* ¶¶ 73, 74.) Clarkstown also passed a moratorium on new construction after the closure of Samuel Road. (*Id.* ¶ 75.) In his November 2015 campaign for re-election as Town of Clarkstown Supervisor, the former Clarkstown Supervisor also emphasized that he was "keeping Clarkstown from Becoming Another Ramapo." (*Id.* ¶ 78.) This slogan was placed in a brochure that publicized that Clarkstown had updated the Town Code and placed a moratorium on new residential construction. (*Id.* ¶ 79.) This literature also depicted a "multi-family housing unit with many children's toys and playground devices ... intended to show areas typically found within ... Ramapo where Hasidic families.... [live]." (*Id.* ¶ 80.)

All of these efforts were part of a discriminatory purpose confirmed by the installation of the "permanent" barrier in 2016. (*Id.* ¶ 81.)

Plaintiffs Ellen Stack, Sean Stack, Patrick Hendrick, and Dan Daly live on Samuel Road, which is located within Ramapo. (Compl. ¶ 25.) Samuel Road traverses both Ramapo and Clarkstown, and previously provided for public travel. (Id. ¶¶ 26, 27.) Ramapo borders the state of New Jersey, and Samuel Road previously served as a means for individual Plaintiffs to travel both intra-New York State within the Towns of Ramapo and Clarkstown, and interstate between New York and New Jersey. (Id. ¶¶ 28, 29.) Public access to Samuel Road also allowed for more expeditious access for emergency and other vehicles. (See id. ¶ 32.)

The County of Rockland and the Village of Chestnut Ridge previously brought litigation to remove the barrier. (*Id.* ¶ 57.) Throughout that litigation, Clarkstown and other Defendants asserted that the barrier provided for access by emergency vehicles that could enter Ramapo through Samuel Road by using a key to open a lock that kept the barrier closed. (*Id.* ¶¶ 58, 59.) After all New York State Court remedies were exhausted "for those wishing to remove the Barrier on Samuel Road," on March 11, 2016, Defendants placed permanent, new

concrete barriers across Samuel Road, affixed to the road with metal stakes so that no emergency vehicles could traverse that portion of the road. (*Id.* ¶ 61.) At that time, a representative of the Defendants told Plaintiff Stack that they were making the closure of Samuel Road "permanent" because no more judicial remedies existed for those who oppose the barrier. (*Id.* ¶ 62.)

The closure of Samuel Road has also had a direct impact upon the general health, safety, and welfare of Ramapo residents on and about Samuel Road; on one occasion, in 2013, an ambulance was unable to pass through Samuel Road to Ramapo due to the barrier and had to reroute, causing a delay in medical assistance to a Ramapo resident who had suffered a stroke. (*Id.* ¶¶ 64, 65.) Prior to the installation of the cement barriers, during the winter months a "pile up" of snow and ice prevented emergency vehicles from passing through the barrier, even if it was open. (*Id.* ¶ 66.) The barrier has also created a virtual dead end on Samuel Road, and has become a location where drugs can be used and sold, "since it is difficult for law enforcement to view such conduct." (*Id.* ¶ 68.) With the closing of Samuel Road, Ramapo residents must also use an alternate route to enter a specific Clarkstown road called Newport Drive; the alternate route has a steep incline that is difficult to drive on during inclement weather. (*Id.* ¶¶ 69, 70.)

Ambulance access to Ramapo through Samuel Road provides for the quickest response time. (*Id.* ¶ 71.) Due to the barrier, an ambulance that intends to traverse Samuel Road must reroute and take a longer route, which increases response time to Ramapo residents. (*Id.* ¶ 72.)

## STANDARD ON A MOTION TO DISMISS

**\*3** Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

87, 98 (2d Cir. 2007) (*quoting Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 662. A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

### I. Timeliness of Plaintiffs' Federal Claims

" 'While a statute-of-limitations defense may be raised in a motion to dismiss under [Rule] 12(b)(6), such a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (citation omitted). A defendant may raise a pre-answer statute of limitations defense, for example, "[w]here the dates in a complaint show that an action is barred by a statute of limitations." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989). Thus, for a Court to grant a motion to dismiss on the basis that the asserted claims are time-barred, there must be no factual question as to whether the alleged violations occurred within the statutory period. *See Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F. Supp. 2d 457, 468 (S.D.N.Y. 1999).

### a. Applicable Statutes of Limitations

Plaintiffs bring federal constitutional claims pursuant to §§ 1981, 1982, 1983 and 1985(3), and the FHA. Plaintiff's claims brought pursuant to §§ 1981, [1] 1982, 1983 and 1985(3) are governed by a three-year statute of limitations, and their FHA claims are governed by a two-year limitations period. *See Carvel v. Franchise Stores Realty Corp.*, 08-CV-8938 (JGK), 2009 WL 4333652, at *8 (S.D.N.Y. Dec. 1, 2009) ("the statute of limitations in New York for claims pursuant to 42 U.S.C. §§ 1981–83 & 1985 is three years"); *see also See Clement v. United Homes*,

*LLC*, 914 F. Supp. 2d 362, 370 (E.D.N.Y. 2012) (citing 42 U.S.C. § 3613(a)(1)(A); *Adams v. Han*, 478 Fed. Appx. 686, 687–88 (2d Cir. 2012)) ("to bring claims under ... the Fair Housing Act '[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice.' "). Since Plaintiffs commenced this action on March 17, 2016, their federal claims are time barred unless: (1) their claims under §§ 1981, 1982, 1983 and 1985(3) accrued after March 16, 2013, and their FHA claims accrued after March 16, 2014 or (2) the statute of limitations was tolled.

### b. Application of Statutes of Limitations to Plaintiffs' Claims

**\*4** Defendants argue that a traffic barrier preventing the unimpeded movement of traffic has been in place since late 2012, that all of Plaintiffs' federal claims are predicated upon this fact, and that they are thus time barred. (*See* Defs.' Mem. of Law In Support of Mot. to Dismiss, at 8-9, [hereinafter "Defs.' Mem."], ECF No. 18.) Plaintiffs contend that the harms alleged in the Complaint arise from the "permanent" closure of Samuel Road which occurred in March 2016. (*See* Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss, at 15-17, [hereinafter "Pls.' Opp."], ECF No. 20.)

Although the parties dispute the meaning of a "permanent" closure as compared to a "temporary" one, Plaintiffs concede that Samuel Road has been blocked by some form of barrier that has, at the very least, prevented the passage of public vehicular traffic since 2012, though emergency vehicles were permitted to pass. (*See* Pls.' Opp., at 2) ("Defendants' own Motion documents confirm that in 2012 only a 'breakaway barrier' was put across Samuel Road.... That 'breakaway barrier' *allowed emergency vehicles to enter and exit Samuel Road by using a 'key'* to open the 'gate' across Samuel Road.") (emphasis added); (*id.*) (*citing* George Hoehmann Declaration In Support of Defs.' Mot. to Dismiss, Ex. B, ¶ 27) (indicating in August 2012, a temporary barrier was replaced with *a double-gate with chain and padlock for key distribution to emergency services, but "nevertheless" residents and general public were prohibited from traveling along Samuel Road*) (emphasis added); (*id.*) ("[P]revious litigation did not concern the fact of a 'permanent barrier' blocking

Samuel *Road preventing the passage of emergency vehicles and pedestrians, as is set forth in this Federal Court Litigation") (emphasis added); (id., at 5) (noting prior litigation involved action taken by Defendant Clarkstown in late 2012 pertaining to the replacement of a temporary barrier with a breakaway barrier that could be opened with keys by emergency service providers*) (emphasis added); (see also id.) ("It is *the current inability of emergency vehicles to cross Samuel Road* to and from Ramopo to Clarkstown (and vice versa) that *is an essential part of Plaintiffs' Complaint.*") (emphasis added). Thus, based upon Plaintiffs' own Memorandum, and the way in which it illuminates the factual allegations alleged in Plaintiffs' Complaint, any injuries arising out of the existence of a barrier across Samuel Road impeding public traffic began to accrue in 2012.

### i. Accrual

Generally, a cause of action for a discrimination claim accrues " 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Lynch v. Suffolk Cty. Police Dep't, Inc.*, 348 Fed.Appx. 672, 674 (2d Cir. 2009) (citing *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002)); *see Washington v. Cty. of Rockland*, 373 F.3d 310, 319 (2d Cir. 2004) (Sotomayor, J.) (noting, in considering claims under § 1981 and § 1983, that "[a]s with all discrimination claims, plaintiffs' claims accrued when they knew or should have known of the discriminatory action"); *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 371–72 (E.D.N.Y. 2012) (quoting *Dombrowski v. City of New York*, 116 F.3d 465, at *1 (2d Cir. 1997)) ("Claims under the FHA, as well as under §§ 1981, 1982 and 1985, are subject to the discovery rule and thus accrue when a 'plaintiff knows or has reason to know of the injury that serves as the basis for the action.' "). Discovery of the injury and its cause " 'require[ ] only knowledge of, or knowledge that could lead to, the basic facts of the injury, i.e., knowledge of the injury's existence and knowledge of its cause or of the person or entity that inflicted it.... [A] plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice.' " *Id.* (citing *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 533 (2d Cir. 1999)).

**\*5** As Defendants correctly point out, though Plaintiffs argue that their claims arise out of alterations made in 2016, preventing the passage of emergency vehicles, many of the factual allegations they allege in support of their claims do appear to pertain solely and specifically to the installation of the initial barrier impeding public traffic, which occurred in 2012. (*See, e.g.,* Compl. ¶¶ 33, 48-49, 68, 69.) In response, Plaintiffs argue in a footnote that the continuing violation doctrine and equitable tolling should apply to toll the limitations periods for those claims relating to the initial installation of the barrier on Samuel Road. (*See* Pl's. Opp., at 17 n.9.)

To the extent that Plaintiffs' claims are based not just on an isolated event, but on an alleged ongoing policy of discrimination, the statute of limitations can be extended under the "continuing violation" theory which "allows a plaintiff in certain circumstances to recover on the basis of an ongoing policy or practice of illegal activity initiated prior to the limitations period." *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir. 1997). Where Plaintiff alleges a continuing violation that gives rise to a claim of a discriminatory policy, the statute of limitations period begins to run at the end of the "last asserted occurrence." *Clement*, 914 F. Supp. 2d. at 373 (citing *Havens Realty Corp v. Coleman.*, 455 U.S. 363, 363 (1982)).

However, the continuing-violation doctrine is generally disfavored in this Circuit. *In re Johnson*, No. 09-49420, 2014 WL 4197001, at *13 (Bankr. E.D.N.Y. Aug. 22, 2014) (citing *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 292 (S.D.N.Y. 2011)) ("Courts in the Second Circuit and elsewhere 'have been loath to apply the continuing violation doctrine absent a showing of compelling circumstances' ") (internal citations and quotation marks omitted). Furthermore, "[c]haracterizing defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as a 'series of interlocking events' does not postpone accrual of claims based on individual wrongful acts." *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) *overruled on other grounds by Roesch v. Otarola*, 980 F.2d 850, 853–54 (2d Cir. 1992), *as recognized in Beberaggi v. N.Y.C. Transit Auth.*, No. 93–CV–1737, 1994 WL 75144, at *5 (S.D.N.Y. Mar. 9, 1994); *see Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (noting that "when a plaintiff knows or ought to know of a wrong, the statute of limitations on that claim starts to run, and the later awareness that the actionable wrong was also part of a

conspiracy does not expand the statutory time limit"). Nor can a "continuing violation ... be established merely because the claimant continues to feel the effects of a time-barred discriminatory act." *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir. 1999).

As they pertain to the general public, this Court finds that Plaintiffs' first, second, and fourth claims for relief alleging that Defendants interfered with Plaintiffs' federal right to interstate travel, right to intrastate travel, and right to freedom of association,[2] respectively, are all *effects* of the initial installation of a barrier on Samuel Road, a separate and discrete act that prevented one form of public access to Clarkstown. Because Plaintiff became aware of the injury underlying these claims when the initial barrier blocking the passage of public traffic was installed,[3] these claims began to accrue at that time and are therefore barred by the aforementioned statute of limitations, and dismissed with prejudice.[4] To the extent that Plaintiffs' sixth claim, alleging that Defendants violated Plaintiffs' rights under the FHA by making housing "otherwise unavailable because of religion," is based upon the existence of the barrier to public vehicular traffic on Samuel Road, this claim is also dismissed as time-barred for the aforementioned reason,[5] and Plaintiffs' seventh claim, a related FHA claim, is dismissed on the same grounds. To the extent that these FHA claims arise out of timely factual allegations asserted within the Complaint (*see, e.g.*, ¶¶ 78-81) (citing discriminatory acts against individuals of Jewish faith), these claims may remain. Finally, as to Plaintiffs' third claim for relief, which merely asserts that Defendants have violated a variety of Plaintiffs' federal rights, to the extent it is premised upon the existence of a barrier to the motoring public across Samuel Road, these claims are also dismissed as time-barred. *See Singleton,* 632 F.2d at 192-93 ("To permit [plaintiffs] to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims ... The existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs. It is the wrongful act, not the conspiracy, which is actionable").

**\*6** In contrast, claims such as those premised upon the delay in emergency response for Plaintiffs on the Ramapo side of the barrier on Samuel Road may remain.

**II. Res Judicata and Collateral Estoppel**
Defendants argue that Plaintiffs' claims are also barred by the doctrines of collateral estoppel and res judicata because they are based on the original installation of a traffic barrier across Samuel Road, which was previously fully litigated and adjudicated on the merits. (*See* Defs.' Mem., at 11.) Specifically, Defendants argue that the issue concerning Clarkstown's right to install and maintain the barrier was litigated by the County and Village of Chestnut Ridge, parties in privity with Plaintiffs, that both the New York State Supreme Court and Appellate Division ruled in Clarkstown's favor, and that Plaintiffs' claims arise out of the same set of facts as those in the previous litigation. (*See* Defs.' Mem. at 11, 15.)

In accordance with the doctrine of res judicata, and pursuant to the Constitution's Full Faith and Credit Clause, "federal courts must accord state court judgments the same preclusive effect as other courts within that state." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994). Because the prior judgments in question here were issued by New York State Courts, the Court's analysis is governed by New York State law, "which has adopted a transactional approach to res judicata, barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." *Id.* However, new claims arising subsequent to a prior action are not barred by res judicata, whether or not they arise premised upon facts stemming from the same "course of conduct." *Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, 383 (2d Cir. 2003).

Given Plaintiffs' remaining claims stem from a different "transaction," namely the alteration to the barrier preventing the passage of emergency vehicles, a change that occurred years after the initial installation of the barrier and subsequent to the initiation of prior litigation, these claims could not have been raised in the prior action and are not barred by the doctrine of res judicata. *See Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir. 1997) ("as a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not

come into play"). The Court does not consider the res judicata effect on time-barred claims discussed above.

Under the doctrine of collateral estoppel, a party may not relitigate an issue that was "*clearly raised* in a prior action or proceeding and decided against that party ..., whether or not the tribunals or causes of action are the same." *Leather v. Eyck*, 180 F.3d 420, 425 (2d Cir. 1999) (internal quotation marks and citations omitted). For the doctrine to apply, the issues raised in the second action must be identical, or substantially similar. *Zherka v. City of N.Y.*, 459 Fed.Appx. 10, 13 (2d Cir. 2012). As to claims not dismissed pursuant to this Order, the Court finds the issues raised, which pertain to the installation of the new barrier in 2016 and discriminatory acts by Defendants, are distinct from those raised in the state court actions.

**\*7** On this basis, Plaintiffs remaining claims are not barred by the doctrines of res judicata or collateral estoppel.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims are resolved as follows.

The following claims are DISMISSED with prejudice to the extent they are premised upon the imposition of a barrier blocking the passage of public traffic across Samuel Road:

- Claim for interference with federal right to intrastate travel and interstate travel;

- Claims arising under 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3) [6];

- Fair Housing Act Claims;

- Claim based on First Amendment right to freedom of association.

Additionally, First Amendment freedom of association claims based on alternate theories are dismissed without prejudice.

Plaintiff shall have until March 28, 2017 to amend the Complaint as to those claims that are dismissed without prejudice. Plaintiffs shall ensure that they allege sufficient factual content to support their remaining claims, and conform with this Opinion for clarity. If Plaintiff elects to file an amended complaint, Defendants shall have until April 28, 2017 to move or file responsive pleadings. If Plaintiff does not file an amended complaint, Defendants shall have until sixty days from the date of this Order to file responsive pleadings, An initial case management and scheduling conference pursuant to Fed.R.Civ.P. 16 is scheduled for April 27, 2017 at 10:30 a.m., at the United States Courthouse, 300 Quarropas Street, Courtroom 218, White Plains, New York 10601. The parties shall confer in accordance with Fed.R.Civ.P. 26(f) at least 21 days prior to the conference and attempt in good faith to agree upon a proposed discovery plan that will ensure trial readiness within six months of the conference date. The parties shall also complete a Civil Case Discovery Plan and Scheduling Order and bring it to the conference. The Court respectfully directs the Clerk to terminate the motion at ECF No. 16.

SO ORDERED.

**All Citations**

Slip Copy, 2017 WL 782500

Footnotes

1    The applicable statute of limitations for § 1981 claims is dependent upon whether Plaintiff states a claim under the statute as it was originally passed, or under its 1991 Amendments. *Wright v. City of Ithaca*, 633 Fed.Appx. 63, 64 (2d Cir. 2016) (summary order). Although not clear from the Complaint, because Plaintiffs' § 1981 claim appears to fall within the original language of the statute, a three-year limitations period applies. *Id.*

2    This claim is dismissed as time-barred to the extent it is premised upon the installation of a barrier blocking public vehicular traffic across Samuel Road. The Court notes that Plaintiffs allege Defendants intruded upon Plaintiffs' "right to associate with others for purposes of protected activity" without alleging factual content to this effect. (*See* Compl. ¶ 98.) This bare, conclusory assertion of a violation is insufficient in any event and must therefore be dismissed, without prejudice, to the extent it relates to other allegations in the Complaint.

2017 WL 782500

3    Plaintiff does not allege that Samuel Road is the only form of access to the Town of Clarkstown from the Town of Ramopo. Even if that were the case, the impediment began in 2012.

4    Nor does equitable tolling apply, given Defendants' conduct did not conceal Plaintiffs' causes of action with regard to these injuries. *See, e.g., Pinaud v. Cty. of Suffolk*, 52 F.3d 1139, 1158 (2d Cir. 1995) (denying equitable tolling on the basis plaintiff submitted evidence of conspiracy, but not of defendants tangible steps to conceal the nature of activities); *Pietri v. N.Y.S. Office of Court Admin.*, 936 F. Supp. 2d 120, 138 (E.D.N.Y. 2013) ("To avoid dismissal on the grounds of equitable tolling due to Defendants' misconduct, Plaintiff must set forth in his Amended Complaint facts from which the Court could conclude that he was unaware of his cause of action *because of* Defendants misleading conduct.") Indeed, Plaintiff has been aware of the blockage since 2012.

5    In support of their sixth claim for relief Plaintiffs state "Defendants installation of a Traffic Barrier and other actions complained of herein have had the effect ... of excluding said Plaintiffs from public roads and other areas within the Town of Clarkstown by discriminating against the said Plaintiffs based on religion." (Compl. ¶ 107.)

6    As Defendants argument regarding the sufficiency of Plaintiffs' §§ 1983, 1985 and other claims are all premised upon the erection of the initial barrier in 2012, and claims premised upon the initial installation of the barrier have been dismissed as time-barred, these arguments are deemed moot. (*See, e.g.*, Defs.' Mem., at 17-20.) Defendants do not address Plaintiffs' state law claims.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

KeyCite Yellow Flag - Negative Treatment
Distinguished by Carrigan v. Davis, D.Del., September 28, 1999

1997 WL 527677
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jack WILLIAMS, Plaintiff,

v.

J.P. KEANE, Superintendent, J. BUONATO,
Lieutenant, P. GIBSON, Lieutenant
and J. BUMP, Corrections Officer, Sing
Sing Correctional Facility, Defendants.

No. 95 CIV. 0379 AJP JGK.
|
Aug. 25, 1997.

*OPINION AND ORDER*

PECK, United States Magistrate Judge.

**\*1**  In this 42 U.S.C. § 1983 action, pro se plaintiff Jack Williams has sued the Superintendent, two Lieutenants and a Corrections Officer at the Sing Sing Correctional Facility for alleged violations of due process, equal protection and cruel and unusual punishment in connection with an alleged sexual assault during a "pat-frisk," and Williams' subsequent alleged seven-day (actually six-day) keeplock confinement.

The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Presently before the Court is defendants' summary judgment motion. Under *Sandin v. Conner* and its progeny, seven days in keeplock does not state a constitutional claim for violation of due process. Under the Second Circuit's recent decision in *Boddie v. Schnieder,* Williams' allegation of sexual fondling during a single pat-frisk is not sufficiently egregious to state a harm of federal constitutional proportions under the Eighth Amendment. Accordingly, for the reasons set forth below, the Court grants defendants' summary judgment motion.

*FACTS*

*The Alleged Incident*

On November 15, 1994, at approximately 1:15 P.M., a metal detector was set off as plaintiff Jack Williams left the mess hall with several other inmates. (Williams Dep. at 29, 43; Defs' Rule 56.1 Stmt. ¶¶ 29-33.) Williams and other inmates were ordered to stand up against the wall for a routine "pat-frisk" and search for contraband. (Williams Dep. at 29-30; Bump Aff. ¶¶ 10-13; Defs' Rule 56.1 Stmt. ¶¶ 32-33.) It is undisputed that pat-frisks are a normal occurrence in prisons, especially for prisoners exiting the mess hall where metal utensils are used. (Williams Dep. at 29-31; Williams 3(g) Stmt. ¶ 10; Gibson Aff. ¶¶ 6-7; Bump Aff. ¶¶ 5-7; Defs' Rule 56.1 Stmt. ¶¶ 11, 13-24, 34; Defs' Ex. D: DOCS Directive No. 4910.)

However, the nature and extent of defendant Officer Bump's pat-frisk on Williams is disputed. Williams testified:

> I had my hands up against the wall. He started fondling my chest. He went down, opened my pants up, put his hands down my pants, starts feeling me, but to keep repeatedly doing that. He felt my testicles, kept doing that. At the same time I was moving down the wall. I was telling him, "What are you doing?" You know, I got kind of hostile with him and other officers, they intervened and told me leave, told him to stop the procedure, told me to leave the mess hall, which I left, but I got his name before I left and wrote it up.

(Williams Dep. at 30; *see also id.* at 43-44). In contrast, Officer Bump stated that he conducted a routine pat-frisk of Williams that involved a "limited physical touching of the inmate's groin area, from the outside with clothes on, and genitals, which is a prime spot for hiding weapons and other contraband." (Bump Aff. ¶ 13.) Bump also stated that "[a]t no time did I 'fondle' or touch Mr. Williams sexually." (Bump Aff. ¶ 18.)

**\*2**  Later that day, Officer Bump issued a misbehavior report for Williams' hostile, aggressive, and uncooperative behavior during the pat-frisk. (Bump Aff. ¶¶ 14-15; Defs' Ex. C at p. 6: Inmate Misbehavior Report.) Officer Bump's Inmate Misbehavior Report states:

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 267 of 282

I gave him a direct order to place his hands on the wall and spread his legs -- and he refused to comply by continuously moving down the wall, and removing his hands. He eventually did comply when an additional officer stepped to him. Inmate Williams ... repeatedly cursed me by calling me "a mother fucker and a goddamn faggot." As a result of this inmate's action this misbehavior report is submitted.

(Defs' Ex. C.) Williams admits asking whether Bump was gay, but denies cursing at him. (Williams Dep. at 44.)

The Misbehavior Report, or "ticket," was then given to defendant Lieutenant Buonato [1] for review. (Bump Aff. ¶ 19; Defs' Rule 56.1 Stmt. ¶ 42.) In accordance with prison policy, the "review lieutenant" determines whether the allegations on the ticket support the charge and, if so, warrant the inmate's placement in keeplock. (Buonato Aff. ¶ 5; Defs' Rule 56.1 Stmt. ¶ 43; *see* Williams Dep. at 46.) Lieutenant Buonato filed his review on November 16, 1994, concluding that the charges were adequately set forth and that a Tier II disciplinary hearing was warranted. (Buonato Aff. ¶¶ 7-10; Defs' Rule 56.1 Stmt. ¶ 43.)

*Williams' Placement in Keeplock and Subsequent Hearing*
Williams was placed in keeplock on November 16, 1994, the day he received a copy of the Inmate Misbehavior Report and the day after the incident. (Williams Dep. at 32-33, 39-40; Defs' Rule 56.1 Stmt. ¶ 44.)

Prison guidelines provide that a hearing on the charges must be held as soon as practical, but in no case longer than seven days from when the inmate is placed in keeplock. *See* 7 N.Y.C.R.R. § 251-5.1. (*See also* Williams Dep. at 50-51; Cplt. ¶ IV (C).) [2]

Williams Tier II hearing took place on November 21, 1994 at 3:00 P.M. (Defs' Rule 56.1 Stmt. ¶¶ 47, 49; Gibson Aff. ¶ 11; Defs' Ex. C at p. 1; Williams Dep. at 40.) Defendant Lieutenant Gibson [3] found Williams not guilty at the conclusion of the Tier II disciplinary hearing. (Defs' Rule 56.1 Stmt. ¶ 51; Gibson Aff. ¶¶ 13, 15-16; Williams Dep. at 41-42; Defs' Ex. C at p. 1.) Lieutenant Gibson stated on the record that Williams was uncomfortable with the search, especially "where he was being touched." (Gibson Aff. ¶ 15; Defs' Rule 56.1 Stmt. ¶ 53; Defs' Ex. C at p. 2.)

Gibson also found that Officer Bump conducted himself within the scope of his official duties and in accordance with prison rules. (Defs' Rule 56.1 Stmt. ¶ 54; Gibson Aff. ¶ 17.) Williams characterized Lieutenant Gibson's hearing as "fair." (Williams Dep. at 58, 60; Gibson Aff. ¶ 18; Defs' Rule 56.1 Stmt. ¶ 55.)

**\*3** Williams was released from keeplock on November 21, 1994. (Williams Dep. at 42-43, 51, 53.) While Williams alleges that he spent seven days in keeplock (Cplt. ¶ IV(D); Williams Dep. at 51, 62; *see* Defs' Rule 56.1 Stmt. ¶ 48), it appears that Williams was in keeplock for six days (November 16 to November 21).

Williams named Superintendent Keane as a defendant, alleging that Keane did not properly train the corrections officers under his control. (Cplt. ¶ IV(E).) Keane also conducted an internal facility investigation into Officer Bump's conduct, which found that Bump complied with all prison rules. (Defs' Rule 56.1 Stmt. ¶¶ 58-59; Keane Aff. ¶¶ 11-12.)

*ANALYSIS*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. §1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "createsno substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S. Ct. 2749 (1994); *accord, e.g., Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at *4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95-CV-975, 1996 WL 732559 at *3 (N.D.N.Y. Dec. 11, 1996). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir. 1990); *accord, e.g., Ruiz v. Selsky,* 1997 WL 137448 at *4.

I. *UNDER SANDIN V. CONNER, SIX DAYS IN KEEPLOCK DOES NOT CONSTITUTE AN*

Williams v. Keane, Not Reported in F.Supp. (1997)

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 268 of 282

1997 WL 527677

*ATYPICAL AND SIGNIFICANT DEPRIVATION OF A PROTECTED LIBERTY INTEREST*

A. *Sandin v. Conner*

Defendants' summary judgment motion on the keeplock claim turns, in part, on application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

> [W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** 115 S. Ct. at 2300 (fn. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at 2295-96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit (SHU). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S. Ct. 2963 (1974). *Sandin v. Conner,* 115 S. Ct. at 2302. The Supreme Court stated:

> *We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest.* The record shows that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at 2301 (footnotes omitted and emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *accord,e.g., Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at *3 (S.D.N.Y. Aug. 14, 1996). A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556-58, 94 S. Ct. at 2974-75, and its progeny. *See, e.g., Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n.4 (S.D.N.Y. Nov. 6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n.1.

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 269 of 282

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

### B. *Williams' Action Fails Because It Is Based on A Miscalculation of the Time He Spent in Keeplock*

**\*5** Williams notes, correctly, that New York's prison regulations require a disciplinary hearing to be held within 7 days of the inmate's placement in keeplock for a disciplinary infraction. 7 N.Y.C.R.R. § 251-5.1. Williams then argues, incorrectly, that he spent 7 days in keeplock before the disciplinary hearing at which he was found not guilty and immediately released from keeplock. (*See* Williams Dep. at 50-51; Cplt. ¶ IV (C).) In fact, however, the incident occurred on November 15, 1994, Williams was placed in keeplock on November 16, and his hearing was held and he was released from keeplock on November 21, 1994. (*See* Fact section, above.) Thus, on the undisputed facts, Williams was in keeplock from November 16 to November 21, at most *six* days. Accordingly, the hearing was held and Williams was released from keeplock within the seven days required by New York's prison regulations. Since the regulations were not violated, it is not necessary to examine either prong of the two-prong *Sandin* analysis; defendants are entitled to summary judgment on the keeplock claim. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (even a violation of 7 N.Y.C.R.R. § 251-5.1 "alone would not be enough generally to establish a constitutional claim"); *Dudley v. Coombe,* 96 Civ. 1665, 1997 WL 423074 at \*2 (S.D.N.Y. July 28, 1997) (in light of 7 N.Y.C.R.R. § 251-5.1 requiring hearing within seven days, prisoner did not have liberty interest in five-day keeplock stay without hearing).

### C. *Application of Sandin to Confinement of 6 Days in Keeplock*

Even if the Court were to assume, contrary to the undisputed evidence, that Williams' keeplock stay violated state regulations, defendants are entitled to summary judgment under the first prong of the *Sandin* analysis.

In recent decisions, the Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

> The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a

per se blanket rule that disciplinary confinement may never implicate a liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest.

**\*6** *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir. 1997); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir. 1997); *Brooks v. Difasi,* 112 F.3d 46 (2d Cir. 1997).

While the courts have not yet determined what length of confinement will constitute an "atypical or significant hardship," the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* "atypical or significant hardship" under *Sandin. See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996) (12 days in SHU); *Johnson v. Coughlin,* 90 Civ. 1731, 1997 WL 431065 at \*1 (S.D.N.Y. July 30, 1997) (8 days confinement prior to disciplinary hearing); *Sullivan v. Schweikhard,* 95 Civ. 0276, 1997 WL 349983 at \*3 (S.D.N.Y. June 25, 1997) (9 days in keeplock); *Duncan v. Keane,* 95 Civ. 1090, 1997 WL 328070 at \*2 (S.D.N.Y. June 13, 1997) (30 days keeplock); *Harris v. Keane,* 962 F. Supp. 397, 404 (S.D.N.Y. 1997) (23 days in keeplock; the "Second Circuit's post-Sandin decisions are unanimous that keeplock of 60 days or less in New York prisons is not an "atypical hardship.'"); *Saulter v. Hanslmaier,* 94 Civ. 6855, 1997 WL 177887 at \*2 (S.D.N.Y. April 14, 1997) (7 days in keeplock); *Ragland v. Crawford,* 95 Civ. 10069, 1997 WL 53279 at \*3 (S.D.N.Y. Feb. 7, 1997) (1 day in keeplock); *Torres v. Keane,* 94 Civ. 4845, 1997 WL 35507 at \*1 (S.D.N.Y. January 30, 1997) (21 days in keeplock); *Grant v. Riley,* 89 Civ. 0359, 1996 Wl 727441 at \*2-3 (S.D.N.Y. Dec. 17, 1996) (10 days in keeplock, only 5 of which were served); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at \*3 (S.D.N.Y. Nov. 6, 1996) (21 days in keeplock); *Santana v. Keane,* 90 Civ. 6309, 1996 Wl 465751 at \*5 (S.D.N.Y. Aug. 14, 1996) (9 days in keeplock during a prison sentence of at least 7 years); *Pampalone v. Young,* 95 Civ. 2348, 1996 WL 511569 at \*3 (S.D.N.Y. August 7, 1996) (Peck, M.J.) (10 days in keeplock); *McAllister v. Zydel,* 929 F. Supp. 102, 104 (W.D.N.Y. 1996) (15 days in keeplock); *Chambers v. Coughlin,* 95 Civ. 298, 1996 WL 243202 at \*2 & n.6 (S.D.N.Y. May 10, 1996) (7 days in SHU); *Beaty v. Scully,* 92 Civ. 3407, 1996 WL 209933 at \*2 (S.D.N.Y. April 30, 1996) (11 days in SHU); *Slaughter v. Coughlin,* 94 Civ. 6734, 1996 WL 200308 at \*3 (S.D.N.Y. April 25, 1996) (10

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

or 11 days in keeplock); *Leyro v. Kennedy,* 95 Civ. 0198, 1996 WL 191741 at *1 (S.D.N.Y. April 22, 1996) (several days in keeplock); *Ramirez v. Coughlin,* 93 Civ. 0765, 1996 WL 194324 at *3-4 (S.D.N.Y. April 22, 1996) (30 days combination of SHU and keeplock); *Dawkins v. Healy,* 94 Civ. 6382, 1996 WL 145989 at *2 (S.D.N.Y. April 1, 1996) (15 days in keeplock) *judgment vacated and reconsideration in part,* 1996 WL 280737 at *2 (S.D.N.Y. May 28, 1996) (reconsideration limited to issue of retaliation); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at *3 (S.D.N.Y. April 1, 1996) (7 days of cell confinement); *Benton v. Keane,* 921 F. Supp. 1078, 1079 (S.D.N.Y. 1996) (9 days in administrative confinement); *Ketchmore v. Stormer,* 94 Civ. 8271, 1996 WL 117572 at *2-3 (S.D.N.Y. March 18, 1996) (10 days of cell confinement); *Moolenaar v. Finn,* 94 Civ. 6778, 1996 WL 112200 at *3 (S.D.N.Y. March 14, 1996) (15 days in keeplock); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions); *Ahlers v. Keane,* 94 Civ. 3297, 1995 WL 375920 (S.D.N.Y. June 22, 1995) (10 days keeplock), *aff'd* (unpublished decision), 101 F.3d 684, No. 95-2454, 1996 WL 281351 at *1 (2d Cir. May 22, 1996); *Martin v. Mitchell,* 92-CV-716, 1995 WL 760651 at *3 (N.D.N.Y. Nov. 24, 1995) (30 days keeplock); *Schmelzer v. Norfleet,* 903 F. Supp. 632, 634-35 (S.D.N.Y. 1995) (11 days in keeplock); *Jackson v. Keane,* 93 Civ. 6453, 1995 WL 622593 at *3 (S.D.N.Y. Oct. 24, 1995) (14 days in SHU); *Kozlek v. Papo,* 94 Civ. 1429, 1995 WL 479410 at *2 (S.D.N.Y. Aug. 11, 1995) (10 days in SHU); *Uzzell v. Scully,* 893 F. Supp. 259, 262-63 (S.D.N.Y. 1995) (23 days in keeplock).

\*7 Indeed, decisions in this Circuit have held that keeplock or SHU confinement of longer than 30 days does not implicate a liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d at 317-18 (12 days in SHU and eleven months in "close supervision unit"); *Thompson v. Keane,* 95 Civ. 2442, slip op. at 5-6 (S.D.N.Y. Aug. 6, 1997) (91 days in SHU); *Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at * 5 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (192 days in SHU during 10-20 year prison sentence); *Reaves v. Williams,* 95 Civ. 0281, 1997 WL 10132 at *4-5 (S.D.N.Y. Jan. 10, 1997) (90 days of keeplock imposed, of which 69 days were served); *Odom v. Keane,* 94 Civ. 8032, 1997 WL 3262 at *1 (S.D.N.Y. Jan. 6, 1997) (46 days of keeplock); *Coleman v. Galgano,* 95 Civ. 5835, 1996 WL 715533 at *1, 3 (S.D.N.Y. Dec. 11, 1996) (60 days in SHU and 180 days in keeplock); *Whitfield v. Scully,*

94 Civ. 3290, 1996 WL 706932 at *5 (S.D.N.Y. Dec. 6, 1996) (60 days in SHU); *Bennett v. Dolan,* 93 Civ. 5215, 1996 WL 499519 at *1, 3 (S.D.N.Y. Sept. 4, 1996) (45 days of keeplock imposed, 24 days served); *Nogueras v. Coughlin,* 94 Civ. 4094, 1996 WL 487951 at *5 (S.D.N.Y. Aug. 27, 1996) ("210 days in SHU does not in and of itself trigger due process concerns."); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *3-5 (S.D.N.Y. Aug. 22, 1996) (Peck, M.J.) (58 days in keeplock); *Brown v. McClellan,* 93-CV-0901, 1996 WL 328209 at *5 (W.D.N.Y. June 11, 1996) (two confinements in SHU for 60 days each); *Guzman v. Kelly,* 88-CV-1391, 1996 WL 291985 at *3 (W.D.N.Y. May 28, 1996) (8 months in SHU); *Trice v. Clark,* 94 Civ. 6871, 1996 WL 257578 at *2-3 (S.D.N.Y. May 16, 1996) (150 days in SHU); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371 at *6-7 (S.D.N.Y. May 14, 1996) (120 days in SHU); *Camacho v. Keane,* 95 Civ. 0182, 1996 WL 204483 at *2 (S.D.N.Y. April 25, 1996) (90 days, only 40 days of which were served, in keeplock); *Roucchio v. Coughlin,* 923 F. Supp. 360, 373 (E.D.N.Y. 1996) (47 days in SHU) (citing cases, including unpublished 2d Cir. decisions upholding 60 days SHU and 71 days segregated confinement); *Villano v. Irvin,* 93-CV-0196, 1996 WL 343251 at *3 (W.D.N.Y. March 18, 1996) (85 days in keeplock out of a 90-day keeplock sentence); *White v. Artuz,* 94 Civ. 4592, 1996 WL 84498 at *2 (S.D.N.Y. Feb. 27, 1996) (55 days in protective custody); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions upholding 60 and 71-day confinements); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342 at *4-5 & n.6 (S.D.N.Y. Jan. 22, 1996) (89 days in disciplinary segregation; loss of good time credits reversed administratively so no effect on length of sentence); *Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178 at *5-6 (S.D.N.Y. Dec. 28, 1995) (120 days imposed but inmate served less than 3 months in SHU during a ten-year sentence); *Tulloch v. Coughlin,* 91-CV-0211, 1995 WL 780970 at *1-2 (W.D.N.Y. Dec. 22, 1995) (180 days in SHU; loss of good time allowance restored through prior state proceeding; implies that any SHU confinement, regardless of length, is permissible under *Sandin*), *appeal dismissed on other grounds* (unpublished decision), 101 F.3d 1393, 1996 WL 414457 (2d Cir. 1996); *Morales v. Santor,* 94-CV-217, 1995 WL 760625 at *2 (N.D.N.Y. Dec. 4, 1995) (60 days in keeplock); *Ross v. Jewett,* 91-CV-1414, 1995 WL 760675 at *2, *4 (N.D.N.Y. Nov. 27, 1995) (60 days in keeplock), *aff'd* (unpublished decision), No. 96-2004, 1996 WL 304752 (2d Cir. June 7,

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 271 of 282

Williams v. Keane, Not Reported in F.Supp. (1997)

1997 WL 527677

1996); *Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1108 (S.D.N.Y. 1995) (Peck, M.J.) (60 days in SHU); *Delaney v. Selsky,* 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995) (365 days in SHU ordinarily not atypical but because plaintiff over 7 feet tall and SHU bed too small for him, summary judgment denied); *Medina v. Bartlett,* 94-CV-0358, 1995 WL 529624 at *2 (W.D.N.Y. Aug. 28, 1995) (no liberty interest created by 2,555 days in SHU); *McMiller v. Wolf,* 94 Civ. 0623, 1995 WL 529620 at *1, *3 (W.D.N.Y. Aug. 28, 1995) (365 days in SHU reduced to approximately 180 days in SHU); *Carter v. Carriero,* 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (360 days reduced to 270 days in SHU); *Hutchinson v. Adorno,* 93 Civ. 3949, 1994 WL 549568 (S.D.N.Y. Oct. 6, 1994), *aff'd* (unpublished decision), No. 94-2652, 1995 WL 737493 at *1-2 (2d Cir. Dec. 13, 1995) (1 year of segregated confinement and 90 days keeplock, reduced to 71 days in segregated confinement).

**\*8** Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to *Sandin*] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin.* Indeed, *it now appears that any period of segregation of one year or less affords no protected liberty interest.*" *Polanco v. Allan,* No. 93-CV-1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996) (emphasis added) (365 days in SHU upheld), *reaffirmed on reconsideration,* 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996) ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence"). [4]

Consistent with the above-cited cases, whatever *Sandin*'s outer limits, it is clear that Williams' confinement of 6 days [5] in keeplock does not constitute an "atypical or significant hardship" under *Sandin.* [6] Accordingly, the Court grants defendants' summary judgment motion on this first issue.

## II. *UNDER BODDIE v. SCHNEIDER, WILLIAMS' ALLEGATION OF SEXUAL ABUSE DOES NOT RISE TO A CONSTITUTIONAL DEPRIVATION*

A. *In Boddie v. Schnieder, the Second Circuit Recognized an Eighth Amendment Claim for Sexual Abuse*

**\*9** Williams' second claim, for alleged sexual abuse by Corrections Officer Bump, is governed by the Second Circuit's recent decision in *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), which recognized a § 1983 Eighth Amendment [7] claim for sexual abuse by a corrections officer, but also found the complaint of conduct there to not involve a harm of federal constitutional proportions. The same is true of Williams' claim here.

In *Boddie,* the Second Circuit recognized that the "Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 861. The Eighth Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' against which we must measure penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976) (citations omitted).

*Boddie* reiterated a two-prong, objective-subjective test for Eighth Amendment violations, including claims of sexual abuse:

> An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

*Boddie,* 105 F.3d at 861 (citations omitted, including to *Farmer v. Branham,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)). [8]

**\*10** Objectively, "[s]exual abuse may violate contemporary standards of decency and can cause serious physical and psychological harm," and "has no legitimate penological purpose." *Boddie,* 105 F.3d at 861. As to the subjective prong of the test, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in

1997 WL 527677

some circumstances, be sufficient evidence of a culpable state of mind." *Id.*

The Second Circuit in *Boddie* nevertheless affirmed the district court's dismissal of Boddie's claim:

> [A]llegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983. However, we agree with the district court that Boddie nevertheless failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

*Boddie,* 105 F.3d at 861. [9]

B. *Williams' Allegation of Sexual Abuse Fails to State a Valid Claim Under § 1983*

**\*11** Williams' allegations, like Boddie's, are not sufficient to state a valid § 1983 claim for sexual abuse. The conduct alleged by Williams, accepting his allegations as true, is no more egregious than the conduct in *Boddie.* Moreover, the instant case involves only a single incident of alleged abuse, whereas *Boddie* involved several. Thus, under *Boddie,* it is clear that Williams' claim does "not involve a harm of federal constitutional proportions as

defined by the Supreme Court." *Boddie,* 105 F.3d at 861; *see also, e.g., Green v. Elias,* 9 F.3d 1551 (9th Cir. 1993) (affirms grant of summary judgment to defendant correction officer where male prisoner alleged female guard grabbed his genitals during a clothed pat frisk of inmates leaving the dining hall); *Kaestner v. Mitchell,* No. C 96-2370, 1996 WL 428357 at \*1 (N.D. Cal. July 24, 1996) (alleged unwarranted sexual advances including touching of prisoner's buttocks "does not rise to the level of egregious, pervasive and/or widespread sexual harassment necessary to implicate the Eighth Amendment."); *Duncan v. Keane,* 95 Civ. 1090, 1995 WL 649931 at \*5-6 (S.D.N.Y. Nov. 6, 1995) (claim that correction officer felt plaintiff's rear end does not provide sufficient facts to state Eighth Amendment claim); *Friedman v. Young,* 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (complaint that correction officer fondled plaintiff's genitals and anus during pat search dismissed; "[a]ccepting the allegations of the complaint [as true], the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort.").

Accordingly, accepting for purposes of this motion Williams' version of the facts, this isolated incident during a routine pat-frisk fails to state an Eighth Amendment claim under *Boddie.* The Court grants defendants' summary judgment motion on this second issue.

*CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion is granted. The Clerk of the Court is directed to enter judgment for defendants dismissing this action with prejudice.

SO ORDERED.

DATED:

**All Citations**

Not Reported in F.Supp., 1997 WL 527677

Footnotes

Williams v. Keane, Not Reported in F.Supp. (1997)

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 273 of 282

1997 WL 527677

1    Williams named Lieutenant Buonato as a defendant because he allegedly improperly reviewed the misbehavior report and unjustifiably placed Williams in keeplock. (Cplt. ¶ IV (E); Williams Dep. at 49-50; *compare* Buonato Aff. ¶¶ 7-10.)

2    Section 251-5.1 provides:

> Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.

> 7 N.Y.C.R.R. § 251-5.1.

3    Williams named Lieutenant Gibson as a defendant because Williams alleges that the hearing should have been held within the 7-day period required by state law. (Cplt. ¶ IV (E); Williams Dep. at 51.)

4    *But see Wright v. Miller,* 96 Civ. 1224, 1997 WL 438795 at *3 (slip op. at p. 6) (S.D.N.Y. July 31, 1997) (12-15 months in SHU may create atypical and significant hardship; summary judgment denied); *Porter v. Coughlin,* 964 F. Supp. 97, 103 (W.D.N.Y. 1997) (36 months in SHU creates liberty interest); *Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443 at *3 n.4 (S.D.N.Y. June 28, 1995) (whether 87 days in keeplock imposes atypical or significant hardship is a question of fact precluding summary judgment); *Lee v. Coughlin,* 902 F. Supp. 424, 431 (S.D.N.Y. 1995) (376 days in SHU imposed an "atypical and significant hardship" for an inmate serving a 2-year sentence), *motion for reconsideration granted, Lee v. Coughlin,* 914 F. Supp. 1004, 1005 (S.D.N.Y. 1996) (reconsideration granted for defendants to address recent *Sandin* decision); *Williams v. Fountain,* 77 F.3d 372, 374 n.3, 376 (11th Cir.) (assumes that a year of solitary confinement is a substantially "atypical and significant hardship" entitling plaintiff to due process, but finds that prisoner received sufficient due process), *cert. denied,* 117 S. Ct. 367 (1996).

5    The Court's analysis would be no different if plaintiff had spent 7 days in keeplock as Williams originally alleged.

6    Because Williams has not established the first *Frazier* prong (that his 6 day keeplock confinement is an atypical and significant hardship under *Sandin),* the Court need not reach the second *Frazier* prong (of whether New York has granted its inmates a liberty interest in being free of disciplinary confinement).

7    The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

8    *See also Mathie v. Fries,* No. 1274, Docket 96-9138, 1997 WL 426567 at *3 (2d Cir. July 31, 1997), *affirming* 935 F. Supp. 1284, 1299 (E.D.N.Y. 1996) (pretrial detainee awarded damages for sexual assault including sodomy by prison official). Decisions in other circuits similarly recognize a § 1983 Eighth Amendment claim for serious sexual abuse by prison personnel. *See, e.g., Freitas v. Ault,* 109 F.3d 1335 (8th Cir. 1997) (to prove a constitutional claim for sexual abuse, the inmate must demonstrate that the alleged abuse objectively caused "pain," and that the officer involved subjectively had a "sufficiently culpable state of mind."); *Jordan v. Gardner,* 986 F.2d 1521, 1527-31 (9th Cir. 1993) (female inmates stated valid § 1983 Eighth Amendment claim challenging prison policy allowing cross-gender clothed body searches); *Watson v. Jones,* 980 F.2d 1165, 1165-66 (8th Cir. 1992) (summary judgment for defendant female correction officer reversed where inmates alleged sexual harassment and sexual fondling of male prisoners during pat frisks almost daily over a two-month period); *Meriwether v. Faulkner,* 821 F.2d 408 (7th Cir.) (complaint that transexual inmate is regularly forced to strip before male guards and inmates states Eighth Amendment claim), *cert. denied,* 484 U.S. 935, 108 S. Ct. 311 (1987); *Thomas v. District of Columbia,* 887 F. Supp. 1, 4-5 (D.D.C. 1995) (summary judgment for defendant denied where corrections officer sexually harassed plaintiff including touching his penis and tried to coerce prisoner to have sexual relations); *Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 877 F. Supp. 634 (D.D.C. 1994) (court found numerous violations of the Eighth Amendment for repeated rape, sexual assaults and harassment of female prisoners), *aff'd in part on other grounds, reversed in part on other grounds,* 93 F.3d 910, 928 (D.C. Cir. 1996), *cert. denied,* 117 S. Ct. 1552 (1997), *on remand,* CA No. 93-2052, 1997 WL 361600 at *2-3 (D.D.C. June 16, 1997) (ordering remedial measures to eliminate sexual harassment); *Galvan v. Carothers,* 855 F. Supp. 285, 291 (D. Alaska 1994) ("minimal standards of privacy and decency include the right not to be subject to sexual advances, to use the toilet without being observed by members of the opposite sex, and to shower without being viewed by members of the opposite sex"; nevertheless, summary judgment for defendant on qualified immunity grounds).

9    The Second Circuit summarized Boddie's allegations as follows:

> First, Boddie maintains that on March 3, 1993, Officer B. Schnieder, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

> Second, Boddie claims that on the next day, Schnieder squeezed his hand, touched his penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

1997 WL 527677

Third, Boddie alleges that on March 19, 1993, ... Schnieder stopped [him], accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door."

*Id.* at 859-60.

---

**End of Document**                                  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7468636
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Derek WILLIAMS, Plaintiff,

v.

A. ROBERTS, Deputy Super. Adj., Washington
Correctional Facility; J. Johnson, Correctional
Officer, Washington Correctional Facility; M.

YAHW,[1] Correctional Officer, Washington
Correctional Facility; Lt. Edwards, Washington
Correctional Facility; and Yaki, Iman,
Washington Correctional Facility, Defendants.

Civ. No. 9:11–CV–29 (GTS/RFT).
|
Dec. 15, 2011.

**Attorneys and Law Firms**

Derek Williams, Rochester, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the
State of New York, Charles J. Quackenbush, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** *Pro se* Plaintiff Derek Williams brings this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that while
he was incarcerated at Washington Correctional Facility,
the Defendants violated his constitutional rights protected
under the First, Eighth, Eleventh, and Fourteenth
Amendments, as well as his rights protected by the
Religious Land Use and Institutionalized Persons Act
("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.* Dkt. No. 1,
Compl. Pending before this Court is Defendants' Motion
to Dismiss, filed pursuant to Federal Rule of Civil
Procedure 12(b)(6), Dkt. No. 11, which Plaintiff opposes,
Dkt. No. 17. For the reasons that follow, it is hereby
recommended that Defendants' Motion be **granted** and
this case be **dismissed**.

### I. ALLEGATIONS IN THE COMPLAINT

In accordance with the applicable standard of review, the
following facts derived from the Complaint [2] are taken as
true.

In October and November 2007, Plaintiff was in
the custody of the New York State Department of
Corrections and Community Supervision (DOCCS) and
was housed in the Washington Correctional Facility. [3]
During this time period, Plaintiff received Misbehavior
Reports on two separate occasions for, essentially, failing
to comply with count procedures and direct orders.
Compl. at p. 3. Plaintiff asserts that for both incidents,
he was engaging in cell prayer in accordance with
his membership in the Nation of Islam. *Id.* Because
Defendants have moved for dismissal of the Complaint
attacking the timeliness of the action, we will discuss the
relevant time line associated with both incidents.

On October 23, 2007, [4] Plaintiff received a Misbehavior
Report from Defendant C.O. Johnson for violating Prison
Rules 106.10 (direct order), 112.21 (count procedures),
and 104.13 (disturbance). Compl. at p. 19. Plaintiff
asserts that at the time, he was engaged in Islamic
prayer in his cell. *Id.* at p. 3. According to the Misbehavior
Report accompanying the Complaint, Plaintiff disobeyed
a direct order to sit on his bed and comply with count
procedure, to which Plaintiff rebuffed, shouting that
he was praying. *Id.* at p. 19. Plaintiff was immediately
placed in confinement pending his hearing on the
Misbehavior Report. *Id.* at p. 3. On October 25, 2007,
Defendant Lieutenant Edwards conducted a Hearing
on the Misbehavior Report, finding Plaintiff guilty of
all three charges and sentencing him to keeplock for
thirty days, with accompanying loss of privileges. [5] *Id.*
at p. 20. Also on that date, Plaintiff appealed the
Hearing disposition asserting that his faith requires
prayer at fixed times, and that practice has never
before interfered with count procedures. *Id.* at p. 25.
On October 31, 2007, Defendant Roberts affirmed the
Hearing disposition, noting that Plaintiff must comply
with legitimate directives given by facility staff; Defendant
Roberts also indicated that he conferred with Defendant
Iman Yaki, who stated that he would counsel Plaintiff
regarding prayer times. *Id.*

2011 WL 7468636

**\*2** On November 6, 2007,[6] Plaintiff received another Misbehavior Report for alleged non-compliance with count procedure. *Id.* at pp. 3 & 22. The Misbehavior Report, authored by Defendant Yaw, charged Plaintiff with violating Prison Rules 104.13 (disrupting order of facility), 106.10 (direct order), 112.20 (delaying count procedure), and 112.21 (facility count procedures). *Id.* at p. 22. Again, Plaintiff asserts that he was engaging in prayer at the time he was ordered to sit on his bunk in compliance with count procedures. *Id.* On November 14, 2007, Defendant Edwards initiated a Disciplinary Hearing and dismissed all charges as "untimely." *Id.* at pp. 23–24.

According to the Complaint and documents incorporated thereto, Plaintiff filed one Inmate Grievance, on October 22, 2007,[7] relative to the issue of prayer interruption. *Id.* at p. 15. By that Grievance, Plaintiff complained that on October 22nd, his early afternoon prayer, as mandated by his religion, was interrupted; he further complained about receiving a disciplinary infraction and for being placed on keeplock status. *Id.* It is not clear whether the Inmate Grievance Review Committee (IGRC) issued a decision on the Grievance, however, Plaintiff provides a decision, dated November 15, 2007, wherein the Superintendent denied Plaintiff's Grievance noting that during count procedures, inmates must be sitting on their beds without exception and that prayers within a prisoner's cube are allowed, but must not interfere with count procedures. *Id.* at p. 16. The decision also noted that Defendant Iman Yaki advised that there is no obligation to pray during count times and that Plaintiff must "make adjustments in order to be in compliance with facility procedures." *Id.* Plaintiff appealed that decision on November 28, 2007, asserting, based upon his understanding of the Holy Qur'an and past prayer participation, that Iman Yaki is incorrect.[8] *Id.* On January 9, 2008, the Central Office Review Committee (CORC) denied Plaintiff's appeal for the reasons stated by the Superintendent. *Id.* at p. 17.

Plaintiff asserts that on or about April 24, 2008, he filed an Article 78 petition in New York State court challenging the Misbehavior Reports and complaining that he was punished for practicing his religion. *Id.* at p. 8. For various reasons, Plaintiff "allowed" his case to be dismissed, opting to pursue remedies in this Court. *Id.* at p. 4. He does not provide a date when that petition was dismissed. On or about November 2, 2010, Plaintiff was released on parole.

Thereafter, on January 10, 2011, he filed the within civil rights Complaint pursuant to 42 U.S.C. § 1983.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

**\*3** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus. ., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly*). [9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly*, 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

**B. Plaintiff's Claims**

**\*4** As noted above, Plaintiff asserts that his rights protected under the First, Eighth, Eleventh, and Fourteenth Amendments were violated when the Defendants penalized him for engaging in prayer in his cell at times that he believes have been designated by his religion. He further asserts that the Defendants violated his rights protected by RLUIPA. Defendants assert that Plaintiff's Fourteenth Amendment Due Process claims are time barred, his RLUIPA claims are barred by the Eleventh Amendment, and, with regard to the First Amendment and RLUIPA claims, Defendants are entitled to qualified immunity. [10]

*1. Due Process Claim*

In his Complaint, Plaintiff does not enunciate the alleged due process infirmities that he believes plagued his two Disciplinary Hearings. Thus, it is not clear to this Court how Plaintiff's Due Process rights were violated during his October 25th and November 14th Disciplinary Hearings. Nor, for that matter, has Plaintiff described what liberty interests he was deprived of as a result of the two Hearings. *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner wishing to pursue a due process claim must show that as a result of insufficient process, he was deprived of some liberty interest). Stated another way, Plaintiff has not shown that either Disciplinary Hearing resulted in a sanction that was atypical and significant in comparison to the ordinary incidents of prison life thereby triggering Due Process protections. *Id.* (stating that an inmate has no constitutional right to any procedural safeguards unless the deprivation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"). Indeed, Plaintiff would be hard-pressed to identify any procedural violation occurring during the November 14th Hearing, wherein the charges were dismissed and no punishment ensued.

Instead, it appears that the entirety of Plaintiff's Due Process claims rest upon the notion that his religious prayers were inappropriately interrupted on two occasions and he was thereafter unduly punished for engaging in such prayer and, by extension, for practicing his religion. While these allegations may suffice at this juncture to support a claim that his First Amendment rights were denied, it does not support a claim for the denial of procedural Due Process under the Fourteenth Amendment. On this basis alone, we could easily recommend dismissal of the Due Process claims for failure to state a claim. However, were this to be our recommendation, we would feel compelled to allow Plaintiff to amend his Complaint in order to expand upon the Due Process violations that occurred and the particular liberty interests at stake. *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir.2010) (quoting several cases for the proposition that a court should not dismiss a *pro se* complaint without first granting leave to amend if there is any indication that a valid claim could be stated). Such amendment, however, would be futile because, as Defendants suggest, the statute of limitations has run on

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7468636

this claim, and no amendment of the Complaint could cure this defect. *See Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000) (noting that while leave to amend should ordinarily be freely granted, the court has discretion to deny such amendment as futile if the claim would be barred by the applicable statute of limitations).

**\*5** In § 1983 actions, the applicable statute of limitations is the State's "general or residual statute for personal injury actions." *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)) (alterations omitted). In New York, a three-year statute of limitations applies for personal injury actions and thus to § 1983 actions. *Id.; see also* N.Y.C.P.L.R. § 214(5). Although State law provides the relevant limitations period, federal law determines when a § 1983 action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) (citation omitted). Thus, in determining when a particular claim accrues, courts must focus on when a "plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. City of New York,* 632 F.2d 185, 192 (2d Cir.1980).

In this case, Plaintiff filed his Complaint on January 10, 2011; for any § 1983 claim to be considered timely filed, it must have accrued no earlier than January 10, 2008.

Courts in this District have generally set the accrual date for procedural Due Process claims related to disciplinary hearings either at the date of the disciplinary hearing or at the date the prisoner's final administrative appeal is decided. *Odom v. Calero,* 2008 WL 449677, at \*6–7 (S.D.N.Y. Feb.19, 2008); *Abbas v. Dixon,* 2004 WL 2202640, at \*2 (W.D.N.Y. Sept.30, 2004). [11] In this case, Plaintiff's Hearings were held on October 25 and November 14, 2007, and those are the relevant dates when Plaintiff was, or should have been, aware of any Due Process violations that ensued. Therefore, for the Due Process claims asserted against Defendant Edwards, who presided over both Disciplinary Hearings, the limitations period expired on October 25 and November 14, 2010, respectively. To the extent Plaintiff asserts a Due Process claim against Defendant Roberts for affirming the October 25th conviction/sentence, such claim accrued on October 31, 2007, the date when the Superintendent

confirmed the October 25th conviction/sentence, and thus expired on October 31, 2010. [12]

Because the statute of limitations expired prior to Plaintiff bringing the within action, we recommend that Defendants' Motion to Dismiss be **granted** as to the Due Process claims asserted against Defendants Edwards and Roberts. [13]

## 2. RLUIPA

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

> **\*6** (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Recently, the Supreme Court declared that monetary damages are unavailable to litigants pursuing claims under RLUIPA. *Sossamon v. Texas,* —— U.S. ——, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). The Court held that the acceptance of federal funds did not mean that the States consented to waiving their sovereign immunity to suits for money damages. *Id.* at 1655 & 1658–59 (noting that the waiver of sovereign immunity for monetary relief must be unambiguously stated, and RLUIPA's authorization of "appropriate relief against a government" does not meet this test). Thus, any request for monetary damages under RLUIPA should be **dismissed.**

What's left then of Plaintiff's RLUIPA claim is the request for injunctive relief, which includes 1) expungement of his

2011 WL 7468636

institutional record with regard to these incidents; and 2) internal investigation by DOCCS to determine whether Defendants should keep their jobs, if they haven't already retired. Compl. at p. 6. Defendants argue that because Plaintiff is no longer in DOCCS's custody, this claim is moot. Dkt. No. 11–1 at pp. 5–6. We agree.

"The mootness doctrine is derived from Article III of the Constitution, which provides that federal courts may decide only live cases or controversies.... This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Van Wie v. Pataki,* 267 F.3d 109, 113 (2d Cir.2001) (internal quotation marks and citations omitted); *see also North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971). A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin–Trigona v. Shiff,* 702 F.2d 380, 386 (2d Cir.1983). The courts have recognized a narrow exception to this rule for repetitive conduct, although only in exceptional circumstances. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Generally only where the plaintiff "can make a reasonable showing that he will again be subjected to the alleged illegality" would such exception apply. *Id.; see also Spencer v. Kemna,* 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998) (citing *Lyons* for the proposition that the capable of repetition doctrine applies when the conduct at issue is of insufficient duration to permit it to be fully litigated and is reasonably likely to reoccur).

Where, as here, a prisoner has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot. *Hallett v. New York State Dep't of Corr. Servs.,* 109 F.Supp.2d 190, 196 (S.D.N.Y.2000). And, the limited exception for repetitive conduct does not appear to be applicable in this instance. Thus, before even getting to the merits of Plaintiff's RLUIPA claim, we recommend that Defendants' Motion to Dismiss be **granted** as the Court lacks jurisdiction over a moot claim.[14]

### 3. Qualified Immunity

**\*7** The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

The only pleading filed in the present case thus far is the Complaint. Defendants have not raised this affirmative defense in a responsive pleading as set forth in Federal Rule of Civil Procedure 8(c), but rather in their Memorandum of Law in support of their Motion to Dismiss. Generally, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983); *see also McKenna v. Wright,* 386 F.3d 432, 435 (2d Cir.2004) (quoting *Green* ). However, an exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; on such an occasion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall,* 22 F.Supp.2d 156, 162 (S.D.N.Y.1998) (citing *Green v. Maraio,* 722 F.2d at 1019); *see also McKenna v. Wright,* 386 F.3d at 435.

We readily acknowledge, and Plaintiff does not contest, that the Complaint, on its face, sets up the qualified immunity defense. Until recently, courts faced with the qualified immunity defense applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), whereby a court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right, and if so, whether the right at issue was "clearly established" at the time of the alleged misconduct. 533 U.S. at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

In light of *Pearson,* we need not decide in the first instance whether Defendants violated Plaintiff's First Amendment rights. Rather, we may get to the heart of the matter and address whether Plaintiff had a clearly established right to pray in his cell at any time he wishes without interruption.

2011 WL 7468636

"A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Jackler v. Byrne,* 658 F.3d 225, 242–43 (2d Cir.2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "In determining if a right is clearly established, [courts] look to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful." *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011) (citation omitted). A qualified immunity analysis must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Saucier v. Katz,* 533 U.S. at 201).

**\*8** The First Amendment to the United States Constitution provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. These provisions are applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Gitlow v. New York,* 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925) (cited in *Wares v. Vanbebber,* 319 F.Supp.2d 1237, 1243 (D.Kan.2004)). Prisoners retain their right to religious freedom even when incarcerated. *Pell v. Procunier,* 417 U.S. 817, 822 (1974); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). Such rights, however, are balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). Free exercise claims of prisoners are therefore "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Farid v. Smith,* 850 F.2d 917, 925 (2d Cir.1988) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)); *see also Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003).

Pursuant to this reasonableness test, a prison regulation that impinges upon an inmate's constitutional rights may be valid, despite such encroachment, if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Farid v. Smith,* 850 F.2d at 925. In this case, it is not entirely clear whether Plaintiff feels that the count procedure itself encroached upon his religious freedom, or if it was simply the individualized acts of Defendants Johnson and Yaw. Nevertheless, an individualized decision to "deny a prisoner the ability to engage in some requested religious practice" is analyzed in the same manner as a prison regulation denying such exercise. *Ford v. McGinnis,* 352 F.3d at 595 n. 15 (citing *Young v. Coughlin,* 866 F.2d 567 (2d Cir.1989)).

Pointedly, neither the Supreme Court nor the Second Circuit has held that brief interruption to prayers performed inside a jail cell for the purpose of conducting security inmate counts is violative of the First Amendment. In fact, all jurisprudence states otherwise, to wit, as noted above, a prisoner's First Amendment right to free exercise may be limited, as long as such limitations are reasonably related to legitimate penological interests. The security interests in conducting an inmate count at set times during the day cannot be understated. And, in such instances, the courts typically defer such security decisions to those in the corrections arena. *Bell v. Wolfish,* 441 U.S. 520, 547–48, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Ochoa v. Connell,* 2007 WL 3049889, at \*7 (N.D.N.Y. Oct.18, 2007) (noting that "while some accommodations are to be made for a prisoner's sincerely held religious beliefs, we questions whether such accommodations reasonably include converting a cell into a sacrosanct venue so that no visitor could ever trespass over the threshold of the cell doors whenever the occupant deemed it appropriate to engage in prayer"). Therefore, without a clearly established right to engage in uninterrupted prayer in one's cell in the face of a legitimate penological interest, and because Defendants Johnson and Yaw acted reasonably, they are entitled to the qualified immunity defense and their Motion should be **granted** on this basis.

*4. Remaining Claims*

**\*9** Plaintiff notes in his Complaint that Defendants violated his Eighth and Eleventh Amendment rights. It is not clear in what way Defendants trampled upon such rights, nor can this Court reasonably discern such a claim from the facts alleged in the Complaint. Thus, we recommend, pursuant to 28 U.S.C. § 1915(e), that such claims be dismissed for failure to state a claim upon which relief could be granted.

2011 WL 7468636

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt. No. 11) be **granted** and this case be dismissed; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2011 WL 7468636

## Footnotes

1   According to papers submitted by the Defendants, the correct spelling of this party's name is "Yaw," thus the Court will refer to him by the correct spelling and the Clerk of the Court is directed to update the Docket Report to reflect this change. *See* Dkt. Nos. 8 & 11.

2   Plaintiff's Complaint is comprised of the following: Complaint; Memorandum of Law; Affidavit in Support of Memorandum of Law; Exhibit One, Excerpted Copy of the Nation of Islam Prayer Book; Exhibit Two, Inmate Grievance Packet; and, Exhibit Three, Copy of Inmate Misbehavior Reports. Because all these purportedly separate documents are enveloped into one continuous document, we consider them all to be a part of the Complaint and all citation references thereto are to the page numbers automatically assigned by the Court's Case Management Electronic Case Files system.

3   Upon information and belief, Plaintiff was released on parole on November 2, 2010. *See* Dkt. No. 1, Compl., at p. 9; *see also* DOCCS Inmate Information, *available at* http://nysdocslookup.docs.state.ny.us (last visited November 25, 2011, search for Department Identification Number ("DIN") 06–B–0593).

4   There appears to be a discrepancy regarding the date of this incident. In his Complaint, Plaintiff lists October 23, 2007, as the date this incident took place, however, the Misbehavior Report, which he attaches to his Complaint, lists October 22, 2007, as the date of the incident. While, in accordance with the applicable standard of review, we've taken the date recited in the Complaint as the true date, the discrepancy has no bearing on our overall analysis.

5   According to the Hearing Disposition, the keeplock penalty, which was supposed to start on October 25, 2007, was suspended for thirty days and deferred for ninety days. Without the benefit of a hearing transcript and full disciplinary report, it is not entirely clear whether Plaintiff served any portion of the keeplock sentence and there is no discussion of his sentence in the Complaint. The corresponding thirty-day loss of privileges was set to commence on November 6, 2007, and expire on December 6, 2007. Compl. at p. 20.

6   Once again, there is a discrepancy within the Complaint regarding the date of this incident. In his Complaint, Plaintiff states he was issued a second Misbehavior Report on November 6, 2007, while the Exhibit attached to the Complaint indicates that the date of the incident was November 5, 2007. Compl. at pp. 3 & 22. Again, we've taken the date recited in the Complaint as the true date and note that it has no bearing on our overall analysis.

7   It is not clear when this Grievance was processed by the facility. The handwritten Grievance attached to the Complaint is dated October 22, 2007, and bears no facility stamp. Compl. at p. 15. The ensuing decisions on this Grievance each reflect a filing date of November 1, 2007. *Id.* at pp. 16 & 17. As with the other discrepancies, it has no bearing on our overall analysis.

8   Attached to the Complaint is an excerpt from the Nation of Islams Prayer Book. Compl. at pp. 11–13. According to such excerpt, there are five daily prayers for Muslims:

   1. THE DAWN or EARLY MORNING prayer (known in Arabic as *Fajr* ), which is performed at daybreak and before sunrise.

   2. THE EARLY AFTERNOON prayer (known in Arabic as *Zuhr* ), which is performed shortly *after* the noon hour.

   3. THE LATE AFTERNOON prayer (known in Arabic as *Asr* ), which is performed around four o'clock in the afternoon, or close to two hours *before* sunset time.

   4. THE SUNSET or EVENING prayer (known in Arabic as *Maghrib* ), which is performed just *after* the sunset.

Case 9:15-cv-00006-BKS-TWD    Document 61    Filed 07/10/17    Page 282 of 282

5. THE LATE EVENING or NIGHTFALL prayer (known in Arabic as *Isha* ), which is performed nearly two hours *after* the sunset time or before retiring.

It says in the Holy Qur'an Sharrieff (4:103), "Prayer indeed has been enjoined on the believers at fixed times." In other words, it is essential that each prayer be performed at the *appointed hour.*

The exact time for each prayer will, of course, differ from coast to coast, especially when "Daylight Saving Time" is in force. To be sure of the precise hours, therefore, consult your Temple Minister.

*Id.*

Plaintiff never states which daily prayer was interrupted by Defendants Johnson and Yaw, thought both Misbehavior Reports reflect that the incidents occurred at approximately 3:00 p.m. *Id.* at pp. 19 & 22.

9　By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561–63 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

10　Defendants do not put forth any argument regarding the purported Eighth or Eleventh Amendment claims. Nevertheless, as noted herein, Plaintiff fails to adequately state a cause of action pursuant to these two Amendments. *See infra* Part II.B.4.

11　Citing the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 490, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Defendants suggest that the Due Process claim accrues on the date the conviction/sentence has been invalidated and state that Plaintiff was " 'aggrieved' for time bar analysis purposes as of October 31, 2007 when the Superintendent affirmed the convictions/sentence." Dkt. No. 11–1 at p. 5. In *Heck* the Supreme Court held that if a decision in the plaintiff's favor would invalidate the underlying conviction in some manner, the § 1983 claim is not cognizable until the prisoner can show that such conviction has been invalidated through appeal or some other mechanism. There is nothing in the current Complaint that would suggest that the sentence meted out on October 25th affected the overall length or duration of Plaintiff's sentence in any manner. Thus, the accrual rule set forth in *Heck* does not apply.

12　The precise accrual date for the due process claims may also be affected by a recent Second Circuit decision which held that the time during which a prisoner exhausts his administrative remedies, as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a), is omitted from the limitations period; in other words, the statute of limitations is equitably tolled during the Plaintiff's pursuit of complete exhaustion. *See Gonzalez v. Hasty,* 651 F.3d 318, 323–24 (2d Cir.2011). It is not clear whether the Second Circuit intended to extend the *Gonzalez* holding to a Due Process claim, wherein the exhaustion requirement is satisfied not through the prisoner grievance program but through administrative appeal. Nor is it clear whether the PLRA applies to Plaintiff Williams who filed this action when he was no longer in jail. We need not speculate on either front since even utilizing the latter date of October 31, 2007, and omitting the six days between the disciplinary Hearing and the appeal determination, Plaintiff's Due Process claims are time-barred.

We also note that Plaintiff's filing of an Article 78 proceeding in New York State court on April 24, 2008, which was thereafter dismissed on some unspecified date, has no effect on the statute of limitations calculation. Although federal law determines when the claim accrues, state tolling rules determine whether the limitations period has been tolled. *Bd. of Regents v. Tomanio,* 446 U.S. 478, 484–86, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). The Second Circuit has held that, in accordance with New York law, the filing of an Article 78 petition does not toll the limitations period. *See Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) (cited in *LeBron v. Swaitek,* 2007 WL 3254373, at *2 (N.D.N.Y. Nov.2, 2007)).

13　Defendants have not moved for dismissal of any other claim under the theory that the statute of limitations has expired. We note that RLUIPA has a statute of limitations of four years, and thus appears to be timely filed. *See* 28 U.S.C. § 1658(a). It is debatable whether the First Amendment claims have expired prior to the filing of the Complaint. Again, because Defendants have not moved on this basis, we do not consider this issue, but we note that the recent holding in *Gonzalez v. Hasty,* 651 F.3d 318 (2d Cir.2011), could affect the limitations period, and by our calculation, it appears that Plaintiff may have filed this action on the last date of such period.

14　As an aside, were we to get to the merits of Plaintiff's RLUIPA claim, the Supreme Court's pronouncement that RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" would certainly weigh heavily against Plaintiff. *Cutter v. Wilkinson,* 544 U.S. 709, 722, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

**End of Document**　　　　　　　　　　　　　　© 2017 Thomson Reuters. No claim to original U.S. Government Works.